UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN DOE NO. 1, *et al.*,  )
 )
              Plaintiffs,  )
     v.  )
 )  Civil Action No. 7:16-cv-8191-KMK-LMS
PUTNAM COUNTY, *et al.*,  )
 )
              Defendants.  )

**PLAINTIFFS' MEMORANDUM OF LAW
<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

January 27, 2020

Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
Davis Cooper*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Appearing Pro Hac Vice*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 5

A.    Doe 2 Has Refrained from Obtaining a Handgun Permit Because of a Well-Founded Concern that the Law's Public Disclosure Requirement Would Subject Him and His Family to a Substantial Risk of Social Stigmatization and Ostracization. ................................................................... 6

B.    The Public Disclosure Requirement of Section 400.00(5)(a) Is Not Substantially, or even Rationally, Related to the Public Safety Interests that the State Alleges It Was Designed To Serve. ............................... 10

    1.    The State's interest in "protecting children from the plague of handgun-related injury." ........................................... 10

    2.    The State's interest in "providing victims of domestic violence information concerning their abusers to protect themselves using New York's protective order laws." ....................... 15

    3.    The State's interest in "permitting the public, social scientists, and medical profession and the media access to information relating to and in order to prevent harm from intentional or unintentional gun violence." ................................................................ 18

STANDARD OF REVIEW ...................................................................................... 20

ARGUMENT ............................................................................................................ 20

A.    New York's Public Disclosure of the Names and Addresses of Handgun Permit Holders Substantially Burdens Doe 2's Second Amendment rights ......... 21

B.    The Public Disclosure Requirement Does Not Bear a Substantial Relationship—or any Relationship—to the Government Interests It Is Alleged To Serve. .......................................................... 22

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)................................................................20

*Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23 (2d Cir. 1988)................................................20

*Heller v. D.C.*, 670 F.3d 1244, 1259 (D.C. Cir. 2011) ..................................................................2

*Kwong v. Bloomberg*, 723 F.3d 160 (2d Cir. 2013).....................................................................20

*McCullen v. Coakley,* 573 U.S. 464 (2014) ...........................................................................21, 23

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)....................................................................25

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) .......................................................25

*Tolbert v. Smith*, 790 F.3d 427 (2d Cir. 2015) ............................................................................20

*United States v. Virginia,* 518 U.S. 515 (1996) ...................................................................3, 4, 21

*Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975).........................................................................24

*Windsor v. United States*, 699 F.3d 169 (2d Cir. 2012).............................................20, 21, 23, 24

**Other**

FED. R. CIV. P. 56(a)....................................................................................................................20

## INTRODUCTION

Over the lengthy course of proceedings in this case, the Court has, among other rulings,

(1) granted Plaintiffs' motion for a preliminary injunction prohibiting Defendant Putnam County

from enforcing Penal Law § 400.00(5)(a)'s public disclosure requirement (Order, Doc. 33 (Nov.

16, 2016)); (2) invited (twice) and then granted the New York Attorney General's ("NYAG" or

"State") unopposed motion to intervene to defend the constitutionality of Section 400.00(5)(a)

(Order, Doc. 49 (Dec. 5, 2017)); and (3) granted the NYAG's Rule 12(b)(6) motion to dismiss

Plaintiffs' claim that Section 400.00(5)(a)'s public disclosure regime violates their Fourteenth

Amendment due process right to privacy, but denied the motion to dismiss Plaintiff John Doe 2's

("Doe 2") claim that the law's public disclosure requirement unconstitutionally chills the

exercise of his fundamental Second Amendment right to possess a handgun for the defense of his

hearth and home (Op. and Order, Doc. 73 (Sept. 29, 2018)).

In its thoroughgoing Opinion and Order resolving the motion to dismiss, the Court

immediately grasped and succinctly stated the essence of Doe 2's constitutional dilemma:

Section 400.00(5)(a)'s disclosure mandate—that "the name and address of any person to whom

an application for any [handgun] license has been granted shall be a public record"—places Doe

2 "in a catch-22: vindication of his Second Amendment rights comes at the expense of his

constitutional rights to privacy." Doc. 73 at 17. And the record confirms the salience of the

privacy interests at stake here, for even the NYAG's own expert witnesses acknowledge the

obvious reality that gun ownership is among the most polarizing, divisive, and emotional

political issues of our time, one that arouses strongly held opinions that often provoke

estrangement and even hostility in otherwise cordial relationships.

Because Doe 2 is unable to certify truthfully that he qualifies for a statutory exception to

public disclosure under Section 400.00(5)(b), New York law forces him, and New Yorkers like

him, to make a choice: he can either (1) not obtain a handgun permit to exercise his Second Amendment right to armed defense of himself and his family or (2) submit to New York's public disclosure regime by obtaining a handgun permit and putting himself and his family at risk of unwanted attention and censure, ostracization, and shunning by people in his community who are hostile to gun owners. This Court, after surveying the controlling Supreme Court and Second Circuit precedents, held that Section 400.00(5)(a) burdens Doe 2's exercise of Second Amendment rights and thus must satisfy intermediate scrutiny to be upheld. *Id.* at 28. Accordingly, the only issue remaining for decision by the Court is whether the NYAG can shoulder its burden of proof by producing " 'meaningful evidence, not mere assertions,' " sufficient " 'to show a substantial relationship between [the public disclosure] requirements and an important government interest.' " *Id.* at 30–31 (quoting *Heller v. D.C.*, 670 F.3d 1244, 1259 (D.C. Cir. 2011)).

