UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DOE NO. 1, *et al.*,      ) | |
|      ) | |
|      Plaintiffs,      ) | |
| v.      ) | |
|      ) | Civil Action No. 7:16-cv-8191-KMK-LMS |
| PUTNAM COUNTY, *et al.*,      ) | |
|      ) | |
|      Defendants.      ) | |

## PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Plaintiffs hereby submit their Local Civil Rule 56.1 statement of material facts as to which there is no genuine issue to be tried and that entitle Plaintiffs to judgment as a matter of law.

## PARTIES

1. John Doe 2 is a resident of Putnam County, New York and a citizen of the United States. Declaration of John Doe No. 2 ¶ 1, Doc. 12-4 (Oct. 21, 2016) ("Doe 2 Decl.") (attached as Exhibit 1). Transcript of Deposition of John Doe No. 2, 10:10–10:20 (June 4, 2019) ("Doe 2 Dep."). (attached as Exhibit 2).

2. John Doe 2 is a former police officer and former member of the United States Coast Guard, and he is highly trained in the use of firearms, including handguns. Doe 2 Decl. ¶ 2, ¶ 5.

3. John Doe 2 served as New York City police officer for five years and served as a Chief Petty Officer in the United States Coast Guard. Doe 2 Dep. 37:9–37:12, 45:4–45:6.

1

4. John Doe 2 has a wife and four children. Two of his children are minors aged 5 and 7 (at the time the complaint was filed) who reside with him. Doe 2 Decl. ¶ 4. Doe 2 Dep. 14:9–15:24.

5. Defendant Putnam County is a county in the State of New York, with its county seat in Carmel, New York.

6. Defendant Michael Bartolotti is the County Clerk for Putnam County. Mr. Bartolotti is the head of the county clerk's office and is the officer responsible for maintaining the firearm permit information at issue in this lawsuit and for responding to public records requests for that information. See N.Y. PENAL LAW § 400.00(5)(a). Mr. Bartolotti is being sued solely in his official capacity. Complaint, Doc. No. 1, ¶ 8 (attached pursuant to Individual Rule of Practice II(B) as Exhibit 3).

7. The State of New York Attorney General ("NYAG") intervened in this case to defend the constitutionality of Penal Law §400.00(5)(a). Order Granting Letter Motion for Conference, Doc. No. 49.

### N.Y. PENAL LAW § 400.00

8. Under New York Law, to qualify for a handgun permit, a citizen of New York must satisfy, "after investigation" by county licensing officers, a host of specific requirements designed to "show the good character, competency and integrity of [the]… individual signing the [permit] application." N.Y. PENAL LAW § 400.00(1), (3)(a).

9. New York law provides that "the name and address of any person to whom an application for any [handgun] license has been granted shall be a public record." *Id.* § 400.00(5)(a).

10. The names and addresses of handgun permit holders are made public by § 400.00(5)(a), regardless of whether the handgun permit holder owns a firearm. *Id.* § 400.00(5)(a).

11. New York law does not make available as a public record the names and addresses of owners/possessors of ordinary long gun (e.g., long-barrel shotguns and rifles including "assault" rifles), unregistered handguns, and registered handguns the owners/possessors of which have applied for and been granted an exception to public disclosure under Section 400.00(5)(a). *Id.* § 400.00(5)(a); § 400.00(5)(b).

12. Handgun permit holders have "an opportunity… to request an exception from his or her application information becoming public record." *Id.* § 400.00(5)(b).

13. Exceptions to disclosure are limited to narrow circumstances, including circumstances in which the applicant has a reason to believe either that "his or her life or safety may be endangered by disclosure" or that "he or she may be subject to unwarranted harassment upon disclosure of such information." *Id.* § 400.00(5)(b).

14. There is no exception to disclosure related to privacy concerns. *Id.* § 400.00(5)(b).

15. New Yorkers must obtain a handgun permit license before purchasing or possessing a handgun. *Id.* § 400.00(12).

16. New York's disclosure-exemption form must "notify applicants that, upon discovery that an applicant knowingly provided false information, such applicant may be subject to penalties pursuant to section 175.30 of this chapter." *Id.* § 400.00(5)(b).

17. Section 175.30 provides that furnishing false information to a public official in writing is a crime punishable by up to a year in jail. N.Y. PENAL LAW § 175.30; *id*. § 70.15(1).

18. The New York Penal Law defines harassment in the first degree. Under the New York Penal Law Section 240.25:

[a] person is guilty of harassment in the first degree when he or she intentionally and repeatedly harasses another person by following such person in or about a public place or places or by engaging in a course of conduct or by repeatedly committing acts which places such person in reasonable fear of physical injury.

N.Y. Penal Law § 240.25.

