# EXHIBIT 7

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF NEW YORK

 3              Civil Action No. 7:16-cv-8191

 4   - - - - - - - - - - - - - - - - - - x

 5   JOHN DOE NO. 1, JOHN DOE NO. 2,        :

 6   NEW YORK STATE RIFLE AND PISTOL        :

 7   ASSOCIATION, INC.,                     :

 8                   Plaintiffs,            :

 9       v.                                 :

10   PUTNAM COUNTY, and MICHAEL C.          :

11   BARTOLOTTI, in his official capacity   :

12   as County Clerk for Putnam County,     :

13                   Defendants.            :

14   - - - - - - - - - - - - - - - - - - x

15

16        DEPOSITION OF ROBERT SEGE, MD, PHD, FAAP

17

18          Friday, July 12, 2019 at 10:33 a.m.

19

20      DoubleTree by Hilton Boston Bayside Hotel

21              821 Washington Street

22                Boston, MA 02111

23

24   ---------------------------------------------

25       REPORTED BY:  Deanna J. Dean, RDR, CRR
```

Case 7:16-cv-08191-PMH-AEK   Document 100-7   Filed 01/27/20   Page 3 of 28

```
 1                 A P P E A R A N C E S

 2

 3    Representing the Plaintiffs:

 4         COOPER & KIRK, PLLC

 5         1523 New Hampshire Avenue, NW

 6         Washington, DC 20036

 7         (202) 220-9600

 8         BY:  CHARLES J. COOPER, ESQ.

 9              ccooper@cooperkirk.com

10         BY:  DAVIS COOPER, ESQ.

11              dcooper@cooperkirk.com

12

13    Representing the Defendants:

14         STATE OF NEW YORK

15         OFFICE OF THE ATTORNEY GENERAL, LETITIA JAMES

16         The Capitol

17         Albany, NY 12224

18         (518) 776-2621

19         BY:  C. HARRIS DAGUE, ESQ.

20              harris.dague@ag.ny.gov

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   Examination                              Page

 4   ROBERT SEGE, MD, PhD, FAAP

 5    By Mr. Cooper                              5

 6

 7

 8                   E X H I B I T S

 9

10   Plaintiff      Description               Page

11   Exhibit 1      Expert Opinion of Robert Sege    9

12   Exhibit 2      Curriculum Vitae of Robert       9

13                  Sege

14   Exhibit 3      Article Titled "Pediatric        28

15                  Firearm-Related Injuries in

16                  the United States"

17   Exhibit 4      Article Titled "Firearm-Related  34

18                  Injuries Affecting the Pediatric

19                  Population" (Pediatrics, April

20                  2000)

21   Exhibit 5      Article Titled "Firearm-Related  36

22                  Injuries Affecting the Pediatric

23                  Population" (Pediatrics, April

24                  2012)

25
```

```
 1                   E X H I B I T S (cont'd.)

 2

 3    Plaintiff       Description                      Page

 4    Exhibit 6       Article Titled "Suicide           80

 5                    Mortality in the United

 6                    States:  The Importance of

 7                    Attending to Method in

 8                    Understanding Population-Level

 9                    Disparities in the Burden of

10                    Suicide"

11    Exhibit 7       Data from CDC WISQARS Accessed    92

12                    7/11/19

13    Exhibit 8       Article Titled "Children and      97

14                    Unintentional Firearm Death"

15                    by D. Hemenway and S. Solnick

16    Exhibit 9       Article Titled "8 Things You      119

17                    Can Do to Support ASK (Asking

18                    Saves Kids) Day"

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2              ROBERT SEGE, MD, PHD, FAAP

 3   a witness called for examination by counsel for the

 4   Plaintiffs, having been satisfactorily identified

 5   by the production of his driver's license and being

 6   first duly sworn by the Notary Public, was examined

 7   and testified as follows:

 8                    EXAMINATION

 9   BY MR. COOPER:

10       Q.   Good morning, Dr. Sege.

11       A.   Good morning.

12       Q.   My name is Charles Cooper.  I represent

13   the plaintiffs in this case, plaintiffs John Doe 1

14   and 2, and I'm going to be asking you a few

15   questions today, as you know.

16            I'd like to ask you first to state your

17   full name for the record.

