# EXHIBIT 8

ARTICLE

# Anticipatory Guidance and Violence Prevention: Results From Family and Pediatrician Focus Groups

Robert D. Sege, MD, PhD[a], Elizabeth Hatmaker-Flanigan, MS[b], Edward De Vos, EdD[a], Rebecca Levin-Goodman, MPH[b], Howard Spivak, MD[a]

[a]Pediatric and Adolescent Health Research Center, Floating Hospital for Children at Tufts-New England Medical Center, Boston Massachusetts; [b]American Academy of Pediatrics, Elk Grove Village, Illinois

The authors have indicated they have no financial relationships relevant to this article to disclose.

## ABSTRACT

**OBJECTIVES.** Anticipatory guidance is a cornerstone of modern pediatric practice. Recent American Academy of Pediatrics policies related to violence prevention, notably those that advocate firearms safety and the use of alternatives to corporal punishment, seem to be discrepant with common parenting practices. To develop more effective anticipatory guidance, we sought the opinions of parents and pediatricians on how best to communicate these messages.

**DESIGN.** Focus groups were conducted to elicit parent and provider opinions.

**SUBJECTS.** Forty-nine parents participated in a total of 9 90-minute focus groups that were held in 3 cities. Twenty-six pediatricians participated in 3 focus groups that were held at a single national meeting.

**PROCEDURES.** Participants were read summaries of current American Academy of Pediatrics policies and led through a systematic discussion of how these policies might best be communicated. The group discussions were audiotaped, transcribed, and analyzed. Common themes heard in multiple groups are reported.

**RESULTS.** Parents provided specific feedback about corporal punishment and firearms and also raised a number of general issues. Pediatricians reported that anticipatory guidance was important to them but cited cultural and reimbursement issues as barriers to practice. They also reported the need for additional training and support to make anticipatory guidance more effective.

**DISCUSSION.** Focus groups provide insight into doctor-patient communications and can inform efforts to improve primary prevention in the clinical setting. Anticipatory guidance that consists of authoritative useful information, offered in a supportive manner that communicates respect for parental decision-making, may be effective in improving parenting practices.

www.pediatrics.org/cgi/doi/10.1542/peds.2005-0377

doi:10.1542/peds.2005-0377

Key Words
community pediatrics, discipline, firearms, anticipatory guidance, physician-patient/parent communication

Abbreviation
AAP—American Academy of Pediatrics

Accepted for publication Jun 1, 2005

Address correspondence to Robert D. Sege, MD, PhD, Pediatric and Adolescent Health Research Center, Tufts-New England Medical Center, 750 Washington St, NEMC Box 351, Boston, MA 02111. E-mail: rsege@tufts-nemc.org

PEDIATRICS (ISSN Numbers: Print, 0031-4005; Online, 1098-4275). Copyright © 2006 by the American Academy of Pediatrics

Downloaded from pediatrics.aappublications.org by guest on May 30, 2013

ANTICIPATORY GUIDANCE DURING routine health-supervision visits is a cornerstone of modern pediatric practice. Although its principal function is to provide information for parents concerning child development, injury prevention has become an important focus of anticipatory guidance. Guidelines for the contents of anticipatory guidance have been published by the American Academy of Pediatrics (AAP) through its *Guidelines for Health Supervision*[1] and by others[2,3] through the Bright Futures collaborative and American Medical Association's *Guidelines for Adolescent Preventive Services*.[4]

These guidelines call on pediatricians to address certain health behaviors that have profound adverse effects on childhood health and well-being. These so-called "new morbidities"[2,5] include child abuse, homicide, and suicide, which are 3 of the leading causes of childhood death in the United States.[6] To further address youth violence, the AAP issued a policy statement in 1999 that called for improved physician counseling for violence prevention.[7] Several existing AAP policies are mentioned in that policy statement, including AAP policies on firearms[8] and counseling parents to use alternatives to corporal punishment.[3]

Some of these AAP policies, although solidly supported by scientific research, seem to be discrepant with current practices in many American families. For example, Farah et al[9] demonstrated that only a minority of parents who owned guns kept them locked and unloaded, as recommended by AAP policy, and Strauss and Stewart[10] demonstrated the high prevalence of corporal punishment in the United States.

