# EXHIBIT 9

```
 1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
 2                        -  -  -

 3   JOHN DOE NO. 1; JOHN DOE   :
     NO. 2; and NEW YORK STATE  :
 4   RIFLE AND PISTOL           :
     ASSOCIATION, INC.          :
 5           Plaintiffs,        :
                                :
 6   vs.                        : Civil Action No.
                                : 7:16-cv-8191
 7   PUTNAM COUNTY; and MICHAEL :
     C. BARTOLOTTI, in his      :
 8   official capacity as       :
     County Clerk for Putnam    :
 9   County,                    :
             Defendants.        :
10

11

12              Oral deposition of MARCI A. HAMILTON,

13   taken at the Residence Inn Philadelphia Center City,

14   One East Penn Square, Philadelphia, Pennsylvania, on

15   Wednesday, July 17, 2019, beginning at approximately

16   10:00 a.m., before Maureen E. Broderick, Registered

17   Professional Reporter and Notary Public in and of

18   the Commonwealth of Pennsylvania.

19

20

21

22

23

24

25
```

```
 1    APPEARANCES

 2    COOPER & KIRK
      BY:  DAVIS COOPER, ESQUIRE
 3    BY:  CHARLES J. COOPER, ESQUIRE
      1523 New Hampshire Ave., N.W.
 4    Washington, D.C. 20036
      (202) 220-9660
 5    pdcooper@cooperkirk.com
      ccooper@cooperkirk.com
 6
      Counsel for Plaintiffs
 7

 8

 9    NEW YORK ATTORNEY GENERAL's OFFICE
      BY:  STAN O'LOUGHLIN, ESQUIRE
10    120 Broadway, 24th Floor
      New York, NY 10271
11    (212) 416-8425
      stan.o'loughlin@ag.ny.gov
12
      Counsel for Defendants
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    EXAMINATION INDEX

 2   WITNESS                                 PAGE

 3   Marci A. Hamilton

 4       By Mr. Cooper                          4

 5

 6                     EXHIBIT INDEX

 7   NAME                DESCRIPTION           PAGE

 8   Hamilton

 9   Exhibit 1           Report of Professor      6
                         Hamilton
10
     Exhibit 2           Curriculum Vitae of      7
11                       Marci A. Hamilton

12   Exhibit 3           "Verdict"               13

13   Exhibit 4           "License To Carry"      75

14   Exhibit 5           State of New York       76
                         Pistol/Revolver License
15                       Application

16   Exhibit 6           Vox Article             78

17

18

19

20

21

22

23

24

25
```

Case 7:16-cv-08191-PMH-AEK   Document 100-8   Filed 01/27/20   Page 5 of 26

```
 1                      - - -

 2                      MARCI A. HAMILTON, having been

 3                      first duly sworn to tell the

 4                      truth, was examined and

 5                      testified as follows:

 6                      - - -

 7         MR. O'LOUGHLIN:  Usual stipulations, I

 8     assume.  And, yeah, the witness will read and

 9     sign.  Send that to me, please.

10                      - - -

11                      EXAMINATION

12                      - - -

13  BY MR. COOPER:

14       Q    Good morning, Professor Hamilton.  My name

15  is Davis Cooper.  I represent the plaintiffs in this

16  case, John Does No. 1 and 2.  I'm going to be asking

17  you some questions today.

18                 Would you please state your full name

19  for the record?

20       A    Sure.  Marci A. Hamilton.

21       Q    Wonderful.

22                 Before we begin, I just want to lay

23  down a few ground rules.

24                 Please provide only verbal responses,

25  rather than head nods and things like that, so the
```

1    children's friends may have access to guns through

2    such licensed individuals, end quote.

3              Is it your opinion that access to the

4    information that Section 400 provides sufficiently

5    informs parents about their children's friends'

6    homes?

7        A    No.  It's just one piece of information

8    that a parent should be able to get.

9        Q    And what other pieces of information

10   should a parent be able to get?

11       A    Parents should be able to get criminal

12   background report.  They should be able to go on the

13   web and be able to find out about the person who

14   lives next door to them or the person that wants to

15   play with their children.  Every parent needs as

16   much information as possible.

17       Q    Would you put any limits on the type of

18   information that should be available to the parents

19   of children when they're researching their

20   children's friends' home?

