EXHIBIT 10

**Rebuttal Report**
**Expert Opinions Concerning Penal Law §400.00(5)(a)**
**William English, PhD**

I have been asked to evaluate the reports submitted by Dr. Zeoli, Dr. Sege, and Dr. Hamilton in support of New York State's defense of Penal Law §400.00(5)(a), which makes the name and address of any person granted a handgun license a public record.

Dr. Zeoli argues that the law has the "potential" to provide information that "may" result in more high-risk batterers being restricted from firearm access. However, she admits that she is unaware of any evidence that petitioners for orders of protection have actually sought and utilized this information. Dr. Sege argues that this law offers an "opportunity" for parents to identify "potentially dangerous situations" and this "may help curb" the death or injury of children by firearms. However, the statistics that he cites reveal that such incidents are exceedingly rare, and he acknowledges that he does not know of any research or data demonstrating that parents have actually sought and used this information. In addition to making a similar claim regarding the supposed value of this law for parents, Dr. Hamilton speculates that the law could enable various kinds of professionals and members of the media to surveil, scrutinize, and study gun owners and that members of the public could use this information to help enforce laws restricting firearms access when the state has failed to do so. However, rather than provide compelling arguments for Penal Law §400.00(5)(a), Dr. Hamilton's reflections suggest that the law indeed poses a real threat to the privacy of handgun owners.

While Dr. Zeoli and Dr. Sege are to be commended for the care with which they summarize prior research and related statistics, their arguments are purely speculative and data that they cite in fact undermines their claims. Even if parents and victims of domestic abuse did systematically avail themselves of the information provided by handgun license records - and there is no evidence that they have - the incidents and scenarios that the authors wish to prevent are so rare that handgun ownership is not a useful risk indicator for the purposes that they propose, particularly on a cost-benefit basis. Indeed it is hard to see how the disclosure requirement could be substantially related to the concerns raised by these reports given that the risk posed by handguns is significantly smaller than a host of familiar activities and common household items. Moreover, based on the statistics cited by these expert reports, more than 99.99% of gun owners will not use their firearms to commit intimate partner violence, and more than 99.99% of gun owning households will not have a child accidentally killed by a firearm.

1

Finally, the larger arguments that the authors make on behalf of the state's interest in this law suffer from three fatal flaws. First, there are many indicators of risk that are much more predictive of the outcomes that these authors want to avoid, but which the state does not make a matter of public record because it would violate privacy and the exercise of other fundamental rights and liberties. That is to say that the state has clearly recognized that the potential benefits of publicizing sensitive information must be weighed against the costs to privacy, and our legal system has set a high bar in that regard. Second, the law is not well tailored to the supposed aims articulated by these reports, as it pertains only to handguns, while the same exact rationales should apply to long guns. Nor does the law cover individual permit holders who seek and are granted an exemption from the public disclosure requirement. The resulting gaps in coverage make the law ill suited for the purposes that it is supposedly meant to serve. Third, the concerns that the authors raise regarding child and intimate partner safety as well as the study and enforcement of firearms laws can clearly be addressed through other, much less burdensome means. Rather than subject law-abiding gun owners (more than 99.99% of whom will never be implicated in accidents or crime) to disclosure requirements that have no evident safety benefits but do have the potential to make these individuals the targets of theft, discrimination, stigma, and ostracism, the state could avail itself of less burdensome means that are equally if not better suited to address the concerns raised by these reports.

In sum, the claims made about the benefits of this law are highly speculative and doubtful, and the state has refused to permit similar invasions of privacy even when they promise to provide much more informative assessments of risk. Given the value our legal system places on privacy, the potential harms of disclosure to gun owners, the doubtful benefits of this law, and the state's ability to address the concerns raised by the authors through less burdensome means, it is my opinion that Penal Law §400.00(5)(a) does not serve an important governmental objective.

<u>Overview of the Law and Privacy Concerns</u>

New York State's Penal Law §400.00(5)(a) makes the name and address of any person granted a handgun license a public record. Due, in part, to public outcry after a media outlet collected and published the names and addresses of handgun license holders in two New York counties in 2012, the law was updated in 2013 to provide limited mechanisms for license holders to request that their information not be made publicly available.[1]

---

[1] https://www.cleveland.com/nation/2013/01/releasing_handgun_owners_names.html ,
https://www.techdirt.com/articles/20130116/18542921709/new-york-state-starts-walking-back-transparency-grants-gun-owners-exemption-disclosure-public-records.shtml ,
https://www.techdirt.com/articles/20121228/09311521511/more-post-newtown-fallout-gun-owners-vs-journalists-new-york.shtml

Specifically, an applicant can request a public records exemption if: a) "the applicant's life or safety may be endangered by disclosure" (due to one of a handful of enumerated reasons or because of a stated reason that gives the applicant reason to believe his or her life or safety would be endangered) or b) "the applicant has reason to believe he or she may be subject to unwarranted harassment upon disclosure."[2] While "harassment" has a specific legal meaning in New York law, what exactly constitutes "unwarranted harassment," and the criteria needed to establish credible belief that it may occur, is unclear. This lack of clarity can create dangers for applicants seeking exemption under this clause, because if the applicant is deemed to have knowingly provided false information as part of the exemption request, he or she can be subject to penalties.

As defined by New York Law, harassment in the first degree occurs when someone "intentionally and repeatedly harasses another person by following such person in or about a public place or places or by engaging in a course of conduct or by repeatedly committing acts which places such person in reasonable fear of physical injury," while harassment in the second degree occurs when a harasser: 1) "strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same;" or 2) "follows a person in or about a public place or places;" or 3) "engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose."[3] Thus, handgun permit applicants who wish to obtain an exception because of concerns about "unwarranted harassment" would have to establish, at least, that they believe they will be subject to stalking, fear of physical attack, or repeated attempts to alarm and seriously annoy them *and then, further,* that these forms of harassment are "unwarranted." This is a high bar, and the law is not clear as to what counts as sufficient reasons to believe that one will be subject to these legally defined forms of harassment.

