UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN DOE NO. 1; JOHN DOE NO. 2; and
NEW YORK STATE RIFLE AND PISTOL
ASSOCIATION, INC.

<em>Plaintiffs</em>,

-against-

16-CV-8191<br>KMK/LMS

PUTNAM COUNTY; and MICHAEL C.
BARTOLOTTI, in his official capacity as
County Clerk for Putnam County,

<em>Defendants</em>,

STATE OF NEW YORK ATTORNEY
GENERAL,

<em>Intervenor</em>.

---

## INTERVENOR'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF INTERVENOR'S CROSS MOTION FOR SUMMARY JUDGMENT

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendant
The Capitol
Albany, New York  12224-0341

C. Harris Dague
Monica Connell
Assistant Attorneys General, of Counsel
Telephone: (518) 776-2621 (Dague)
       (212) 416-8965

Date: March 13, 2020

**Table of Contents**

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF RELEVANT FACTS AND LEGAL BACKGROUND ........................... 4

ARGUMENT ............................................................................................ 4

LEGAL STANDARD ....................................................Error! Bookmark not defined.

POINT I ................................................................................................. 4
ABSTENTION DOCTRINES COUNSEL AGAINST EXERCISE OF JURISDICTION .... 4

POINT II ............................................................................................... 12
"UNWARRANTED HARASSMENT" IS A CATCHALL EXEMPTION THAT APPLIES
TO PLAINTIFF'S ARTICULATED THEORY OF HARM .................................... 12

POINT III ............................................................................................. 19
IF PLAINTIFF'S INJURY IS INSUFFICIENT TO QUALIFY FOR THE CATCHALL
EXCEPTION, IT IS ALSO INSUFFICIENT TO DEMONSTRATE COGNIZABLE
CONSTITUTIONAL INJURY ...................................................................... 19

POINT IV .............................................................................................. 20
PENAL LAW § 400.00(5) DOES NOT VIOLATE THE SECOND AMENDMENT ......... 20

CONCLUSION ....................................................................................... 31

# TABLE OF CASES

**Case Name**                                                                                              **Page**

Abuzaid v. Mattox, 726 F.3d 311, 317 (2d Cir. 2013)………………………………………16

Accident Fund v. Baerwaldt, 579 F. Supp. 729, 732 (W.D. Mich. 1984)…………………...11

Ashcroft v. Free Speech Coal, 535 U.S. 234, 263 (2002)…………………………………….21

Bethphage Lutheran Serv., Inc. v. Weicker, 965 F.2d 1239, 1244-45 (2d Cir. 1992)……….6

Burford v. Sun Oil Co., 319 U.S. 315 (1943)……………………………………………...5

Clapper v. Amnesty Int'l USA, 568 U.S. 398, 411-12 (2013)………………………………18

Crown Castle NG E., Inc. v. Town of Greenburgh, 2013 U.S. Dist. LEXIS 93699, at *59 (S.D.N.Y. July 3, 2013)………………….……………………………………………………..15

Doe No. 1 v. Putnam Cty., 344 F. Supp. 3d 518, 534 (S.D.N.Y. 2018)………………………1

Ernst v. Dish Network, LLC, 49 F. Supp. 3d 377, 384 (S.D.N.Y. 2014)……………………..15

Frank C. Gaides, Inc. v. Provident Life & Accident Ins. Co., 1996 U.S. Dist. LEXIS 20149 (E.D.N.Y. Aug. 26, 1996)………………………………………………………………………..13

Freeman v. Brown Bros. Harriman & Co., 250 F. Supp. 32, 34 (S.D.N.Y. 1966)……………13

Fyock v. City of Sunnyvale, 25 F. Supp. 3d 1267, 1280 (N.D. Cal. March 5, 2014)…………27

Hachamovitch v. Debuono, 159 F.3d 687, 697 (2d Cir. 1998)…………………………………6

Harris County Commiss. Court v. Moore, 420 U.S. 77, 83 (1975)……………………………10

Kachalsky v. Cacace, 817 F. Supp. 2d 235, 269 (S.D.N.Y. 2011)…………………………...6

Lake Carriers' Assoc. v. MacMullen, 406 U.S. 498, 509-512 (1972)…………………………10

Libertarian Party v. Cuomo, 300 F. Supp. 3d 424, 443 (W.D.N.Y. 2018)……………………..29

Liberty Mut. Ins. Co. v. Hurlbut, 585 F.3d 639, 650 (2d Cir. 2009)……………………………6

Marchie Tiger v. W. Inv. Co., 221 U.S. 286, 307, 31 S. Ct. 578, 583 (1911)…………………17

McDonald v. City of Chi., 561 U.S. 742, 922 (2010)…………………………………………….8

McRedmond v. Wilson, 533 F.2d 757, 761 (2d Cir. 1976)…………………………………………10

Medtronic, Inc. v. Lohr, 518 U.S. 470, 475 (1996)……………………………………………………8

Naylor v. Case & McGrath, Inc., 585 F.2d 557, 564 (2d Cir. 1978)……………………………10

Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 598 (1976)…………………………………………24

New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (1989)…...5

New State Ice Co. v. Liebmann, 285 U.S. 262, 311, (1932)……………………………………….28

Nicholas v. Bratton, 376 F. Supp. 3d 232, 270 (S.D.N.Y. 2019)………………………………..21

NRA of Am. v. Cuomo, 350 F. Supp. 3d 94, 106 (N.D.N.Y. 2018)……………………………6

NRDC, Inc. v. United States Consumer Prod. Safety Comm'n, 597 F. Supp. 2d 370, 381 (S.D.N.Y. 2009)………………………………………………………………………………………………...13

NY v. Ferber, 458 U.S. 747, 756-57 (1982)…………………………………………………………21

NY State Rest. Ass'n v. NYC Bd of Health, 556 F.3d 114, 123 (2d Cir 2009)…………………8

NYSRPA v. Cuomo, 804 F.3d 242, 259 (2d. Cir. 2015)…………………………………………..12

Onondaga Landfill Sys., Inc. v. Williams, 624 F. Supp. 25, 29 (N.D.N.Y. 1985)……………..11

People v. Battaglia, 2018 NYLJ LEXIS 2265, *8 (Queens Co. Supr. 2018)……………………6

Pirone v. MacMillian, Inc., 1989 U.S. Dist. LEXIS 7137, at *10-11 (S.D.N.Y. June 27, 1989).17

Quadir v. N.Y. State DOL, 39 F. Supp. 3d 528, 538 (S.D.N.Y. 2014)…………………………16

Ray v. City of New Haven, 2018 U.S. Dist. LEXIS 33714, at *12-13 (D. Conn. Mar. 1, 2018).21

Railroad Commission of Texas v. Pullman Company, 312 U.S. 496 (1941)………………….10

See Residents & Families United to Save Our Adult Homes v. Zucker, 2018 U.S. Dist. LEXIS 36559, at *23 (E.D.N.Y. Mar. 5, 2018)………………………………………………………...18

Soc'y for Good Will to Ret. Children v. Cuomo, 652 F. Supp. 515, 522-23 (E.D.N.Y. 1987)...10

Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016)……………………………………………19

United States v. DeCastro, 682 F.3d 160 (2d Cir. 2012)………………………………………..21

<u>United States v. Lundquist</u>, 847 F. Supp. 2d 364, 373 n.10 (N.D.N.Y. 2011)……………………13

<u>United States v. Morrison</u>, 529 U.S. 598, 618 (2000)……………………………………………….8

<u>Volvo Const. Equip. N. Am, LLC. v. Clyde/West, Inc.</u>, 26 F. Supp. 3d 1033, 1036 (W.D. WA 2014)……………………………………………………………………………………………….5

Intervenor, New York State Attorney General ("Intervenor" or "NYAG") respectfully submits this memorandum of law, the accompanying Declaration of C. Harris Dague ("Dague Decl."), the declarations of April M. Zeoli, Robert Sege and Marci Hamilton, and all exhibits thereto, in opposition to Plaintiff's ("Doe 2" or "Plaintiff") motion for summary judgment [Dkt. Nos. 98-100] and in support of Intervenor's own cross motion for summary judgment.