In the pages that follow, we demonstrate that the NYAG has produced no evidence— none—establishing *any* relationship, let alone a substantial one, between the law's public disclosure requirement and the important government interests that the NYAG claims the requirement is designed to serve. First, as to the government interests allegedly served by making the names and addresses of handgun permit holders a public record, the NYAG's search for such interests can best be described as experimental. It initially defended Section 400.00(5)(a) by, as this Court put it, "proffer[ing] conclusory assertions that FOIL serves the important interest of 'shedding light on government decision making' and permit[ting] 'the electorate to make informed choices regarding governmental activities' and . . . [that public disclosure of the identities of handgun permit holders] serves to aid the 'law-enforcement interests served by the statute' by 'enlisting the public in the enforcement of the statute." Doc.73 at 30 (quoting Doc. 59

at 20). The NYAG also claimed that the public disclosure requirement enabled the press "to inform the public about trends, accountability gaps and other potential problems in the state's gun licensing scheme." *Id.* The Court noted its "skeptic[ism] about what additional assistance the public could provide in enforcing the licensing regime above and beyond what is gained from just disclosure to the government." Doc. 73 at 30. Discovery in this case has established that the Court's skepticism was well-founded, for when the NYAG and the relevant state agencies were asked to produce data and other tangible evidence supporting these claimed government interests, they were forced to concede that they had none—none at all.

The NYAG thus had to come up with different governmental interests allegedly served by New York's public disclosure regime, and it settled on three new ones, which it describes as follows: (1) "protecting children from the plague of handgun-related injury," (2) "providing victims of domestic violence information concerning their abusers to protect themselves using New York's protective order laws," and (3) "permitting the public, social scientists, and medical profession and the media access to information relating to and in order to prevent harm from intentional or unintentional gun violence . . . ." Premot. Conf. Letter from Harris Dague to Judge Karas, Doc. 92 at 3 (Nov. 5, 2019). To carry its burden of proof on these purported public safety interests, the NYAG offers the expert reports of three experts, one for each interest.

As an initial matter, the NYAG's documented groping for plausible government interests to assert in support of Section 400.00(5)(a) is itself fatal to the law, for a defining distinction between intermediate scrutiny and mere rational basis review is that under the former the proffered government interest "must be genuine, not hypothesized or invented *post hoc* in response to litigation," or based "on overbroad generalizations." *United States v. Virginia,* 518 U.S. 515, 533 (1996); *id.*, at 535−36 ("a tenable justification must describe actual state

purposes, not rationalizations for actions in fact differently grounded"). But even if one were to accept at face value the government interests that the NYAG now says are served by New York's law publicly outing handgun permit holders, the undisputed facts established in discovery make clear that the challenged law, far from being substantially related to the newly proffered government interests, is actually at war with them.

The basic theory underlying the NYAG's proffered government interests is that affording the public access to the names and addresses of gun permit holders will enhance public safety by enabling any member of the public to determine whether a particular individual or household environment poses a danger of intentional or accidental gunshot injury. The analyses put forward by the State's experts are rife with serious flaws, including their admissions that they are not aware of any incident—not one—in which a person has actually accessed the handgun permit holder records for any of the asserted purposes. But the overarching flaw—indeed, the fatal flaw—in the State's theory is the undisputed fact that the public record of handgun permit holders is far too underinclusive to rationally serve its purported public safety purposes. A person seeking information about a county resident's gun ownership would learn nothing from the county handgun permit records about whether the resident owned a long gun, or a lawfully possessed handgun for which the resident had been granted a permit and an exemption from the public disclosure requirement, or an unlawfully possessed handgun for which the resident held no permit. As Doe 2's expert witness, Dr. William English, emphasizes: "Between the number of people who illegally own handguns, the number of people who legally own handguns but have a disclosure exemption, and the number of people who only own long guns, a substantial number of gun owning households (perhaps more than 50%) will not be identifiable by Penal Law § 400.00(5)(a)." SUMF 100.

It follows that a person genuinely concerned about the possible possession of a firearm by a particular county resident could not reasonably rely on the county handgun permit records to determine that the resident did not own a firearm, or even a handgun. Indeed, reliance on the handgun permit records for this purpose would actually *disserve* the State's asserted public safety interest, for the absence from the permit records of the name and address of the resident could give the concerned person a false sense of security about the resident's possession of a firearm. The State's experts concede these common-sense points about the "false negative" problem inherent in the scope of New York's handgun permitting laws, and they recommend *against* any member of the public relying on the handgun permit records for any of the asserted government purposes.

Thus, the State's asserted public safety justifications for Section 400.00(5)(a)'s public disclosure requirement collapse under the weight of the inescapable reality that the handgun permit information made a public record by Section 400.00(5)(a) cannot reasonably be relied upon by the public to serve the State's asserted government interests. It therefore serves, at best, no purpose at all and, at worst, a purpose that is counterproductive to the State's asserted interests. Section 400.00(5)(a) cannot stand.

## STATEMENT OF FACTS

The Court, in its Opinion and Order on the NYAG's motion to dismiss, Doc. 73, has accurately described in detail the relevant provisions of New York's firearms licensing scheme, as well as the factual allegations and the procedural history of this case. *See* Doc. 73 at 2–8. *See also* Pls.' Mem. in Supp. of Their Mot. for a Prelim. Inj., Doc. 12, at 2–4 (Oct. 21, 2016); Pls.' Mem.in Opp'n to Intervenor Att'y General's Mot. to Dismiss the Compl., Doc. 64, at 1–6 (Apr. 16, 2018). Accordingly, we will not unnecessarily replicate that discussion here, but rather will

focus on the undisputed facts establishing that Plaintiff Doe 2 is entitled to judgment on his Second Amendment claim as a matter of law.