19. The New York Penal Law defines harassment in the second degree. Under New York

Penal Law section 240.26:

[a] person is guilty of harassment in the second degree when, with intent to
harass, annoy or alarm another person: (1) He or she strikes, shoves, kicks or
otherwise subjects such other person to physical contact, or attempts or threatens
to do the same;  or (2) He or she follows a person in or about a public place or
places;  or (3) He or she engages in a course of conduct or repeatedly commits
acts which alarm or seriously annoy such other person and which serve no
legitimate purpose.

N.Y. Penal Law § 240.26.

## JOHN DOE NO. 2

20. John Doe No. 2 "desire[s] to exercise [his] Second Amendment right to possess a

handgun to protect [him]self and [his] family in [his] home," and he believes that his

"decision to exercise [his] Second Amendment right to possess a handgun in defense of

hearth and home is a private, personal matter." Doe 2 Decl. ¶¶ 6–7.

21. John Doe No. 2 is qualified under New York law to receive a permit to possess a

handgun in his home, but he has refrained from applying for such a permit because

"Under New York law, [his] name and address as a handgun permit holder would

constitute a public record subject to public disclosure under the New York Freedom of

Information Law. Doe 2 Decl. ¶¶ 5–7, 9.

22. But for the threat of disclosure of his name and address under Penal Law § 400.00(5)(a),

John Doe No. 2 would apply for a handgun permit and acquire a handgun to keep for

self-defense in his home. Doe 2 Decl. ¶ 9.

23. John Doe No. 2 desires a gun because he lives in a remote, "very rural, wooded area"

where "police response times are quite a period of time." Doe 2 Dep. 71:8–72:3.

24. John Doe No. 2 desires "to own and possess a handgun" because he believes a handgun is "easier to lock up in your house and secure, keep away from the kids and stuff of that nature, and then quicker access if needed." Doe 2 Dep. 72:4–72:10.

25. John Doe 2 became concerned about the potential disclosure of his name and address when he learned on the news that handgun permit holders in other counties had their names disclosed and publicized. Doe 2 Dep. 72:24–73:22.

26. John Doe No. 2 does not want his name and address to be disclosed to the public because he fears unwanted attention, censure, and ostracization from members of the community. Doe 2 Decl. ¶7; Doe 2 Dep. 79:5–82:8.

27. John Doe No. 2 believes having his name and address "given out for people to look at" is "an invasion of [his] privacy." Doe 2 Dep. 75:7–75:16.

28. Based on interactions and discussions with members of his community, John Doe No. 2 believes that "there are people in town that don't look kindly to gun owners," that his community is "not a gun loving community," and that disclosure of his name and address as a handgun permit holder would "affect some of our circles of friends." Doe 2 Dep. 75:7–76:21.

29. John Doe No. 2 is concerned that he and his family may be ostracized or excluded from certain "circles of friends," "community event[s]," and "organization[s]" like his wife's garden club. Doe 2 Dep. 75:7–24, 79:5–82:8.

30. John Doe No. 2 cannot lawfully opt-out of disclosure under §400.00(5)(b) because he has no reason to believe, and he does not believe, that his life or safety may be endangered or that he may be subjected to unwarranted harassment if his name and address as a

handgun permit holder is disclosed publicly. Doe 2 Decl. at ¶ 8. Doe 2 Dep. 122:2–123:15.

31. John Doe No. 2 does not believe his concerns constitute harassment in the common sense of the word or as defined by New York Law. John Doe No. 2 understands that "harassment is a crime" and that "there are different degrees of it in the New York State Penal Law," but he does not believe "anybody is going to come and follow me around in public and hold up going to come and follow me around in public and hold up signs and harass me just because my name is publicly disclosed as a gun owner." Doe 2 Dep. 123:10–124:8.

**Gun Rights/Ownership Is Controversial and Polarizing**

32. According to statistics-based website FiveThirtyEight, "[G]uns as an issue has become one of the most polarized topics in modern American politics. More than that, it's become a defining issue – which [political] party people choose to identify with is inextricably intertwined with their relationship with guns and gun policy." Harry Enten, *The U.S. Has Never Been So Polarized On Guns*, FIVETHIRTYEIGHT (Oct. 4, 2017, 6:00 AM), https://53eig.ht/2t1jInA (attached as Exhibit 4).

33. According to the New York Times, "Americans are deeply split along demographic lines, but there aren't many demographic characteristics that embody America's cultural divide better than gun ownership." Nate Cohn & Kevin Quealy, *Nothing Divides Voters Like Owning a Gun*, N.Y. TIMES (Oct. 5, 2017), https://nyti.ms/37uBEWQ. (attached as Exhibit 5).

34. According to the Pew Research Center, "Partisanship continues to be *the* dividing line in the American public's political attitudes, far surpassing differences by age, race and

ethnicity, gender, educational attainment, religious affiliation or other factors" and that there are "[w]ide partisan gaps on political values across a number of areas, but the largest differences are on guns and race," with gun policy issues beating racial attitude issues by two percentage points. *In a Politically Polarized Era, Sharp Divides in Both Partisan Coalitions*, PEW RESEARCH CENTER (Dec. 17, 2019) (attached as Exhibit 6) (emphasis in original).