18       A.   Sure.  Robert David Sege.

19       Q.   Just a couple of ground rules.

20            It's important that you provide verbal

21   responses rather than head nods so the court

22   reporter can record them.  And I will try my best

23   not to talk over you.  If I begin to make a comment

24   or ask a question before you've finished your

25   answer, just signal to me, because I'm not doing
```

 1                Is there anything in this report that

 2    suggests that the public accessibility of handgun

 3    permit holders' names and addresses has prevented

 4    suicides?

 5                MR. DAGUE:  Object to form.

 6                You can answer if you can.

 7        A.    I don't think that specific question was

 8    addressed in this review.

 9        Q.    Okay.  Are you aware of any study that has

10    addressed that question?

11        A.    I'm not aware of any study that has

12    addressed that specific question, no.

13        Q.    Were you aware of any study that would --

14    that would be in any way illuminating on what the

15    answer to that question might be?

16                MR. DAGUE:  Object to the form.

17                You can answer.

18        A.    Yeah.  If I were to look, the American

19    Academy of Pediatrics sponsored a program called

20    ASK, Asking Saves Kids, where they suggested that

21    parents might ask a neighbor if there was a gun in

22    the home before allowing their child to go there,

23    and discuss how the gun is stored and those sort of

24    things.  And so I would look and see what the

25    underlying evidence for that program was, which is

1    know how much point there is in getting there, but

2    I don't think it matters what I think.  It's

3    just -- I'm only referring back to that table so we

4    can understand that our questions refer to that

5    table.

6        Q.    Okay.  Would you -- I'm going to make a

7    representation to you about at least how I count

8    these narratives up --

9        A.    Sure.  Of course.

10       Q.    -- and just ask you if you would disagree

11   with it.

12            The way I count and understand these

13   narratives, I count 6 of the 15 examples involving

14   long guns and three other examples that didn't

15   identify the type of firearm involved one way or

16   the other, whether it was long gun or a handgun.

17            Is that a fair --

18            MR. DAGUE:  Object to form.

19       A.    Okay.  Want me to do the same thing you

20   did?

21       Q.    Thank you.  Thank you.

22       A.    Then I will.

23            (Discussion off the record.)

24       A.    Okay.  I got five handguns, seven long

25   guns, and three unknown.  Is that what you said?

1       Q.   I actually got six long guns and three

2    unknowns.

3       A.   I got three unknowns, several long guns,

4    and five handguns.  But --

5       Q.   Okay.  Well, we're close enough.

6       A.   We're close enough.  So, yes, I would

7    agree with your characterization.

8       Q.   Okay.  And the -- at least if one accepts

9    these 15 narratives as roughly representative, it's

10   clear that at least a substantial minority of the

11   guns involved in these kinds of deaths are long

12   guns?

13      A.   That's correct.

14      Q.   Do you believe that unintentional firearm

15   fatalities among children and adolescents could be

16   eliminated or at least very sharply reduced if guns

17   were properly stored as the AAP recommends:

18   unloaded and in a locked place?

19      A.   Yes.  We recommend that guns be locked up

20   unloaded with the ammunition locked separately, and

21   there's substantial data that shows that will

22   reduce it by at least 50 percent.

23      Q.   At least 50 percent.

24           And at page 5 of Exhibit 8, the authors

25   say that -- and I can't find it here, but it's

```
 1        A.    Yeah.

 2        Q.    You've mentioned that previously in your

 3   testimony.

 4              Why don't we go ahead and mark as Exhibit

 5   9 the document you cite at Footnote 8.

 6              (Plaintiff Exhibit 9 marked for

 7              identification.)

 8   BY MR. COOPER:

 9        Q.    I think you've already testified that you

10   support this campaign and actually follow it in

11   your own clinical work.  Is that correct?

12        A.    Mm-hmm.  Mm-hmm.  Yes.

13        Q.    Do you believe that the ASK campaign, if I

14   can call it that, the AAP's ASK campaign has been

15   effective in helping to curb the rates of firearm

16   deaths and fatalities to children and adolescents?

17        A.    I think I previously testified that I'm

18   not aware of studies that show directly its

19   effectiveness or not.  One of the important things

20   I think is it raises parents' awareness about this

21   issue, which is always worth doing.

22        Q.    And in your experience, what have you

23   found in terms of whether parents have actually

24   implemented the ASK policy in their own

25   child-rearing practices?
```

```
 1   being interpreted as a nitpicker or something like

 2   that.  So they want to be -- they don't consider it

 3   very friendly, I guess, to be maybe second-guessing

 4   the safety practice of another family, being

 5   perceived as questioning the safety practices of

 6   another family.  So if they don't know the parents

 7   very well, they might not want to ask.