The public health implications of youth violence combine with the clinical experience of pediatricians to create an interest in violence prevention in clinical practice. Surveys of AAP member pediatricians, conducted in 1998 and 2003, showed that although most pediatricians believe that violence-prevention counseling would be potentially effective, only a minority of pediatricians reported feeling comfortable counseling parents about violence prevention, and 85% stated that they would be interested in using training and support materials on the topic if they were issued by the AAP.[11,12] These results confirm independent results of a national survey[13] and regional focus groups conducted in California.[14]

Similar demand for violence-prevention education as part of health supervision has also been reported from parents. The National Survey of Early Child Health demonstrated that 56% of families wanted physician counseling regarding community violence, whereas only 10% reported discussing the topic with their child's clinician. Moreover, parents reported less counseling than desired on other precursors to youth violence and child abuse, including the parent's emotional support, the presence of a supportive partner, and alcohol/drug use in household.[15]

The AAP has undertaken the task of developing tools to assist health care providers in the implementation of violence-related policies. As a preliminary step in developing tools to assist pediatricians in promoting these policy objectives, we sought a method to better understand the current practices and beliefs of families who bring their children to pediatricians for health supervision and of the pediatricians who provide these services. There is some evidence that pediatric counseling may help to promote safer parenting practices, including the use of alternatives to corporal punishment.[16] The evidence base for primary prevention based in clinical practice is growing, and recent summary analyses have identified areas of effectiveness.[17–20] Scientifically based and rigorously developed materials are required to further improve the efficacy of office-based counseling.

To develop these materials, we conducted focus groups to assess family knowledge, attitudes, and beliefs concerning certain key issues in violence prevention. Typically, focus-group interviews last 1 to 2 hours and involve 6 to 12 individuals who have no prior relationship to each other. Participants are recruited from a target population and may be offered financial and/or other incentives to participate. The groups are led by a trained moderator using a structured interview guide. Comments are recorded by a note-taker and audiotape or videotape. Recordings may be transcribed and analyzed manually or by using qualitative data analysis software to identify key themes.

Focus-group methods, per se, are a relatively new phenomenon in the field of social science research, tracing their academic roots back only 60 years to Columbia's Bureau of Applied Social Research.[21] In both the private and public sectors, the approach has proven to be quite effective in soliciting subjective and experiential responses to stimuli from diverse audiences in a timely and cost-effective way. Although the results of focus-group interviews may not be generalizable in the formal statistical sense of the term, the results provide important insights into different groups of individuals' experiences (perceptions and impressions) and how they might respond to a variety of strategies and materials that are presented to them. Focus groups with pediatricians and with parents were ideally suited to our needs, in terms of both the input that we sought and the time frame for development and implementation that we had set for ourselves.

This article presents findings from focus groups of parents and pediatricians that were conducted in 2002.

**METHODS**

All focus groups were conducted and analyzed by using previously described techniques.[22–24] Focus-group protocols were reviewed by the American Academy of Pediatrics and the New England Medical Center institutional review boards and considered exempt from additional review as outlined by federal regulations. All participants

Downloaded from pediatrics.aappublications.org by guest on May 30, 2013

were presented with, and signed, an informed-consent form before their participation. Rigorous adherence to the approved protocols helped to standardize the process.

Consistent with the literature on methods and given the potentially sensitive nature of the topics discussed, we chose to conduct focus-group interviews with smaller numbers of participants, typically groups of ≤10.[25] Each focus group was moderated by 1 of the first 3 authors (R.D.S., E.H.-F., or E.D.V.).

In addition to concurrent note taking, all focus groups were audiotaped and transcribed. Transcripts were read and analyzed manually for thematic content and salient examples. To enhance validity, all transcripts were read by multiple researchers, and analyses were reviewed against the data. Finally, the validity of the results was strengthened further by triangulating findings across geographically and ethnically diverse settings, as described below.

### Parent Focus Groups

Regional variation in gun ownership has been identified in the literature and associated with different levels of violence-related injury, especially suicide.[26,27] Recognizing that regional variation might influence parent knowledge, attitudes, beliefs, and practices, focus groups were conducted in 3 different regions across the United States: 3 parent focus groups were conducted in Seattle, Washington, 2 were conducted in Albuquerque, New Mexico, and 4 were conducted in Chattanooga, Tennessee. Convenience samples of parents were recruited through their pediatric practices with the assistance of the AAP chapters in each state. Parents received a modest financial incentive ($25) for participating. Participants represented a convenience sample and generally did not know each other before the group interview.

Participants were assigned to groups on the basis of race, ethnicity, and gender. Whenever possible, ethnically homogeneous groups were assembled. Groups were held in community locations in each city and lasted for ~2 hours. Table 1 provides a demographic breakdown of participants.