21             MR. O'LOUGHLIN:  Objection.

22             You can answer.

23             THE WITNESS:  Secrecy about dangers to

24        children have been so catastrophic to children

25        that what we really need is more information to

 1                    Do you think it's important for

 2    parents to have access to information about long

 3    guns in the homes of the friends their children will

 4    play with?

 5         A    That would also be helpful, just like

 6    information about whether or not the father is a

 7    registered sex offender.

 8         Q    What about unregistered handguns?

 9         A    That information would be valuable.

10         Q    So any information about any gun would be

11    valuable?

12         A    It would be valuable to the parent trying

13    to make an informed decision.

14         Q    And do you believe parents need

15    information about gun storage practices to decide

16    whether to permit their child to attend a playmate's

17    home?

18         A    That would certainly help them.

19         Q    For parents that want to know if there's a

20    firearm in a home where their children will spend

21    time, is the information made by public, made public

22    by Section 400 enough?

23         A    It is enough for purposes of informing

24    them about some categories of gun owners.

25         Q    Is it enough -- understood.

1              Is it enough for a parent who is

2    concerned about all firearms that a child friend's

3    parent may have in the home?

4              MR. O'LOUGHLIN:  Objection.

5              You can answer.

6              THE WITNESS:  Well, there will never be

7         perfect information.  So it's part of the

8         information that a parent would want to protect

9         their children.

10   BY MR. COOPER:

11        Q    But it's -- understood.

12             But it's not, it doesn't paint a

13   complete picture.  It is insufficient to inform the

14   parent whether or not there are long guns in the

15   home, correct?

16        A    It's not enough by itself to have a

17   universal set of beliefs about whether your child's

18   going to be safe in that home.

19        Q    Understood.

20             How about with regards to firearms?

21        A    It's not enough by itself, but it

22   contributes to the knowledge that the parent needs

23   to protect their child.

24        Q    Given the limitations of Section 400's

25   public records requirement, what would you recommend

1    a parent of a child do before they allow their child

2    to spend time with a friend --

3              MR. O'LOUGHLIN:  Objection.

4              You can answer.

5    BY MR. COOPER:

6         Q    -- at a friend's home?

7         A    On the one hand, they should avail

8    themselves of this opportunity to learn about the

9    people that are going to be with their children.

10   And they can certainly ask the parents of the other

11   children, and hope that they tell the truth.

12        Q    Do you think it -- when you say "hope they

13   tell the truth," why -- could they be confident that

14   the other parent would tell the truth?

15        A    Not necessarily.

16        Q    Why not?

17        A    Because not everybody tells the truth all

18   the time.  It's just a human reality.

19        Q    Does the fact that gun ownership is

20   controversial play a role in whether or not a parent

21   would tell the truth about whether or not they have

22   a gun in the home?

23             MR. O'LOUGHLIN:  Objection.

24             THE WITNESS:  I honestly don't know.

25   BY MR. COOPER:

1       Q    Do you believe gun ownership is a

2  controversial activity?

3            MR. O'LOUGHLIN:  Objection.

4            THE WITNESS:  Gun ownership?  It's just a

5       reality.

6  BY MR. COOPER:

7       Q    Do you think that some people have

8  negative feelings about guns?

9            MR. O'LOUGHLIN:  Objection.

10           You can answer.

11           THE WITNESS:  I've really focused on what

12      the science is telling us, so what people's

13      feelings are is the pollsters and politics.

14      And with respect to the science, there is

15      reason to be concerned about guns near

16      children.

17  BY MR. COOPER:

18      Q    So you -- so have you ever encountered any

19  person or seen any evidence that some people have

20  strong negative feelings about guns?

21      A    It's in the newspapers.  Sure.  But that's

22  politics, and that's not what I work in.

23      Q    Given that Section 400 provides

24  exemptions, does Section 400 offer parents and

25  caregivers the opportunity to know whether there are

 1    individuals with a gun license in a home?

 2        A    It gives them the possibility of learning

 3    that information, but it's not a guarantee.  Parents

 4    who treat it as a guarantee would be short changing

 5    their children.

 6        Q    How so?

 7        A    Because it's under-inclusive.

 8        Q    Understood.

 9             So you're saying a parent should not

10    rely on Section 400 alone?

11        A    You should never rely on one piece of the

12    law alone, but it's a valuable piece of information.

13        Q    Do you agree that parents in New York

14    cannot be confident that there are no guns in the

15    house if there's no permanent information available

16    under Section 400 for anyone that lives in that

17    house?