However, it does seem clear that there are many harms that handgun license holders could suffer as a consequence of disclosure that do not rise to the level of harassment as formally defined by New York Law. For example, license holders could be targeted by burglars seeking to steal firearms, or subject to discrimination, stigmaization within their communities, and ostracism from social circles. As the State's own expert reports suggest, firearms ownership can be a sensitive and politically charged issue. Those who are prejudiced against gun ownership can use the information disclosed by Penal Law §400.00(5)(a) to target and adversely affect gun owners in a variety of ways. Moreover, this may prevent law abiding citizens who wish to acquire a handgun from doing so,

---

[2] https://codes.findlaw.com/ny/penal-law/pen-sect-400-00.html
[3] https://codes.findlaw.com/ny/penal-law/pen-sect-240-25.html
https://codes.findlaw.com/ny/penal-law/pen-sect-240-26.html

because of a reasonable fear that this information could be used against them in a manner that is not encompassed by the formal definition of harassment in New York.

There is good reason for current and prospective handgun license holders to be worried about being the targets of discrimination, stigma, and ostracism. Like political affiliation, firearms ownership is not a class afforded protection by New York's anti-discrimination laws.[4] New York's Labor Law (Section 201-d) does prohibit *employment* discrimination on the basis of off-duty "recreational activities" and "political activities outside of working hours." However, studies have shown not only that politically related bias has increased in recent years, but that such bias is often implicit as well as explicit. For example, recent research by Shanto Iyengar of Stanford University and Sean J. Westwood of Princeton University has concluded:

> "When defined in terms of social identity and affect toward copartisans and opposing partisans, the polarization of the American electorate has dramatically increased. We document the scope and consequences of affective polarization of partisans using implicit, explicit, and behavioral indicators. Our evidence demonstrates that hostile feelings for the opposing party are ingrained or automatic in voters' minds, and that affective polarization based on party is just as strong as polarization based on race. We further show that party cues exert powerful effects on nonpolitical judgments and behaviors. Partisans discriminate against opposing partisans, doing so to a degree that exceeds discrimination based on race. We note that the willingness of partisans to display open animus for opposing partisans can be attributed to the absence of norms governing the expression of negative sentiment and that increased partisan affect provides an incentive for elites to engage in confrontation rather than cooperation.[5]

What makes this study particularly relevant to the present case is that the most discriminant set of "Partisan Stimuli" that the authors identified to measure bias was the National Rifle Association logo along with an "R" in red and an outline of Texas and the Republican Elephant. Partisanship, thus defined, goes beyond mere registered party affiliation, associating bias specifically with pro-gun affiliation.

This study demonstrated that partisans favored their own in a variety of non-political contexts, including the award of valuable resources such as academic scholarships, and that Republicans were discriminated against the most in a scholarship competition: "approximately 80% of partisans (both Democrats and Republicans) selected their inparty

---

[4] https://dhr.ny.gov/law
[5] Iyengar, Shanto, and Sean J. Westwood. "Fear and loathing across party lines: New evidence on group polarization." *American Journal of Political Science* 59.3 (2015): 690-707.

candidate. Democratic leaners showed a stronger preference for the Democratic candidate than Republican leaners showed for the Republican candidate, though both groups displayed the in-party preference (80.4% and 69.2%, respectively). Independents showed a slight preference for the Democratic candidate (57.9%)." Moreover, implicit partisan bias was not only widely documented, but "remarkably sensitive to small partisan cues."

In economic games, players were not only "more generous toward copartisans," but they were also "more punitive and untrusting of opposing partisans" compared to neutral controls. Ultimately, the researchers found that "Outgroup animosity is more consequential than favoritism for the ingroup," and that this bias was extensive and larger even than racial bias:

> "Compared with the most salient social divide in American society—race— partisanship elicits more extreme evaluations and behavioral responses to ingroups and outgroups. This remarkable pattern applies to both explicit and implicit measures of group affect and holds even when the tests of ingroup favoritism are unobtrusive and completely nonpolitical, and partisans are incentivized to treat copartisans no differently from opposing partisans."

Given that a pro-gun association is intertwined with perceptions of partisan identity, and that the bias against opposing partisans is so extreme, it is reasonable for gun owners to fear that if they are publicly identified as such they will be the subject of bias, which could occur in many forms - *e.g.* explicit, implicit, social, economic, *etc.*.

Moreover, in recent years, the disclosure of personal information has become a tool that is increasingly used to stigmatize those who do not share some partisan view, a practice that has become known as "doxing." According to David Douglas, "Doxing is the intentional public release onto the Internet of personal information about an individual by a third party, often with the intent to humiliate, threaten, intimidate, or punish the identified individual."[6] The power of doxing is that it can mobilize large numbers of people who disapprove of some activity in a manner that harms the person being doxed. One way in which this works is through what Danielle Citron has described as the mobilization of "cyber mobs." Citron writes that: "this term captures both the destructive potential of online groups and the shaming dynamic at the heart of the abuse. As the legal philosopher Martha Nussbaum observed, 'Mobs from dominant groups are notorious for shaming relatively powerless groups, in taking delight in the discomfort of the excluded and stigmatized.'"[7] Douglas notes that doxing can also "serve as a tool for Internet vigilantism,

---

[6] Douglas, David M. "Doxing: a conceptual analysis." *Ethics and information technology* 18.3 (2016): 199-210. https://link.springer.com/article/10.1007/s10676-016-9406-0
[7] Citron, Danielle Keats. Hate crimes in cyberspace. Harvard University Press, 2014. p.5.

where those opposed to someone's actions retaliate by revealing her identity and personal information, leaving the victim open to public ridicule, harassment, and vilification (Solove 2007)."[8] Finally, the research cited above by Iyengar and Westwood suggests that even those who do not deliberately participate in such efforts may still act on implicit bias in response to such information in a manner that disfavors those perceived to be aligned with unpopular views or activities.

While rights of privacy are protected in various ways within our legal system, privacy is particularly important when it affects people's ability to exercise other fundamental rights and liberties. One paradigm of such a privacy protection is the secret ballot, which was one of the great political innovations of the 19th century and whose advent was aided by technologies that made the privacy of voting feasible on a mass level. Protecting the privacy of a citizen's vote ensures that he or she can exercise the right to vote according to conscience and not be intimidated or punished for casting an unpopular vote.