## PRELIMINARY STATEMENT

New York Penal Law §400.00(5)(a) is one of the interrelated provisions in New York's longstanding, multi-part scheme for regulating firearm access and use in the State. Subject to one of several statutory exceptions, the provision makes the names and addresses of all handgun permit holders in New York a matter of public record. The statutory exemptions counterbalance the government's important interests in disclosure with the licensee's rights to privacy. In content, the exemptions proceed from fact-specific, see Penal Law §400.00(5)(b)(i) – (ii), to a broad catchall exclusion for persons whom disclosure would subject to "unwarranted harassment". Id. §400.00(5)(b)(iii).

Plaintiff alleges that he fears public disapproval from "hostile" individuals but not "unwarranted harassment" should his acquaintances learn that he has a handgun. Asserting that he does not qualify for any of § 400.00(5)'s statutory exemptions, he challenges that provision as an unconstitutional burden on his Second Amendment rights.  In a prior order, this Court declined to definitively rule on Plaintiff's standing, stating that any potential distinction between Plaintiff's stated fear of "censure" and the statue's exemption for "unwarranted harassment" was a fact question to be pursued during discovery.  Doe No. 1 v. Putnam Cty., 344 F. Supp. 3d 518, 534 (S.D.N.Y. 2018) [Dkt. No. 73].

Discovery has revealed that Plaintiff—who is a resident of a conservative county, and a

member of a hunting and fishing club—has multiple gun owning friends in the community that to his knowledge have never suffered from censure. Plaintiff's specific basis for a fear of stigma is that his wife might be ostracized from her garden club, although Plaintiff has noted that "[i]f you don't have your lawn looking great, you are kind of ostracized a little bit from that club" and he has admitted that no one had ever told him that they would look unkindly upon gun ownership and that if asked if he owned a gun he would tell the truth and admit that he does. Dague Decl. Exs. 6-7 (Deposition of John Doe No, 2, dated June 4, 2019) pp. 68, 75-78, 80-81, 83).

Plaintiff tries to compensate for this lack of any concrete injury or threat of injury by relying upon purported expert testimony about partisan political divides relating to guns, and that purported expert's speculations about the partisan prejudice to which gun owners could be subject. See Intervenor's Motion to Preclude Expert Testimony of William English, Ph.D. But, as previously recognized by this Court, if Plaintiff has a legitimate question about whether such circumstances qualify for § 400.00(5)'s catch-all exemption, he may obtain a no-risk determination from state authorities on whether he qualifies for an exemption. Dkt. No. 73 at 3-4 (Karas, J.). Specifically, the handgun license application form that Plaintiff must submit gives him an "opportunity … to request an exception from his or her application information becoming public record." CITE? Section 400.00(5)(g) allows him to obtain judicial review of an unfavorable decision, with his application maintained as confidential during this process. Id.

Discovery revealed that Plaintiff failed to take advantage of this readily-available state mechanism that could have established whether the catch-all exception actually applies to him and thus potentially resolved his injury. As Plaintiff acknowledged, he never even took the basic step of examining the online license form, which would have alerted him to this remedy. Dague Decl. Ex. 8. Instead, powerful neighbors recruited him for suit seeking facial invalidation of § 400.00(5).

For three dispositive reasons, Plaintiff's motion for summary judgment must be denied and Intervenor's cross motion granted.

First, based upon the record developed through discovery, a threshold issue of jurisdiction looms over this entire matter. Plaintiff's case hinges on the meaning of § 400.00(5)(b)'s "unwarranted harassment" exemption and Plaintiff's articulation of injury. But the New York State courts have yet to interpret the scope of the "unwarranted harassment" exemption, including whether Plaintiff's proposed interpretation is correct. Accordingly, both the <u>Burford</u> and <u>Pullman</u> abstention doctrines counsel against the Court exercising jurisdiction over this matter until the State courts have an opportunity to be heard on this dispositive issue.

Second, even if the Court elects to proffer its own <u>de novo</u> statutory construction of the catchall "unwarranted harassment" exemption, rather than deferring to the State courts, Plaintiff's proposed interpretation is simply not viable. Plaintiff either qualifies under the exemption and lacks standing to sue, or has set forth an injury that is so watered down and speculative that it is not actionable. Thus, either Plaintiff has no standing to challenge the Public Disclosure Law as qualifying for an exemption, or he is not constitutionally aggrieved enough to bring suit. Either way, this Court lacks original jurisdiction over this claim.

Third, and in any event, Plaintiff's Second Amendment challenge to the longstanding statute fails on substantive grounds. During the course of discovery, Intervenor presented evidence on the important State interests that § 400.00(5) advances, including declarations from three expert witnesses who explained how § 400.00(5) works with other aspects of the state's broader scheme for regulation of firearm access and use. Dague Decl. Ex. 1-3.

Plaintiff's response to that showing rests on the statements of a purported expert, William English, who has asserted that unless § 400.00(5) "saved [at least] more lives than had died from

AIDS over the last 30 years" it cannot pass constitutional muster.  Dague Decl. Exs. 6-7 [English Dep. 161:14-22; 162:16-22; 163:1-3.

Plaintiff's three lines of attack against Intervenor's presentment of important interests – that they are "experimental", "underinclusive", and "subject to ready alternatives" [Pl. MOL Dkt. 99 at 2-3, 23] – are mere echoes of this baseless standard and a function of the unscientific and unreliable interest-balancing test employed by this expert.

The record before the Court provides incontrovertible and meaningful evidence of a substantial relationship between § 400.00(5) and at least three important State interests.  Plaintiff's facial challenge falls well short of establishing no set of circumstances for validity of §400.00(5).

## STATEMENT OF RELEVANT FACTS AND LEGAL BACKGROUND

The Court has previously summarized relevant portions of New York's Penal Law, the pertinent allegations of fact and the procedural history of the matter.  See Dkt. No. 73. Like Plaintiff ([Pl. MOL Dkt. 99 at 5]), Intervenor will not repeat that undisputed information here. Facts related to New York's three important interests are summarized throughout this memorandum [See infra Point IV], with supporting references to record evidence.

## ARGUMENT

The standards for adjudication of a motion pursuant to FRCP 56 are well-established in the Second Circuit.  See FTC v. Moses, 913 F.3d 297, 305 (2d Cir. 2019).  To prevail on a facial challenge, Plaintiff must establish that "no set of circumstances exists under which the statute would be valid under the Second Amendment".  Dkt. No. 73 at 24 (Karas, J.)

## POINT I
## ABSTENTION DOCTRINES COUNSEL AGAINST EXERCISE OF JURISDICTION

Doctrines of federal abstention create an exception to the exercise of original federal jurisdiction where important countervailing State interests are at stake. See generally, Volvo Const.

4

Equip. N. Am, LLC. v. Clyde/West, Inc., 26 F. Supp. 3d 1033, 1036 (W.D. WA 2014).

Abstention is appropriate here because this matter turns on a previously untested, threshold issue of statutory interpretation: the meaning of the phrase "unwarranted harassment" in New York Penal Law §400.00(5)(b)(iii). Plaintiff illogically argues that term should be defined narrowly to mean criminal harassment in the first or second degrees under other provisions of the Penal Law. Pl. MOL at 22, citing PL §§ 240.25, 240.26 [See also Point II infra]. In the alternative, Plaintiff insists that that "unwarranted harassment" should not be interpreted to extend to acts of ostracizing and stigmatizing. Id. He is wrong in both respects, as discussed below. See infra Point II.

But in any event, the interpretation of the statutory phrase "unwarranted harassment" is fully dispositive of the issues presently before the Court, including Plaintiff's standing to sue and/or ability to announce a cognizable injury. The New York State courts have not yet had an opportunity to address this issue of construction of the State's Penal Law. The doctrine of abstention was formulated for this very purpose – to give States the opportunity to weigh in on matters of State concern. There are two primary abstention doctrines that apply to this matter – Burford abstention and Pullman abstention.