### A. Doe 2 Has Refrained from Obtaining a Handgun Permit Because of a Well-Founded Concern that the Law's Public Disclosure Requirement Would Subject Him and His Family to a Substantial Risk of Social Stigmatization and Ostracization.

In this time of extreme political polarization in our country, few current public policy issues are more divisive than the gun rights/gun control debate. One need only open a newspaper or turn on a television for near-daily confirmation of this legislative fact. "[G]uns as an issue has become one of the most polarized topics in modern American politics. More than that, it's become a defining issue – which [political] party people choose to identify with is inextricably intertwined with their relationship with guns and gun policy." *The U.S. has never been so polarized on guns*, FiveThirtyEight, (Oct. 4, 2017) SUMF 32. *See also* SUMF 33, 34. Indeed, empirical academic studies confirm that "the polarization of the American electorate has dramatically increased." SUMF 48. These studies show that politically related bias is associated with pro-gun affiliation, manifests itself both explicitly and implicitly, and is more extensive and larger than racial bias. SUMF 47, 49, 50, 51. And as Dr. English notes, given that "a pro-gun association is intertwined with perceptions of partisan identity, and that the bias against opposing partisans is so extreme, it is reasonable for gun owners to fear that if they are publicly identified as such they will be the subject of bias . . . " SUMF 134. In short, "there is good reason for current and prospective handgun license holders to be worried about being the targets of discrimination, stigma, and ostracism." SUMF 135.[1]

---

[1] Although we are not aware of any study reliably calculating the number of handgun permit holders in New York, Dr. English conservatively estimates the number to be around 250,000. SUMF 52. And it is impossible to estimate, of course, how many New Yorkers have, like Doe 2,

The gun rights/gun control debate is especially volatile in New York, with partisans on both sides often using exceedingly hostile rhetoric. Governor Andrew Cuomo, for example, has been harshly critical of opponents of gun restrictions that he supported in the Secure Ammunition and Firearms Enforcement Act ("SAFE Act"):

> The Republican Party candidates are running against the SAFE Act . . . . Who are they? Are they these extreme conservatives who are right-to-life, pro-assault-weapon, anti-gay? Is that who they are? Because if that's who they are and they're the extreme conservatives, they have no place in the state of New York, because that's not who New Yorkers are.

SUMF 54. *See also* SUMF 53. Attorney General Letitia James recently censured of a local pro-gun advocacy group for holding an event promoting the Second Amendment, stating, "there is no room in Coney Island or our city for events like this." SUMF 55.

In this environment, it is hardly surprising that there are countless people like Doe 2—ordinary, law-abiding New Yorkers who do not want to participate in this polarizing debate, but rather simply want their ownership of a handgun for self-defense to be, and to remain, a private, personal matter. This common sentiment among permit holders broke into public view in December 2012, when the Journal News published an interactive map disclosing the name and address of every handgun permit holder in Westchester and Rockland Counties. The newspaper's publisher, after a firestorm of protest, removed the interactive map, acknowledging that "permit holders were outraged at what they considered to be an invasion of privacy." SUMF 136. Indeed, a law review article relied upon by the State explains that "[i]n the months following the [Journal News'] publication of the [interactive] map, constituents around the country voiced fears that their privacy could be invaded by other media outlets publishing their identities and addresses"

---

refrained from exercising their Second Amendment rights because of the chilling effect of the public disclosure requirement.

and that "[t]he article caused many state legislatures to reconsider their policies relating to disclosure of concealed handgun permit records." Ex. I to Decl. of William J. Taylor, Jr., Doc. 58-9 at 2, 4 (Feb. 16, 2018). Today, a total of 44 states do not publicly disclose the identities of firearms owners. *Id* at 5.

The State's own experts confirm all this, acknowledging that private gun ownership is a "controversial public policy and political issue," and that there is a widespread belief among gun owners that information about their gun ownership is personal and private. SUMF 35, 36, 39, 46. Indeed, Dr. Robert Sege, the co-lead author of the American Academy of Pediatrics position on the protection of children from firearms injuries, has performed focus group studies on the reactions of parents to inquiries from their pediatricians about firearms in their homes. SUMF 37. A major concern voiced in his focus groups was "that healthcare providers would be venturing into private areas of family life that were not relevant to the medical encounter." SUMF 38, 40, 41, 42. Participants were often quite blunt in describing this concern. One parent stated: '[I] think it's too intrusive on our personal lives.'" SUMF 40. "Another parent simply said: 'That's none of your business.'" SUMF 40.

Doe 2, like countless Americans, "desire[s] to exercise [his] Second Amendment right to possess a handgun to protect [him]self and [his] family in [his] home," and he believes that his desire to do so "is a private, personal matter." SUMF 20. Not only is he a law-abiding, responsible resident of Putnam county, he is a former law-enforcement officer, having served for five years as a New York City police officer. SUMF 3. He also served as a Chief Petty Officer in the United States Coast Guard. SUMF 3. He is, accordingly, highly trained in the proficient and safe use of firearms, including handguns. SUMF 2. Doe 2 has a wife and four children, two of whom are young minors who live in his household. SUMF 4. His home is in a remote "very

rural, wooded area," where "police response times are quite a period of time." SUMF 23. He wants "to own and possess a handgun," as opposed to a long gun," because a handgun is "easier to lock up in your house and secure, keep away from the kids, . . . and quicker to access if needed." SUMF 24.