35. According to NYAG expert witness Dr. Robert Sege, the incidence of gun ownership and possession is controversial. Transcript of Deposition of Dr. Robert Sege ("Sege Dep.") 121:8–121:11 (attached as Exhibit 7).

36. Dr. Sege believes that gun ownership is a "controversial public policy and political issue." Sege Dep. 121:12–121:20.

37. Dr Sege has performed focus group testing and conversed with parents about issues involving gun ownership and children. Sege Dep. 122:14–124:3.

38. According to focus group research performed by Dr. Sege, "Many parent participants indicated discomfort with being asked about their own gun-ownership and storage habits, which was echoed by pediatricians' reluctance to screen for handgun ownership." Robert D. Sege, Elizabeth Hatmaker-Flanigan, Edward De Vos, Rebecca Levin-Goodman & Howard Spivak, *Anticipatory Guidance and Violence Prevention: Results From Family and Pediatrician Focus Groups*. 117(2) PEDIATRICS 455, 459 (Feb. 2006) (attached as Exhibit 8).

39. Dr. Sege's focus group study repeatedly refers to firearms as a "controversial" topic. *Id.*

40. Dr. Sege states that a major theme of his focus group study,

were concerns [from participants] that health care providers would be venturing into private areas of family life that were not relevant to the medical encounter.

Participants were often quite blunt in describing this concern. One parent stated: '[I] think it's too intrusive on our personal lives.' Another parent simply said: 'That's none of your business.'

*Id.* at 459.

41. Parents in Dr. Sege's focus group study noted "that even within a single family, both parents may not always agree on important child-raising issues. Pediatricians were advised to be careful, because '[gun ownership] becomes a touchy issue between [a wife and her] husband, and the pediatrician may make it worse.'" *Id.* at 459.

42. Some participants in Dr. Sege's Focus Group study,

advised pediatricians to offer advice without inquiring about whether the family had a gun: 'Well, the doctor can talk to you about the safety of it, but I personally don't think it's a doctor's business whether or not I have a gun.' In particular, some participants did not want their possession of a gun noted in the medical records…

*Id.* at 459.

43. Dr. Sege agrees that some parents "would be interested to know if they were arranging a play date at the home of a friend who had not been vaccinated for, say, the measles" and that in some cases, he would "counsel a parent inquire" of the parents of their child's friends whether or not the friend has been vaccinated for various communicable diseases. Sege Dep. 141:10–146:9.

44. When asked if he would "support a law that made the names and addresses of parents who do not vaccinate their children a matter of public record," Dr. Sege answered that "[i]t never occurred to me that you would have a public registry of shaming people for immunizations." Sege Dep. 141:17–142:9.

45. According to Dr. Sege, the intention of making a public "shaming list" of kids who aren't immunized "might be to shame the parents into it" and might cause children to "feel excluded or shamed by their friends." Sege Dep. 146:10–147:8.

8

46. NYAG expert witness Dr. Marci Hamilton agrees that some people have strong negative feelings about guns. Transcript of Deposition of Dr. Marci Hamilton. ("Hamilton Dep.") 36:18–36:22 (attached as Exhibit 9).

47. Politically related bias has increased in recent years, and that bias is often implicit as well as explicit. The Expert Report of Dr. William English ("English Report") at 4 (attached as Exhibit 6).

48. According to Dr. English, recent research has concluded:

> When defined in terms of social identity and affect toward copartisans and opposing partisans, the polarization of the American electorate has dramatically increased. We document the scope and consequences of affective polarization of partisans using implicit, explicit, and behavioral indicators. Our evidence demonstrates that hostile feelings for the opposing party are ingrained or automatic in voters' minds, and that affective polarization based on party is just as strong as polarization based on race. We further show that party cues exert powerful effects on nonpolitical judgments and behaviors. Partisans discriminate against opposing partisans, doing so to a degree that exceeds discrimination based on race. We note that the willingness of partisans to display open animus for opposing partisans can be attributed to the absence of norms governing the expression of negative sentiment and that increased partisan affect provides an incentive for elites to engage in confrontation rather than cooperation."

English Report at 4.

49. According to studies, implicit partisan bias is widely documented and "remarkably sensitive to small partisan cues." English Report at 5 (internal quotation marks omitted).

50. Studies show that partisan bias is associated with pro-gun affiliation. English Report at 4.

51. Studies show that partisan bias is more extensive and larger than racial bias. English Report at 5.

52. Dr. English estimates that the total number of New Yorkers affected by the disclosure requirements of Section 400.00(5)(a) is between 185,000 and 330,000 people. English Report at 7–8.