 8        Q.   In your experience or in your opinion, do

 9   you think that the incidence of gun ownership and

10   possession is a controversial one?

11        A.   Yes, I think it is.

12        Q.   Okay.  Among some -- there are some

13   parents who and people who are very opposed to gun

14   ownership and the presence of guns in homes, and

15   then, as you say, you have some of your relatives

16   are begun enthusiasts and they're quite on the

17   other side of that.  I mean, this is a

18   controversial public policy and political issue, is

19   it not?

20        A.   It is.

21        Q.   Okay.  And would you agree with me if I

22   suggest that some parents are reluctant to broach

23   controversial -- politically controversial issues

24   such as that with the parents of their friends?

25             MR. DAGUE:  Object to form.
```

 1              You can answer.

 2      A.    Certainly the answer is do some parents do

 3   anything?  The answer is always yes.  I have to

 4   agree with you.

 5      Q.   Okay.  Well -- but that -- are you -- if a

 6   parent were to ask the parent of another child if

 7   their young daughter, you know, was contemplating

 8   an abortion, would that be a subject you think

 9   would be awkward and difficult to take up?

10              MR. DAGUE:  Object to form.

11      A.   I would think so.

12      Q.   I would, too.  I would, too.

13      A.   Okay.

14      Q.   And so I'm just trying to see if you will

15   agree with the proposition that controversial

16   public policy or political issues are often avoided

17   among parents of schoolmates and playmates.

18              MR. DAGUE:  Object to form.

19              You can answer.

20      A.   I agree with you, but the reason I'm

21   hesitant is that attitudes vary a great deal with

22   region.  When we ran focus groups to the American

23   Academy of Pediatrics, we found in one region of

24   the country parents who did not own guns would lie

25   to their neighbors and say that they do own a gun

1    or have one in the home, because that was the

2    social norm in their community.

3           So we all -- none of us live in this

4    homogeneous United States where 43 percent believe

5    that and 42 -- we all live within our local

6    communities and subcultures.  So that's why I'm a

7    little hesitant, because before I started talking

8    to people, I thought I knew the answer.

9       Q.   And I think that answer is very

10   illuminating and I appreciate it.  And I want to

11   ask you about the focus groups you just mentioned.

12          Tell me about the focus group.  Were you

13   involved in a study that involved focus groups of

14   that kind?

15      A.   Yeah.  It was published also in

16   "Pediatrics."  It's in my CV.  We ran focus groups

17   around the country in developing violence

18   prevention materials for the American Academy of

19   Pediatrics.  So we would go to different

20   communities in different parts of the United States

21   and talk with parents about a range of issues

22   involving child-rearing.

23      Q.   So I take it it was a range of issues that

24   included subjects unrelated to firearms?

25      A.   Oh, yes.

 1        Q.   But it also included the subject of

 2   firearms?

 3        A.   Yes, it did.

 4        Q.   And which article are you referring to?

 5        A.   If you can refer to Exhibit 2.

 6             How am I doing with it?

 7        Q.   You're doing better than I.

 8        A.   I'll try to find it for you.

 9             It was the article published in 2006 in

10   "Pediatrics," with myself as the first author,

11   Hatmaker, De Vos, Levin-Goodman, and Spivak.

12        Q.   What page are you referring to?

13        A.   Page 12 of my CV.

14        Q.   Page 12.

15        A.   So it goes "Trokel," "Trokel," "Sege."

16        Q.   I'm sorry.  Would you, on my copy of it,

17   would you maybe highlight that?

18        A.   I can do that.

19        Q.   Okay.  Thank you.

20             So that's -- and it's entitled

21   "Anticipatory guidance and violence prevention:

22   results from family and pediatrician focus groups."

23   All right.  It says it right there.

24             Do you explain your methodology in

25   selecting focus groups?

1  it?

2      A.   Apparently not.  My understanding of the

3  law is that it's handguns and certain other -- I

4  think assault weapons are included, certain other

5  guns.  But there are definitely kinds of firearms

6  that are not included in the law, that are not

7  covered.

8      Q.   Okay.  Would you agree that, generally,