Participants were asked to comment on relevant AAP policies and how they might be received in their communities. After a general introduction, the interview sought participant reactions to AAP policies concerning car safety seats, corporal punishment, and restricting access of children to firearms. Car safety seats were discussed first as a relatively noncontroversial topic; the order in which the other topics were discussed was varied between groups to avoid response sets. Parents were first introduced to the current AAP policy and then were asked: "How would you recommend pediatricians get that message across to parents?" In follow-up, participants were asked: "Here in [community], what objections or concerns do you think parents might have

**TABLE 1** Characteristics of Parent Focus-Group Participants According to City

| Demographic | Seattle (N = 16) | Chattanooga (N = 20) | Albuquerque (N = 13) | Total (N = 49) |
|---|---|---|---|---|
| Gender | | | | |
|   Male | 1 | 5 | 5 | 11 |
|   Female | 15 | 15 | 8 | 38 |
| Race | | | | |
|   Black | 0 | 11 | 0 | 11 |
|   Hispanic or Latino | 0 | 0 | 7 | 7 |
|   Native American or Alaskan Native | 1 | 0 | 2 | 3 |
|   Asian or Pacific Islander | 2 | 0 | 0 | 2 |
|   White, Non-Hispanic | 13 | 9 | 4 | 26 |
| Practice setting | | | | |
|   Urban, inner city | 2 | 2 | 0 | 4 |
|   Rural | 1 | 2 | 6 | 9 |
|   Urban, non–inner city | 3 | 5 | 2 | 10 |
|   Suburban | 9 | 6 | 5 | 20 |
|   No data | 1 | 5 | 0 | 6 |

about this type of advice?" These barriers were copied onto a flip chart, and participants were asked: "If you were a child's doctor how would you answer these concerns?" At the conclusion, participants were asked open-ended questions concerning the methods that clinicians might use to communicate these ideas.

### Physician Focus Groups

Pediatrician focus groups were held at an AAP national continuing medical education conference in Orlando, Florida. Participants were recruited from the conference registration roster. Physician registrants were mailed an invitation that explained the nature of the focus groups. Potential participants completed a demographic form indicating their practice type, setting, race, age, gender, geographic region, and choice of meeting times. Twenty-six volunteer participants were recruited and divided into 3 focus groups by geographic region (Northeast [N = 11], Midwest [N = 9], and Southeast [N = 6]). Each group was heterogeneous by age, gender, and practice setting (see Table 2). Participants ranged in age from 27 to 62 years (mean age: 43 years).

Pediatrician focus groups began with questions about the participants' own anticipatory-guidance experiences: "Do you offer anticipatory guidance in your practice?"; "How important is it to be skilled at offering anticipatory guidance?"; and "Do your patients expect this from you?" The topic agenda then shifted to violence prevention, with specific queries regarding more sensitive anticipatory-guidance topics: "Focusing even more closely on certain topics that have been controversial in the past, what has been your experience discussing these sensitive topics with parents: (*a*) firearms, (*b*) corporal punishment, and (*c*) television viewing?"

Downloaded from pediatrics.aappublications.org by guest on May 30, 2013

TABLE 2  Participants in Pediatrician Focus Groups

| Demographic | Northeast (N = 11) | Southeast (N = 6) | Midwest (N = 9) | Total |
|---|---|---|---|---|
| Gender | | | | |
|   Male | 5 | 4 | 7 | 16 |
|   Female | 6 | 2 | 2 | 10 |
| Race | | | | |
|   Black | 1 | 1 | 0 | 2 |
|   Asian | 3 | 2 | 2 | 7 |
|   White | 6 | 3 | 4 | 13 |
|   No data available | 1 | 0 | 3 | 4 |
| Practice setting | | | | |
|   Rural | 2 | 0 | 3 | 5 |
|   Urban, inner city | 3 | 4 | 0 | 7 |
|   Urban, non–inner city | 1 | 2 | 2 | 5 |
|   Suburban | 3 | 0 | 2 | 5 |
|   Other | 2 | 0 | 2 | 4 |
| Practice type | | | | |
|   Solo/2-physician | 0 | 1 | 2 | 3 |
|   Government clinic | 0 | 1 | 0 | 1 |
|   Nongovernment hospital or clinic | 0 | 1 | 0 | 1 |
|   Medical school | 1 | 1 | 0 | 2 |
|   Pediatric/multispecialty | 6 | 2 | 4 | 12 |
|   No data available | 4 | 0 | 3 | 7 |
| Age range, y | 27–56 | 34–52 | 30–62 | 27–62 |

### Analysis

Both pediatrician and parent focus groups were audiotaped; these audiotapes then were transcribed for coding with nonverbal, extraneous noises recorded (eg, laughter, all talk, clapping, etc). The note-taker and the facilitator were careful to make note of nonverbal cues such as nodding and hand raising so that both verbal and nonverbal interactions were recorded in either the transcripts or notes. Both verbatim transcripts and notes comprised the data used for analysis. The notes served as an interim analysis tool for segmenting the interviews into analytical units while transcription and data were still being gathered. Once the transcripts were available, the initial categories developed from the focus-group notes were used to code the text. New categories were developed, and existing categories were modified on the basis of the coding process. The transcript text was recoded as codes changed. At the conclusion of this iterative procedure, the final set of codes was organized into overarching themes to facilitate analysis, interpretation, and presentation.