18             MR. O'LOUGHLIN:  Objection.

19             You can answer.

20             THE WITNESS:  They can rely on a positive

21        report, if they get one, that there is a

22        licensed gun owner in that home.  They cannot

23        assume the opposite.  They cannot assume that

24        because the licensed gun owners are listed,

25        that everybody else is.

```
 1   BY MR. COOPER:

 2        Q    And they cannot assume that there's not

 3   someone in the house that was granted an exception;

 4   is that right?

 5             MR. O'LOUGHLIN:  Objection.

 6             THE WITNESS:  Or that there's someone in

 7        the house that has a gun illegally.

 8   BY MR. COOPER:

 9        Q    Do you know how many parents have access

10   to records under Section 400?

11        A    I do not.

12        Q    Do you know of one instance in which a

13   parent has access to records under Section 400?

14        A    I do not know of any studies that have

15   been able to quantify that.

16        Q    You're not aware of any studies, and

17   you're not aware of any stories or examples of --

18        A    No.

19        Q    Do you know how many parents would use,

20   would use Section 400 to learn more about the gun

21   safety of their children's friends' homes?

22             MR. O'LOUGHLIN:  Objection.

23             You can answer.

24             THE WITNESS:  I don't know how many.  I

25        know that parents are increasingly asking for
```

1           tools to find out how safe their children's

2           environments are.  So they're interested in sex

3           offender registries, and they'd be interested

4           in this information too.

5    BY MR. COOPER:

6           Q    Do you have any proof of that?

7                MR. O'LOUGHLIN:  Objection.

8                THE WITNESS:  That parents are interested

9           in the prevention of harm, yes.

10   BY MR. COOPER:

11          Q    Do you have any proof that parents are

12   interested in access to information related to the,

13   access to the names and addresses of handgun permit

14   holders?

15               MR. O'LOUGHLIN:  Objection.

16               You can answer.

17               THE WITNESS:  I think that's just common

18          sense.

19   BY MR. COOPER:

20          Q    But beyond common sense, you don't have

21   any --

22          A    No.

23          Q    Is it possible that it would be

24   counterproductive or could be counterproductive for

25   a parent to rely on records provided under Section

1    400?

2              MR. O'LOUGHLIN:  Objection.

3              You can answer.

4              THE WITNESS:  Can you ask that again?

5         Sorry.

6    BY MR. COOPER:

7         Q    Sure.

8                   Is it possible that it would be

9    counterproductive for a parent to rely on records

10   provided under Section 400?

11             MR. O'LOUGHLIN:  Objection.  Note my

12        objection.

13             THE WITNESS:  If a parent misunderstood

14        that Section 400 is somehow a blanket guarantee

15        of information, it could be a problem.  But if

16        they understood that this is a subset of the

17        gun license owners in the state, then, no, I

18        don't think that it would be problematic for

19        them.

20   BY MR. COOPER:

21        Q    How might it be a problem if they don't

22   understand the specific details of the types of

23   records that are available under Section 400?

24        A    If they don't understand it, then they

25   might be misled into thinking that their children

1    are safe when they're not.

2              It's just like, you know, the whole

3    problem of the sex offender registry is

4    under-inclusive.

5         Q    I see.  So -- I understand.

6              So I guess what you're saying is that

7    a parent may rely on an inaccurate understanding of

8    Section 400, not ask another parent, and rely on

9    that information instead, and assume that the child

10   is safe related, in relation to guns at the friend's

11   house?

12             MR. O'LOUGHLIN:  Objection.

13             You can answer.

14             THE WITNESS:  If they understood the law

15        to be a blanket guarantee, then they could make

16        a false assumption about whether or not there's

17        going to be a gun in the house.

18             And then the second question is that

19        parent's decision as to whether or not they're

20        going to let their child be in a home with

21        guns.

22   BY MR. COOPER:

23        Q    And a parent in that situation may not

24   seek additional information if they think that

25   Section 400 provides all information they need to

1  Create some valuable knowledge base for teachers,

2  school administrators, medical professionals,

3  therapists, and many other professionals regarding

4  gun availability to children at risk of either

5  domestic violence at home or at risk of harming

6  others, these individuals who are often the first to

7  be aware of a child suffering from depression,

8  suicide ideation, or plans to commit violence.

9              Is it the responsibility of teachers

10  or any other professional you list to alert

11  government authorities if they believe a child is at

12  risk of either domestic violence at home or at risk

13  of harming others?