While the integrity of electoral systems requires voter registration, and parties may require partisan affiliation in order to vote in their primaries, those who wish to vote in general elections need not register a political affiliation. However, even the disclosure of basic voter registration information has proved controversial. The New York City Board of Elections recently published voter registration information for some 4.6 million voters online. Privacy advocates criticized the disclosure of this information, as did New York's Governor, whose office warned that "the perceived invasion of privacy comes during a time of increased political division and fears the unnervingly detailed records could be used for voter intimidation."[9] With regard to a separate request for voter information by the federal government, New York's Governor emphasized, "The electoral process is sacred and New York law has strong safeguards in place to prevent sharing of sensitive voter data and harassment against those who exercise their right to vote."[10] Just as New York employs strong privacy safeguards in order to ensure that the right to vote is not infringed, the state should be expected to employ strong privacy safeguards in order to ensure that the right to keep and bear arms is not infringed.

Finally, note that privacy is protected in a wide range of domains even when the violation of privacy promises to yield public benefits. For example, if the state were to require public disclosure of the names and addresses of every individual infected with an incurable sexually transmitted disease, this could undoubtedly help stem the transmission of such diseases, but doing so would be a gross violation of privacy and further stigmatize those

---

[8] Douglas, David M. "Doxing: a conceptual analysis." *Ethics and information technology* 18.3 (2016): 199-210. https://link.springer.com/article/10.1007/s10676-016-9406-0

[9] https://www.msn.com/en-us/news/politics/nyc-board-of-elections-exposes-all-voters%E2%80%99-names-and-addresses-online/ar-BBWm9Eo

[10] Ibid.

suffering from them. Or, if the state were to require public disclosure of the names and addresses of every individual afflicted with mental illness, this might help prevent a variety of dangerous scenarios, but doing so would be a gross violation of privacy and further stigmatize those with mental health problems. The most conspicuous precedent that I am aware of for requiring public disclosure of names and addresses for the purpose of public safety are sex offender registries, but the obvious difference is that convicted sex offenders have committed a crime.

The larger point also needs to be made that our legal system does not sanction guilt by association. The Supreme Court made clear in *U.S. v. Brignoni-Ponce* (1975) that a person's ethnicity (in this case the appearance of being of Mexican descent) is not sufficient to establish reasonable suspicion that a person was involved in criminal activity (in this case ferrying illegal immigrants). Indeed, racial profiling has been widely condemned, not because it is ineffective - statistically speaking it may be the case, for example, that illegal imigrants near the southern border are more likely to be of Latin American descent than not - but because it violates Fourth Ammendment rights against unreasonable search and seizures. Similarly, the fact that someone owns a firearm cannot be a reason for suspecting them of a crime; and, in fact, the vast majority of gun owners are not involved in gun related crimes or accidents, which is to say that knowing someone possesses a firearm is not a good guide to predicting danger. However, even if some racial group, for example, were to be involved in certain sorts of crime at high rates that actually yielded substantial predictive value for the use of racial profiling, I am aware of no legal grounding that would allow the government to target such groups on the basis of race or to require public disclosure of an individual's racial identity. The question is whether there is something special about handgun license holders that would justify publicly identifying them and, in so doing, making it feasible for others to stigmatize, ostracise, and discriminate against them.

The number of people affected by the disclosure requirements of Penal Law §400.00(5)(a) is substantial. Although the original article published by *The Journal News* that listed the names and addresses of pistol permit holders in Westchester and Rockland Counties has been taken down, other media outlets reported that Westchester County had 16,616 pistol license holders.[11] Given that the county has a population of 980,244, according to the Census Bureau, this means that approximately 1.7% of the population held handgun licenses. If New York State's 19.54 million residents own handguns at similar rates, that would suggest that over 330,000 residents own handguns. Even if we were to assume that no one in New York City owns handguns, the number would be over 185,000. Taking the

---

[11] http://www.westchestermagazine.com/Westchester-Magazine/March-2013/Gun-Ownership-in-Westchester-Who-Owns-Firearms-and-Why/

average of these two estimates would suggest that some quarter million New York residents own handguns and could have their names and addresses disclosed.

In sum, there are reasons to believe that gun owners may be harmed by the disclosure requirements of New York State's Penal Law §400.00(5)(a), and the American legal system affords significant privacy protections when they concern the exercise of fundamental rights and liberties. Moreover, privacy is protected even with regard to many attributes that may be predictively useful for purposes of public policy, and the law does not permit the abscription of guilt by association. Against the backdrop of these basic considerations, the expert reports in this case argue that Penal Law §400.00(5)(a) serves an important governmental objective of advancing the safety of its citizens. In evaluating the claims of Dr. Zeoli, Dr. Sege, and Dr. Hamilton, I consider whether there is in fact good reason to believe that the law advances the safety of citizens, how substantial the purported safety benefits are, whether these are sufficient to justify privacy violations that impinge on the exercise of a fundamental constitutional right, and whether less burdensome means could accomplish the same ends that these experts claim are advanced by Penal Law §400.00(5)(a).

Dr. Zeoli's Report and Concerns Regarding Intimate Partner Violence

Dr. Zeoli speculates that the disclosure required by Penal Law §400.00(5)(a) could potentially help reduce intimate partner homicides. The precise mechanisms through which this might be accomplished, she suggests, are two-fold. First, a petitioner for a protective order might use knowledge of a partner's handgun license as evidence for seeking to include a firearm restriction with a protection order at the outset. Second, if a protective order is granted without a firearm restriction, a petitioner may monitor public records and, if the respondent acquires a firearm, the petitioner may seek to modify the protective order to include a firearm restriction.

As Dr. Zeoli explains, in order for a petitioner for a protective order to have a firearm restriction included with that order, one of two sets of conditions must be met. Either: a) the respondent must have inflicted physical injury or used "or threatened use of a deadly weapon or dangerous instrument" in the past, or b) the court must find "a substantial risk that the respondent may use or threaten to use a firearm, rifle, or shotgun unlawfully against the person or persons for whose protection the temporary order of protection is issued."