## A. BURFORD ABSTENTION

In describing the abstention doctrine it announced in Burford v. Sun Oil Co., 319 U.S. 315 (1943), the Supreme Court has explained that where "timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings…[w]here the exercise of federal review … would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern". New Orleans Pub. Serv., Inc. v. Council of City of New Orleans[1], 491 U.S. 350, 361 (1989) (cited shorthand as "NOPSI").

---

[1] NOPSI further "distilled" Burford in an effort to announce a more workable definition of the doctrine. See Liberty Mut. Ins. Co. v. Hurlbut, 585 F.3d 639, 650 (2d Cir. 2009).

The Second Circuit has identified three factors to aid courts in determining whether federal interference would disrupt state efforts to establish coherent public policy on a matter of public interest. See Liberty Mut. Ins. Co. v. Hurlbut, 585 F.3d 639, 650 (2d Cir. 2009); citing Bethpage Lutheran Serv., Inc. v. Weicker, 965 F.2d 1239, 1244-45 (2d Cir. 1992). The Bethpage factors are: "(1) the degree of specificity of the state regulatory scheme; (2) the need to give one or another debatable construction to a state statute; and (3) whether the subject matter is traditionally one of state concern." Id. Here, each of these factors supports abstention.

### 1. Specificity of Regulatory Scheme

The first Bethpage factor looks at the specificity of the actual regulatory scheme in question, and the extent "to which the federal claim requires the federal court to meddle in a complex state scheme". Hachamovitch v. Debuono, 159 F.3d 687, 697 (2d Cir. 1998).

New York State's firearm regulation laws unquestionably constitute an interlocking and complex regulatory scheme created to address an issue of statewide public concern.[2] New York's longstanding laws and more recent amendments to those laws present the "most comprehensive and balanced answer in the nation to gun violence". People v. Battaglia, 2018 NYLJ LEXIS 2265, *8 (Queens Co. Supr. 2018), citing NY Leg. Introducer's Mem in Support, Bill Jacket, L 2013, ch 1 [Dague Decl. Ex. 10]; Matter of Douglas L. B., 44 Misc. 3d 241, 242, (Otsego Cnty. 2014).

New York employs a variety of different gun control and safety measures aimed at striking at the problem of gun violence. Kachalsky, 701 F.3d at 97; NRA of Am. v. Cuomo, 350 F. Supp. 3d 94, 106 (N.D.N.Y. 2018). These include requirements that persons acquire a license before possessing a handgun [Dague Decl. Ex. 10 citing NY SAFE Act], register any assault weapons

---

[2] New York has regulated firearms since before the Constitution was ratified, and has regulated handguns since the enactment of the Sullivan Act more than a century ago. Kachalsky v. Cty. of Westchester, 701 F.3d 81, 84 (2d Cir. 2012); See Intervenor's Rule 56.1 Statement ¶¶ 1-15.

[Id.], and report any stolen guns within 24 hours [Id.]. In addition, the state has mandated certain reporting requirements for mental health professionals [Mental Hygiene Law §9.46], and required individuals residing with convicted felons to safely store guns using specific measures [Id.]. More recently, New York has enacted a special category of protective order through which courts may suspend or remove firearm licenses from persons determined by the court to be "extreme risks" [CPLR Art. 63-A]; a prohibition on possession of a weapon on school grounds [PL §265-01(a)]; and a ban on bump stocks [PL §265-01(c)]. See Intervenor's Statement Pursuant to LR 56.1 ¶¶ 7-15. These and many other provisions make up a complex and reticulated gun control scheme codified by New York's State legislature to address what the State deems to be an issue of crucial import. Kachalsky, 701 F.3d at 97.

Plaintiff is asking the federal courts to "meddle" in this complex scheme by interpreting de novo a core term in § 400.00(5). In an effort to establish standing for this facial challenge, Plaintiff argues for an exceedingly narrow definition of "unwarranted harassment" under § 400.00(5)(b)(iii) that would change the scope of that exemption. Pl. MOL Dkt. 99 at 22. But this question of statutory construction also has ramifications for the totality of New York's firearm regulation scheme. Hachamovitch, 159 F.3d at 697. The complexity of New York's gun laws and the degree of "meddling" requested by the Plaintiff satisfies the first Bethpage factor.

### 2. **Debatable Construction**

The second Bethpage factor asks whether an exercise of federal jurisdiction would put this Court "into the business of interpreting the state regulatory regime". Hachamovitch, 159 F.3d at 698. Plaintiff's own Complaint and motion papers show that de novo statutory construction is precisely what Doe 2 seeks from this Court. Pl. MOL Dkt. 99 at 22.

Penal Law §400.00(5)(b) sets forth a series of exclusions to the public disclosure provided

7

under §400.00(5)(a). Sub-section 400.00(5)(b)(iii) states that a handgun license applicant can opt out of disclosure where there is reason to believe that "he or she may be subject to unwarranted harassment upon disclosure of such information". Plaintiff argues that the term "harassment" in § 400.00(5) should be construed as meaning criminal harassment in the first and second degrees under Penal Law §240.25 and §240.26. Pl. MOL Dkt. 99 at 22.

For a host of reasons, Plaintiff's proposed construction of the term "unwarranted harassment" is illogical and unreasonable. See Point II, infra. But the merits of that proposed statutory construction aside, it is indisputable that the Court cannot adjudicate this action without resolving this threshold issue of statutory interpretation. In claiming inapplicability of the exemption and arguing for an interpretation that serves his suit, Plaintiff has pushed statutory construction to the fore. For this reason, Plaintiff fails the second Bethpage factor.

### 3. Subject Matter of Regulations Traditionally of State Concern

The final Bethpage factor – whether the subject matter at issue is traditionally one of State concern – weighs heavily in Intervenor's favor. It is beyond dispute that gun regulation and safety is primarily a State concern for which the several States enjoy regulatory preeminence. The Supreme Court and Second Circuit have routinely and expressly recognized this very proposition. See McDonald v. City of Chi., 561 U.S. 742, 922 (2010); see also NY State Rest. Ass'n v. NYC Bd of Health, 556 F.3d 114, 123 (2d Cir 2009); Medtronic, Inc. v. Lohr, 518 U.S. 470, 475 (1996); United States v. Morrison, 529 U.S. 598, 618 (2000).

### 4. Availability of State Judicial Process

While resolution in Intervenor's favor of the three Bethpage factors alone should result in a finding of abstention by the Court, there are other considerations relevant to a Burford analysis that also cut in favor of federal abstention.

One such additional <u>Burford</u> factor is the availability of State process to resolve dispositive issues of State law. Under <u>Burford,</u> a district court may abstain from exercising jurisdiction in order to "avoid a decision of a federal constitutional question where the case may be disposed of on questions of state law". <u>Bethpage</u>, 965 F.2d at 1242. Such is exactly the situation here, where ample State process exists to determine this issue of substantial State concern.

Penal Law 400.00(5)(b) provides that the State Police must make a form which allows a licensee to request an exemption and offers "an opportunity to specify the grounds on which he or she believes his or her application information should not be publicly disclosed." The State Police form, which is itself confidential and non-public under Penal Law 400.00(5)(d), provides such a space--a literal blank where, if a licensee is not certain whether he qualifies for an exception, he can lay out his concerns and let the licensing officer decide. <u>See</u> Dague Decl. Ex. 12. Upon receiving "a request for exception from disclosure, the licensing officer shall grant such exception, unless the request is determined to be null and void" under subdivisions (b) or (c) of Penal Law §400.00(5). <u>Id</u>.

Accordingly, an applicant like Plaintiff can lay out his concerns about retaliation, censure, stigma, or discrimination; indicate that he is not certain whether the same constitutes unwarranted harassment; and request that his information be maintained as confidential. Should he be denied the exemption by county officials, he can challenge such denial as arbitrary, capricious, or contrary to law under Article 78 of New York's Civil Practice Law and Rules ("CPLR"). §400.00(5)(g). Dkt. 73 at 3-4 (Karas, J.) ("If the exception is denied, the applicant …mat seek review of that denial under Article 78 of New York's [CPLR]"). The existence of an available CPLR Article 78 process has been held as sufficient State process to invoke <u>Burford</u> Abstention. <u>See Carey</u> 727 F.2d at 245.