Although he desires to obtain a permit to lawfully purchase a handgun, he has refrained from doing so because "[u]nder New York law, [his] name and address as a handgun permit holder would constitute a public record subject to public disclosure under the New York Freedom of Information Law." SUMF 21. Doe 2 believes that public disclosure of his name and address as a handgun owner would be "an invasion of [his] privacy," and he knows that "there are people in town that don't look kindly to gun owners." SUMF 27–28. He has learned from "meeting people and discussing things with them, you know, it's not a gun loving community, and it would affect some of our circles of friends, the way I feel." SUMF 28. When asked by the State's counsel to elaborate on what he meant in his sworn declaration when he said that public disclosure of his handgun ownership would subject him and his family to "unwanted attention" and "censure" from members of his community who are hostile to guns and gun owners, Doe 2 elaborated that it means "being ostracized" — "you might be on the outside with their little group, so you might not be a member of that garden club or some community event and stuff based upon you being a gun owner." SUMF 29. He continued: "I would clarify it more as a way you are treated. . . . [L]ike I say, maybe ostracizing you from a different event or organization or a circle of groups of people." SUMF 29.

Doe 2 is not concerned, however, that public disclosure of his name and address as a handgun owner would endanger his life or safety or that it would subject him to "unwarranted harassment." SUMF 30. As he testified at his deposition, Doe 2 believes that being socially

ostracized is different from being subjected to "unwarranted harassment" as that term is used in

the exemption from public disclosure in Section 400.00(5)(b)(iii). SUMF 30,31. When asked by

counsel for the State to describe his understanding of the meaning of "unwarranted harassment,"

Doe 2 replied:

> [F]irst of all, harassment is a crime. There are different degrees of it in the New
> York State Penal Law, but I don't feel anybody is going to come and follow me
> around in public and hold up signs and harass me just because my name is
> publicly disclosed as a gun owner.

SUMF 31. Accordingly, Doe 2 does not believe that he qualifies for any of the exemptions from

public disclosure available for handgun permit holders under Section 400.00(5)(b).

### B. The Public Disclosure Requirement of Section 400.00(5)(a) Is Not Substantially, or even Rationally, Related to the Public Safety Interests that the State Alleges It Was Designed To Serve.

As noted at the outset, the State has asserted three newly discovered public safety

interests that it says the public disclosure requirement was designed to serve. The facts relevant

to the State's asserted governmental interests, however, establish that the alleged interests are

more likely to be harmed than advanced by the public disclosure of handgun permit holders. We

address each asserted governmental interest in turn.

### 1. The State's interest in "protecting children from the plague of handgun-related injury."

The NYAG devotes the bulk of its energy to supporting this asserted government interest,

which focuses on the informational needs of parents concerned about the firearms safety of their

young children when visiting the homes of playmates. The State supports this justification solely

with the testimony of two expert witnesses, Dr. Robert Sege and Professor Marci A. Hamilton,

both of whom have long been advocates (consistent with the American Academy of Pediatrics'

established policy) of encouraging parents to ask the playmate's parents upfront about the

presence of firearms in their home. SUMF 64, 78. Here, they argue, in Dr. Sege's words, that

10

"Section 400.00(5)(a) provides parents a mechanism to inquire into the presence of a *gun* in their child's playmate's home before permitting their child to visit." SUMF 63. (emphasis added); SUMF 74.

The flaw in this thesis is manifest on its face: the public records under Section 400.00(5)(a) do not disclose the identity and address of persons who may have a *gun* in their home; they disclose such information only about *handgun* permit holders. SUMF 9. The public records thus provide no information to parents (or anyone else, including law enforcement) about individuals who own only an ordinary shotgun and/or rifle, or who illegally own a handgun that is not licensed, or who own a licensed handgun for which they have been granted an exemption from the public disclosure requirement. SUMF 11. Dr. Sege admits that he does not know how many households contain a firearm that would not be identified in the public records of handgun permit holders, and we are not aware of reliable data estimating the number. SUMF 69. Dr. English suggests, however, that the number may well exceed half of the gun-owning households in the State. SUMF 100. And Dr. Sege admits that a substantial percentage, perhaps as many as half, of the reported accidental firearm deaths of children were inflicted by long guns. SUMF 72.[2] *See* SUMF 96 ("'[L]ong guns are implicated in a substantial percentage of accidental firearms deaths of children (50.3% according to the CDC's records since 1999)'").

In light of these facts, parents who consult the handgun permit records to determine whether there is a firearm in their child's playmate's home would have a substantial chance—possibly as high as 50%—of getting a "false negative." That is, they may conclude that there is

---

[2] Dr. Sege relies heavily on a study in which the authors discussed 15 examples of accidental firearm deaths of children younger than 15. SUMF 72. Of the 15 examples of fatal gunshot injuries, six were inflicted by a long gun, six by a handgun, and three by an unspecified firearm. SUMF 72.

no firearm in the playmate's home because the playmate's parents are not listed in the handgun permit records when, in fact, the playmate's parents have a long gun, or a licensed handgun for which they have been granted an exception from public disclosure, or an unlicensed handgun. It therefore seems obvious that no prudent parents genuinely concerned about the possible presence of a firearm in the home of their child's playmate would rely on the handgun permit records for the answer to that question.