**Elected Leaders in New York Are Hostile to Gun Ownership**

53. In a national television interview on February 15, 2018 Governor Cuomo stated:

I passed the SAFE Act in New York days after Sandy Hook, because let's be honest, politicians are afraid of this issue. It is a tough issue for politicians. They fear the backlash from the conservatives and the second amendment types. And, by the way, it is a legitimate fear. When I passed the SAFE Act, I took a political pounding. My favorability dropped because I trampled the Second Amendment.

*Gov. Andrew Cuomo On Background Checks: "Bunch Of Boloney," The Beat With Ari Melber, MSNBC*, YOUTUBE, https://bit.ly/37uXV6I (last visited January 27, 2020).

54. On January 17, 2014, Governor Cuomo appeared on a radio program and stated,

The Republican Party candidates are running against the SAFE Act — it was voted for by moderate Republicans who run the Senate! Their problem is not me and the Democrats; their problem is themselves. Who are they? Are they these extreme conservatives who are right-to-life, pro-assault-weapon, anti-gay? Is that who they are? Because if that's who they are and they're the extreme conservatives, they have no place in the state of New York, because that's not who New Yorkers are.

*See* Heather Long, *Conservatives aren't welcome in New York, according to Governor Cuomo*, THE GUARDIAN (Jan. 14, 2014, 8:49 AM), https://bit.ly/2RYbTaC (attached as Exhibit 11).

55. In February 2018, Attorney General Laetitia James, then New York City Public Advocate, issued a statement concerning a local pro-gun advocacy group for holding an event promoting the Second Amendment. The statement read: "There is no room in Coney Island or our city for events like this." Max Jaeger & Tina Moore, *Iconic Coney Island eatery under fire for NRA fundraiser*, NEW YORK POST (Feb. 26, 2018, 4:58 PM), https://bit.ly/2Ryfo8R (attached as Exhibit 12).

**NYAG, The New York State Police, and The New York Division of Criminal Justice Services Cannot Produce Tangible Evidence That N.Y. Penal Law § 400.00(5)(a) Serves Any Governmental Interest**

56. The NYAG, The New York State Police, and The New York Division of Criminal Justice Services cannot produce evidence that identify or describe FOIL requests seeking documents or information governed by Section 400.00(5)(a). Intervenor NYAG's Response to Plaintiff's First Set of Document Demands ("NYAG Doc. Resp.") No. 9 (attached as Exhibit 13); Intervenor NYAG's Response to Plaintiff's First Set of Interrogatories ("NYAG Rog Resp.") No. 22 (attached as Exhibit 14); New York State Police Responses and Objections to Document Demands In Plaintiff's Subpoena to Testify At a Deposition In A Civil Action and Supplemental Responses ("NYSP Resp.") No. 9 (attached as Exhibit 15); New York Division of Criminal Justice Services Letter Responding to Plaintiff's Subpoena ("NYDCJS Resp.") No. 9 (attached as Exhibit 16).

57. NYAG, The New York State Police, and The New York Division of Criminal Justice Services cannot produce evidence that Section 400.00(5)(a) has ever benefitted government officials, agencies, or law enforcement. NYAG Doc. Resp. Nos. 4,5; NYAG Rog Resp. Nos. 17, 20, 21; NYSP Resp. No. 4; NYDCJS Resp. No. 4.

58. NYAG, The New York State Police, and The New York Division of Criminal Justice Services cannot produce evidence of the New York Legislature's purposes for making handgun permit holder names and addresses a public record. NYAG Doc Resp. No. 7; NYSP Resp. No. 7; NYDCJS Resp. No. 7.

59. NYAG, The New York State Police, and The New York Division of Criminal Justice Services cannot produce evidence of any governmental purpose allegedly served by the public disclosure requirement. NYAG Doc. Resp. No. 6; NYAG Rog Resp. Nos. 1,3,4; NYSP Resp. No. 6; NYDCJS Resp. No. 6.

60. NYAG, The New York State Police, and The New York Division of Criminal Justice Services cannot produce evidence relating to any understanding of the governmental interests served by the Public Disclosure Requirement. NYAG Doc. Resp. No. 11; NYAG Rog Resp. No.1; NYSP Resp. No. 11; NYDCJS Resp. No. 11.

61. NYAG, The New York State Police, and The New York Division of Criminal Justice Services cannot produce evidence relating to crime statistics concerning arrest records and/or convictions for crimes involving firearms committed by registered gun owners who are subject to the Public Disclosure Requirement and unregistered gun owners who are not subject to the Public Disclosure Requirement. NYAG Doc. Resp. No. 4; NYSP Resp. No. 11; NYDCJS Resp. No. 12.