9  long guns are not part of that?

10      A.   Generally, long guns are not part of it,

11  yeah.

12      Q.   And we previously discussed, and you just,

13  I think, just mentioned the fact that there are --

14  there are people in New York who qualify to be

15  excluded from the requirement that their names and

16  addresses be made public record --

17      A.   That's correct.

18      Q.   -- even though they are permitted to have

19  a handgun license?

20      A.   Mm-hmm.  Yes.

21      Q.   Do you have any knowledge concerning how

22  many people there are or what percentage of the

23  lawful handgun permit holders are excluded and have

24  opted out?

25              MR. DAGUE:  Object to form.

1     A.   I don't know quantitatively.  My

2   understanding is it's a minority of permit holders.

3   In other words, most permit holders would be in the

4   database.

5     Q.   Do you have any knowledge about how many

6   people in New York may possess a handgun that they

7   have not registered?

8     A.   I don't have such knowledge, no.

9     Q.   Do you have any knowledge about how many

10  people in New York own a long gun that is not

11  required to be permitted and therefore registered?

12          MR. DAGUE:  Object to form.

13    A.   I don't.

14    Q.   Do you have any knowledge about how many

15  parents of children and adolescents actually

16  consult the public records regarding handgun permit

17  holders before they permit their children to visit

18  the homes of friends?

19    A.   No, I do not.

20    Q.   Do you have any knowledge about how many

21  people in New York who have registered a handgun

22  and obtained a permit to possess it no longer have

23  that handgun in New York?

24    A.   No, I do not.

25    Q.   Okay.  You agree that there is undoubtedly

 1   some number of people who have gotten rid of a

 2   handgun that they were registered to possess?

 3            MR. DAGUE:   Object to form.

 4        A.   I'm sure that's true.

 5        Q.   When you say in your report that Section

 6   400 -- and I'm quoting now from the top of

 7   page 6 -- "may help to curb the unacceptable rates

 8   of firearm deaths and injuries to children and

 9   adolescents," on what do you base that?

10        A.   I think the discussion is that, as we've

11   discussed, there are a number of childhood

12   unintentional injuries, suicides, and homicides

13   that occur with guns obtained in various ways,

14   including from a friend or a friend's home.  And

15   conscientious parents may be able to foresee that

16   possibility and prevent their child from being

17   involved in a tragedy.  So it certainly opens up

18   the possibility of reducing that rate.

19        Q.   If a parent consulted the public records

20   through the Freedom of Information Act process or

21   any other source of that public record data, and it

22   did not disclose that the parents of their child's

23   friend possessed a gun, and so is it not possible

24   that the parent could permit their child to visit

25   the home of that friend on the incorrect factual

1    went down that hypothetical, anything is possible,

2    but I think that it seems that having more

3    information is always better than having less.

4         Q.   Well, you state in your opinion and in

5    your report here a couple of times that access to

6    the public record of the friend's -- with respect

7    to the possibility of guns in the home of the

8    friend, that the parent can use that information to

9    either deny the child authorization to visit the

10   friend's home -- correct?

11        A.   Mm-hmm.

12        Q.   -- or make inquiry of the parents of the

13   friend?

14        A.   Yeah.

15        Q.   Okay.  Is it not also -- does it not

16   follow from that observation that a parent who

17   consults the public record and insofar as the

18   public record is concerned concludes that the

19   friend's home does not have a registered handgun in

20   it, because the parents aren't revealed in that

21   public record, would then conclude that the child

22   can visit the friend's home for the playdate?

23             MR. DAGUE:  Object to form.

24        A.   It's certainly possible that might happen,

25   and I can imagine that the parent is a retired

1    police officer who had a lawful gun and wasn't

2    required to register.  And I can certainly imagine

3    all kind of things might happen, and that's

4    possible.  But I think that my expert opinion is it

5    also gives the parents when the report is positive