Results of each focus group were analyzed separately; common themes that emerged across multiple groups and locations are reported here.

### RESULTS

Pediatricians and parents responded to anticipatory guidance in general and to the specific controversial issues under study. Themes observed in multiple focus groups are described below, with verbatim comments selected to illustrate them. Results are reported as topic-specific themes (in response to individual queries) and overarching themes that were heard in response to multiple topics.

### Parent Focus Groups

*Specific Policies*

Two controversial topics were discussed in detail in each focus group: advice concerning alternatives to corporal punishment and to restrict access of children and teenagers to handguns. Table 3 demonstrates that several themes emerged in at least 2 of the 3 US cities in which focus groups were held.

*Corporal Punishment*

The AAP recommends that pediatricians advise parents against the use of corporal punishment, in part by teaching them about more effective methods for disciplining children (eg, using timeouts).[3] The AAP policy that recommends the use of alternatives to corporal punishment was not well known to the parents. Very few parents reported that they used corporal punishment as their primary method of discipline, although many felt it was important to hold in reserve. Instead, it seemed that many parents spank their children when other methods of discipline fail. One parent said: "In certain instances, when you've tried all the alternatives, you need to go to spanking [although] I don't believe there should be any." Another said: "Spanking isn't something I pull out like the first thing in the morning. It's there if you need it." In some circumstances spanking is seen as more socially acceptable than alternatives, as one parent reported: "You can't say 'time out' to that child in the supermarket."

Parents were troubled about the potential conflicting roles of physicians in providing counseling about child discipline and as mandated reporters of child abuse. This issue arose in every parent focus group. As one parent put it: "Oh, if I spanked my kid, is that considered abusive? Am I going to have my kids taken away from me?"

On the other hand, many parents clearly understood a possible connection between corporal punishment and abuse, as exemplified by the comment: "Hot-headed as I

TABLE 3  Parent Focus Groups: Themes According to City

| | Seattle | Chattanooga | Albuquerque |
|---|---|---|---|
| Corporal punishment | | | |
|   Spanking is last resort | X | X | X |
|   Spanking vs abuse | X | X | X |
|   Cultural expectations | X | X | |
| Firearms | | | |
|   Infringement on rights | X | X | X |
|   Parental disagreement | | X | X |
|   Context of household hazards | X | | X |
|   Don't ask, do inform | | X | X |
|   Part of mainstream culture | X | X | X |

Downloaded from pediatrics.aappublications.org by guest on May 30, 2013

am, I recognized very early on, if I were to have spanked my kids, one of them would probably be dead by now."

Some parents reported feeling a cultural expectation to spank their children. One mother commented: "I would caution pediatricians when looking into [corporal punishment]. If they are going to ask somebody—especially people who've just immigrated here—what type of parenting or what type of discipline they are doing, to keep in mind that there is a cultural sensitivity involved. And one should not assume that just because they do it a certain way, that they're being terrible parents in the way they discipline."

Another mother told us: "I'll tell you, in our culture [rural African American], if you do not spank your child, . . . [people] looked at me like I was just a no-good parent. . . . That I was less of a mother because she was spanking hers and I didn't do mine." Nevertheless, this same mother persisted in using alternatives to corporal punishment with her children, explaining: "Now that's when you had to be a real advocate, 'cause you have to you know, I don't have to explain to you what I'm doing, but let me tell you something."

*Firearms*

We also elicited responses to AAP policy on firearms, which recommends that pediatricians counsel parents not to have handguns in the home, or, if guns are present, to have the guns locked and unloaded, with the ammunition locked separately. The AAP also recommends that parents inquire about guns in the homes that their children visit.[8]

Some parents in each focus group cited the AAP position on handgun ownership as a potential infringement on their rights: "It's my right to have a gun . . . you need to have a gun to protect your family." In Chattanooga, one participant noted: "I grew up in a household just absolutely… full of guns." One participant explained that guns are generally accepted because "[e]verybody does feel the need to protect themselves. That's not a bad thing to feel that need to protect yourselves." In fact, because of the high prevalence and social acceptability of gun ownership, one participant advised: "[The doctor] will probably not be able to convince me that—that—that keeping the firearms out of your home is the way to keep children from being shot." In fact, parents in each city described owning firearms as normative behavior.

Parents noted that even within a single family, both parents may not always agree on important child-raising issues. Pediatricians were advised to be careful, because "[i]t becomes a touchy issue between [a wife and her] husband, and the pediatrician may make it worse." At the same time, and precisely because of parent disagreement, other participants requested that pediatricians discuss handguns. Raising the issue in the context of the child's well-being legitimizes the discussion, provides an opportunity for both parents to talk about the issue, and lends support to the parent who disapproves of keeping loaded guns in the home. As one participant noted: "Having a professional to open the discussion [about firearms] and show them the concern is helpful."