14      A    Yeah.  They're mandated reporters.

15      Q    What does that mean?

16      A    Mandated reporter is a professional who is

17  required to report to either child protective

18  services or the police if they suspect that a child

19  is being abused or neglected.

20      Q    Is there a specific point where that

21  responsibility to report kicks in?

22              (Interruption.)

23              (Off the record.)

24  BY MR. COOPER:

25      Q    We were just talking about the

1    responsibility of teachers and other professionals

2    that deal with children to report suspicions of, you

3    know, or, I guess, report their beliefs that a child

4    is at risk of either domestic violence or at a risk

5    of harming others.

6         A    Right.

7         Q    When does that responsibility kick in?  At

8    what point is a teacher or the professional required

9    to alert authorities?

10        A    Well, it's state by state.  But typically

11   if they have a suspicion that a child is either at

12   risk or putting other children at risk, they have an

13   obligation to go to the authorities.

14        Q    So it's not optional?

15        A    No, it is not optional.

16        Q    It's not optional?

17        A    No.

18        Q    And the standard, as far as you understand

19   it, is belief that -- you know, suspicion --

20             MR. O'LOUGHLIN:  Objection.

21             You can answer.

22             THE WITNESS:  Right.

23   BY MR. COOPER:

24        Q    Is it the same for all of those

25   professions, therapists and teachers and school

```
 1   administrators?

 2           MR. O'LOUGHLIN:  Objection.

 3           You can answer.

 4           THE WITNESS:  Yes.

 5   BY MR. COOPER:

 6      Q    Does that responsibility cease if the

 7   teacher or therapist suspects there are no guns in

 8   the child's home?

 9           MR. O'LOUGHLIN:  Objection.

10           THE WITNESS:  What I'm talking about in

11       this paragraph is that, if a teacher suspects

12       domestic violence or the child is a risk of

13       harming others, in those circumstances, they

14       should be ultra-concerned about whether or not

15       there are guns in the home.  But those are the

16       two instances that I think guns in the home

17       would be the most disturbing.

18   BY MR. COOPER:

19      Q    Sure.  But does that, does that change

20   their responsibility to alert authorities?

21      A    Their legal responsibility is to report

22   suspected child abuse or neglect, period.

23      Q    Whether there were firearms in the home or

24   not?

25      A    What there are firearms or any other risk
```

1    factor.

2         Q    Is it your understanding that the

3    government authorities have ready access to the

4    information provided under Section 400?

5         A    Yes, as I understand it, the authorities

6    do.

7         Q    And is it your understanding that the

8    authorities have even more information available to

9    them than what is available under Section 400?

10        A    Yes.

11        Q    Do you think it is important for teachers

12   and therapists to know if there are long guns in a

13   child's home?

14        A    It's important for them to know if there

15   are any guns when you have a risk of abuse or

16   neglect.

17        Q    What changes if a teacher or other

18   official caretaker, you know, professional caretaker

19   suspects that a child's at risk and has a gun in the

20   home or not?

21             MR. O'LOUGHLIN:  Objection.

22             THE WITNESS:  The presence of a gun by

23        itself is not the trigger.  The trigger is

24        whether or not there were unsafe circumstances.

25   BY MR. COOPER:

1     Q     And how does a teacher or other caretaker,

2     therapist, learn of dangerous circumstances?

3     A     Typically a child tells them.

4     Q     And it's your position that the more

5     information a teacher or therapist have with regards

6     to any type of hazard is beneficial?

7     A     That's right.

8     Q     Do teachers and therapists know all of the

9     individuals that may be living or visiting a student

10    or patient's home?

11    A     No.

12    Q     And do they know all the adults who are

13    interacting with the child?

14    A     No.

15    Q     Can teachers and therapists safely assume

16    there are handguns in the home of at-risk children

17    if there are no handgun permit records under Section

18    400 available for anyone in that home?

19    A     No.  As I said before, this requirement is

20    under-inclusive, and so there are going to be

21    licensed gun owners that aren't part of this record.

22    Q     Is it your position that once a teacher or

23    therapist or other professional caretaker determines

24    that a child is at risk of domestic violence at home

25    or at risk of harming others, they should go through

 1    the process of accessing records before alerting

 2    authorities?

 3              MR. O'LOUGHLIN:  Objection.

 4              You can answer.

 5              THE WITNESS:  No.

 6    BY MR. COOPER:

 7        Q    So they should not wait; they should, they

 8    should act immediately, in your opinion?