Dr. Zeoli argues that if the first set of conditions isn't met, an important piece of information that is highly relevant for determining whether the second set of conditions is met is knowing if the respondent has access to a firearm. Specifically, she asserts, "One

8

piece of information that is highly relevant to risk of future firearm violence is whether the violent intimate partner has access to a firearm." Strictly speaking, this statement is true; but it is tautologically true – obviously, one cannot commit violence with a firearm without access to a firearm. However, there is some circularity with regard to her larger line of reasoning here, as she seems to suggest that the fact that someone owns a firearm is evidence that he or she should not be allowed to own a firearm. It's unclear why a determination of whether or not someone has a substantial risk of using or threatening to use a firearm should depend on whether he or she has owned a firearm in the past, particularly given the fact that a law abiding citizen may acquire a firearm in the future in the absence of any firearm restriction order. Put another way, if there is reason to believe that someone has a substantial risk of using or threatening to use a firearm *if they were to possess a firearm*, that alone should be sufficient to secure a firearm restriction, whether or not they in fact currently own a firearm. Dr. Zoeli does tell us that "access to a firearm indicates an increased risk of intimate partner homicide (Campbell et al., 2003)," but this could be a reason to prohibit firearms ownership by everyone subject to an order of protection or, in fact, firearms ownership by anyone at all. This may be Dr. Zoeli's ultimate position, but it is not the position of New York law.

A detailed examination of intimate partner violence statistics further weakens Dr. Zeoli's arguments. Dr. Zeoli reports that 76 individuals were killed in New York in 2015 by intimate partner violence, citing a scholarly paper by Díez et al (2017), which claims to have arrived at this number using a database maintained by the anti-gun activist group Everytown for Gun Safety. However, this number conflicts with the number reported by New York State's Office for the Prevention of Domestic Violence and the Department for Criminal Justice Statistics. According to New York State, there were 64 intimate partner homicides in 2015; and in 2017, which is the most recent year for which statistics are reported, the number was 59.[12] Moreover, the State's own report notes, "A knife, cutting instrument or blunt object was used most frequently in intimate partner homicides: 28 of 59 (47.5%)" while firearms were used in only 16 of the 59 intimate partner homicides (27.1%).

We are not told by the State, nor by Dr. Zeoli, how many of these 16 firearms homicides involved handguns, nor how many involved perpetrators who had orders of protection and used a handgun that was legally owned, which the victim was unaware of and would have otherwise petitioned for a firearm restriction had they been aware - which is the hypothetical scenario Dr. Zeoli's entire line of reasoning is concerned with. The number may very well be zero. However, even if this elaborate scenario were to describe all 16 intimate partner firearm homicides that took place in New York, that is an extraordinarily

---

[12] https://www.criminaljustice.ny.gov/crimnet/ojsa/FINAL%202017%20Domestic%20Homicide%20Report.pdf

small number in a state with over 19.5 million residents (yielding an incidence rate of 0.0000008), and it would mean that over 99.99% of handgun permit holders were not implicated in intimate partner homicides (1-(16/250,000)).

Although Dr. Zeoli is not aware of any evidence that order-of-protection petitioners have searched for and used handgun license information, and this information has historically not been easy to search, could it be that the small number of intimate partner firearms homicides is itself evidence of the effectiveness of Penal Law §400.00(5)(a)? The problem with this theory is that the numbers are not substantially different for neighboring states that have demographics that are similar to New York but do not make gun ownership a matter of public record. A recent article published in the *Annals of Internal Medicine* examined intimate partner homicide rates across the United States with a particular focus on firearms laws and firearms related homicides.[13] For 2015, the authors calculated the ratio of firearms-related intimate partner homicides to total intimate partner homicides. The ratio was 39.6 in New York, while it was 38.4 in New Jersey, 31.3 in Massachusetts, 35.0 in Delaware, and 16.3 in Rhode Island - all nearly identical to or less than New York. (Incidentally, it appears that these estimates are slightly inflated by rounding errors introduced when the authors first converted prior statistics to rates per 100,000. According to New York State's own report, the rate was 35.9% for 2015). Vermont and Maine also have firearms-related intimate partner homicide rates similar to New York's. In sum, New York's low firearms-related intimate partner homicide rate is on par with most states in New England, none of which make firearms ownership a matter of public record.

Curiously, Dr. Zeoli says nothing about the role of knives in intimate partner violence, despite the fact that they are the most commonly used intimate partner homicide instrument in many states. One wonders if she thinks that the state ought to maintain public records of who owns knives as well? (And, if not, why?) Also, although the fact that 16 people were killed by an intimate partner wielding a firearm in New York State in 2017 is lamentable, it's important to consider that number in perspective in a state as large as New York. Over the last seven months, 14 people have been killed on bicycles in New York City alone, but I am aware of no initiatives to restrict or control bicycle ownership.[14]

Finally, even if we were to accept Dr. Zeoli's general claim that it would be valuable for petitioners for orders of protection to know whether respondents have a handgun license, this could easily be determined by courts without any need to publicize the records of all license holders. New York State could simply allow only judges and law enforcement

---

[13] Díez C, Kurland RP, Rothman EF, Bair-Merritt M, Fleegler E, Xuan Z, et al. State Intimate Partner Violence–Related Firearm Laws and Intimate Partner Homicide Rates in the United States, 1991 to 2015. *Ann Intern Med.* [Epub ahead of print 19 September 2017]167:536–543. doi: 10.7326/M16-2849 https://annals.org/aim/fullarticle/2654047/state-intimate-partner-violence-related-firearm-laws-intimate-partner-homicide
[14] https://www.nytimes.com/2019/07/03/nyregion/nyc-bicycling-deaths.html

personnel to access handgun license records for a variety of purposes, including inquiries made by petitioners for an order of protection, without making these records available to the public at large.

Indeed, there is precedent for exactly this type of system, which describes how New York State manages Domestic Incident Reports. Police in New York are required to submit a detailed "Domestic Incident Report" for all domestic incidents they respond to.[15] On the standardized Domestic Incident Report form, responding officers indicate the name and address of the suspect, the nature of the relationship to the victim, whether the suspect made threats, made the victim fearful, injured the victim, has access to guns, used a weapon, the type of any weapon involved.[16] These reports are all entered into New York State's Domestic Incident Report (DIR) Repository, which is an electronic database that contains all reports from counties outside of New York City (the NYPD maintains its own system).