New York courts have not had an opportunity to weigh in on the scope and extent of § 400.00(5)'s exemptions and this question will affect the applicability of the law and thus New York's larger firearm regulation scheme.  As such, these issues should be left to New York's courts in the first instance. See Naylor v. Case & McGrath, Inc., 585 F.2d 557, 564 (2d Cir. 1978).

## B.  PULLMAN ABSTENTION

For similar reasons, the Pullman abstention doctrine applies equally to this case and likewise strongly cautions against exercise of federal jurisdiction[3].

The Pullman doctrine "rests on the desirability of avoiding unnecessary decisions of constitutional issues where there is present an unclear issue of state law that, once decided, may make it unnecessary to decide a federal constitutional question".  Soc'y for Good Will to Ret. Children v. Cuomo, 652 F. Supp. 515, 522-23 (E.D.N.Y. 1987); see also Harris County Commiss. Court v. Moore, 420 U.S. 77, 83 (1975); Lake Carriers' Assoc. v. MacMullen, 406 U.S. 498, 509-512 (1972).  Where a complaint "touches a sensitive area of social policy" and "adjudication … can be avoided if a definitive ruling on the state issue would terminate the controversy", the Pullman doctrine urges federal abstention.  Soc'y for Good Will to Ret. Children, 652 F. Supp. at 522-23, quoting Railroad Commission of Texas v. Pullman Company, 312 U.S. 496 (1941).

The three essential conditions for application of Pullman abstention are:  (1) that the State law be unclear or the issue of State law be uncertain; (2) that resolution of the federal issue depends upon the interpretation to be given to the State law; and (3) that the State law be susceptible of an interpretation that would avoid or modify the constitutional issue.  McRedmond v. Wilson, 533 F.2d 757, 761 (2d Cir. 1976) (citations omitted).  Analysis of these three factors in the instant controversy weighs heavily in favor of federal abstention.

---

[3] It is not unusual for a court to apply both the Burford and Pullman abstention doctrines simultaneously.  See Accident Fund v. Baerwaldt, 579 F. Supp. 729, 732 (W.D. Mich. 1984).

## 1.  State Law Unclear

As discussed above in Point I(A)(2), Plaintiff and Intervenor strongly disagree about the meaning and scope of the term "unwarranted harassment" in PL §400.00(5)(b)(iii). Resolution of that disagreement is a threshold and fully dispositive issue in this litigation.  See supra Point I(A). That alone satisfies the first Pullman factor.  See Accident Fund, 579 F. Supp. at 731 ("Although Plaintiffs have phrased…their cause of action in federal constitutional terms, the threshold question is whether the Accident Fund is a state agency or instrumentality; a question of state law interpretation").  Moreover, the fact that the State law in question "has never been interpreted by the state courts" is also a factor considered under Pullman.  Onondaga Landfill Sys., Inc. v. Williams, 624 F. Supp. 25, 29 (N.D.N.Y. 1985).  Policy "dictates that the state should be allowed the first opportunity to interpret its own law".  Onondaga Landfill Sys., Inc., 624 F. Supp. at 29.

## 2.  Resolution of Federal Issue Hinges on Interpretation of State Law

The second Pullman element looks at what impact a state court determination of state law would have on the outcome of the federal constitutional claims.  McRedmond 533 F.2d at 761. Where the federal claim would be "mooted or presented in a different posture by a state court determination of pertinent state law", the second Pullman element is satisfied.  Accident Fund, 579 F. Supp. at 732. This is precisely the present situation, where a state court's construction of the term "unwarranted harassment" could render Plaintiff's claim non-justiciable as lacking standing or cognizable injury in fact.  See infra Point II for further discussion.

## 3.  State Law is Susceptible to Interpretation that Modifies the Constitutional Issue

The final Pullman element concerns whether the state statute is susceptible to an interpretation that would impact the constitutional issue before the court.  McRedmond 533 F.2d at 761.  As discussed both above and below, the interpretation of "unwarranted harassment" as

used in §400.00 (5)(b)(iii) is essential to the constitutional issues before this Court.  <u>See</u> supra Point I(A); <u>see also</u> infra Point II.  Should a state court interpret the "unwarranted harassment" exemption as Intervenor has described, Doe 2 would  have no standing here.  Indeed, if "unwarranted harassment" is broadly construed it would necessarily exempt more applicants and alter the Court's analysis of the law's "burden on the [Second Amendment] right".  <u>NYSRPA v. Cuomo</u>, 804 F.3d 242, 259 (2d. Cir. 2015).

The elements of both <u>Burford</u> and <u>Pullman</u> abstention are satisfied here.  The Court should therefore abstain from its exercise of jurisdiction, and permit New York courts the first opportunity to interpret the State's Penal Law.

**POINT II**

**"UNWARRANTED HARASSMENT" IS A CATCHALL EXEMPTION THAT APPLIES TO PLAINTIFF'S ARTICULATED THEORY OF HARM**

For the reasons set forth above, this Court should permit the state courts to resolve the state-law statutory interpretation issue raised by Plaintiff. If the Court nonetheless decides to undertake a <u>de novo</u> interpretation of state law, it should adopt the logical and reasonable interpretation of "unwarranted harassment" proffered by Intervenor.  Under that construction of the term, Plaintiff's articulation of purported harm either qualifies him under for the exception – rendering him unaffected by § 400.00(5) and thus without standing to sue – or shows that his claimed injury is so minimal and speculative that it neither endows him with standing nor establishes a burden on his Second Amendment right.

**A.  <u>Application of the Canons of Construction</u>**

Intervenor proposes an interpretation of "unwarranted harassment" that gives full effect to the text and structure of both the Penal Law and the specific sub-division of §400.00(5)(b) in which the term appears.  Under this construction, the phrase "the applicant has reason to believe he or

she may be subject to unwarranted harassment upon disclosure of such information" functions as a wider ranging complement to the more specific exemptions set forth in the directly preceding sub-divisions of §400.00(5)(b). By contrast, Plaintiff proposes a construction that creates textual absurdities, is illogical, disregards the plain text to impose a highly technical meaning of the terms.

    1.   **The Context and Structure of the Sub-Division**

It is a "fundamental canon of statutory construction that that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme". <u>NRDC, Inc. v. United States Consumer Prod. Safety Comm'n</u>, 597 F. Supp. 2d 370, 381 (S.D.N.Y. 2009). Thus, "in construing a statute, a particular expression should not be detached from its context so as to give it a special meaning". <u>Freeman v. Brown Bros. Harriman & Co.</u>, 250 F. Supp. 32, 34 (S.D.N.Y. 1966). Statutory words and phrases should not be isolated so as to create variance with general purpose and spirit of the sub-section – "context and structure are … of substantial import". <u>Frank C. Gaides, Inc. v. Provident Life & Accident Ins. Co.</u>, 1996 U.S. Dist. LEXIS 20149, at *30 (E.D.N.Y. Aug. 26, 1996). Finally, "the construction of a statute that is unreasonable, illogical, unjust, unworkable, or inconsistent with common sense should be avoided". <u>United States v. Lundquist</u>, 847 F. Supp. 2d 364, 373 n.10 (N.D.N.Y. 2011).

Here, the structure of § 400.00(5)(b) supports Intervenor's construction. The list of exemptions in § 400.00(5)(b) proceeds from the most specific exceptions to the most general. Sub-section (5)(b)(i) presents five very specific statuses that implicate a fear of danger to life or safety, i.e., (i)(a) "active or retired police officer, peach officer"; (i)(b) "protected person under a…valid order of protection"; (i)(c) "a witness in a criminal proceeding"; (i)(d) "juror in a criminal proceeding"; or (i)(e) "a spouse…of a person" identified in the prior paragraphs.

Sub-section 5(b)(ii) is more general than (b)(i), as it permits the applicant to articulate other

"life or safety" concerns not contemplated in the five specific examples under (5)(b)(i). Finally, sub-section (b)(iii) sets forth the most general exemption, which applies where "the applicant has reason to believe he or she may be subject to unwarranted harassment upon disclosure of such information". Sub-section (iii) does not contemplate fear for "life or safety" at all, but rather a more generic and subjective concern about "unwarranted harassment".