And, indeed, Dr. Sege and Dr. Hamilton recognize that there is a substantial risk of the handgun permit records reporting such a false negative. Dr. Sege, in advising the parents of his own pediatric patients, "would certainly never suggest that if you get a negative inquiry, you can rest assured that there's no danger" in allowing your child to visit the playmate's home. SUMF 66. Dr. Hamilton warns that Section 400.00(5)(a) does not "sufficiently inform[] parents about their children's friends' homes" and that parents "who treat [information acquired under that section] as a guarantee would be shortchanging their children." SUMF 75, 76. Both experts agreed at their depositions that they would,

> counsel parents of patients, if they consulted the public record and it did not disclose the presence of a gun in the [playmate's] house, to nonetheless ask the parents whether they have a gun in the house, be it a long gun, be it an unregistered handgun, be it a gun belonging to somebody who has opted out of the public record process, to ask them . . . if there is a firearm present in the home[.]

SUMF 66; *See* SUMF 78. Dr. Sege also recognizes the possibility that the handgun permit records can also report false positives—that is, persons "who have registered a handgun and obtained a permit to possess it [but who no longer have that handgun in New York." SUMF 70. And he believes that even "when the report [from the handgun permit records] is positive," parents should ask the playmate's parents whether they have a firearm in their home and how they ensure its safety. SUMF 67.

Thus, because the handgun permit records cannot be relied upon to serve the State's asserted purpose of informing parents of young children about the presence of firearms in their child's playmate's home, the State's own experts continue to recommend, as they always have, that parents simply ask the playmate's parents upfront about firearms in their home. Given that no purpose is served by parental access to the names and addresses of handgun permit holders, it is hardly surprising that neither the NYAG, nor any of New York's law-enforcement agencies, nor either of its expert witnesses on this subject, can identify a single instance of a parent of a young child who has actually consulted the handgun permit records for firearms information about the parents of the child's playmate. SUMF 56, 59. This justification for the public disclosure requirement of Section 400.00(5)(a) is further undermined by the fact, as noted by Dr. English, that only one case has been reported in New York over the last 20 years of a gunshot fatality corresponding to the key hypothesized scenario; namely, a young child (under 15) visiting a playmate's home who was accidentally killed by a handgun legally licensed to a member of that household. SUMF 94.[3]

Notwithstanding their recognition of the highly contentious nature of the gun ownership issue and of the concomitant sentiment among many, likely most, current and would-be gun owners that it is a highly personal and private matter, the State's experts are not concerned about

---

[3] Even putting aside the fatal underinclusiveness of the handgun permit records for serving the State's asserted governmental purposes, "the kinds of incidents that Dr. Sege claims that Section 400.00(5)(a) can prevent . . . are so rare," as Dr. English notes, "that knowledge of who has a handgun license is of little, if any, predictive value for parents." SUMF 95. According to death statistics kept and reported regularly by the Centers for Disease Control ("CDC"), the total number of children under the age of 15 accidentally killed by handguns in New York over the last 19 years for which the CDC has tracked such deaths is *one*. SUMF 87. Moreover, "we do not know if such deaths recorded by the CDC in New York and other states were in the narrow context [hypothesized by the State's experts] of a child visiting a playmate's house and due to a handgun that was legally licensed, and there's no reason to expect that they were." SUMF 88.

the clear and serious harm to personal privacy interests caused by Section 400.00(5)(a)'s public disclosure requirement, a cost that must be balanced against the requirement's supposed public safety benefits. They support the primacy of personal privacy interests, however, in other closely analogous public safety contexts. For example, Dr. Sege at his deposition agreed that some parents "would be interested to know if they were arranging a play date at the home of a friend who had not been vaccinated for, say, measles." SUMF 43. But when asked whether he would "support a law that made the names and addresses of parents who do not vaccinate their children a matter of public record," he recoiled from the idea of such a public "shaming list." SUMF 44, 45. "It never occurred to me that you would have a public registry of shaming people for immunizations." SUMF 44. Thus, Dr. Sege opposes on privacy grounds public disclosure by the government of personal immunization information that would have an obvious and direct public safety benefit, yet he is not similarly concerned about the privacy costs of the government's public disclosure of personal firearm information that, at the end of the day, he admits has no public safety benefit whatever.

In sum, the State's foremost public safety justification for Section 400.00(5)(a)'s public disclosure requirement is doomed by the State's own experts, for they concede the obvious reality that the handgun permit records are so incomplete and unreliable that the prudent parent must ultimately do what these experts have always advocated anyway—ask the playmate's parents upfront about the firearms issue. Consulting the handgun permit records, in other words, yields nothing of value to parents concerned about the possible presence of firearms in their child's playmate's home. The public disclosure requirement therefore serves, at best, no purpose at all and, at worst, a purpose that endangers the State's asserted child-safety interests (if a parent relies on a false negative in the handgun permit records). And the State's experts' insistence that

parents, in all events, ask the playmate's parents about firearms in their home brings into sharp focus the common-sense fact that this alternative is readily available and more reliable than consulting the handgun permit records, and it neither infringes on the privacy interests of existing permit holders nor chills the exercise of Second Amendment rights of New Yorkers, like Doe 2, who have refrained from obtaining a handgun permit because of the public disclosure requirement.

### 2. The State's interest in "providing victims of domestic violence information concerning their abusers to protect themselves using New York's protective order laws."

The State supports this justification for the public disclosure requirement exclusively through the expert opinion of Dr. April Zeoli. Her thesis is that public access to identifying information about handgun permit holders "allows victims of intimate partner violence to have more complete knowledge of whether their violent partners own firearms," and thus better equips such victims to demonstrate to a court that a firearm restriction on an order of protection is warranted under New York law requiring a showing of "a substantial risk that the [abusive partner] may use or threaten to use a firearm, rifle or shotgun unlawfully against the" victim. SUMF 101, 102.  She argues: "The ability to search for a firearm license under their violent partner's name can provide the knowledge and evidence needed to argue that [victims] are at risk of their batterer committing firearm violence against them." SUMF 103. Although Dr. Zeoli admits that she has "not done any research on this [public disclosure] law," she speculates that it has "potential" to help reduce intimate partner firearm homicides. SUMF 106, 107, 109.