62. NYAG, The New York State Police, and The New York Division of Criminal Justice Services cannot produce any evidence relating to any definition of harassment except for the definitions in Penal Law Sections 240.25 and 240.26. NYAG Doc. Resp. No. 10; NYAG Rog Resp. Nos. 8,9,10,11; NSYP Resp. No. 10; NYDCJS Resp. No. 10.

**Section 400.00(5)(a) Does Not Promote Child Safety**

I.     Intervenor's Expert Dr. Robert Sege.

63. In his report, NYAG expert Dr. Sege argues that "[Section] 400.00(5)(a) provides parents a mechanism to inquire into the presence of a gun in their child's playmate's home before permitting their child to visit." Expert Report of Dr. Robert Sege ("Sege Report") at 6 (attached as Exhibit 17).

64. Dr. Sege is a supporter and advocate for the American Academy of Pediatrics' Asking Saves Kids (ASK) campaign. Sege Report at 5. Sege Dep. 119:9–119:21; 140:20–141:10.

65. Dr. Sege is "unaware of any research or data demonstrating the extent to which individuals make use of the ability to publicly search firearm licensees." Sege Report at 6.

66. Dr. Sege testified that he would counsel parents of his patients to ask the parents of a playmate whether there is a firearm present in the home, even if handgun permit records under Section 400.00(5)(a) did not disclose the presence of a handgun in the playmate's house and that he "would . . . never suggest that if [a parent] get[s] a negative inquiry, [they] can rest assured that there's no danger." Sege Dep. 140:20–141:10.

67. Dr Sege testified that parents should ask about guns in their children's playmates' homes even if they use Section 400.00(5)(a) and learn that a member of the household is a handgun permit holder. Sege Dep. 139:4–140:16.

68. Dr. Sege testified that it is "certainly possible" that "a parent who consults the public record and insofar as the public record is concerned concludes that the friend's home does not have a registered handgun in it, because the parents aren't revealed in that public record, would then [erroneously] conclude that the child can visit the friend's home for the playdate". Sege Dep. 139:15–140:19.

69. It is unknown how many gun owners in New York would not be discoverable under Section 400.00(5)(a) because they own long guns, unregistered handguns, or have been granted an exemption from disclosure. Sege Dep. 135:12–136:19.

70. There are New Yorkers who have a handgun permit but do not own a handgun. Sege Dep. 136:20–137:4.

71. Dr. Sege has no knowledge about whether or how many parents of children or adolescents actually consult public records regarding handgun permit holders before they permit children to visit the homes of friends. Sege Dep. 136:14–136:19.

72. Relying on a 2015 report, Dr. Sege believes that at least a substantial minority of guns involved in accidental firearm deaths of children are long guns. Sege Report at 4–5. Sege Dep. 115:6–116:13.

73. Dr. Sege is unaware of any evidence that suggests that the public accessibility of handgun permit holders' names and addresses prevents suicides. Sege Dep. 82:1–82:12.

II.    Intervenor's Expert Dr. Marci Hamilton.

74. In her report, Dr. Hamilton testified that Section 400.00(5)(a) promotes child safety because "it offers parents and caregivers the opportunity to know whether there are individuals with a gun license in a home where their children will spend time, and whether their children's friends may have access to guns through such licensed individuals." Expert Report of Dr. Marci Hamilton at 6 ("Hamilton Report") (attached as Exhibit 18).

75. Section 400.00(5)(a) does not sufficiently inform parents about firearm risks in their children's friends' homes. Hamilton Dep. 31:3–31:8; 33:19–34:23.

76. According to Dr. Hamilton, parents who rely on Section 400.00(5)(a) alone to evaluate the firearm ownership status of those who interact with their children would be "shortchanging" their children, because section 400.00(5)(a) is "under-inclusive." Hamilton Dep. 36:23–37:7.

77. According to Dr. Hamilton, parents and caregivers in New York cannot assume that there are no guns in a house if a FOIL records request under Section 400.00(5)(a) reports no

permit holder information on the homeowners. In this situation, the child's parents and/or caregivers cannot assume there are no long guns, unregistered handguns, or registered handguns for which the owners have applied for and been granted an exemption to disclosure in the house. Hamilton Dep. 36:23–38:7.

78. Dr. Hamilton recommends that "[g]iven the limitations of Section 400.00[(5)(a)]'s public records requirement," parents should "ask the parents of the other children" before they allow their child to spend time in the home of the friend. Hamilton Dep. 34:24–35:11.

79. According to Dr. Hamilton, "If a parent misunderstood that Section 400.00(5)(a) is somehow a blanket guarantee of information, it could be a problem" because "they might be misled into thinking that their children are safe when they're not." Hamilton Dep. 40:7–41:1.

80. Dr. Hamilton is unaware of "one instance in which a parent has access[ed] records under Section 400[.00(5)(a)]" Hamilton Dep. 38:9–38:18.