6    an opportunity to say, as I mentioned later on

7    page 6, that -- to call up you up and say, "You

8    know, Chuck, my son here is a little troubled, and

9    I know you have a registered gun, and I just want

10   to make sure that it's not available to him if he

11   comes over and visits, and visits with Paul."

12   Right?

13          So you can have that conversation, because

14   I know -- and that's when I say it creates parents

15   an opportunity to act.  That's the kind of thing

16   that I think that this would allow.

17       Q.   Would --

18            THE WITNESS:  Didn't mean to pick on you

19       in particular.

20       Q.   Would you counsel parents of your patients

21   if they consulted the public record and it did not

22   disclose the presence of a gun in the house to

23   nonetheless ask the parents whether they have a gun

24   in the house, be it a long gun, be it an

25   unregistered handgun, be it a gun belonging to

1    somebody who has opted out of the public record

2    process, to ask them if they -- if there is a

3    firearm present in the home?

4         A.   I think we established that I sign on to

5    the AAP's ASK campaign, so I would in general

6    counsel parents that.  We also discussed that maybe

7    they wouldn't follow my advice exactly, but I

8    would -- I would certainly never suggest that if

9    you get a negative inquiry, you can rest reassured

10   that there's no danger.

11        Q.   You support the law requiring that

12   handguns be registered and that the names and

13   addresses of permit holders be public record.

14   Correct?

15             MR. DAGUE:  Object to form.

16        A.   Yes.

17        Q.   Would you support a law that made the name

18   and addresses of parents who do not vaccinate their

19   children a matter of public record?

20             MR. DAGUE:  Object to form.

21        A.   I have no idea how that's relevant, but I

22   do support schools having the right to not allow

23   children who aren't vaccinated in the school.  And

24   so I think that there are issues.

25             I know a lot of parents now, particularly

1    in New York State, are asking their child's

2    playmates/friends if they've been vaccinated, and

3    certainly have gotten questions about that for kids

4    who are too young to be immunized.  So it's a

5    different kettle of fish, because I -- but I don't

6    really know how to answer it and I haven't thought

7    about it until this very second.  It never occurred

8    to me that you would have a public registry of

9    shaming people for immunizations.

10        Q.   I mean, you would agree, wouldn't you,

11   that a parent, as you say, would be interested to

12   know if they were arranging a playdate at the home

13   of a friend who had not been vaccinated for, say,

14   the measles?

15            MR. DAGUE:  Object to form.

16            You can answer.

17        A.   Okay.  Just in direct answer to your

18   question, if my child has been vaccinated against

19   the measles, it would not necessarily matter to me

20   whether the other child had been vaccinated or not.

21   If -- there is no vaccine for firearms injuries, so

22   that's why I'm having real trouble with this

23   analogy, because it is possible for me as a parent

24   to protect my own child against vaccine-preventable

25   diseases, for the most part, and it's not possible

1   for me as a parent to protect my child against the

2   effect of a bullet.

3        Q.   I think I understood you to say that in

4   New York this is becoming a controversial issue and

5   that schools are exercised about it and are denying

6   entry to the schools of kids who have been

7   vaccinated and --

8        A.   Have not been vaccinated.

9        Q.   -- have not been vaccinated for various

10  communicable diseases, and that -- and that is

11  notwithstanding the fact that the vast majority of

12  the one -- of the other playmates have been

13  vaccinated.  Is that not true?

14           MR. DAGUE:  Object to form.

15       A.   That's true, but the other issue is that

16  at a given school, there may be some children who

17  are on immunosuppressive therapy for things like

18  juvenile arthritis or cancer or God knows what.

19  But there are kids who are particularly vulnerable

20  at a school, and with a large enough school, you

21  can guess that some kids will be -- will be

22  vulnerable.  So it's the responsibility of the

23  school to make sure that that doesn't -- that

24  they're protected.

25           But I feel like you're trying to lead me