At the same time, parents felt that pediatricians might consider bringing up handguns in the context of other household hazards: "Maybe you can call it a safety packet . . . and it has information on gun safety." Another parent added: "That way you educate the parents without intimidating them with personal questions."

Many participants advised pediatricians to offer advice without inquiring about whether the family had a gun: "Well, the doctor can talk to you about the safety of it, but I personally don't think it's a doctor's business whether or not I have a gun." In particular, some participants did not want their possession of a gun noted in the medical records, as seen in the following statement: "The doctor says, 'we're not going to record this. This has no bearing on your life. . . . Do you have a gun?' And, they check it 'yes,' you do have this. And the next thing you know, something happens—your gun gets stolen, somebody gets shot with it, or something. And the doc says 'yeah, I know he had a gun at his house.'"

*Other Overarching Themes*

Three additional themes were heard repeatedly in parent focus groups in all 3 cities in response to queries about multiple topics: (1) parents voiced concerns about not knowing why a pediatrician might inquire about matters that they considered to be outside the scope of pediatrics; (2) pediatricians' attitudes in conveying messages was crucial; and (3) participants offered advice concerning effective ways to communicate parenting messages.

*Theme I: Scope of Pediatrics*

Primary among the difficulties identified by parents were concerns that health care providers would be venturing into private areas of family life that were not relevant to the medical encounter. Participants were often quite blunt in describing this concern. One parent stated: "[I] think it's too intrusive on our personal lives." Another parent simply said: "That's none of your business." In particular, discipline is a "really touchy subject," and another parent worried aloud: "How touchy is this going to get?"

Underlying this concern about privacy is a common conception that parenting issues lie outside the realm of routine medical care, which some participants viewed as properly focused only on the physical health of their child. "I think it is beyond the scope of the pediatrician's call. It's a real personal discussion you have with your friends and family." Another parent bluntly stated: "The doctor's only there to take care of my child's physical needs." Parents reacted particularly strongly to questions that do not seem relevant to the encounter: "You didn't give me an explanation of why you need to know." "If

Downloaded from pediatrics.aappublications.org by guest on May 30, 2013

you have a survey thing . . . ask some little questions, you know, I'll do that. But I don't think you should go off into the details."

In many of the groups, these concerns generated discussion among parents, with some participants supporting the role of the pediatrician in dispensing parenting advice. For example, one parent stated that "people rely on their pediatricians for child-rearing advice, and particularly before the kids are in school. So I think it's really important that the pediatrician discuss . . . issues."

Many parents observed that, although it might be nice to discuss these issues, the doctor didn't seem to have enough time to discuss behavioral issues. These parents were often sympathetic: "The poor pediatricians are so busy sometimes . . . there are times when I think that the last [thing] I'm going to do is ask a question right now. He looks like he's just overwhelmed."

*Theme II: Physician Attitude*

Parents in all focus groups cited physician attitude as a key variable in effectively communicating potentially sensitive messages. Parents voiced concerns at the possibility of being judged or treated condescendingly. As one mother described her reaction to professional advice: "I understand what you are saying. Don't treat me like I'm stupid." Both clinicians and parents come to the office visit because of their concern for the child's well-being, forming the basis of the therapeutic alliance in pediatrics. In discussing anticipatory guidance on controversial topics, one participant reminded the group: "[providers and parents] both have a common goal . . . you are allying yourself as opposed to setting yourself off on different ends of the spectrum, because [we] are both there for the good of the child."

Parents suggested that providers just give them the facts and not try to persuade them or convince them, allowing parents to integrate this new information into their own decisions. One participant suggested to pediatric health care providers: "bring the facts along and then you leave it alone . . . you can't make a person believe your way." In the view of another participant: "Any information presented in the right way . . . is not condescending . . . they [the families] are going to welcome that." Many focus-group participants reported that they wanted information from which to make their own decisions rather than being told what to do. As one parent put it: "Don't say 'you should,' and then maybe the parent will be more open. They [parents] truly care about getting this information and the effect it's going to have on your child."

Parent participants cited cultural and economic barriers to effective communication. One patient warned about giving advice counter to religious values and cultural beliefs that "this is how it's done" in raising children. Parents wanted counseling to be individualized, and not based on class or race: "You don't [want to] feel, okay, I'm getting this information because of the neighborhood I live in, [or] the color of my skin."

Parents cited the need for having a prior relationship in discussing private matters: "I wouldn't feel comfortable saying, 'well, I do spank my child' . . . to someone that I didn't have a relationship with." Parents repeatedly recommended that pediatricians build relationships with families.