 9        A    Under the mandated reporting law, they

10    don't have the option to wait.

11        Q    Given that records made available by

12    Section 400 do not include records related to long

13    guns, do not include records related to unregistered

14    handguns, do not include records related to those

15    who qualify for exemptions, and are not immediately

16    available, what good are records under Section 400

17    to teachers and therapists?

18              MR. O'LOUGHLIN:  Objection.

19              THE WITNESS:  These records are a slice of

20        the information that's valuable to parents.

21    BY MR. COOPER:

22        Q    You just said that the teachers and

23    therapists don't have an option, that once they

24    suspect the child is at risk, they are required to

25    alert authorities, totally independent of any gun

1    a valid license.

2         Q    Just so I understand, that being true,

3    there's still -- you're saying that the public

4    records available under Section 400 should be taken

5    into consideration when a teacher or therapist is

6    concerned that a child is at risk?

7         A    It's worth taking into consideration as a

8    positive indication of gun ownership.  If the answer

9    is that there is no listing, it's not a guarantee of

10   no gun ownership.

11        Q    Okay.  Thank you.

12             Do you know how many teachers,

13   therapists or other professional caretakers have

14   obtained records under Section 400?

15        A    I do not.

16        Q    Do you know of any specific instances?

17        A    I do not.

18        Q    Do you have any reason to believe that it

19   has ever happened?

20        A    I don't have any idea.

21        Q    Later on, on page 7, in the first

22   paragraph, you state, quote:  Knowledge of guns in

23   the home or in the ownership of others who deal with

24   children is critically important to putting together

25   the clues needed to prevent school shooting

 1   assertion?

 2        A    Well, again, Section 400 offers a piece of

 3   evidence, a fact about a handgun licensee.  But

 4   others, the press, social scientists, members of the

 5   public, the authorities, they can put other evidence

 6   together to figure out whether or not this is a

 7   person who really should have had this gun.

 8               And so it's just another part of the

 9   puzzle of trying to understand who is appropriately

10   having a, owns a gun and who is, even if it's

11   appropriate, is dangerous if they have a gun.

12        Q    So is this an opinion that Section 400

13   offers press, social scientists and members of the

14   public the opportunity to see who has been issued a

15   handgun license and to review the propriety of the

16   issuance of such license to see if it has been

17   issued appropriately or in accordance with the law,

18   and so is important, despite the efforts to block

19   transparency by those seeking secrecy?

20               MR. O'LOUGHLIN:  Objection.

21   BY MR. COOPER:

22        Q    Are you aware of any instances in which

23   members of the press, social scientists or the

24   public have used records, under Section 400, to

25   review the propriety of the issuances of licenses?

1      A    No.  That's why I say that it creates an

2  opportunity.

3      Q    Would you be in favor of a public

4  disclosure regime like Section 400 for other types

5  of personal information that have a direct

6  relationship to public safety?

7      A    If they have a direct relationship to

8  child safety, yes.

9      Q    Would you be in favor of making a public

10  record of the names and addresses of people who have

11  communicable diseases?

12            MR. O'LOUGHLIN:  Objection.

13            You can answer.

14            THE WITNESS:  I don't even know.  Never

15      thought about it.

16  BY MR. COOPER:

17      Q    Well, as you sit here today, would you be

18  in favor of making a public record of the names and

19  addresses of those who have HIV?

20      A    Only if it would be relevant to their

21  working with children.  If it would put children at

22  risk, then I think that should be part of an

23  employee record.

24      Q    What about those who may have HIV in the

25  home of a friend, of a child's friend's house?

1          as well.

2                MR. COOPER:  Same.  Draft, as well.

3                (Witness excused.)

4                (Deposition concluded at 12:09 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4   COMMONWEALTH OF PENNSYLVANIA   :

5                                  :

6   COUNTY OF PHILADELPHIA         :

7

8

9                    I, MAUREEN BRODERICK, Registered

10  Professional Reporter - Notary Public, within and

11  for the Commonwealth of Pennsylvania, do hereby

12  certify that the proceedings, evidence, and

13  objections noted are contained fully and accurately

14  in the notes taken by me of the preceding

15  deposition, and that this copy is a correct

16  transcript of the same.

17

18

19

20                    _____

21                    MAUREEN BRODERICK

22                    Registered Professional

23                    Reporter - Notary Public

24

25