It's easy to understand the utility of collecting this information on a systematic basis. As New York's Division of Criminal Justice Statistics explains, the Repository "Enhances safety for all - A more complete history of suspect's reported abuse can show a pattern of incidents and escalating dangerousness/risk of dangerousness." One would also expect that this information could be of use to citizens at large who would like to know whether someone with whom they are considering becoming romantically involved has a history of domestic abuse allegations. As Huecker and Smock (2019) note, "Perpetrators of domestic violence commonly repeat acts of violence with new partners."[17]

However, as the Division of Criminal Justice Statistics explains, "The DIR Repository is for law enforcement purposes only; it is not accessible to the public."[18] Who can access the repository? "Law enforcement agencies – such as a police department, sheriff's office, district attorney's office, county probation department, parole/community supervision – and 9-1-1 Call Centers – can register to access the DIR Repository."

Here we have a clear case of the state collecting information that directly pertains to domestic violence and which could be of material value in anticipating and avoiding intimate partner violence, but the state does not make these records public, presumably because of privacy concerns. Rather, the state has judged that it is appropriate to make this information only accessible to law enforcement and the courts. It would obviously be a very strange position for the state to claim that the prevention of intimate partner violence

---

[15] https://opdv.ny.gov/public_awareness/bulletins/spring2015/nysdir.html

[16] https://www.criminaljustice.ny.gov/ojis/documents/dir.pdf

[17] Huecker MR, Smock W. Domestic Violence. [Updated 2019 May 2]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2019 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK499891/

[18] https://www.criminaljustice.ny.gov/ojis/documents/dir-repository-faq-april2016.pdf

requires disclosing the identity of handgun owners, over 99.99% of whom will never be implicated in intimate partner homicides, while it does not require disclosing the identity of those who have actually been suspects in domestic violence incidents.

Even setting aside this comparison, the benefits that Dr. Zeoli claims are advanced by Penal Law §400.00(5)(a) - namely, the ability of petitioners for an order of protection to determine whether a defendant has a handgun license - can clearly be secured without making the names and addresses of all licenses holders a matter of public record. Given that this is the case, it is my opinion that no important governmental objective is served by the disclosure requirements of Penal Law §400.00(5)(a), at least with regard to intimate partner violence.

Dr. Sege's Report and Concerns Regarding Accidental Firearm Deaths of Children

Dr. Sege argues that Penal Law §400.00(5)(a) may help to curb firearms deaths and injuries to children and adolescents, specifically by providing parents a way of inquiring into whether a handgun license has been issued to the household of a child's playmate. He speculates that a parent who looks up this information could then either prohibit his or her child from playing at that household or have a conversation to ensure that any firearms are safely stored. The theory is clear, but the evidence that disclosure of handgun license information will actually impact accidental firearms deaths through this mechanism is weak.

Dr. Sege admits that he is unaware of any research or data that demonstrates whether parents have ever searched for and used such information. Although he summarizes a number of statistics that are meant to suggest that firearms pose a serious risk to children at large, closer examination of these statistics reveals that the kinds of incidents that Dr. Sege claims that Penal Law §400.00(5)(a) can prevent are exceedingly rare. Indeed, they are so rare that knowledge of who has a handgun license is of little, if any, predictive value for parents. However, if a parent does want to know if a household in which his or her child might play has a firearm, the parent can always just ask. Ultimately, though, statistics suggest that legal firearms ownership should be among the least of parent's concerns and that many familiar activities and common household items pose a much greater risk to children.

In evaluating the role that firearms play in the death and injury of children, we must pay close attention to whether we are considering accidents, homicides, or suicides, whether we are talking about handguns, long guns, or both, and the exact age ranges in question (e.g. is it children 14 and under, or does it include "adolescents" who may be as old as 20

and eligible for military or police service or involved in violent criminal activity?). As for the specific scenario for which Dr. Sege believes that Penal Law §400.00(5)(a) can make a difference - preventing accidental deaths caused by a legally owned handgun at the house of a child's playmate - how many such deaths actually occur?

Dr. Sege repeatedly emphasizes that he has concerns with the death statistics reported by the Center for Disease Control. It's understandable that he would, as the ,'s official statistics are devastating to his argument. Dr. Sege reports that according to the CDC in 2017 "at least 115 children and adolescents younger than 20 years died as a result of unintentional firearms-related injuries" in the entirety of the United States, although a paragraph later he notes that the number for children aged 0-14 was 49 (for 2014 according to the CDC). Keep in mind that this for the entirety of the United States and includes deaths accidentally caused by both handguns and long guns. However, the CDC's database can be further sorted by state, and it tracks handguns and long gun deaths separately.

Recall that the scenario for which Dr. Sege argues Penal Law §400.00(5)(a) can potentially help prevent the accidental deaths of children concerns those killed by handguns while visiting a playmate's house in New York. So, according to the CDC how many children age 0-14 in New York have accidentally been killed by handguns? The total combined number that have occurred over the entire span of the last 19 years for which the CDC has tracked accidental handgun deaths is ___.[19] (Note that for this search I included both handgun deaths officially classified as accidents [W32] and handgun fatalities of undetermined intent [Y22] in order to be as comprehensive as possible). The number is so low that it is in fact difficult to query through the CDC database, which suppresses the display of death statistics of 9 or fewer. However, the number can be inferred by first searching for all accidental handgun deaths in New York, then searching for all accidental handgun deaths in New York for those age 15 and above, and subtracting the latter from the former.

Although there is no evidence that parents have searched for and used handgun license information, which has historically been difficult to access, one might wonder whether Penal Law §400.00(5)(a) is responsible for the low incidence of accidental deaths caused by handguns in New York. This is extremely doubtful, as the total number of accidental handgun deaths of children over the same period in New Jersey, Connecticut, and Massachusetts - three bordering states whose combined population is almost equal to New York's and which do not disclose the identity of gun owners - is the same as New York's according to the CDC.

---

[19] The CDC has a peculiar data use restriction that prohibits publishing sub-national death counts of 9 or fewer (https://wonder.cdc.gov/ucd-icd10.html). Pending clarification from the CDC Confidentiality Officer, I must err on the side of caution and not state the number directly. However, I can report that the number of accidental handgun deaths in New York from 1999-2017 was 16 and the number of accidental handgun deaths of those of age 15 and above was 15. The mathematically inclined reader can draw his or her own conclusion.