Plaintiff's proposed construction jumbles the progression from specific to general in the subsections of § 400.00(5)(b). Plaintiff proposes that §400.00(5)(b)(iii)'s reference to "harassment" be defined as conduct constituting criminal harassment under Penal Law §§240.25 and 240.26. Pl. MOL Dkt. No. 99 at 22; Dague Decl. Ex. 8 [Doe 2 Dep. at 124:2-8]. But criminal harassment in the Penal Law contemplates specific incidents of physical abuse such as strikes and kicks and threats to safety by repeated following or annoying. PL §§240.25 240.26. Thus, under Plaintiff's theory, the exemptions in subsection 400.00(5)(b) would progress from specific categories of life or safety concern under § (b)(i), to more general life or safety concerns under §(b)(ii), and then back to the most specific examples of threats to life and safety—i.e., the types of strikes, shoves and physical contact contemplated under the criminal harassment statutes. This structural flow is illogical and also redundant, as the types of threats to life or safety that qualify as criminal harassment would be already reportable under §(b)(ii) – making §(b)(iii) wholly superfluous.

### 2. Colloquial/Common Sense Meaning

Statutory language should be construed according to its common meaning, without resorting to a forced or artificial construction. Freeman, 250 F. Supp. 32, 34 (S.D.N.Y. 1966). Words should be given meanings that "avoid absurd results" and are not "contrary to reason". Ernst v. Dish Network, LLC, 49 F. Supp. 3d 377, 384 (S.D.N.Y. 2014). Moreover, "giving effect

to all words of a statute is a cardinal principal of statutory construction". <u>Crown Castle NG E., Inc.</u> <u>v. Town of Greenburgh</u>, 2013 U.S. Dist. LEXIS 93699, at *59 (S.D.N.Y. July 3, 2013).

The common or colloquial definition of "harassment" is "behavior that annoys or upsets someone".  https://dictionary.cambridge.org/dictionary/english/harassment (last accessed March 5, 2020).  The colloquial definition of "unwarranted" is "not having a good reason and therefore annoying or unfair".  https://dictionary.cambridge.org/dictionary/english/unwarranted (last accessed March 5, 2020).  The colloquial meaning of the term "unwarranted harassment" is thus akin to baseless behavior that annoys or upsets someone.  This is a more open ended, general type of conduct than that contemplated under PL 400.00(5)(b)§§(b)(i) or (b)(ii), both of which require a fear for "life or safety".

Applying the colloquial definition of "harassment," sub-section (iii) encompasses a more general category of misconduct than the specific "life or safety" exceptions in sub-sections (b)(i) and (b)(ii).  Thus, where an applicant does not meet the highly specific status-based fear for his life or safety under §(b)(i), and cannot articulate a perceived generalized threat to his "life or safety" under §(b)(ii), he can still apply for an exemption under §(b)(iii), where he deems there to be a different type of risk or threat.  <u>See</u> Dague Decl. Ex. 12 [State Police Exemption Form].

Plaintiff's construction of the term "harassment" to reference only specific criminal conduct under Penal Law §§240.25 and §240.26 (Pl. MOL Dkt. 99 at 22; Dague Decl. Ex. 13 English Rpt. at 3) both disregards the common sense meaning of the word, and creates a <u>per se</u> textual absurdity. By its terms §(b)(iii) implicates "unwarranted harassment".  But there is no such thing as "warranted" criminal harassment under Penal Law.  Thus, if the court were to define "harassment" as contemplated under Penal Law §240.25 and 240.26, the Legislature's use of the term "unwarranted" is rendered redundant.  Indeed, Plaintiff's proffered interpretation asks the

Court to simply disregard the Legislature's use of the term "unwarranted" all together. That is contrary to basic principles of statutory construction. <u>Crown Castle,</u> 2013 U.S. Dist. LEXIS 93699, at *59.

### 3. Implication from Legislative Silence

Additionally, Plaintiff asks the Court to read language into the law and to disregard the plain import of Legislative silence. It is axiomatic that where the "legislature had intended the statute to include the matter in question, it would have been easy for them to have said so expressly and included it". McKinney's Statutes §74; <u>see also</u> <u>Abuzaid v. Mattox</u>, 726 F.3d 311, 3s17 (2d Cir. 2013); <u>Quadir v. N.Y. State DOL</u>, 39 F. Supp. 3d 528, 538 (S.D.N.Y. 2014).

Sub-section (b)(iii) does not say "harassment, as defined in sub-sections 240.25 and 240.25". The Legislature was silent as to the definition of the term "harassment". This silence denotes an intention for the term to be construed in a colloquial or common-sense manner. Plaintiff's construction requires the Court to disregard the Legislature's silence and to impose a technical definition of the term not stated by the Legislature.

Throughout the Penal Law, where the Legislature wanted to define a specific term or reference a separate provision of the law, the Legislature expressly stated this. Section 400.00(5)(b), for example, states that "upon discovery that an applicant knowingly provided false information, such applicant may be subject to penalties <u>pursuant to section 175.30 of this chapter</u>". <u>Id</u>. (emphasis added). The Legislature could have but did not limit the definition of "harassment" in the way that Plaintiff advocates. This Court should not disregard that choice.

### 4. <u>Harmonization with Penal Law</u>

Plaintiff's proposed construction is also inconsistent with the rest of the Penal Law. When construing statutory terms or undefined words, the proper interpretation depends on the meaning

of the whole act.  See McKinney's Statutes §97; see also NRDC, Inc., 597 F. Supp. 2d at 381.  Constructions that promote "harmony with the other provisions of the act" are favored.  Marchie Tiger v. W. Inv. Co., 221 U.S. 286, 307, 31 S. Ct. 578, 583 (1911).  Different parts of the same act should be construed together and in light of one another.  Pirone v. MacMillian, Inc., 1989 U.S. Dist. LEXIS 7137, at *10-11 (S.D.N.Y. June 27, 1989).

The term "harassment" appears frequently throughout the Penal Law, and in ways that do not implicate criminal harassment under PL §240.25/26—thereby undercutting Plaintiff's argument that the reference to "harassment" term in § 400.00(5)(b)(iii) must be construed to have that specific meaning.  For example, PL §242.05 uses the term "harassment" in a manner not contemplating the definition of criminal harassment under PL § 240.25/.26, providing that "[a] person is guilty of interference, harassment or intimidation of a service animal when he or she commits an act with intent to and which does make it impractical, dangerous or impossible for a service animal to perform its assigned responsibilities of assisting a person with a disability").  The same is true of PL §240.32, which provides that "[a]n inmate or respondent is guilty of aggravated harassment of an employee by an inmate when, with intent to harass, annoy, threaten or alarm a person" he causes the person to come into contact with enumerated fluids or materials.  Another example can be found in PL §215.51, which provides that "[a] person is guilty of criminal contempt in the first degree when: with intent to harass, annoy, threaten or alarm a person for whose protection such order was issued, [he or she] repeatedly makes telephone calls to such person…"

Application of these well established and fundamental principles of statutory construction demonstrates that Intervenor's interpretation of "unwarranted harassment" as a general, catchall exemption is far more viable then Plaintiff's narrow and technical criminal definition.  And Intervenor's logical and reasonable construction of the exemption leaves Plaintiff with no standing.

## B.  Plaintiff Has No Standing to Sue Under the Catchall Exemption

If the Court applies Intervenor's proper construction of the "unwarranted harassment" exemption, Plaintiff's articulation of his perceived harm from public disclosure may qualify him for an exemption[4]. And if Plaintiff is exempt from public disclosure, he is not harmed by the statute and thus has no standing for suit.  A party invoking federal jurisdiction "bears the burden of establishing standing".  Clapper v. Amnesty Int'l USA, 568 U.S. 398, 411-12 (2013).  A plaintiff cannot create his own constitutional injury by not accessing the statutory protections available to him or by failing to avoid said injury.  See Residents & Families United to Save Our Adult Homes v. Zucker, 2018 U.S. Dist. LEXIS 36559, at *23 (E.D.N.Y. Mar. 5, 2018) ("Plaintiffs do not establish an injury in fact, because the option remains open to them to comply with the Regulations and thus avoid penalties"); see also Clapper, 568 U.S. at 416 ("[R]espondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending").