Once again, the underinclusiveness of the handgun permit records makes them woefully inadequate to meaningfully serve this public safety purpose. The rare victim of intimate partner violence who does not already know whether his or her violent partner has access to a firearm

15

will not be able to safely conclude from the absence of the partner's name from the permit records that the partner does not have a firearm. Dr. Zeoli concedes this point, and she admits that "it is entirely possible" that such a victim could "be led to a false sense of security or misled because they think they do not need to pursue a firearm restriction because the section 400[00(5)(a)] records do not show that their intimate partner has a firearm." SUMF 116.

The State's intimate-partner-protection justification for the public disclosure requirement suffers from a variety of other debilitating flaws. First, even if the handgun permit records were a fail-safe method for determining whether a specific person has access to a firearm, the data would benefit only a fraction of the victims of intimate violence. As Dr. Zeoli acknowledges, "many victims of intimate partner violence will know that their violent partners have access to firearms . . . ." SUMF 108. And the number of intimate partner firearm homicides in New York is itself very small. According to statistics kept by the New York Office for the Prevention of Domestic Violence and the Department for Criminal Justice Statistics, of the 59 intimate partner homicides in 2017, a firearm was used in only 16 cases, while a knife, cutting instrument, or blunt object was used in 28 cases. SUMF 122. As Dr. English notes:

> We are not told by the State, nor by Dr. Zeoli, how many of these 16 firearms homicides involved handguns, nor how many involved perpetrators who had orders of protection and used a handgun that was legally owned, which the victim was unaware of and would have otherwise petitioned for a firearm restriction had they been aware—which is the hypothetical scenario Dr. Zeoli's entire line of reasoning is concerned with. The number may very well be zero.
>  SUMF 123. Dr. Zeoli agrees that that number may very well be zero.

SUMF 120. Indeed, Dr. Zeoli concedes that it is possible that the scenario described above, the only situation in which she claims Section 400.00(5)(a) could be useful, has "never happened anywhere in the United States, ever." SUMF 120.

Second, as noted previously, Dr. Zeoli admits that her belief in the "potential" for the handgun permit records to reduce intimate partner homicides is speculative. Indeed, even though the names and addresses of handgun permit holders have been available in New York to victims of intimate partner violence for many decades, she (1) has no "evidence that records available to the public related to handgun ownership has prevented intimate partner violence"; (2) does not "know whether any intimate partner who has sought entry of an order of protection against their partner has ever accessed records under Section 400.[00(5)(a)]"; and (3) does not "know whether a person in that situation has accessed . . . public records related to gun ownership anywhere." SUMF 110, 111, 112.

Third, it is clear that a family court judge can order a firearm restriction in connection with an order of protection without determining that the allegedly violent intimate partner has current access to a firearm. SUMF 104, 105. Dr. Zeoli admits that because firearms restrictions prohibit firearm purchases, there "would not be a circumstance" in which she "would advise a petitioner not to seek a firearms restriction solely because the petitioner had no knowledge of the respondent's access to a firearm." SUMF 119. Indeed, Dr. Zeoli believes that it would be "a bad result, with potentially lethal consequences" if a court denied a firearm restriction because the petitioner failed to prove that a respondent has access to a firearm. SUMF 118. Dr. Zeoli thus grasps the common-sense point, emphasized by Dr. English, that "if there is reason to believe that someone [poses] a substantial risk of using or threatening to use a firearm *if they were to possess a firearm*, that alone should be sufficient to secure a firearm restriction, whether or not they in fact currently own a firearm." SUMF 121.

Finally, there is simply no need for the public to have access to the identities of approximately 250,000 handgun permit holders in order for the State's alleged interest in

ensuring that orders of protection include firearm restrictions when warranted. A Family Court judge can always access the handgun permit records to determine whether the allegedly violent intimate partner is listed as a permit holder, if the judge determines that such information is somehow relevant to his or her decision. This is a clear instance in which the public, as this Court suspected, can provide no assistance to enforcing the law "beyond what is gained from disclosure just to the government." Doc. 73 at 30.

3. **The State's interest in "permitting the public, social scientists, and medical profession and the media access to information relating to and in order to prevent harm from intentional or unintentional gun violence."**

Dr. Hamilton's expert opinion is the State's sole support for the notion that the public disclosure requirement is justified by this alleged public safety interest. She first offers a variant of the hypothetical scenario, discussed above, that she and Dr. Sege advanced about the need for parents of young children to have access to the firearms ownership of parents of their children's playmates. She makes the related argument here that a child's other caregivers—e.g., school teachers, therapists, medical professionals—who may be "aware of a child suffering from depression, suicide ideation, or plans to commit violence" should have access to the "valuable knowledge base" of the handgun permit records to enable them to alert appropriate government authorities about the at-risk child's potential firearm access. SUMF 81, 82. This variant of the parent-based justification for the public disclosure requirement suffers from all the same deficiencies discussed previously, plus two more.