81. Dr. Hamilton claims that making the names and addresses of handgun permit holders a public record "creates a valuable knowledge base for teachers, school administrators, medical professionals, therapists, and many other professionals regarding gun availability to children at risk of either domestic violence at home or at risk of harming others. Hamilton Report at 7.

82. Dr. Hamilton claims that "teachers, school administrators, medical professionals, therapists, and many other professionals" are "often the first to be aware of a child suffering from depression, suicide ideation, or plans to commit violence." Hamilton Report at 7.

83. Teachers, counselors, medical professionals, and other professionals who work with children are required by law to alert authorities if they have a suspicion that a child puts themselves or other children at risk. That responsibility exists whether there is a gun in the child's home or not. Hamilton Dep. 46:25–49:1, 49:11–49:24.

84. It is unlawful for caretakers to wait to request under FOIL information about handgun permits under Section 400.00(5)(a) before alerting authorities if they believe a child is at risk of violence at home or at risk of harming others. Hamilton Dep. 50:22–51:10.

85. Dr. Hamilton is not aware of any instance in which a teacher, therapist, or any other professional caretaker of children has obtained records under Section 400.00(5)(a). Hamilton Dep. 59:12–59:20.

86. Government authorities have ready access to information made public under Section 400.00(5)(a). Hamilton Dep. 49:2–49:6.

III.    Plaintiff's Expert Dr. William English.

87. According to the Centers for Disease Control ("CDC"), from 1999–2017 only 1 child aged 0-14 in New York was accidentally killed by a handgun. English Report at 13.

88. According to Dr. English, "we do not know if [accidental child deaths] recorded by the CDC in New York and other states were in the narrow context of a child visiting a playmate's house and due to a handgun that was legally licensed, and there's no reason to expect that they were." English Report at 14.

89. According to the CDC, the total number of accidental handgun deaths of children from 1999–2017 in New Jersey, Connecticut, and Massachusetts, whose combined population is almost equal to New York and which do not disclose the identity of gun owners, is the same as New York's. English Report at 13.

90. CDC data provides no evidence that Section 400.00(5)(a) has ever prevented or will ever prevent one child death. English Report at 14.

91. CDC data shows that less than half of accidental firearms deaths among children are due to handguns. English Report at 14.

92. Even if one uses data estimates that are most favorable to the NYAG, there is, on average, only one child shooting death due to accident or undetermined intent every five years in New York. English Report at 14.

93. After searching news articles, a database maintained by the Gun Violence Archive, and a study conducted by The Associated Press and the USA Today Network, Dr. English was unable to find a single reported case over the last 20 years of an accidental child death in New York that involved a legally owned handgun. English Report at 15–16.

94. There is evidence of only one instance over the last 20 years in which a child under the age of 15 was killed in New York by a handgun legally licensed to a member of a playmate's household while visiting a playmate's home. Transcript of Deposition of William English ("English Dep.") 317:4–318:2 (attached as Exhibit 19).

95. Dr. English reports that "the kinds of [child deaths] that Dr. Sege claims that Penal Law § 400.00(5)(a) can prevent are exceedingly rare. Indeed, they are so rare that knowledge of who has a handgun license is of little, if any, predictive value for parents." English Report at 12.

96. "[L]ong guns are implicated in a substantial percentage of accidental firearms deaths of children (50.3% according to the CDC's records since 1999)." English Report at 17.

97. According to the CDC, long guns are implicated about four times more than handguns in the accidental deaths of children. This disparity holds true in neighboring states that do not have disclosure regimes similar to Section 400.00(5)(a). English Report at 17.

98. Twenty-eight percent (28%) of gun owners do not own a handgun. English Report at 16–17.

99. Among people who only own one gun, 38% do not own a handgun. English Report at 17.

100.    Dr. English testified that, "[b]etween the number of people who illegally own handguns, the number of people who legally own handguns but have a disclosure exemption, and the number of people who only own long guns, a substantial number of gun owning households (perhaps more than 50%) will not be identifiable by Penal Law §400.00(5)(a)." English Report at 17.

**Section 400.00(5)(a) Does Not Serve Victims of Intimate Partner Violence**

101.    Dr. Zeoli claims that Section 400.00(5)(a) "serves the important governmental objective of advancing the safety of New York's citizens" by "allow[ing] victims of intimate partner violence to have more complete knowledge of whether their violent partners own firearms." Expert Report of Dr. April Zeoli ("Zeoli Report") at 1. (attached as Exhibit 20).

102.    According to Dr. Zeoli, courts are required to include a firearm restriction on a temporary order of protection if the court finds "a substantial risk that the [abusive partner] may use or threaten to use a firearm, rifle or shotgun unlawfully against the [victim]." Zeoli Report at 2.

103.    Dr. Zeoli claims that Section 400.00(5)(a) gives victims of intimate partner violence "[t]he ability to search for a firearm license under their violent partner's name"

and "can provide the knowledge and evidence they need to argue that they are at risk of

their batterer." Zeoli Report at 2.