```
 1    to a different controversy.  There are a lot of

 2    controversies in the world.

 3              MR. DAGUE:  Just answer the question,

 4       Doctor.

 5              THE WITNESS:  Sorry.

 6              MR. DAGUE:  It's all right.

 7       Q.   Yeah.  Well, look.  I am asking you what I

 8    believe to be a relevant question about your expert

 9    opinion as a pediatrician and a danger that

10    might -- a risk that might influence a parent to

11    deny their child permission to play at a friend's

12    home.  And I think that if I were a parent of a

13    young child today, it would be a concern that I

14    would want to make inquiry about the parents of my

15    child's friend.

16              And I'm asking you your expert opinion on

17    whether you would counsel, in this time in

18    particular, your patients or the parents of your

19    patients to inquire of the parents of their child's

20    friends whether or not the friend has been

21    vaccinated for various communicable diseases.

22              MR. DAGUE:  Object to form.

23       Q.   And I -- and my question is would you

24    counsel your patients?

25              MR. DAGUE:  Object to form.  I'd just note
```

1        he hasn't been qualified as an expert on the

2        issue of vaccinations.  You can ask him his

3        opinion as based on his experience as a

4        pediatrician.  I'm fine with that.  But just for

5        the record, we didn't qualify him as a

6        vaccination expert.

7             But you can answer to the extent you

8        understand it.

9        Q.   Okay.  Well, as a pediatrician, are you an

10   expert on vaccinations of children?

11       A.   Sure.

12       Q.   Okay.  And do you have an opinion on -- do

13   you have a response to my question?

14       A.   Yeah.  So there are two circumstances in

15   which I would counsel a parent to inquire.  One is

16   if their child is either too young to be immunized,

17   has a disease or a treatment that makes her or him

18   more vulnerable to infectious disease, so a child

19   with cancer or a child who is less than 1, those

20   sort of things, I would do that.

21            The second is if there is an epidemic

22   going around in the community and there are public

23   health warnings, because we know immunizations are

24   not 100 percent effective, I would counsel parents

25   to ask in those situations, because it's difficult

```
 1    to know for sure whether any individual child is

 2    one of the 90-plus percent for whom the

 3    immunization was very effective or one of the few

 4    percent where it didn't quite take.

 5              So under those two circumstances where the

 6    child had a particular individual vulnerability, I

 7    would counsel parents to ask, which is a very

 8    different question than what the school should do.

 9    That's a different issue.

10         Q.   Earlier in response to one of my questions

11    in this line of questioning, you said, I think you

12    used the term "public shaming" or -- what was the

13    term?  Do you recall?

14         A.   No, but I did use the word make a shaming

15    list or something like that, yeah.

16         Q.   And what did you mean by that?

17         A.   That making a public list of kids who

18    aren't immunized, the intention of that might be to

19    shame the parents into it, but it also creates

20    issues for the child who is perhaps an innocent

21    victim of all of this.

22         Q.   The child who is not vaccinated?

23         A.   Yes.

24         Q.   And what are those issues?

25              MR. DAGUE:  Object to form.
```

1        A.    They might feel excluded or shamed by

2    their friends.  I know that there are issues that

3    are discussed among pediatricians now about when

4    can a child request vaccinations when her or his

5    parents object, at what age are they mature enough.

6    So the child and parents' opinions may not be

7    completely in sync, and it may be the child who

8    suffers from that list in a way that's not fair.

9        Q.    Would you think that a child, at whatever

10   stage of maturity a child can form a judgment about

11   his or her own vaccinations or status with respect

12   to vaccinations against disease, should be allowed

13   to make that decision despite parental resistance?

14          MR. DAGUE:  Object to form.

15       A.    The answer to that is yes, and certainly

16   once a person is 18, they can -- an adult -- they

17   can do what they want.  And in adolescent medicine,

18   there are some specific circumstances where

19   children can consent to care on their own.  And so

20   this is more of a legal ethical issue that I am not

21   expert on.

22          But the general concept that a child

23   should be able to have control over his or her own

24   body as they become an adult, the answer is yes.

25          MR. COOPER:  Okay.  So I think we're not

```
1        only in the ninth inning, but we may actually

2        have a couple of outs.  And so if we can take a

3        break, I'll work back through my notes to see if

4        we're done.

5               MR. DAGUE:  Sure.  We'll step out and give

6        you guys a few minutes to chat.

7               THE WITNESS:  Okay.

8               (Recess taken from 3:13 to 3:19 p.m.)

9               MR. COOPER:  We can go back on the record.

10              Thank you very much, Dr. Sege.  I

11       appreciate your time and attention today.

12              THE WITNESS:  Thank you.

13              MR. COOPER:  And I hope this hasn't been

14       too taxing.  But I appreciate very much your

15       collegiality as well.

16              THE WITNESS:  Thank you.

17              MR. DAGUE:  Nothing further.

18              (Witness excused and deposition concluded

19              at 3:19 p.m.)

20

21

22

23

24

25
```

```
1                      C E R T I F I C A T E

2

3        I, Deanna J. Dean, the certified court reporter

4        and MA Notary Public before whom the proceeding

5        occurred, pages 1 through 149, do hereby

6        certify that the witness, ROBERT SEGE, MD, PHD,

7        FAAP, was duly sworn; that the testimony of

8        said witness was taken by me and thereafter

9        reduced to this typewritten transcript under my

10       supervision; that said transcript is a true

11       record of the testimony given by said witness;

12       that I am neither attorney or counsel for,

13       related to, nor employed by any of the parties

14       to the proceeding; and further, that I am

15       neither a relative nor an employee of any

16       attorney or counsel employed by the parties

17       thereto, nor am I financially or otherwise

18       interested in the outcome of the proceeding, or

19       any action involved therewith.

20

21

22       _____                    _____

23            Deanna J. Dean, RDR, CRR

24         Signed this 16th day of July 2019

25    My MA commission expires on December 28, 2018
```