*Theme III: Modes of Communication*

Parents endorsed the use of written materials to supplement in-office counseling. Families suggested that providers use written sheets as a way to provide information in a nonjudgmental way, telling parents or patients: "Well, here's a sheet that we've developed and you can read this at your own time if you'd like." Another parent commented: "Pamphlets in his office . . . that's not intrusive on my personal life."

Families varied on whether this information should focus on statistics. One parent commented: "[the doctor should say] 'Alright it is your choice, it is your responsibility, and I'm here to help you make an informed choice and if you choose not to have a car seat here—here are the statistics, here's what's likely to happen.'" In contrast, in another group, participants laughed with understanding as one parent commented: "As a new mom of a daughter I am inundated with statistics. I'm tired of statistics. I'm done with statistics [all laugh]. They're really meaningless after a while, because you know '7 out of 10 children' this and '1 out of 3 children' that. . . . After a while you just start to feel, you know. So, I think reaching out on an emotional level . . . is probably more productive." Within the focus-group setting, parent participants occasionally told their own personal stories or those of family members in support of the AAP policies under discussion. Whenever these personal stories were told, other participants became more sympathetic and engaged.

When prompted, participants endorsed electronic media (video or Internet) as useful tools for communication. In the technology-rich Northwest, Seattle focus-group participants, in particular, suggested that electronic newsletters with developmental information tailored to a child's age would be useful.

**Pediatrician Focus Groups**

All pediatricians at all focus groups felt that anticipatory guidance is an important part of pediatrics. In fact, many cited that some or all of their patients came to expect this, noting that "[m]ore established patients begin to expect anticipatory guidance." However, busy clinicians also strike a balance between their own agenda and those of the parents within a relatively tight time allowance: "I have to talk with parents about what their concerns are that they came in with. In that you have 8 to 10 minutes that I have with them, anticipatory guidance tends to be the thing that gets short-changed."

Downloaded from pediatrics.aappublications.org by guest on May 30, 2013

Several participants noted that their time constraints are linked to insurance reimbursements: "I think this prevention with all the good things that we are trying to do for the kids is never recognized by the third party."

To help mitigate time constraints, providers used handouts and stories to provide context for anticipatory guidance. In particular, providers cited the use of handouts both as an ice-breaker and a response to time pressure. Some felt that personalizing the handout (eg, writing something on it) resulted in the information having higher value or salience. One provider said: "Communication may be stamped with individual handouts on top of what you said."

Pediatricians reported that they often used news media stories or their clinical experience to introduce anticipatory-guidance topics: " I can say, you know, 'Gosh, the boy at the high school down the street killed himself.' I can open up a discussion of the risks on adolescents and depressed teens."

In contrast to the importance that they place on providing anticipatory guidance, physicians reported having received little specific training. One participant noted the ironic contrast between residency training and primary practice: "It's funny that so little of the time that you spend in residency is so much of what you do once [you] get out." Another participant described providing anticipatory guidance based on personal experience as a parent, reporting that "[I] didn't learn how to be a parent until I had my own kids."

Some physicians noted difficulty in prioritizing issues to be included in anticipatory guidance, citing the large number of topics that are expected to be covered, especially with infants and young children: "We are not sure how to prioritize them. Out of the 17 things you are supposed to discuss, which 5 do you pick?"

Cross-cultural communication issues also were a challenge, as physicians in every group cited their difficulties in providing anticipatory guidance to less educated parents and to families of lower socioeconomic status. The challenge is exacerbated further by the need to individualize care for each patient at the same time that providers struggle to keep subconscious biases from shaping that care. As noted by one participant: "I come with a set of prejudices and biases to that room based on, if I can't hit all 17 or 18 or 20 topics, you have to rely on some intuition to tell you what's the best thing to do, and I'm not sure that that's very scientific either."

Pediatricians who attended these groups voiced concerns about discussing the specific issues of firearms and corporal punishment. Discussing firearms may be outside families' expectations of their child's doctor, and AAP policy may be at odds with local cultural norms. As one physician stated: "Most of the families I see expect you to talk about developmental milestones. They are surprised if you ask, 'Are there weapons in the home?'" Another reported: "We have a number of parents who, quite frankly, may very well have guns at [home]. And I think they would not necessarily be receptive to their pediatrician saying, 'you know you need to get rid of it or lock it up, and why do you have this in the first place.'"

In discussing the general issue of corporal punishment, several physicians voiced concerns about the dividing line between legal uses of corporal punishment and child abuse and were reluctant to venture into discussions of disciplinary practices to avoid confronting this issue. One participant was particularly candid when he reported that he was reluctant to discuss the parents' discipline practices: "Because sometimes that [discipline] can open up a can of worms as far as abuse—spousal abuse, child abuse issues."