13

Note that we do not know if such deaths recorded by the CDC in New York and other states were in the narrow context of a child visiting a playmate's house and due to a handgun that was legally licensed, and there's no reason to expect that they were. Dr. Sege ends his report by asserting that the law in question would be justified if lead to the avoidance of even one child's senseless death. The CDC data provides no compelling evidence that the law could accomplish even that. Meanwhile, according to the CDC, during that same period in New York State, 1,143 children died in transport accidents, 402 died of fire or smoke inhalation, 398 died by accidental drowning and submersion, 104 children died by falling, and 50 children died of poisoning by drugs or alcohol accidentally or by undetermined intent.

It is possible that the CDC has undercounted, as Dr. Sege suggests, but even with the larger counts that he and others have proposed as sound statistics, the numbers remain uncompelling. According to a *New York Times* report, which closely examined gun deaths in five states, they identified "roughly twice as many accidental killings as were tallied in the corresponding federal data."[20] The 2015 report by Hemenway and Solnick that Dr. Sege cites comes to a similar conclusion, estimating a total of 110 unintentional firearms death in children age 0-14, which is roughly twice the CDC's reported numbers. If we indeed accept that unintentional firearms deaths of children are unreported by 50%, that would still mean that the total estimate of accidental handgun deaths of children in New York over the last 19 years would be a very small number. Moreover, that small number is a plausible estimate even based on Hemenway and Solnick's numbers.

From the CDC data we learn that slightly less than half of accidental firearms deaths among children are due to handguns (48.1%). This would imply that of the 110 unintentional firearms deaths in the US estimated by Hemenway and Solnick, 53 were due to handguns. We also learn from CDC data that out of the 257 child handgun deaths due to accidents or undetermined intent over the last 19 years nationally, the share recorded for New York multiplied by the handgun deaths estimated by Hemenway and Solnick, would suggest that about .206 should be expected to occur in New York each year. Put another way, according to this estimate, based on Hemenway and Solnick's numbers, one such death occurs about every five years in New York, and we should expect about 4 to have occured in the last 19 years. Any way one looks at this data - even the data that Dr. Sege argues is likely to be the most accurate - the numbers are extremely small.

To further address concerns about under-reporting of this data, I searched for news articles reporting accidental deaths of children by firearms in New York State. I found one

---

[20] https://www.nytimes.com/2013/09/29/us/children-and-guns-the-hidden-toll.html

incident that occurred in 2019 that would not be included in the current CDC count, which ends in 2017. A 12 year old boy obtained a handgun, which was illegally owned, in his own home and shot at a window first and then shot himself in the head.[21] Although the fact that a shot was fired before the boy turned the gun on himself would suggest a deliberate suicide, it is possible that this was an accidental death. However, given that it involved an illegally owned handgun in the child's own home, it is not a death that would have been prevented by the disclosure advocated by Dr. Sege. I also discovered an incident that took place in 2015 in which a 4 year old child shot and killed herself with a handgun in her own home in Yonkers.[22] The handgun was illegally possessed, and the mother was arrested for allegedly "allowing sales and usage of narcotics in the home as well as permitting illegal, unsecured, loaded firearms to be loaded and stored in the apartment."[23]

I also searched a database maintained by the Gun Violence Archive (https://www.gunviolencearchive.org/). According to its website, "Gun Violence Archive (GVA) is a not for profit corporation formed in 2013 to provide online public access to accurate information about gun-related violence in the United States."[24] The database reports six incidents in New York that involved the accidental death of children by a firearm. However, upon examination, four of these six were mischaracterized as accidents. Three of them were, in fact, intentional murder-suicides committed by adults and one was an intentional homicide committed by an adult.[25] Of the remaining two that were actually accidents, one involved a 9 year old who accidentally shot his brother at his own house with a handgun that was illegally owned by the father.[26] The second involved a 2 year old child who died in his own house from a handgun that was illegally owned, and reports differ as to whether the child or the father actually pulled the trigger.[27]

Another resource that I consulted was a study conducted by The Associated Press and the USA TODAY Network. As explained by those organizations, "Using information collected by the Gun Violence Archive, a nonpartisan research group, news reports and public sources, the news media outlets spent six months analyzing the circumstances of every death and

---

[21] https://www.nbcnewyork.com/news/local/Child-Shoot-Self-Head-Yonkers-Police-New-York-Investigation--508597511.html
[22] https://www.lohud.com/story/news/crime/2017/04/13/yonkers-arrest/100432580/
[23] https://www.westchesterda.net/news-and-information/current-press-releases/3170-mother-charged-with-endangering-the-welfare-of-a-child-in-the-death-of-makayla-manners
[24] https://www.gunviolencearchive.org/about
[25] https://www.nytimes.com/2018/03/14/nyregion/brownsville-brooklyn-shooting.html
https://www.wgrz.com/article/news/crime/arrest-made-in-connection-with-grape-street-shooting/71-588682910
https://altamontenterprise.com/05172019/police-investigating-murder-suicide-schoolhouse-road-home
https://www.wgrz.com/article/news/crime/arrest-made-in-connection-with-grape-street-shooting/71-588682910
[26]
https://www.syracuse.com/crime/2017/08/syracuse_2nd_grader_shot_killed_wanted_to_grow_up_to_be_a_ninja_to_protect_his_d.html
[27] https://www.democratandchronicle.com/story/news/2017/10/25/zayden-phillips-dies-from-gunshot-wound/797834001/

injury from accidental shootings involving children ages 17 and younger from Jan. 1, 2014, to June 30 of this year [2016]"[28] The Associated Press identified seven incidents that occurred in New York State, including some I have already referenced above.[29] The majority (5 out of 7) involved adolescents aged 15-17, and none of the seven incidents involved legally owned handguns.

Ultimately, I could not find a single reported case over the last 20 years of an accidental handgun death of a child that corresponds to the hypothesized scenario that Dr. Sege believes Penal Law §400.00(5)(a) is meant to prevent, namely a child visiting a playmate's house who was killed by a handgun legally licenced to a member of that household. It is possible that such incidents have occurred, but given the statistics demonstrating how rare accidental handgun deaths among children are to begin with and the fact that every recorded incident noted by prominent databases does not fit the hypothesized scenario, it would not be surprising if, in fact, the kind of tragedies that Dr. Sege want to prevent through Penal Law §400.00(5)(a) have never actually happened in New York. Of course, all of this severely undermines Dr. Sege's argument that Penal Law §400.00(5)(a) has a genuine governmental purpose of advancing the safety of citizens of New York.