Plaintiff claims that if his personal identifying information were disclosed, he and his family "would be subject to unwanted attention and censure" by community members who are "hostile to gun and gun owners".  Dkt. No. 101-1 at ¶ 7; Dkt. No. 1 at ¶ 25. He cites a purported expert opinion that he could be subject to criminal conduct and discrimination.  See Dague Decl. Ex. 13 at 2-3.  Under Intervenor's common sense and logical construction of § 400.00(5)(b)(iii), a person who had such fears could explain those on an application for the "unwarranted harassment" exemption, and would likely qualify for the exemption if he could demonstrate that those fears were concrete rather than speculative. Dague Decl. Ex. 12.  Plaintiff cannot manufacture standing by simply disregarding the exemption.

---

[4]  If plaintiff does not qualify for the exemption because his claimed concerns are too minimal and speculative, he also would lack Article III standing to sue, see Point III, infra.

**POINT III**

**IF PLAINTIFF'S INJURY IS INSUFFICIENT TO QUALIFY FOR THE CATCHALL EXCEPTION,  IT CANNOT DEMONSTRATE CONSTITUTIONAL INJURY**

The only reason why Plaintiff's concerns of harm would not qualify for the catchall exemption under Intervenor's interpretation of § 400.00(5)(b)(iii) is if his concerns are so minimal and speculative that they also do would not constitute a cognizable injury in fact sufficient to give him standing to sue.  He cannot have it both ways – minimize his purported injury to claim it does not constitute "unwarranted harassment", while simultaneously claiming that his injury is constitutionally cognizable.

Article III of the U.S. Constitution limits the federal judicial power to cases and controversies. Clapper, 568 U.S. at 408.  One "element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue".  Id. at 408 (citations omitted).  To establish Article III standing, a plaintiff must demonstrate, inter alia "injury-in-fact, which means an actual or imminent and concrete and particularized harm to a legally protected interest".  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016).  In this context, concrete "means it must actually exist" and be "actual or imminent, not conjectural or hypothetical".  Id.  Injuries that rely on attenuated theories of future possibilities are not concrete.  Clapper, 568 U.S. 398, 414 (2013).

The only specific examples of "unwanted attention and censure" Plaintiff provides revolve around his unfounded fear that his wife could potentially be ostracized from his town's Garden Club [Dague Decl. Ex. 8  Doe 2 Dep. at 80:5-17], or that he will lose "standing" in his community [Id. at 124: 10-15] or among his "circles of friends" Id. 75:20-24].  He concedes that he does not have any firm evidence of exclusion from the garden club or loss of community standing.  Id. at 78:8-19.  He acknowledges that community members can be ostracized for many different reasons – including things as trivial as "if you don't have your lawn looking great".  Id. at 80: 10-13.  In

his motion, Plaintiff bases his theory of ostracism on his expert's claim that guns are a politically hot button issue. Dague Decl. Ex. 13 [English Rpt. at 2-5]. Yet, Plaintiff's expert admits that he conducted no research into gun ideologies in Putnam County and had no data as to Putnam County's position on guns. Dague Decl. Exs. 6-7 [English Depo. at 256:2-25; 257-262]. In fact, Plaintiff's expert did not even know what county Doe 2 resides in and was unsure if the county was considered to be upstate or downstate NY or its overall political ideology. Id.

Moreover, despite his purported fears of being ostracized, Plaintiff admits that regardless of the public disclosure requirements, if he owned a handgun and was asked about it by a community member, he would answer truthfully. Dague Decl. Ex. 8 at 80:18-22. Ironically, he even concedes that he shares the Legislature's concerns about children accessing handguns at playmates' homes and that his wife calls to ask about handgun ownership before his own children attend playdates. Id. at 77:7-21. Finally, Plaintiff's fears rest on a highly attenuated chain of contingencies that rely on a chain of intervening acts – such as someone requesting his personal information and alerting community members of the results. Clapper, 568 U.S. at 410, 414.

Plaintiff's concerns may be appreciable, or they may be minimal, but they cannot be too minimal to qualify under the "unwarranted harassment" exemption and yet sufficiently substantial to constitute a cognizable injury in fact. Whichever way, Plaintiff does not have standing to assert a justiciable case or controversy.

## POINT IV

## PENAL LAW § 400.00(5) DOES NOT VIOLATE THE SECOND AMENDMENT

Should the Court decide to assume jurisdiction over this case, Plaintiff cannot satisfy his burden of demonstrating "no set of circumstances under which the [Public Disclosure Law] would be valid" as required in this facial challenge. Dkt. No. 73 at 24. The Court has previously

announced that the question of the law's constitutionality under the Second Amendment is to be controlled by intermediate scrutiny[5]. Id. at 28, citing New York State Rifle & Pistol Ass'n, Inc., 883 F.3d at 62. Under such scrutiny, Intervenor must establish the existence of a "substantial or important" governmental objective and a "reasonable, but not perfect, fit" between the challenged law and the asserted objective. Id. at 29. Promoting public safety has been routinely recognized as an important or legitimate governmental interest for intermediate scrutiny analyses. See Nicholas v. Bratton, 376 F. Supp. 3d 232, 270 (S.D.N.Y. 2019) (Oetken, J.); see also Ray v. City of New Haven, 2018 U.S. Dist. LEXIS 33714, at *12-13 (D. Conn. Mar. 1, 2018), collecting cases. In addition, protection of minors from violence and abuse has been widely recognized as a "compelling" interest. see e.g. New York v. Ferber, 458 U.S. 747, 756-57 (1982) ("A State's interest in 'safeguarding the physical and psychological well-being of a minor' is compelling."); Ashcroft v. Free Speech Coal, 535 U.S. 234, 263 (2002) (O'Connor, J., concurring) ("The Court has long recognized that the Government has a compelling interest in protecting our Nation's children.").

### A. Intervenor Has Proffered At Least Three Important Interests Linked to § 400.00(5)

Intervenor has developed a record illustrating multiple important governmental objectives with a substantial relationship to § 400.00(5). Those interests are: (1) avoiding and/or reducing accidental handgun related deaths and injuries to children; (2) helping reduce or avoid injury and/or death from handgun related domestic violence through the availability of gun ownership information and; (3) providing access to gun ownership data in order to act as a check on

---

[5] Given the facts developed in discovery, the interpretation of § 400.00(b)(iii) urged by Intervenor, and the fact that Plaintiff could have applied for an exemption without risking perjury, see § 400.00(5)(c)-(g), it is Intervenor's position that §400.00(5) does not substantially burden Plaintiff's Second Amendment rights and should not be subject to heightened scrutiny. United States v. Decastro, 682 F.3d 160, 164 (2d Cir. 2012). Intervenor proceeds with heightened analysis here for the sake of argument, given the Court's prior order.

government action and to aid research and prevent harms associated with gun violence.  Dague Decl. Exs. 1-3[6]; Sege Declaration Ex. A; Hamilton Decl. Ex. A.; Zeoli Decl. Ex. A.

In light of space limitations, only a brief summary of Intervenor's three expert opinions is set forth herein.  A more complete recitation is set forth in Intervenor's Statement of Material Facts, and each expert's report and salient portions from their deposition testimony have been provided separately to the Court.  See Id.

Dr. Robert Sege: Dr. Sege posits that § 400.00(5) is one reliable mechanism that parents can use to inquire into the likely presence of handguns at their child's playmate's homes.  Sege Decl. Ex. A at 6.  Dr. Sege notes the tragedy of death and serious injury to children and adolescents from unintentional firearm incidents in the United States – and the prevalence of such deaths and injuries occurring at a friend's home.  Id. at 4.  In addition, suicide is among the leading causes of death of adolescents and young adults and the availability of firearms to children, who can be impulsive, can lead to an increased likelihood of suicide. Id. at 3. As a result of the dangers to children and adolescents, the AAP "urges parents to ask about the presence of firearms in the homes where children play".  Id. at 5.