As Dr. Hamilton admits, a child's caregivers are obligated by law to inform law-enforcement or other appropriate government authorities when they reasonably suspect that a child is at risk of harming himself or others, and this obligation exists without regard to the child's potential access to a firearm or, for that matter, any other dangerous item or substance

18

that can cause a serious or fatal injury. SUMF 83. And the caregiver is required to notify authorities immediately, without awaiting completion of a FOIL inquiry into the handgun permit records. SUMF 84. More importantly, law enforcement authorities who are informed of the at-risk child have ready access to the handgun permit information, which may explain why Dr. Hamilton is not aware of any caregiver ever accessing the handgun permit records for this purpose. SUMF 49. Opening to public inspection the personal identifying information of all handgun permit holders in New York clearly is not needed to serve the public safety interest that Dr. Hamilton hypothesizes.

Dr. Hamilton also asserts, in all of two paragraphs, that the public disclosure requirement of Section 400.00(5)(a) could enable social scientists, the medical profession, the media, and the public at large to conduct research into the handgun permit approval process of the counties to determine whether any permits may have been "inappropriately granted." SUMF 128. Dr. Hamilton is not aware that anyone has ever actually studied the handgun permit records of any county for this purpose, SUMF 130, and so this rationale for publicly identifying all New York handgun permit holders is, like the State's other alleged rationales, wholly imaginary. Further, subjecting handgun permit holders to research in this way "violates long standing principles of research ethics and runs contrary to existing privacy protections that govern public health research." SUMF 132. But even if the State genuinely has such a public safety interest, "there is an obvious solution that would respect the privacy of gun owners." SUMF 131. As Dr. English notes, "The state could treat this data like it does almost every other dataset with identifying information and only permit access to qualified researchers with [Institutional Review Board] approval who have made appropriate guarantees and taking appropriate measures to protect identifying information." SUMF 131.

## STANDARD OF REVIEW

Pursuant to Rule 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g.*, *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013). When deciding a motion for summary judgment, the court "must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party." *Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 26 (2d Cir. 1988). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## ARGUMENT

The legal principles governing this case were set out by the Court in its Opinion and Order on the NYAG's motion to dismiss. Doc. 73 at 24–31. Noting that the Supreme Court has "'consistently refused to allow government to chill the exercise of constitutional rights by requiring disclosure of protected, but sometimes unpopular, activities,'" Doc. 73 at 27 (quoting *Thornburgh v. Am. Coll. of Obstetricians and Gynecologists*, 476 U.S. 747, 767 (1986)), the Court concluded that this principle applies to Second Amendment rights no less than to other fundamental constitutional rights. See *id*., at 28. And because Doe 2 had plausibly alleged that Section 400.00(5)(a)'s public disclosure requirement placed "some burden" on his possession of a handgun for self-defense in his home—the core of the Second Amendment right—the Court determined that it "will apply intermediate scrutiny." *Id*. Accordingly, the State "must show that the challenged [public disclosure requirement] is substantially related to an important governmental interest." Doc. 73 at 29–30 (*quoting Ramos v. Town of Vernon*, 353 F.3d 171, 175 (2d Cir. 2003)). And, "'[s]ubstantially related,' means that the [government's] explanation must

be 'exceedingly persuasive.'" *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012)

(*quoting United States v. Virginia*, 518 U.S. at 533 (1996)). *See, e.g., McCullen v. Coakley,* 573

U.S. 464 (2014).

 As we demonstrate below, discovery in this case has confirmed the facts establishing that

Doe 2 is entitled to judgment as a matter of law. First, the burden imposed by the disclosure

requirement on Doe 2 (and untold numbers of other New Yorkers) is heavy; indeed, its chilling

effect has deterred him entirely from exercising his Second Amendment rights. Second, the

public disclosure requirement does not bear a substantial relationship—or even a rational

relationship—to the important governmental interests that the NYAG says the requirement was

designed to serve.

 **A.  New York's Public Disclosure of the Names and Addresses of Handgun Permit Holders Substantially Burdens Doe 2's Second Amendment Rights.**

 As previously discussed, supra at 8-9, Doe 2 is a law-abiding, upstanding resident of

Putnam County, and he is fully qualified to obtain a handgun license under the laws of New

York. And he would do so but for the requirement under Section 400.00(5)(a) that his name,

address, and status as a handgun permit holder "shall be a public record." This requirement has

deterred him from obtaining a handgun to protect his home and family because he believes that it

will put him and his family at risk of being stigmatized and ostracized in certain circles by

people who are passionately opposed to guns and intolerant of gun owners. Doe 2's concern,

then, is simply that he and his family members will be shunned, a concern that is neither

idiosyncratic nor unreasonable, as the record in this case establishes and the State's own expert

witnesses have acknowledged. See supra at 6–9.

 The discovery in this case has thus shown that "there is daylight," as this Court put it,

"between Plaintiffs not wanting their status as a gun owner public for fear of, for example, being

shunned by community members hostile to guns, and fear of the type of bona fide threat of 'unwanted harassment' the exception [from the public disclosure requirement] was written to cover." Doc. 73 at 21–22 n. 11. The term "harassment" has a defined meaning in Sections 240.25 and 240.26 of the New York Penal Code, and the *least serious* conduct embraced by that term is to "engage[] in a course of conduct or repeatedly commit[] acts which alarm or seriously annoy such other person and which serve no legitimate purpose." SUMF 18, 19. There is no reason to suspect that the New York Legislature deliberately used the same term in Section 400.00(5)(b)'s "harassment" exception from public disclosure but intended it to mean something different. But whether the term "harassment" in the exception is used in its Penal Law sense, or its dictionary sense, or its colloquial sense, it is clear that it is not a synonym for shun or ostracize. Indeed, if the meaning of "harassment" in Section 400.00(5)(b) is expansive enough to include shunning, then it is difficult to think of any adverse conduct that would not be covered. And that interpretation of the term would render the public disclosure requirement purely optional.