104.    Family courts are able to issue firearms restrictions regardless of whether the

respondent possesses a handgun permit. Transcript of Deposition of Dr. April Zeoli

("Zeoli Dep.") 56:6–56:9 (attached as Exhibit 21).

105.    Individuals accused of intimate partner violence cannot avoid firearms restrictions

by not owning or possessing a firearm. Zeoli Dep. 58:11–58:14.

106.    Dr. Zeoli admits that she has "not conducted research on [the public disclosure]

law, nor am I aware of any scientific research on this law." Zeoli Report at 1.

107.    Dr. Zeoli speculates that the information made available by Section 400.00(5)(a)

has the "potential" to help reduce intimate partner violence, but admits that she is

"unaware of any research that has examined" the "extent to which orders of protection

petitioners and their legal representation (if any) make use of the ability to publicly

search firearm licensees." Zeoli Report at 4.

108.    Dr. Zeoli admits that "many victims of intimate partner violence will know that

their violent partners have access to firearms." Zeoli Report at 2.

109.    Dr. Zeoli admits Section 400.00(5)(a)'s effectiveness has never been studied in

any context. Zeoli Dep. 23:20–24:8.

110.    Dr. Zeoli is unaware of "any evidence that records available to the public related

to handgun ownership has prevented intimate partner violence" Zeoli Dep. 131:9–131:12.

111.    Dr. Zeoli does not "know whether any intimate partner who has sought entry of

an order of protection against their partner has ever accessed records under Section

400[.00(5)(a)]." Zeoli Dep. 131:13–131:17.

112.    Dr. Zeoli "does not know whether [an intimate partner who has sought entry of an order of protection] has accessed public records related to gun ownership anywhere." Zeoli Dep. 131:18–131:21.

113.    Dr. Zeoli believes that courts should be able to issue firearms restrictions to people who do not own firearms because, absent a firearms restriction, these people would be able to purchase a firearm. Zeoli Dep. 56:6–56:22.

114.    Dr. Zeoli testified that "petitioners in New York cannot be confident that their partners do not have a firearm if there is no information available for that person under Section 400.00[(5)(a)]." Zeoli Dep. 70:18–70:23.

115.    According to Dr. Zeoli, "records made available by Section 400[.00(5)(a)]" are not "100 percent sufficient" to "inform [intimate partner] petitioners about their partner's gun ownership status" because "there are exemptions[,]" and "not everyone who has a gun has a license[,]" and "Section 400[.00(5)(a) doesn't include long guns." Zeoli Dep. 68:1–68:23.

116.    Dr. Zeoli believes it is "entirely possible" that "a person trying to determine whether to pursue a firearm restriction" could "be led to a false sense of security or misled because they think they do not need to pursue a firearm restriction because the Section 400[00(5)(a)] records do not show that their intimate partner has a firearm." Zeoli Dep. 67:6–67:19.

117.    According to Dr. Zeoli, "someone who is monitoring someone else's handgun possession status cannot rely totally on Section 400[.00(5)(a)] to inform them whether or not the person they're monitoring has obtained a firearm". Zeoli Dep. 77:20–77:25.

118.     According to Dr. Zeoli, it would be "a potentially bad result, with potentially lethal consequences" if a family court denies a firearms restriction because the petitioner cannot prove that a respondent has access to a firearm. Zeoli Dep. 85:15–86:19.

119.     Dr Zeoli testified that there "would not be a circumstance" in which she "would advise a petitioner not to seek a firearms restriction solely because the petitioner had no knowledge of the respondent's access to a firearm." Zeoli Dep. 135:22–136:16.

120.     Dr. Zeoli testified that it is possible that the following scenario has never occurred in New York, or anywhere else in the United States, ever:

> A homicide that involved a perpetrator who had an order of protection entered against them, first condition, and used the handgun that was legally owned, second condition, to kill a victim who was unaware the perpetrator had a gun, third condition, who would have petitioned for a firearm restriction had they been aware the perpetrator had a gun.

> Zeoli Dep. 104:5–105:10.

121.     In his report, Dr. English testified that

> [i]t's unclear why a determination of whether or not someone has a substantial risk of using or threatening to use a firearm should depend on whether he or she has owned a firearm in the past, particularly given the fact that a law abiding citizen may acquire a firearm in the future in the absence of any firearm restriction order. Put another way, if there is reason to believe that someone has a substantial risk of using or threatening to use a firearm *if they were to possess a firearm*, that alone should be sufficient to secure a firearm restriction, whether or not they in fact currently own a firearm.

> English Report at 9 (emphasis in original).

122.     According to statistics kept by the New York Office for the Prevention of Domestic Violence and the Department for Criminal Justice Statistics, of the 59 intimate partner homicides in New York in 2017, a firearm was used in only 16 cases, while a knife, cutting instrument, or blunt object was used in 28 cases. English Report at 9.