## DISCUSSION

Focus groups of parents and pediatricians were conducted to explore controversial issues that will be addressed in a new national violence-prevention and intervention program under development by the AAP. Parent participants indicated concerns about their personal privacy and the way that behavioral information is communicated. Many were unaware of AAP policies that discourage corporal punishment and did not view firearms issues as lying within the scope of pediatric practice. Pediatricians concurred with many of the concerns raised by parents and also raised issues of cross-cultural communication and reimbursement.

Focus groups provide an opportunity to delve into culturally sensitive areas. Although many individual comments will be self-revealing, by focusing participant attention and comments on the generalized other (eg, "other parents within this community"), we were able to provide a safe and less contentious setting within which to discuss sensitive issues that may be the object of strongly held beliefs and feelings. This characteristic of focus-group research makes it extremely well suited to practice-oriented research activities, many of which focus on such deeply held beliefs and convictions. We conducted multiple parent focus groups in several US cities and pediatrician focus groups at a national meeting with the specific intent of exploring areas of controversy and disagreement.

The convenience-sampling strategy that was used to identify and select participants as well as the focus-group–interview method itself were not intended to be representative or to provide any estimate of the prevalence of these attitudes and opinions. In fact, focus groups were conducted in diverse geographic locations that were selected specifically to include areas with high gun-ownership rates and in which popular opinion seemed to support the use of corporal punishment.

We found striking concurrence of themes among different focus groups that were recruited and conducted in different regions of the United States. These results have

Downloaded from pediatrics.aappublications.org by guest on May 30, 2013

important implications for this AAP project in particular and may provide broader insights on anticipatory guidance in general.

On the basis of our findings, we conclude that the most successful written anticipatory guidance will strengthen the therapeutic alliance between pediatricians and families. Primary care providers can offer authoritative information to support parental decision-making in a respectful manner and without seeming to judge the quality of parenting that the child experiences. Written material seems to be a relatively nonthreatening way to provide such information, particularly on topics with which the child's adult caretakers might disagree. When prompted, there was considerable interest in electronic media.

This approach to the development of written protocols and public education materials complements a large literature in doctor-patient communication, including guidance for the conduct of pediatric office visits.[28,29]

In the 2 specific controversial topics that were examined in depth, it seems that there may be more reluctance and sensitivity to screening and assessment rather than simply providing information. As might be expected from the high rates of gun ownership in the United States, participants seemed to view gun ownership as normative. Many parent participants indicated discomfort with being asked about their own gun-ownership and -storage habits, which was echoed by pediatricians' reluctance to screen for handgun ownership.

Both physicians and parents were concerned that screening concerning corporal punishment may raise issues of potential child abuse. However, parents were quite positive about receiving information in these areas that focused on child development and safety.

The results reported here contributed to a change in philosophy and context for new anticipatory-guidance materials and accompanying provider training now under development. On the basis of the results from these groups, newly developed materials will assist clinicians as they move from a risk-reduction strategy to one that includes an assessment of child and family strengths and offers anticipatory guidance based on a more positive, strength-based model. This will promote clinical encounters that result in building and deepening the alliance between families and pediatricians, both of whom share the goal of developing resilient children. Adopting a positive developmental approach may also overcome some of the potential conflict experienced by many physicians as mandated reporters of child abuse. Intervening early and promoting positive approaches to child discipline may help to prevent abuse and provide a more comfortable forum for beginning a dialogue.

Written materials will be designed to present, in straightforward and practical terms, specific information for families based on our emerging understanding of child and family development. Authoritative information, clearly presented, will allow families to make their own informed decisions about their child-raising practices.

Effective communication requires that information be exchanged in a manner that reflects the language and beliefs of both parties. Involvement of families in the preparation of anticipatory-guidance materials allows for their perspective, as well as those of the health care providers, to enter into the conceptual design and creation of new programs. In this way, the process of development can mirror the 2-way dynamic exchange of information that characterizes effective clinical practice. Structured focus groups allow for this meaningful interchange to occur.