To be clear, I do not mean to suggest that children are not involved in fatal firearms accidents - some 50 to 100 are each year nationally - or to belittle the tragedy of these deaths. However, the question is whether there are effective and appropriate means of preventing such deaths. The cases cited above suggest that in New York not only are such deaths extremely rare, but also that legally owned handguns are rarely if ever implicated in the few that have occurred. Burdening a quarter million law abiding handgun license owners, who will never be involved with the accidental death of a child, with disclosure in the hope of preventing a scenario that is vanishingly rare and would require elaborate and statistically uninformative discrimination by parents is not a reasonable approach to public policy.

There is an additional, glaring problem with the supposed rationale for the law that Dr. Sege articulates. He touts the "reliability" of the disclosure law for determining whether there is a firearm in a potential playmate's house. However, these records are not a reliable indicator of firearms ownership for two reasons. First, handgun owners may seek exemption from disclosure. Second, the law and records do not encompass long gun owners (*e.g.* those who own rifles and shotguns). The number of households that only own a long gun, and would thus not be disclosed by this law, is substantial. A recent Pew survey that is cited in Dr. Hamilton's report finds that 28% of gun owners do not own a handgun at

[28] https://www.usatoday.com/story/news/2016/10/14/ap-usa-today-gun-accidents-children/91906700/
[29] https://www.app.com/story/news/local/emergencies/2016/10/15/accidental-shootings-claim-ny-nj-kids/92141730/

16

all, and among those who only own one gun, 38% do not own a handgun.[30] It is thus no surprise that long guns are implicated in a substantial percentage of accidental firearms deaths of children (50.3% according to the CDC's records since 1999), and the same is true of child suicides by firearms (48.6%).

Within the state of New York, the CDC reports that long guns are in fact implicated more often in the accidental death of children than handguns (about four times as often).[31] Note that this pattern holds true of neighboring states like New Jersey, Connecticut, and Massachusetts where the names and addresses of handgun owners are not dislosed. Similarly, long guns are used more often in child suicides by firearms in New York, and again this pattern is not substantially different than New Jersey, Connecticut, and Massachusetts.[32] The data thus suggests not only that firearms deaths of children are extremely rare, but that long guns pose a greater risk to children than handguns, particularly in the northeast. If the purpose of Penal Law §400.00(5)(a) were to prevent the accidental deaths of children through the elaborate mechanism that Dr. Sege suggests, then disclosing the names and address of long gun holders would technically be more informative. In any case there is no reason, with regard to this purported rationale, that handgun owners should be disclosed and long gun owners not.

As I have already stated, I think it would be bad public policy for New York state to require that the names and addresses of everyone infected with an incurable sexually transmitted disease to be a matter of public record. Although such disclosure would likely prevent the spread of such diseases, it would be a gross violation of privacy. However, it would be even worse public policy for New York state to require, for example, that only infected women must have their identities publicly disclosed. If the rationale for disclosure is to prevent the spread of disease, that should apply equally to women and men. Similarly, if the rationale for Penal Law §400.00(5)(a) were what Dr. Sege claims it is, the law would have to be crafted differently. As it stands, the information that Penal Law §400.00(5)(a) makes available is not a particularly reliable indicator of whether a household has a firearm; and long guns, which are not disclosed, technically pose a greater risk to children. Between the number of people who illegally own handguns, the number of people who legally own handguns but have a disclosure exemption, and the number of people who only own long guns, a substantial number of gun owning households (perhaps more than 50%) will not be identifiable by Penal Law §400.00(5)(a). A parent would thus be mistaken if he or she thinks that these records are a good guide for discerning whether there is a firearm at a playmates house and any associated risk.

---

[30] https://www.pewsocialtrends.org/2017/06/22/the-demographics-of-gun-ownership/

[31] Pending clarification from the CDC's Confidentiality Officer, the numbers are too small to publish (https://wonder.cdc.gov/ucd-icd10.html).

[32] Pending clarification from the CDC's Confidentiality Officer, the numbers are too small to publish (https://wonder.cdc.gov/ucd-icd10.html).

Finally, a parent who does want to know if a household at which his or her child will play possesses a gun can simply ask. Moreover, unlike public records, asking may actually reveal information about long guns and guns that are illegally owned, which appear to predominate the few accidents that ever occur in New York. Dr. Sege cautions that such conversations could be awkward, presumably because he believes firearms ownership could be associated with social stigma. But this observation would equally counsel against exposing some quarter million legal handgun owners to stigmatization. Additionally, it's not as if parents are randomly sending their kids to play at the houses of strangers. Presumably, there will generally be some social connection and familiarity that would provide a context for asking this sort of question, which should mitigate Dr. Sege's concern.

In summary, Dr. Sege argues Penal Law §400.00(5)(a) serves an important governmental objective, speculating that it might curb accidental handgun deaths of children at the house of playmates if parents systematically searched for and used information disclosing the location of licensed handgun owners. However, there is no evidence that parents have sought and used such information; and an examination of the actual rates at which such freak accidents occur explains why parents are apparently not seeking access to this information. Accidental deaths of children by handguns in New York are vanishingly rare, much rarer than deaths of children by cars, water, fire, or even accidental falls. Indeed, there is little if any evidence that the scenario that Dr. Sege argues this law has the power to prevent has ever actually occurred in New York, and the few handgun accidents that have been publicly documented overwhelming involve handguns that were illegally owned. Thus, the purported benefits of Penal Law §400.00(5)(a) are extremely doubtful, and it's hard to see how the lack of real safety benefits could justify the disclosure of handgun license information. Moreover, parents who do want to know if there is a gun at a home at which their child plays at can simply ask, which can provide more information about long guns and illegally owned guns than Penal Law §400.00(5)(a). Given the doubtful to non-existent benefits of Penal Law §400.00(5)(a) for child safety, the burden the law places on handgun owners, and the availability of alternative and more informative means to inquire about firearms ownership, it is my opinion that Penal Law §400.00(5)(a) does not serve an important governmental objective of advancing the safety of citizens by preventing accidental deaths of children by firearms.