Based on his experience as a treating pediatrician and discussions with parents, Dr Sege acknowledges that despite their best intentions, asking about the presence of guns in a playmate's home "can be difficult or awkward" and thus "may be avoided" by parents.  Id. at 6.  Further, he points out that even when a discussion on the topic is ventured, there is no assurance that the question would be answered accurately.  Id.  Dr. Sege explains that § 400.00(5) provides one avenue for parents to "identify potentially dangerous situations", and thus serves the profound interest of protecting the safety of children and adolescents.  Id.

---

[6] Handguns have long been particularly regulated by New York due to their concealability and disproportionate use in crime. See Kachalsky v. Cacace, 817 F. Supp. 2d 235, 269 (S.D.N.Y. 2011), aff'd, Kachalsky, 701 F.3d 81.

Dr. April Zeoli:   Dr. Zeoli, is considered one of the nation's leading experts on the intersection between intimate partner violence and gun policy.  Zeoli Decl. Ex. A. at 1.  Dr. Zeoli opines that § 400.00(5) provides one mechanism for victims of intimate partner violence to access more complete and reliable information regarding whether their abusers own handguns.  Id.  This information, in her opinion, can be useful to the victim in seeking firearm restrictions in orders of protection under New York law.  Id.

Dr. Zeoli notes that 25% of women and 10% of men in the U.S. "have been stalked or experienced sexual and/or physical violence committed by an intimate partner in their lifetime".  Id. at 3.  She notes that 3.4% (or 32,900 cases annually) of nonfatal intimate partner violence victimizations involve a firearm.  Id.  Moreover, she cites data illustrating that "when a violent male intimate partner has access to a gun, the risk of homicide to the female partner is five times greater" than when there is no firearm access.  Id. at 4.  Dr. Zeoli notes that under New York's protective order law, to obtain a firearms restriction on an order of protection, a petition bears the burden of demonstrating a "risk of future firearm violence".  Id. at 2.  Inclusion of firearms restrictions in orders of protection "has been associated with reduction" in intimate partner homicide and injury.  Id. at 4.  In Zeoli's opinion, § 400.00(5) provides intimate partners with one means to identify their abuser's likely access to handguns, so as to substantiate such arguments when seeking orders of protection. Id.  In this respect, Dr. Zeoli opines that § 400.00(5) serves New York's important interest in protecting public safety[7].  Id.

Professor Marci Hamilton: In Professor Hamilton's expert opinion, § 400.00(5) advances the compelling state interest of providing: (1) parents information to protect their children from the dangers of gun access; (2) teachers, school administrators, medical professions, therapists and

---

[7] Dr. Zeoli's opinion is echoed by the NY Legislature in passage of the SAFE Act.  Dague Decl. Ex. 10 at 61-62.

other professionals information regarding gun availability to children at risk of either domestic violence or children suffering from mental issues, and; (3) the public, social scientists, the medical professionals and the media with information to access future risk and study why gun tragedies occur. Id. at 7.

Professor Hamilton's expert report contains statistics and data regarding the presence and impact on minors of having guns in the home. Id. Based on data and studies, Professor Hamilton opines that § 400.00(5) advances the State's interests in increasing fire-arm safety and decreasing harm to children. Id. at 8. She notes that due to the complexity of the issues surrounding guns, the Legislature cannot be expected to solve all problems with one piece of legislation but must act incrementally through measures like § 400.00(5), to address the State's compelling interests. Id.

Further, Prof. Hamilton opines about the beneficial and important uses of publicly available firearms data to monitor and police the government's licensing function, to identify when dangerous or prohibited people possess licenses, and to study the causes and effects of gun violence. Such information has been used in numerous cases to identify misconduct by licensing officials and instances where dangerous prohibited persons were nevertheless given or retained firearms licenses. Id. pp. 7-8, citing various news articles; See also Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 598 (1976).

**B. Plaintiff's Attacks on the State's Important Interests Are Baseless**

Plaintiff devotes most of his memorandum of law in support of summary judgment to attacking Intervenor's articulation of the important interests justifying § 400.00(5). See Pl. MOL Dkt. No. 99. He advances three separate arguments in a vain attempt to discredit Intervenor's experts and the myriad data and studies they each rely upon in rendering their opinions. Specifically, Plaintiff argues that Intervenor's governmental interests are: (1) "experimental" or

"invented post hoc"; (2) "underinclusive", and; (3) subject to "ready alternatives".  Id. 2-4, 23-25.

Before analyzing the specific flaws in Plaintiff's three arguments against the State's interests, it is important to understand that all of these arguments are rooted in the same flawed "cost-benefit" analysis proposed by Plaintiff's "expert[8]" witness, Dr. William English.  See Dague Decl. Ex. 13 [English Rpt. at 1] and Exs. 6-7 [English Dep 114:9-22; 115:1-19].   Under this "analysis", Dr. English defined the "costs" of § 400.00(5) as the impact on handgun owners' privacy, and the "benefits" of the law as the number of deaths of New York minors and domestic violence victims, "homicide rates and that sort of thing"[9].  Id. [English Dep. 144:7-22; 145:1-17].  He utilizes his "cost-benefit" analysis as the lynchpin to his ultimate conclusion that the law "does not serve an important governmental objective" and thus Dr. Sege's, Dr. Zeoli's and Professor Hamilton's opinions regarding the value of § 400.00(5) must be rejected.  Dague Decl. Ex. 13 [English Expert Rpt. at 21].

According to Dr. English and his "cost-benefit" analysis, New York's stated interests cannot be deemed "important" enough to outweigh the cost to gun owners' privacy until the State can demonstrate that more minors or domestic violence victims have died as a result of handguns than have died from AIDS over the last 30-years.  Dague Decl. Ex 6-7 [English Depo. 159-163].

> Q [AAG Dague]: What I'm wondering is by proposing that [cost-benefit analysis], you must have a line where you believe the benefits outweigh the cost.  And what is that line that the state would have to hit for you to change your opinion?
>
> A [Dr. English]:  Sure.  So if it – if it saved more lives than had died from AIDS over the last 30 years, then it would at least be above the standard that we've already stated.  It at least has to exceed that standard. Id. [161:7-18]
> …
> Q [AAG Dague]:  So in order for you to change your opinion, the State would have to

_____

[8] Intervenor has also filed a Motion to Preclude the report and testimony of Dr. William English on grounds that his proffered opinions fail the test for admissibility under Fed. R. Ev. 702 and 703.
[9] Inexplicably, despite all three of Intervenor's experts' premising their conclusions not just on homicide rates but on injuries to minors and domestic violence victims, Dr. English simply disregarded the injury category in his "cost benefit" analysis.  Dague Decl. Exs. 6-7 [English Dep. 145:18-22; 146-149].  His disregard of injuries appears based on his overly simplistic conclusion that death is more severe and final than injury.  Id. 149:4-21.

demonstrate that on a national level that more people have died from domestic – just died – from domestic violence and/or unintentional gun deaths of children than how many died from AIDS over the last 30 years to justify this law, is that fair?

A: [Dr. English]:  I would say at least – so this is a – a lower boundary, at least, given our existing legal – yeah.  Id. [162:16-22; 163:1-3].

Pursuant to U.S. Centers for Disease Control and Prevention ("CDC") data, since 1985 approximately 675,000 have died from HIV/AIDS in the United States.  See www.cdc.gov/nchhstp/newsroom/docs/factsheets/todaysepidemic-508.pdf (last accessed March 9, 2020).  Essentially, under Dr. English's opinion, § 400.00(5) cannot be considered to serve an important governmental interest unless the State demonstrates that Penal Law 400.00(5) has prevented at least 675,000 deaths.  This is an absurd position.  See McDonald, 561 US 742 (2010) (Second Amendment analysis does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise").