The bottom line is that, for Doe 2 and untold numbers of New Yorkers like him, "the equation is . . . simple: no public disclosure, no firearm license." Doc. 73 at 20. The public disclosure requirement's burden on the exercise of his Second Amendment right is thus not just substantial, it is preclusive.

### B. The Public Disclosure Requirement Does Not Bear a Substantial Relationship— or any Relationship—to the Government Interests It Is Alleged To Serve.

In its Opinion and Order, the Court concluded that "the record before the Court" was inadequate to resolve the factual question whether there is a "'substantial relationship between [the public disclosure] requirements and an important governmental interest.'" Doc. 73 at 30–31 (*quoting Heller v. D.C.*, 670 F.3d 1244, 1259 (D.C. Cir. 2011)). This Court noted further that the NYAG had made only "conclusory assertions" about the important government interests

22

allegedly served by the public disclosure of the names and addresses of handgun permit holders, and emphasized that "the NYAG 'needs to present some meaningful evidence, not mere assertions, to justify its' interest in the law." Doc. 73 at 30, quoting *Heller*, 670 F.3d at 1259.

In our discussion above of the material facts of this case, we demonstrated in detail and at length that the governmental interests offered by the State, on its second try, to justify Section 400.00(5)(a)'s public disclosure requirement are not even rationally served, let alone substantially served, by the requirement, and we will not belabor those facts here. It suffices to reiterate the fatal flaw, among many flaws, in the State's claims: the handgun permit records are on their face so underinclusive in reporting firearm ownership that, as the State's own experts concede, no reasonable parent, child caregiver, or intimate partner could responsibly rely on them for the purposes asserted by the State. SUMF 66, 67, 68, 69, 75, 76, 77, 78, 79, 114, 115, 116, 117. This common-sense reality is confirmed by the glaring fact that neither the NYAG nor its expert witnesses can point to a single instance in which *anyone* has *ever* consulted the handgun permit records for *any* of the purposes for which the NYAG says they were designed. SUMF 56, 65, 71, 80, 85, 107, 110, 111, 112, 130. And even if the asserted governmental purposes were in fact served in some way by the public disclosure requirement, it remains a fact, effectively admitted by the State, that there are readily available alternatives to serve these purposes that do not implicate the privacy rights of handgun permit holders, nor chill the exercise of Second Amendment rights of New Yorkers who have refrained from obtaining a handgun permit because of the public disclosure requirement. See, e.g., *McCullen v. Coakley. supra.*

Which brings us to our concluding point: the public safety justifications offered by the State in support of its public disclosure requirement are pretextual, for they were plainly "'hypothesized [and] invented *post hoc* in response to litigation.'" *Windsor*, 699 F.3d at 185

23

(*quoting United States v. Virginia*, 518 U. S. at 533). The Court will recall that the NYAG initially asserted that the public disclosure requirement was designed to serve the following governmental interests: (1) "shed[ding] light on government decision making"; (2) permitting "the electorate to make informed choices regarding governmental activities"; (3) "enlist[ing] the public in the enforcement of the statute"; and (4) enabling the press "to inform the public about trends, accountability gaps and other potential problems in the state's gun licensing scheme." Doc. 73 at 30 (internal quotation marks omitted). But when Doe 2 asked the NYAG, the State Police, and the Division of Criminal Justice Services to produce any data, documents, or other tangible evidence relating to the public disclosure requirement's relationship to each of these alleged governmental interests, they all admitted they had *none at all*. SUMF 56, 57, 58, 59, 60, 61.

The NYAG then offered a new set of justifications for the public disclosure requirement, supported only by the academic theories of expert witnesses. The litigation-inspired, post hoc, hypothesized nature of the State's justifications for the public disclosure requirement, standing alone, dooms the disclosure requirement at the threshold, before the Court even gets to whether it is substantially related to those interests. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 (1975).

The State's inability to offer a plausible governmental purpose for publicly disclosing the identities and addresses of handgun permit holders brings its genuine purpose into view: to discourage and deter New Yorkers from exercising their constitutional right to possess a handgun for protection of their families and homes. And the disclosure requirement served its purpose when Plaintiff Doe 2 decided, reluctantly, to refrain from obtaining a handgun permit.

Again, our Constitution protects the privacy of a person's identifying information when governmental disclosure, even accidental, of such information "would have the practical effect of discouraging the exercise of constitutionally protected . . . rights." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 461 (1958) (internal quotation marks omitted). This constitutional principle applies whether the right at stake is to obtain an abortion, to receive subversive literature, to distribute unsigned handbills, to associate with an unpopular advocacy organization, or to view pornographic material. *See* Doc 73 at 27.  Unless the Second Amendment right to keep and bear arms is a "second-class right," *but see McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010), this principle also protects Doe 2.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff Doe 2's motion for summary judgment.

Dated: January 27, 2020                              Respectfully submitted,

                                                     s/ Charles J. Cooper
                                                     Charles J. Cooper*
                                                     David H. Thompson*
                                                     Peter A. Patterson*
                                                     Davis Cooper*
                                                     COOPER & KIRK, PLLC
                                                     1523 New Hampshire Avenue, N.W.
                                                     Washington, D.C. 20036
                                                     (202) 220-9600
                                                     ccooper@cooperkirk.com

                                                     *Appearing Pro Hac Vice*

                                                     *Attorney for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 27, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that the foregoing was served upon all counsel of record using the CM/ECF system.

<u>s/ Charles J. Cooper</u>
Charles J. Cooper*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Appearing Pro Hac Vice*

*Attorney for Plaintiffs*