123.     According to Dr. English,

> [w]e are not told by the State, nor by Dr. Zeoli, how many of [the 16 firearms homicides in New York in 2017] involved handguns, nor how many involved perpetrators who had orders of protection and used a handgun that was legally owned, which the victim was unaware of and would have otherwise petitioned for a firearm restriction had they been aware — which is the hypothetical scenario Dr. Zeoli's entire line of reasoning is concerned with. The number may very well be zero.

> English Report at 9.

124.     Assuming, counterfactually, that *all* 16 intimate partner homicides in 2017 involved handguns, perpetrators who had orders of protection and used a handgun that was legally owned, which the victim was unaware of and would have otherwise petitioned for a firearm restriction had they been aware—which is the hypothetical scenario Dr. Zeoli's entire line of reasoning is concerned with—it would mean that 99.99% percent of handgun permit holders are not implicated in intimate partner violence. English Report at 9–10.

125.     New York's low firearms-related intimate partner homicide rate is on par with most states in New England, none of which make firearms ownership a matter of public record. English Report at 10.

126.     Police in New York are required to submit a detailed "Domestic Incident Report" for all domestic incidents they respond to. These reports are all entered into New York State's Domestic Incident Report (DIR) Repository, which is an electronic database that contains all reports from counties outside of New York City (the NYPD maintains its own system). This information is not available to the public. Only "[l]aw enforcement agencies – such as a police department, sheriff's office, district attorney's office, county probation department, parole/community supervision – and 9-1-1 Call Centers – can register to access the DIR Repository." English Report at 11.

127.      The alleged benefits that Dr. Zeoli claims are advanced by Penal Law

§400.00(5)(a)—namely, the ability of petitioners for an order of protection to determine

whether a defendant has a handgun license—can be secured by New York without

making the names and addresses of all license holders a public record by allowing judges

and law enforcement personnel to access the relevant records. English Report at 10–11.

**Disclosure of names and addresses of handgun permit holders to social scientists, the
medical profession, and the media does not prevent harm from gun violence**

128.      Dr. Hamilton claims that Section 400.00(5)(a) "offers the press, social scientists,

and members of the public the opportunity to see who has been issued a handgun license

and to review the propriety of the issuance of such license, to see if it has been issued

appropriately or in accordance with the law…." Hamilton Report at 7.

129.      Dr. Hamilton claims that "teachers, school administrators, medical professionals,

therapists, and many other professionals" are "often the first to be aware of a child

suffering from depression, suicide ideation, or plans to commit violence." Hamilton

Report at 7.

130.      Dr. Hamilton is not "aware of any instances in which members of the press, social

scientists, or the public have used records, under Section 400[.00(5)(a)], to review the

propriety of the issuances of licenses." Hamilton Dep. 65:22–66:2.

131.      In his report, Dr. English testified that,

    if researchers wanted to conduct a compelling study of handgun licenses
    (sic) owners, there is an obvious solution that would respect the privacy of
    gun owners. The state could treat this data like it does almost every other
    dataset with identifying information and only permit access to qualified
    researchers with IRB approval who have made appropriate guarantees and
    taken appropriate measures to protect identifying information.

    English Report at 20.

132.     Subjecting handgun permit holders to research in a manner that does not protect
their personal identity "violates long standing principles of research ethics and runs
contrary to existing privacy protections that govern public health research" because
studies of this type normally require the informed consent of those being studied. English
Report at 20.

133.     Privacy guarantees are generally paramount in public health research, as almost
all datasets made publicly available by government agencies are thoroughly anonymized.
English Report at 20.

134.     Dr. English testified that "[g]iven that a pro-gun association is intertwined with
perceptions of partisan identity, and that the bias against opposing partisans is so
extreme, it is reasonable for gun owners to fear that if they are publicly identified as such
they will be the subject of bias, which could occur in many forms—*e.g.* explicit, implicit,
social, economic, etc." English Report at 5.

135.     Dr. English believes that "[t]here is good reason for current and prospective
handgun license holders to be worried about being the targets of discrimination, stigma,
and ostracism." English Report at 4.

136.     In January 2013, The Journal News removed its interactive map, acknowledging
that "permit holders were outraged at what they considered to be an invasion of privacy."
*Westchester publisher posts letter about gun permit map*, USA TODAY (Jan. 18, 2013),
https://bit.ly/2GqZyX4 (attached as Exhibit 22).

Dated: January 27, 2020                     Respectfully submitted,

<u>s/ Charles J. Cooper</u>
Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
Davis Cooper*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that the foregoing was served upon all counsel of record using the CM/ECF system.

s/ Charles J. Cooper
Charles J. Cooper*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Admitted Pro Hac Vice*

*Attorney for Plaintiffs*