**REFERENCES**

1. American Academy of Pediatrics, Committee on Psychosocial Aspects of Child and Family Health. *Guidelines for Health Supervision III, Revised*. 3rd ed. Elk Grove Village, IL: American Academy of Pediatrics; 2002
2. Green M, Palfrey JS, eds. *Bright Futures: Guidelines for Health Supervision of Infants, Children, and Adolescents*. Arlington, VA: National Center for Education in Maternal and Child Health; 2002
3. American Academy of Pediatrics, Committee on Psychosocial Aspects of Child and Family Health. Guidance for effective discipline [published correction appears in *Pediatrics*. 1998;102:433.]. *Pediatrics.* 1998;101:723–728
4. American Medical Association, Department of Adolescent Health. *Guidelines for Adolescent Preventive Services, Recommendations Monograph*. 2nd ed. Chicago, IL: American Medical Association; 1995
5. American Academy of Pediatrics, Committee on Psychosocial Aspects of Child and Family Health. The new morbidity revisited: a renewed commitment to the psychosocial aspects of pediatric care. *Pediatrics.* 2001;108:1227–1230
6. Centers for Disease Control and Prevention, National Center for Injury Prevention and Control. Welcome to WISQARS. Available at: www.cdc.gov/ncipc/wisqars. Accessed August 5, 2004
7. American Academy of Pediatrics, Task Force on Violence. The role of the pediatrician in youth violence prevention in clinical practice and at the community level. *Pediatrics.* 1999;103:173–181
8. American Academy of Pediatrics, Committee on Injury and Poison Prevention. Firearm-related injuries affecting the pediatric population. *Pediatrics.* 2000;105:888–895
9. Farah M, Simon H, Kellerman A. Firearms in the home: parental perceptions. *Pediatrics. Nov.* 1999;104:1059–1063
10. Straus M, Stewart J. Corporal punishment by American parents: national data on prevalence, chronicity, severity, and duration, in relation to child and family characteristics. *Clin Child Fam Psychol Rev.* 1999;2:55–70
11. Olson LM, O'Connor KG, Spivak H, Esquivel MZ. Pediatricians' views on the treatment and prevention of violent injuries to children. Presented at: Pediatric Academic Societies annual meeting; New Orleans, LA; May 1–5, 1998
12. Trowbridge MT, Sege RD, Olson L, O'Connor K, Flaherty E, Spivak H. Intentional injury management and prevention in pediatric practice: results from 1998 and 2003 American Academy of Pediatrics periodic surveys. *Pediatrics.* 2005;116:996–1000
13. Borowsky IW, Ireland M. National survey of pediatricians'

Downloaded from pediatrics.aappublications.org by guest on May 30, 2013

violence prevention counseling. *Arch Pediatr Adolesc Med.* 1999; 153:1170–1176
14. Barkin S, Ryan G, Gelberg L. What pediatricians can do to further youth violence prevention: a qualitative study. *Inj Prev.* 1999;5:53–58
15. Kogan M, Schuster M, Yu S, et al. Routine assessment of family and community health risks: parent views and what they receive. *Pediatrics.* 2004;113(6 suppl):1934–1943
16. Sege RD, Perry C, Stigol L, et al. Short-term effectiveness of anticipatory guidance to reduce early childhood risks for subsequent violence. *Arch Pediatr Adolesc Med.* 1997;151:392–397
17. Moyer VA, Butler M. Gaps in the evidence for well-child care: a challenge to our profession. *Pediatrics.* 2004;114:1511–1521
18. Thompson RS, Taplin SH, McAfee TA, Mandelson MT, Smith AE. Primary and secondary prevention services in clinical practice: twenty years' experience in development, implementation, and evaluation. *JAMA.* 1995;273:1130–1135
19. Thompson RS, Rivara FP, Thompson DC. Case-control study of the effectiveness of bicycle safety helmets. *N Engl J Med.* 1989; 320:1361–1367
20. Rivara FP, Thompson DC, Thompson RS, et al. The Seattle children's bicycle helmet campaign: changes in helmet use and head injury admissions. *Pediatrics.* 1994;93:567–569
21. Bloor M, Frankland J, Thomas M, Robson K. *Focus Groups in Social Research*. London, United Kingdom: Sage; 2001
22. Fern EF. *Advanced Focus Group Research*. Thousand Oaks, CA: Sage; 2001
23. Krueger RA. *Focus Groups: A Practical Guide for Applied Research*. 2nd ed. Thousand Oaks, CA: Sage; 1994
24. Simon JS. *Wilder Nonprofit Field Guide to Conducting Successful Focus Groups*. Saint Paul, MN: Amherst H Wilder Foundation; 1999
25. Morgan DL. Doctor caregiver relationships: an exploration using focus groups. In: Crabtree BF, Miller WL, eds. *Doing Qualitative Research*. Thousand Oaks, CA: Sage; 1992:205–227
26. Hemenway D, Miller M. Association of rates of household handgun ownership, lifetime major depression, and serious suicidal thoughts with rates of suicide across US census regions. *Inj Prev.* 2002;8:313–316
27. Azrael D, Cook PJ, Miller M. State and local prevalence of firearms ownership measurement, structure, and trends. *J Quant Criminol.* 2004;20:43–62
28. Stein M. The Pediatric Clinical Interview. In: Osborn L, DeWitt T, First L, Zenel J, eds. *Pediatrics*. Philadelphia, PA: Elsevier-Mosby; 2005
29. Glascoe FP, Oberklaid F, Dworkin PH, Trimm F. Brief approaches to educating patients and parents in primary care. *Pediatrics.* 1998;101(6). Available at: www.pediatrics.org/cgi/content/full/101/6/e10

Downloaded from pediatrics.aappublications.org by guest on May 30, 2013