Dr. Hamilton and the Surveillance of Gun Owners

In addition to making the same basic argument as Dr. Sege, Dr. Hamilton suggests that Penal Law §400.00(5)(a) could enable interested parties to surveil and study handgun

owners and that this could potentially help prevent gun violence, by or against children, and encourage the vigilante enforcement of firearms laws when the state has failed to do its job.

In the first five pages of her report, Dr. Hamilton establishes that Americans own many firearms, that firearms are used more frequently in crime in the United States than in countries with low rates of gun ownership, and that gun violence against children has negative effects. However, none of these facts are in dispute, nor is it clear what relevance they have to Dr. Hamilton's argument on behalf of Penal Law §400.00(5)(a).

The crux of Dr. Hamilton's argument in favor of the law is her assertion that Penal Law §400.00(5)(a) provides information that is "vitally important to decrease the possibility of gun violence." She speculates that it could do so in three ways. The first is through the mechanism suggested by Dr. Sege, which has already been thoroughly critiqued. Second, Dr. Hamilton speculates that "teachers, school administrators, medical professionals, therapists, and many other professionals" could use this information to prevent gun violence, presumably by alerting authorities and parents if a child who is perceived to be disturbed resides at a home with a handgun license (Dr. Hamilton presents no evidence that such surveillance/warning has ever occurred). Upon scrutiny, this rationale does not provide a compelling justification for the law either.

Given that there are many ways that a psychologically disturbed child could harm him or herself or others, one would expect that those who have a professional responsibility for the care of children would intervene regardless of whether or not a household possesses a firearm. For example, if an educator believes that a child is suicidal, this is something worth mentioning to parents regardless of whether or not they have a registered handgun. However, even if it were the case that it would be valuable for certain types of professionals who are charged with the care of minors to be able to confirm whether a household possessed a firearm for some specific safety purpose - and this is a highly speculative assumption - it would clearly be feasible for the state to permit qualified professionals to access that information without making it publicly available. This could be done by contacting law enforcement, or through a channel set up specifically for this purpose.

The third way in which Dr. Hamilton speculates that Penal Law §400.00(5)(a) could decrease gun violence is by making it possible for social scientists, doctors, members of the media, and others to scrutinize and study gun owners. In particular, Dr. Hamilton suggests that such parties could review the propriety of handgun licenses, some of which could possibly have been issued in error.

19

If it's true that the state systematically fails to follow the law in granting handgun licenses, this would be reason to reform the state, not reason to burden law abiding gun owners. Indeed, it's hard to imagine that a similar logic would be applied to other rights recognized in New York. For example, there have been documented cases of abortion providers endangering the lives of women by providing substandard medical care and of violating existing law governing the timeframes during which abortions can legally be performed.[33] Surely social scientists, medical professionals, and members of the media could better understand the socio-economic conditions that give rise to abortion and assist in verifying that abortion providers are following the letter of the law, if only the state would make the name and address of every woman who receives an abortion, along with the clinic ID, a public record!

I doubt that Dr. Hamilton would find this proposal as compelling, perhaps because she believes that privacy is important for a woman's right to choose an abortion. But what about the right to keep and bear arms? The language that Dr. Hamilton uses to describe gun ownership suggests that she has a low view of it. In summarizing survey results, she writes "30% of respondents **admitted** to owning a gun, and 42% of respondents **admitted** that they lived in a home that had a gun" [emphasis mine]. "Admitting" is what someone does when he or she has committed a crime or done something that is stigmatized. Here, Dr. Hamilton's language ironically reinforces the perception that gun ownership is an improper or stigmatized activity.

Dr. Hamilton's proposal to involuntarily subject gun owners to research in a manner that does not protect their personal identity also violates long standing principles of research ethics and runs contrary to existing privacy protections that govern public health research. The kinds of studies that Dr. Hamilton suggests that Penal Law §400.00(5)(a) could facilitate would be considered "human subjects research," which normally requires the informed consent of those who are being studied.[34] It is possible that an Institutional Review Board (IRB) could provide a waiver of consent or a ruling of exemption, but privacy guarantees are generally paramount in public health research, and almost all datasets that government agencies make publicly available for research purposes are thoroughly anonymized. Moreover, if researchers wanted to conduct a compelling study of handgun licenses owners, there is an obvious solution that would respect the privacy of gun owners. The state could treat this data like it does almost every other dataset with identifying information and only permit access to qualified researchers with IRB approval who have made appropriate guarantees and taken appropriate measures to protect identifying information.

---

[33] https://www.propublica.org/article/gruesome-pennsylvania-abortion-clinic-had-not-been-inspected-for-17-years
[34] https://grants.nih.gov/policy/humansubjects/research.htm

If Dr. Hamilton would not be satisfied with such an arrangement, which would permit studies by researchers but not make data available, for example, to the media, this raises questions about what Dr. Hamilton hopes that media scrutiny and surveillance of handgun license holders can accomplish. While studies can be conducted without making the names and addresses of handgun license holders public, publicizing personal details is a tactic that media organizations may employ to name and shame gun owners. Dr. Hamilton may think that public naming and shaming of handgun owners is appropriate, but this would only serve to confirm the fears that privacy advocates have, namely that the effectual truth of this law is that it facilitates the stigmatization of law abiding gun owners.

Conclusion

In my opinion, the expert reports submitted by Dr. Zeoli, Dr. Sege, and Dr. Hamilton do not make a compelling case that Penal Law §400.00(5)(a) serves an important governmental objective.  The claims made about the benefits of Penal Law §400.00(5)(a) are highly speculative and doubtful, and the state has refused to permit similar invasions of privacy even when they promise to provide much more informative assessments of risk. Given the value our legal system places on privacy, the potential harms of disclosure to gun owners, the doubtful benefits of this law, and the state's ability to address the concerns raised by the authors through less burdensome means, it is my opinion that Penal Law §400.00(5)(a) does not serve an important governmental objective.

I hereby delcare that the foregoing is true and correct to the best of my knowledge and belief.

_____  7/23/'19