### 1.  The State's Interests are Not "Experimental"

In asserting that Intervenor's statements of governmental interest are "experimental" (see Pl. MOL Dkt. 99 at 2-3), Plaintiff emphasizes that Intervenor's experts do not have data showing how many people have accessed public disclosure information to avoid harm to a minor or domestic violence victim.  Id. at 23.  But requests for information under § 400.00(5)(a) are made to the County-level authorities that maintain this information, and thus such documentation is not centrally available to anyone—including the State and its experts. Plaintiff's insistence on a showing regarding this unknowable data point creates an impossible burden on the State that is not required by intermediate scrutiny.  Intermediate scrutiny does not require the State to demonstrate the "exact effect the law may have".  Fyock v. City of Sunnyvale, 25 F. Supp. 3d 1267, 1280 (N.D. Cal. March 5, 2014).  How many individuals have accessed public disclosure information and

successfully headed off a tragedy is neither known nor knowable, as such information would require an ability to see an alternate reality wherein a tragedy was not averted. Moreover, data on how many individuals accessed PL §400.00(5) for these purposes is not available. Dague Decl. Ex. 3 [Zeoli Dep. 131:18-25; 132:1-14].

Plaintiff further argues that the governmental interest in the safety of minors is "experimental", relying on Dr. English's claim to have found only one case of an unintentional gunshot fatality in New York in the last twenty years. Dague Decl. Ex. 13 at p. 13. But this claim is false and misleading. First, despite the fact that Dr. Sege relied on both fatalities and injuries to minors in his report, Dr. English concedes that he simply did not study the numbers of injuries caused by unintentional gunshots. Dague Decl. Exs. 6-7 [English Dep. 145:18-22; 146-149:1-12]. Second, Dr. English inexplicably selected 14 years of age as his age cut-off point, despite the fact that Dr. Sege relied upon data and studies that looked at minors under 20 years old. Sege Decl. Ex. A at 4. Third, Dr. English artificially limits his data to NY State only – but the NY Legislature is not limited solely to safety issues it observes within its own borders. https://www.nysenate.gov/legislation/bills/2013/s2230 (last accessed 3/10/2020) (noting NY Legislature's consideration of national gun violence statistics). Fourth, Dr. Sege relies on CDC data demonstrating at least 115 deaths to children from unintentional fire-arm related injuries in 2017, and he demonstrates that this number may be significantly higher due to State reporting errors. Sege Decl. Ex. A at 4. Finally, English's data is just wrong – Intervenor identified two such tragedies in New York alone in just a seven-year period. Dague Decl. Exs. 4 and 5.

The irony of Plaintiff's argument that the State's concern over the safety of minors from unintentional gunshots injuries or death is "experimental", is that Plaintiff himself contradicted this claim. Plaintiff testified that information about gun ownership is important information that

he and his wife would like to have before his own children go to a friend's home to play, that his wife asks playmate's families this question and he would answer this question truthfully if asked, undercutting his own allegation of fear of ostracism. Dague Decl. Ex. 8 [Doe 2 Dep at 77:10-21].

Finally, even to the extent the Court were to consider § 400.00(5) as a more experimental aspect of New York's larger gun paradigm, it is important to acknowledge that such should not be fatal to the law. As articulated by Justice Brandies:

> To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country…If we would guide by the light of reason, we must let our minds be bold.

New State Ice Co. v. Liebmann, 285 U.S. 262, 311, (1932) dissent, Brandeis, J; see also McDonald v. City of Chicago, 561 U.S. 742, 785 (2010)("[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment.").

## 2. The State's Interests are Not "Underinclusive"

Plaintiff argues that § 400.00(5) is "underinclusive in reporting firearm ownership" such that it cannot be relied upon to serve the government's goals. Pl. MOL Dkt. No. 99 at 4, 23. This argument stems from the fact that PL §400.00(5) does not encompass information regarding long guns or handguns possessed illegally. Id. at 11. This argument misconstrues the scope and intent of § 400.00(5) and Intervenor's experts' characterization of its impact.

As noted above, New York's Public Disclosure Law is but one element in a much larger, complex scheme enacted to combat the multi-front issue of gun violence. See supra Point I(A)(1). There is no requirement under intermediate scrutiny that a law on its own prevent all gun violence. As represented by all three of Intervenor's expert witnesses, PL §400.00(5) functions together with a larger network of options to promote public safety. Sege Decl. Ex. A; Zeoli Decl. Ex. A;

Hamilton Decl. Ex. A.

Plaintiff's "underinclusiveness" argument wrongly presumes that § 400.000(5) is invalid unless it addresses every conceivable angle of the State's interests. This is not the applicable standard on a facial challenge, whereunder Plaintiff must establish "no set of circumstances … under which the statute would be valid" to prevail. Dkt. No. 73 at 24 (Karas, J.). Moreover, to succeed under intermediate scrutiny, the State need only demonstrate a substantial relationship between the law and the stated interests – not a "perfect fit". <u>Libertarian Party v. Cuomo</u>, 300 F. Supp. 3d 424, 443 (W.D.N.Y. 2018) ("So long as the Defendants produce evidence that fairly supports their rationale, the laws will pass constitutional muster").

### 3. The State's Interests are Not "Subject to Ready Alternatives"

Plaintiff claims that the State's interest in protecting minors and individuals at risk for domestic violence are not valid justifications unless there are no "readily available alternatives to serve these same purposes". Pl MOL Dkt. No. 99 at 23. He argues that parents do not need public disclosure to determine the presence of a handgun in a playmates' home because they can simply ask about handgun ownership. <u>Id</u>. at 13. And he argues that intimate partners do not need disclosure to track a partner's access to handguns for protective order because a judge can conduct such research during a protective order proceeding. <u>Id</u>. at 17. Neither of these purported alternatives address the underlying state interest sufficiently.

As opined by Dr. Sege, the issues with relying exclusively on parental inquiry into the presence of handguns are: (1) discussions between parents as to the presence of guns in a home can be "difficult or awkward and thus may be avoided despite a parents' best intentions" [Sege Decl. Ex. A at 6]; (2) even where such discussions are had, there is no way to ascertain the veracity of a parents' representations. <u>Id</u>. In Dr. Sege's opinion, Section 400.00(5) is one reliable

mechanism for parents to inquire in a less awkward manner.  Id.

As Dr. Zeoli explained, a judge inquiring as to gun licensure is not a suitable alternative to the intimate partner having his/her own access.  Dague Decl. Ex. 3 [Zeoli Dep. at 73-85].  In New York, a court can include a "firearm restriction" in an order of protection where a petitioner proves a "substantial risk that the respondent may use or threaten to use a firearm…against the person" seeking the protective order.  Zeoli Decl. Ex. A at 2.  Dr. Zeoli notes that where a protective order did not initially contain a firearm restriction, § 400.00(5) is a useful tool for concerned intimate partners to track whether their abuser later obtained a handgun.  Dague Decl. Ex. 3 [Zeoli Dep. 75-80].  Information documenting that the abuser later obtained a handgun would alert the intimate partner of a need to go back to Court to seek amendment of the protective order.  Id.  It is unreasonable to expect that the court is monitoring every subject of every protective order and will sua sponte amend protective orders as needed.  Id.

Further, as Dr. Zeoli observed, it is incumbent upon a petitioner seeking a protective order to provide evidence to substantiate a request for a firearm restriction.  Id. at 82-85.  A petitioner or his/her legal representative should have access to the information to present their case to the judge, particularly when the consequences of error are potentially dire.

In sum, Plaintiff does not offer ready alternatives to what § 400.00(5) offers.  He presents ineffective options that were directly considered and rejected as flawed by Intervenor's experts.

## CONCLUSION

For the reasons set forth herein, Plaintiffs' Complaint must be dismissed in its entirety

and Intervenor's motion for Summary Judgment granted.

Dated: Albany, New York
March 16, 2020

                                                LETITIA JAMES
                                                Attorney General of the State of New York
                                                Attorneys for Intervenor
                                                The Capitol
                                                Albany, New York 12224-0341
                                                By: S/ C. Harris Dague
                                                C.Harris Dague*
                                                Monica Connell
                                                Assistant Attorneys General, of Counsel

                                                *admitted pro hac vice*

To:    Plaintiff's Counsel (via CM/ECF)
        Defendant's Counsel (via CM/ECF)