# Exhibit 6

# Alderson®

## COURT REPORTING



**A Trustpoint Company**

Transcript of **William E. English, Ph.D.**

Friday, September 13, 2019

*Doe No. 1 et al v. Putnam County et al*

Alderson Court Reporting
1-800-FOR-DEPO (367-3376)
Info@AldersonReporting.com
www.AldersonReporting.com

Alderson Reference Number: 88181

CONDENSED COPY

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF NEW YORK

 3                 Civil Action No. 7:16-cv-8191

 4    - - - - - - - - - - - - - - - - - - - x

 5    JOHN DOE NO. 1; JOHN DOE NO. 2; and    :

 6    NEW YORK STATE RIFLE AND PISTOL        :

 7    ASSOCIATION, INC.,                     :

 8          Plaintiff,                       :

 9                 v.                         :

10    PUTNAM COUNTY, and MICHAEL C.          :

11    BARTOLOTTI, in his official capacity   :

12    as County Clerk for Putnam County,     :

13          Defendants.                      :

14    - - - - - - - - - - - - - - - - - - - x

15                 Friday, September 13, 2019

16        Deposition of:  WILLIAM E. ENGLISH, Ph.D.,

17    called for examination by counsel for Defendants,

18    pursuant to notice, at the Law Offices of Cooper &

19    Kirk, 1523 New Hampshire Avenue, NW, Washington,

20    D.C., commencing at 9:36 a.m., before Barbara A.

21    Huber, CSR and Notary Public in and for the

22    District of Columbia
```

Page 2

1  APPEARANCES:
2    On behalf of Plaintiffs:
3      CHARLES J. COOPER, ESQUIRE
4      DAVIS COOPER, ESQUIRE
5      Cooper & Kirk, PLLC
6      1523 New Hampshire Avenue, NW
7      Washington, D.C. 20036
8      202.220.9600
9      ccooper@cooperkirk.com
10     dcooper@cooperkirk.com
11
12   On behalf of Defendants:
13     C. HARRIS DAGUE, ESQUIRE
14     MONICA A. CONNELL, ESQUIRE
15     State of New York
16     Office of the Attorney General
17     The Capitol, Albany, New York 12224 -- and
18     28 Liberty Street, New York, New York 10005
19     518.776.2621; 212.416.8965
20     harris.dague@ag.ny.gov
21     monica.connell@ag.ny.gov
22        * * * * *

Page 3

1      C O N T E N T S
2  EXAMINATION BY:                         PAGE

3  Mr. Dague                     4
4  Ms. Connell                  328
5
6
7
8  DEFENDANTS' DEPOSITION EXHIBITS:        PAGE
9  1 - Rebuttal Report              12
10 2 - Curriculum Vitae             41
11 3 - Article by Iyengar and Westwood        240
12 4 - Online Article from Poststar.com       286
13 5 - Online Article from NBCNewYork.com     286
14 6 - Article from Annals of Internal Medicine   297
15
16
17
18
19
20
21
22

Page 4

1          P R O C E E D I N G S
2  Whereupon,
3        WILLIAM E. ENGLISH, Ph.D.,
4  was called as a witness and, having been first duly
5  sworn, was examined and testified as follows:
6        EXAMINATION BY COUNSEL FOR DEFENDANTS
7  BY MR. DAGUE:
8    Q   Good morning, Dr. English.  How are you?
9    A   Good morning.  Very well.  Thank you.
10   Q   We met a few minutes ago off the record.
11 Let me formally introduce myself.  My name is
12 Harris Dague.  I'm an Assistant Attorney General
13 with the State of New York, out of our Albany
14 office.
15        I'm joined by my colleague, Monica
16 Connell, to my left.  She is an Assistant Attorney
17 General Special Counsel with the State of New York
18 out of our New York City office.
19        Nice to meet you, sir.
20   A   Likewise.
21   Q   Have you ever been deposed before?
22   A   I have, yes.

Page 5

1    Q   Okay.  I'm going to ask you about that in
2  a few minutes, but let me run through some rules
3  and things that'll maybe make this go smoother and
4  get us both out of each other's hair sooner rather
5  than later.
6    A   Great.
7    Q   You probably know these if you've been
8  deposed, so don't worry about it if you know them
9  already.  I'm going to ask you a series of
10 questions today.
11       Can you provide me with verbal answers?
12   A   Yes.
13   Q   Okay.  Barbara, the court reporter here,
14 is taking down everything we say.  To the extent
15 you nod or provide an "uh-huh," which is common
16 parlance, it's harder for her to take down so we
17 try to get a clean transcript.  By the same token,
18 let's both try not to talk over one another.  I
19 know that is very tempting, especially as the
20 afternoon wears on and my questions get less and
21 less sharp and you know where I'm going.  If we do,
22 your counsel or I'll just remind you,

Page 6

1  non-insultingly, that, okay, let's try not to talk
2  over each other here.  And I --
3      A    Sounds good.
4      Q    -- will try to do the same.  I could be
5  guilty of it as well.
6          If you don't understand my question,
7  please ask me to rephrase it.  You're not going to
8  insult me in any way.  Sometimes questions are
9  ill-formed, especially when talking about kind of
10 complex data and things of that nature.  So just
11 ask me to make sure you understand the question or
12 ask me to rephrase it.
13         If you answer a question, is it fair for
14 me to assume that you understood the question?
15     A    Right.  Yes.
16     Q    Okay.  This is not a quiz.  I'm not here
17 to trick you.  So, again, if you think a question
18 doesn't make sense or sounds tricky, just let me
19 know that and I'll rephrase it, because that's not
20 the goal.  We all want a clean transcript that we
21 can use.
22         As your counsel probably advised you,

Page 7

1  breaks are fine.  The only thing I would ask is if
2  you do want break, a bathroom break or something,
3  just let's not take one when there's a question
4  pending.  Answer the question.  Let me know.  Take
5  a break.
6          I try to take a five-minute break every
7  hour or so anyway, just to stretch out, you know,
8  use the bathroom, get fresh.
9          Okay.  Could you just state your full
10 name for the record, Doctor?
11     A    Yeah.  William Edward English.
12     Q    Okay.  And are you a Ph.D.?
13     A    I am.
14     Q    In what?
15     A    My Ph.D. is in political science.
16     Q    Okay.  And did you meet with counsel in
17 preparation for today?
18     A    Yes.
19     Q    How many times?
20     A    Oh, I don't remember off the top of my
21 head.  We probably had at least two phone calls and
22 at least one in-person discussion.

Page 8

1      Q    And just to be clear, I'm not asking you
2  to testify as to the content of those discussions,
3  just the time generally.
4          Who was present when you met in person?
5      A    Two counsels to my right.
6      Q    Referring to Davis and Chuck Cooper?
7      A    Yes.
8      Q    And who was present when you were on the
9  telephone -- two phone calls, if you know?
10     A    I believe it was the same two counsels.
11 And I believe there was a third lawyer.  Perhaps
12 Pete.
13     Q    Okay.  And do you know if this third
14 lawyer worked with Mr. and Mr. Cooper?
15     A    Yes.  At this same firm.
16     Q    At any time during these prep sessions
17 did you review any materials?
18     A    What do you mean by review materials?
19     Q    Did any of your counsel provide you with
20 documentary records to review in preparation for
21 the deposition?
22     A    Oh, yeah.  They provided me, I believe,

Page 9

1  documents that had already been from the court, and
2  explaining the judge's initial decisions.
3      Q    Okay.
4      A    And then they provided me with the expert
5  witness reports that I was asked to comment upon.
6      Q    Okay.  And did they provide you,
7  obviously, with a copy of your expert report in
8  this matter to review as well, prior to this
9  deposition?
10     A    Yes.
11     Q    Did they provide you at any time with a
12 copy of the civil complaint in this action?
13     A    Yes.
14     Q    And when I say civil complaint, do you
15 know what I mean by that?
16     A    I believe so.
17     Q    Okay.
18     A    If I -- if I've understood that correct,
19 this is the -- the initial objection to this law,
20 and then, as well, the judge's -- whatever stage
21 it's at right now.  My recollection is that running
22 through the arguments of the case, the potential

Page 10

1  focal points and -- and questions that have been
2  identified.
3     Q   Okay.  So fair to say that you saw a
4  document called "complaint," which you understand
5  to be the document that initiated this lawsuit
6  challenging the law, and you saw, at some point, a
7  determination or decision from a judge in this case
8  that went through the issues and arguments and made
9  a rule?
10    A   Yes.  I -- I definitely saw the latter.
11 I -- I believe the -- the complaint may have been
12 summarized in that latter statement.  I'm not sure
13 if --
14    Q   Sure.
15    A   -- was a separate PDF or --
16    Q   Do you review civil complaints frequently
17 in your field?
18    A   I do not.
19    Q   How many civil complaints would you
20 estimate you've reviewed in your -- in your
21 professional --
22    A   And by reviewed --

Page 11

1     Q   -- career?
2     A   -- just to clarify, you mean read, seen,
3  offered a professional opinion on?
4     Q   How about offered professional opinions
5  on.
6     A   Yeah.  Probably one other.
7     Q   Okay.  In preparation for the issuance of
8  your expert report, did you meet with anyone
9  associated with the National Rifle Association?
10    A   I did not.
11    Q   In preparation for your deposition
12 testimony today, did you meet with anyone
13 associated with the National Rifle Association?
14    A   And just to be clear, associated, what
15 does associated --
16    Q   Sure.  That's a fair question.
17    A   I -- I gather, from the conversation
18 earlier, that Mr. Cooper has done work with the
19 NRA.  Does that make him an associate?
20    Q   Sure.  That's fair.  That's a very fair
21 question.  And I will -- let me rephrase.
22        In preparation for your deposition today,

Page 12

1  did you meet with any officials of the NRA?
2     A   No.
3     Q   In preparation for your expert report,
4  did you meet with any of the named Plaintiffs in
5  this lawsuit, either John Doe Number 1 or John Doe
6  Number 2?
7     A   I did not.
8     Q   Have you ever met John Doe Number 1 or
9  John Doe Number 2, as they are styled in this
10 lawsuit?
11    A   I have not.
12        MR. DAGUE:  If you would mark that as
13 Defendants' Exhibit 1.
14        (Defendants' Deposition Exhibit No. 1
15        marked for identification.)
16 BY MR. DAGUE:
17    Q   Dr. English, I've handed you what's been
18 marked as Defendants' Exhibit 1.  I'm going to ask
19 you just to take a brief look at that, familiarize
20 yourself with it.  I'm, obviously, going to have a
21 lot of questions on that particular document
22 throughout the deposition, but at this point I just

Page 13

1  want you to identify it.
2     A   Yes.  This is my expert witness report.
3     Q   Okay.  And that's the report that you
4  drafted and submitted in this action, right?
5     A   That is correct.
6     Q   And this report that you're looking at
7  constitutes your entire expert opinion in this
8  matter?
9     A   I was the -- my entire opinion on what I
10 was asked to do, which is to evaluate the three
11 expert witness reports --
12    Q   Sure.
13    A   -- that I was given.
14    Q   And at this point, what I meant by that
15 is there's no supplemental --
16    A   There's not --
17    Q   -- to this?
18        So at this point, there's no supplements
19 or amendments to this document that you know of?
20    A   Correct.
21    Q   Okay.  Did anyone assist you with the
22 creation of this report?

Page 14

1      A    To be clear about --

2      Q    Yeah, let me be clear.  I'm not looking

3  for any specific details, what -- if counsel

4  assisted you with creation of this, so let me

5  specify.

6          Did anyone non-counsel to you in this

7  action assist you with the creation of this report?

8      A    No.

9      Q    You don't have any research assistants

10  that assisted you on this?

11      A    Not on this, no.

12      Q    Does this report include your opinions

13  with respect to the questions that counsel asked

14  you to respond to?

15      A    It does.

16      Q    And this report was issued on or about

17  July 23rd of 2019; is that fair?

18      A    Yes.

19      Q    And since July 23rd of 2019, do you have

20  any amendments or changes that you'd like to offer

21  to this report at this point?

22      A    No.

Page 15

1      Q    Okay.  So as this report stands currently

2  in Defendants' Exhibit 1, you stand by all the

3  conclusions and opinions you issued in this report,

4  fair?

5      A    Yes.

6      Q    What do you consider to be your field of

7  expertise?

8      A    So I'm a social scientist by training.

9  And my dissertation -- as long-standing interest,

10  I'll say the methodological foundations of social

11  science.  So my dissertation examined the strengths

12  and weaknesses of different methodological

13  approaches, approaches and statistics, formal

14  modeling.  And I'd say the -- the one thing that

15  has defined my scholarly arc has been thinking

16  about how do we -- how do we do good public policy,

17  think about social phenomenon in the most

18  comprehensive and informative way, and how do we

19  integrate data and analysis into those evaluations.

20          And a concern, for me, can run two ways.

21  I think there's a lot of bad social science; there

22  is, there's a lot of ways in which -- you know,

Page 16

1  sometimes intentional, sometimes not intentional --

2  people misuse or misunderstand data.

3          And so a -- a good portion of my work has

4  been to take studies, and often important studies,

5  and examine their underlying data or methods or

6  statistical approaches, and to try to evaluate

7  their conclusions in the light of their particular

8  claims as well as in light of larger say public

9  policy, debates that they feed into.

10          So I think of myself as a methodologist,

11  someone who's interested in public policy.  And my

12  work has also examined problems of institutional

13  failures, institutional design, role of informal

14  norms, informal institutions.  And I'm in a -- in

15  the department of -- of ethics, economics, and

16  public policy.  So I'd say, you know, in sum,

17  I'm -- I'm a methodologist interested in the use of

18  evidence in the social sciences, and the

19  implications on policy.

20      Q    Do you find, in your professional career,

21  that a lot of social science, say prior to your

22  engagement in the field, didn't or doesn't rely on

Page 17

1  data enough?

2      A    Oh, no, the question is not whether

3  people rely on data enough.  I think there's

4  certainly some areas of public policy where

5  historically we haven't had good data, and -- and

6  there's many attempts to increase our data.  And

7  those are generally I think good developments.  I

8  think the -- the larger challenge for many social

9  scientists is there's a desire to be scientific, a

10  desire to use data, but it's actually very

11  difficult to do that well.

12          And so, you know, colleagues and I

13  debate -- sometimes jokingly -- but I -- I -- in my

14  own opinion, probably the majority of say published

15  social science research.

16          And so there's been these replication

17  crisises (sic) that you may know in the

18  psychological sciences.  Many findings, many

19  experiments, many statistical conclusions we

20  haven't been able to replicate.

21          And I'd say this feeds into criticisms

22  I've been concerned about or criticisms that I've

Page 18

1  made for the last decade that there's a variety of
2  statistical ways that people can reach conclusions
3  they'd like to reach without really being rigorous
4  in alternative explanations. I mean rigorous
5  about, you know, different modeling approaches.
6         And so to answer your question, I think
7  in the social sciences, there's a lot of misuse of
8  data. And that's my con -- my primary concern, is
9  that, you know, how -- you know, what really is the
10  most important data that bears on this question:
11  How can we best reason with and about it.
12     Q   Are there areas that you found -- strike
13  that.
14         Have you found generally in the social
15  science area that data is harder to come by than in
16  other research areas because of the nature of --
17  because of the natures of the questions studied in
18  social sciences?
19     A   I -- you might have to rephrase that.
20     Q   Sure.
21     A   Are you saying -- and just as a time
22  point, you're saying more recently has data --

Page 19

1     Q   Yeah, more --
2     A   -- been known?
3     Q   -- recent.
4     A   Just to clarify, to make sure I
5  understand the question, it's about whether data
6  has become more or less difficult to obtain in
7  certain areas of the social scientists?
8     Q   Let me ask you -- let me rephrase.
9         Certainly in other fields, like the
10  medical field --
11     A   Uh-huh.
12     Q   -- or other scientific fields, do you
13  find that data is generally more available in those
14  fields than in more generic social science-type
15  fields?
16     A   It's a very hard question to answer in
17  the abstract. You know, on the one hand -- so I
18  have friends that study political psychology and
19  they look at Twitter posts. And if you study
20  Twitter, there are literally trillions of data
21  points now you can use.
22         So in some areas of the social sciences,

Page 20

1  because of digital technologies, there's been a
2  wealth of data. In other areas of the social
3  sciences -- I have friends that study lobbying and
4  money in Congress. And what I hear from them is
5  the way deals are actually done are not things that
6  show up on campaign contribution disclosures.
7  They're things that happen over dinners. And so
8  that data is hard to get.
9         So I -- I think it's very particular to
10  the question you're asking, whether or not there's
11  been a dearth or a -- a wealth of data. But I'd
12  say social scientists have been thinking more in
13  recent decades of how do you get data that's
14  appropriate for the question you're asking.
15     Q   Are there areas or topics that you have
16  studied in your career where data points are
17  immeasurable, there is no data for certain reasons?
18     A   Sure. There's many questions you could
19  ask where you begin by realizing if I really wanted
20  to answer that question, there's certain data I
21  want which I can't find publicly now. And then you
22  think of other ways that -- sometimes you can

Page 21

1  approximate that data. And then sometimes you can
2  get at it directly.
3         But I mean to put a finer point on it, I
4  mean there's the old joke about, you know, people
5  only find their keys under the -- the lamp lights
6  in the street. And I'd say many social scientists
7  focus on the data at hand, when, in fact, I mean in
8  trivial manner, arguably most of the questions we
9  want to ask, we don't have great data for. And
10  it's probably for good reason.
11         Because a lot of -- you know, there's,
12  you know, all sorts of things I'd like to study,
13  which would mean a enormous -- a violation of, you
14  know, person's privacy, person's, you know,
15  personal life. And at the end of the day, you
16  know, certain fields where that's highly recognized
17  or -- you know, medicine and whatnot.
18         And for social scientists, it's always
19  the default, that, you know, sometimes if there's a
20  very important public policy question, you look for
21  creative ways to get data. But certainly the --
22  the vast array of human affairs, you know, social

---

Page 22

1 scientists don't always have that luxury of being
2 able to treat somebody like an experiment or petri
3 dish --
4    Q   Right.
5    A   -- or invade their lives to get whatever
6 information they'd like.
7    Q   Have you ever conducted a study where you
8 didn't have the data points you wanted so you
9 theorized or had to theorize based on the data you
10 did have?
11   A   So all studies involve theorizing.  And I
12 think it's -- you theorize sometimes with better
13 evidence and data to support you, sometimes with
14 less evidence.
15       So I'd say a theory is a -- a theory is
16 always there.  You know, there's always a question
17 of reasoning within the -- you know, best evidence
18 you have, both theoretical inferences and
19 speculations as well as, you know, data that may or
20 may not, to some different degrees, be relevant to
21 some underlying question.
22   Q   How many currently outstanding or

Page 23

1 incomplete -- incompleted research projects are you
2 working on now, if you know?
3    A   Oh, well, I'll -- I'll interpret the term
4 "projects" here widely.  So, you know, there are
5 things that I'd like to write some day, things that
6 I have a paragraph on, there are things that are 90
7 percent written.  I'd say there's -- is at least a
8 dozen papers that I'm working on that are in
9 various degrees of completion, and at least two
10 book projects that are in different degrees of
11 completion.
12   Q   And do you -- other than your research
13 work right now, do you have any other current jobs?
14   A   The -- so my -- my primary job, I'm a
15 professor -- assistant professor at Georgetown
16 University.  The -- I run a very small business.
17 Business is an exaggeration, because it doesn't
18 really make money.  But an online dossier service
19 for academics.
20       So that would -- so, for example, if
21 somebody has confidential letters of
22 recommendation, they can solicit that from the

Page 24

1 professor.  It gets online into our site.  And we
2 can send it out to them on their behalf.
3        I'm a member -- the Senate confirmed me
4 this summer to serve on the National Endowment for
5 Humanities.  So we have three meetings a year for
6 that.  I think that's -- and then -- yeah, those
7 would be the core professional --
8    Q   Sure.
9    A   -- activities that I engage in.
10   Q   What do you -- what do you teach as an
11 assistant professor at Georgetown?
12   A   So we have an undergrad core course for
13 our business MB -- our business undergrad
14 students.  The title is now called Ethical Values
15 of Business:  Politics, Regulation, and Corporate
16 Governance.  And later this fall, in our second
17 mod, I'll also be teaching an MBA course, for our
18 second-year MBAs, on principal leadership.
19   Q   And the -- the first class you mentioned,
20 not the -- not the MBA course --
21   A   Right.
22   Q   -- the first class, is that for undergrad

Page 25

1 students?
2    A   That is.  Yes.
3    Q   Okay.  And real generally --
4    A   Uh-huh.
5    Q   -- can you give me a few sentence, one
6 sentence, three thousand foot flyover, as to what
7 material you cover in that undergrad class?
8    A   Yeah, so --
9    Q   And I promise I won't provide this to
10 your students to present --
11   A   Oh, I can --
12   Q   -- if there's any --
13   A   -- as -- I could give you 12 hours of the
14 summary.
15   Q   Not looking for that.
16       MR. CHUCK COOPER:  Nor is counsel.
17       MR. DAVIS COOPER:  Nor counsel.
18       THE WITNESS:  So the course thinks about
19 the relationship between economics and politics at
20 the highest level.  We consider problems of
21 collective action, problems that occur within the
22 firm, the problems that occur within the larger

Page 26

1 society.

2    So we examine a variety of corporate

3 failures. We look at regulatory approaches to try

4 to deal with that. We look at also issues within

5 firms, how you motivate, manage, surveil people.

6 We look at a variety of whistleblower programs,

7 ways to try to increase ethical accountability. We

8 deal some, near the end of the course, with

9 contemporary policy debates, about the business and

10 place in society, some questions of, you know, use

11 of digital technology, use of data.

12    So it's -- it's, generally speaking, I

13 think of it as a business ethics course, but which

14 cashes out in a variety of particular theoretical

15 controversies and dilemmas in -- in economics and

16 political science and -- and issues of regulation.

17    Q   And have you started teaching this

18 semester --

19    A   I have --

20    Q   -- yet?

21    A   -- yes.

22    Q   Okay. Are you teaching mostly the

Page 27

1 economics majors?

2    A   So they're actually business school --

3 they -- our students will apply to the business

4 school when they go to Georgetown. So they'll --

5 they'll be business school students who might be

6 majoring in a variety of finance, accounting,

7 although we do allow students to enroll in the

8 college, so I will have some government majors,

9 some economic majors and that sort of thing.

10    Q   Any law taught in that course?

11    A   Yes. I mean we -- we go over a variety

12 of, you know, regulatory -- well, a history of

13 certain regulations. And we'll -- we'll read a --

14 some cases, and so there -- there is some law

15 taught.

16    Q   Okay. I want to turn back to your 1 2 or

17 so outstanding research projects, for a little bit

18 of follow-up questions.

19    Are you currently researching the impact

20 of firearms laws in the United States at all?

21    A   Yeah. One research project I just

22 started -- well, I shouldn't say -- maybe a few

Page 28

1 months into it. You know, there's obviously a

2 controversy over the effect -- a long-standing

3 controversy over the effect of concealed carry

4 laws. And some -- a very interesting recent study

5 came out which seems to me to have two glaring

6 methodological problems. And I think this study

7 will -- I mean it's an ambitious study, so it will

8 get attention. And I'm very interested to see what

9 it'll look like if you correct for these issues.

10    Q   Okay. You said you started that research

11 project a few months ago?

12    A   Yeah, I'm gonna think of -- that's a -- I

13 means that's -- it's a long standing interest.

14 I've only been thinking about this for -- for ten

15 years, but the -- I started that one probably six

16 months ago or so that I actually, you know, on a

17 systematic basis started looking, you know, and

18 saying, well, how I might have approached -- on a

19 systematic basis, I started asking how I might

20 approach data gathering.

21    Q   Now, you said that is a long-standing

22 interest, is that -- you just said that was a --

Page 29

1 it's a --

2    A   Yeah --

3    Q   -- long-standing --

4    A   -- yeah.

5    Q   -- interest?

6    Approximately ten years?

7    A   Yeah, that's probably right.

8    Q   And what do you mean by that? This

9 particular concealed carry issue was a

10 long-standing interest, or is it more generally?

11    A   I'd say more general. So there's a -- a

12 guy at Harvard named Steven Pinker, who is a famous

13 psychologist there. And he has a book. Came out a

14 few years ago called -- I think it's "The Better

15 Angels of our Nature." And he documents it in this

16 huge secular -- by secular, I mean over time --

17 decline in rates of violence in the modern world,

18 roughly in the -- the last 400 years, but

19 particularly since World -- the end of World War

20 II.

21    And so I'd say there's this ongoing

22 debate in the social sciences, like have people

Page 30

1  become less violent?  Is it technology?  Do we have
2  more cameras?  So what's responsible for it?
3  Because -- I mean one part -- in Pinker's telling,
4  he thinks this is --
5          MR. DAVIS COOPER:  You may want to slow
6  the pace --
7          THE WITNESS:  Ah.
8          MR. DAVIS COOPER:  -- of your speaking
9  down just --
10         THE WITNESS:  I'm sorry.
11         MR. DAVIS COOPER:  -- a bit.
12         THE WITNESS:  It got me excited.
13         MR. DAVIS COOPER:  She's gotta get every
14  word you say and it's --
15         THE WITNESS:  Right.
16         MR. DAVIS COOPER:  -- pretty difficult,
17  so --
18         THE WITNESS:  Yes.
19         So the question is, what explains this.
20  And Pinker identifies a variety of things.  But in
21  Pinker's telling, he thinks this is a -- a product
22  of a variety of cultural forces and economic

Page 31

1  conditions that really were kind of.  We can coast
2  and things are gonna just increasingly get better.
3  And I'd say critics of Pinker's say, well, maybe
4  not; things could get more violent.
5          And I thought even since the book's come
6  out, I think that there's been, you know, a variety
7  of things around the world -- terrorist attacks --
8  that have made people question, you know, what are
9  the sources of violence, what are the criminal
10  technologies, the social conditions, the economic
11  conditions.
12         So I'd -- I'd this is a big question the
13  social scientists, a lot of people, write about and
14  think about.  And, you know, the United States --
15  you know, obviously this is a hot button issue to
16  deal with all the Second Amendment stuff, but it
17  strikes me as there are these, you know, historical
18  debates.  People are very partisan on every side
19  about this.
20         But if you could actually do really good,
21  you know, really detailed data doing work on this,
22  I think it could make a contribution, so --

Page 32

1      Q   So your current work or study in the
2  concealed carry is, this is kind of as an off-shoot
3  of that larger question, potentially?
4      A   It is.  And -- and just tangentially,
5  it's -- it's also a project which I only want to be
6  working on after I've received tenure, because of
7  the potential -- you know, it's something which,
8  you know, as you know, is a -- a thing in which
9  some people find controversial to work on.  People
10  have partisan interest on it.
11         So, you know, it -- it was -- you know,
12  plenty of people kinda would say, you know, nod and
13  wink, you don't work on something this
14  controversial until you've got a tenure.
15         So I -- I'm very much, you know, you
16  might say, you know, kind of self-sensitive on that
17  to say it's a long-standing interest, but I -- I
18  can't really touch this until -- in a big way until
19  I know I have like a protection for it.  If
20  somebody gets mad at it, I don't need to worry
21  about it.
22      Q   Has anyone at Georgetown -- in the

Page 33

1  Georgetown administration expressed that opinion to
2  you directly?
3      A   They don't know about my interests in
4  that, so no, they haven't.
5      Q   Who funds that research project that
6  you're working on?
7      A   So right now -- so -- so Georgetown
8  itself provides us with a -- a research budget.
9  And the -- at this point, the -- as far as the
10  research I've done, has come out of my Georgetown
11  budget, there -- I've mentioned this, however, to
12  other people.
13         And so there are -- like we had -- the
14  last spring at Georgetown, I had -- two of my
15  students in my fall class were research assistants
16  for me, so -- and these are Georgetown-funded.  So
17  on -- you know, I would tell it -- at one point I
18  told them I'd like to look up some of these
19  numbers, you know, state by state in concealed
20  carry.  And we ran out of time, but had some of
21  them do that.
22         I had mentioned this summer to some other

Page 34

1 students, you know, I'm interested in looking at
2 this. And one of those students did begin to -- to
3 help me look up some of these numbers. But the --
4 as far as my own research on this, it's entirely
5 Georgetown-funded.
6     Q   Okay. What type of data -- what type of
7 data are you pulling with respect to the concealed
8 carry --
9     A   Oh, yeah.
10    Q   -- issue at this point that --
11    A   Yes, it -- briefly, to give you the
12 overview of this. It -- the way a lot of people
13 have conceptualized the analysis of these laws is
14 you either have a state that's pro carry or anti
15 carry. So the way I think puts into, it's either a
16 zero or a one.
17        And one thing that struck me as odd is
18 when you actually look -- like a state like
19 Massachusetts, it's not a -- it's -- it's not a
20 shall carry state, so it has relative -- you know,
21 it's counted as a zero. But if you look at the
22 numbers, it's actually a remarkably high percentage

Page 35

1 of the population has concealed carry permits.
2 Because, you know, all the people in mid -- middle
3 Massachusetts, western Massachusetts, they're a --
4 I -- I forget how it works in Massachusetts, but I
5 believe there's some local discretion by sheriffs
6 or something like that.
7        So I -- I'm not gonna remember the number
8 off the top of my head, but I wanna say something
9 like 6 or 8 percent of the population concealed
10 carry permits in Massachusetts.
11        And it occurred to me what would be a
12 more rigorous econometric setup is if you can go
13 state -- state by state and not only look at
14 numbers of permits or percentage of the population
15 with permits, but also look at over years how those
16 have changed. Because econometrically, you want
17 variation, is what helps you, you know, essentially
18 estimate how these changes might work on those
19 changes.
20        So the -- what I'd like to do at some
21 point is look at all the 50 states. And there's
22 probably with some of them -- some of them won't

Page 36

1 have these records available. Some of them have
2 now so-called -- well, open carry or permitless
3 carry. But there's also ways you can impute based
4 on states where you do have good data, good
5 estimates to those.
6        But the idea is to get state -- year by
7 year, state by state concealed carry numbers, which
8 will allow you to do just much more rigorous,
9 highly powered econometric inference on their
10 effects on crime, their effects on suicide, their
11 effects on all these sorts of things.
12    Q   And just a brief follow-up, you had
13 mentioned there is a more recent study covering the
14 concealed carry that has, in your mind, too many
15 primary flaws.
16        Could --
17    A   Yeah.
18    Q   -- you tell me what you believe those
19 primary flaws are?
20        And let me just add to that.
21    A   Yeah.
22    Q   I don't know your field, right. So are

Page 37

1 there any proprietary interests in you testifying
2 about noncompleted research that you're concerned
3 about? Because if so, we can place this transcript
4 under some sort of -- that portion of the
5 transcript under confidentiality.
6     A   None in that I'm --
7     Q   Okay.
8     A   -- concerned about.
9     Q   Fair enough.
10    A   So I mean -- I mean the first -- the
11 first flaw, in my mind, is the -- the binary
12 coding, wherein it should be feasible to get these
13 numbers state by state.
14        And the -- and part of that -- and the
15 second flaw is how it -- so there's -- there's a --
16 the -- a method he uses in this study that -- to
17 put it delicately, it -- it -- it -- it literally
18 involves making up data to look like -- so -- so
19 you have this question of you try to create
20 artificial control states that would mirror the
21 states you have data on. And so the -- the
22 approach is sometimes called synthetic control

William E. English, Ph.D.

Washington, DC

Page 38

1 analysis.

2    Q    Uh-huh.

3    A    And the problem is you're literally

4 fabricating data. So you're saying, you know,

5 suppose we have a date -- a -- a state that looked

6 this much like Massachusetts, this much like New

7 York, this much like California, this much like

8 Maryland. We create this Frankenstein state, and

9 then compare that on average to this state.

10 It's -- it's made up data.

11       Again, and there are -- there are

12 circumstances where that's entirely appropriate

13 because of limitations on data and the counter

14 factuals you're exploring.

15       In my mind, what -- and part of the

16 reasoning pursues that is because of this binary

17 coding. You don't have that much variation. If

18 you're able to get state by state, year by year,

19 then you can do a variety of conduct -- econometric

20 techniques, including one. It's sometimes called

21 differences and differences, where you -- you know,

22 you're able to tell by year difference changes,

Page 39

1 both in the crime rates and the concealed carry

2 rates.

3       And you also have these big

4 discontinuities. When a law is first passed, it

5 allows this. And so I -- in my -- I -- I believe

6 it's a much more rigorous econometric approach that

7 you can employ at a methods level and then also

8 this -- either flubbing the data itself.

9    Q    Thank you.

10       Will this -- this project is -- in your

11 mind, will it result in a scholarly paper or a

12 book?

13    A    I hope a paper.

14    Q    Okay. Do you currently have any

15 published writings, finalized research in the areas

16 of gun control, gun laws, or the gun debate?

17    A    I have not published anything that --

18 that primarily looks at that. There is -- there's

19 at least one other project I -- I -- I was telling

20 you when I was doing a lit review, I came across a

21 recent study -- just came out last year -- by some

22 people at NYU, in a surgery journal of all places.

Page 40

1 And it had to do with from assault weapon, assault

2 weapon bans, and mass shootings.

3       And I was looking at -- into the paper.

4 And -- and they had a statistic on the front page

5 about -- I -- I'm paraphrasing -- something like 76

6 percent of mass shootings are committed with

7 assault rifles. And that struck me as really --

8 I -- you know, I -- I know these numbers a little

9 bit. And that couldn't be right.

10       So I went and looked at their data. And

11 I ended up emailing them. I said, Can I get your

12 code? And it turns out they had mis-quoted in the

13 datasets that they were -- they were, you know,

14 counting numbers of a -- of assault weapons and --

15 in fact, they used the term "semi-automatic" as one

16 of their coding things, which meant every

17 semi-automatic pistol in the entire dataset was

18 counted as one of these.

19       And so I think I may submit a little --

20 it turns out when you code it right, there's also

21 some interesting results. And I may write that up

22 now.

Page 41

1    Q    Okay.

2    A    And so I have a draft of that. I haven't

3 submitted that. And, again, I -- my hope and plan

4 right now is really to not have any of this stuff,

5 you know, out in the public until I'm post tenure

6 review. And so that's been a part of the

7 consideration.

8    Q    When is tenure review?

9    A    Oh, I'm prob -- probably two years away.

10    Q    Okay. And not to backtrack too far, but

11 I just wanted to close the loop on --

12    A    Uh-huh.

13    Q    -- the concealed carry research.

14       Who was the author of the article that

15 you found two inherent flaws in?

16    A    Oh, John Donohue at Stanford. He might

17 have co-authors, but I remember him --

18    Q    Okay.

19    A    -- as the first one on the paper.

20    Q    Okay. Thank you.

21       MR. DAGUE: Mark this as "número dos."

22       (Defendants' Deposition Exhibit No. 2

Page 42

1        marked for identification.)

2    BY MR. DAGUE:

3        Q    Dr. English, I've just handed you what

4    has been marked for this deposition as Defendants'

5    Exhibit 2.

6            While you're reviewing that, I'm just

7    going to, for the record, state this is a copy of

8    what I believe to be Dr. English's CV provided to

9    me by counsel during the discovery -- the expert

10   discovery phase.

11           Just ask you to take two seconds to

12   review that.  I'm not gonna ask you too much about

13   it, but general questions about it.

14           MR. DAGUE:  And also, just note for the

15   record -- my apologies -- the original sticker copy

16   of this is not the one that we'll use for the

17   original deposition.  I've written on the original

18   by accident.  So if anyone's comparing this in the

19   future, that bears a photocopied sticker of

20   Defendants' Exhibit 2.

21   BY MR. DAGUE:

22       Q    Dr. English, are you familiar with this

Page 43

1    document?

2        A    Yes.

3        Q    And what is this document?

4        A    This is my CV.

5        Q    And does this CV include an accurate

6    description of your education?

7        A    Yes.

8        Q    And do you -- well, could you briefly

9    summarize your education?

10       A    Sure.  I was an undergrad at Duke

11   University, got a BA in mathematics, a BS in the

12   economics, graduated with distinction in economic

13   (sic), wrote a thesis, went to Oxford, did a

14   master's program in ethics, returned to Duke, did a

15   MA and Ph.D. in political science.

16           My two -- we had to pick subfields, so I

17   did both -- what's sometimes called methodology,

18   and political theory.  And we had a sub

19   concentration, political economy.  Then got my Ph.D

20   in 2010.  And I can go through professional stuff,

21   too, if you like.

22       Q    No, that's fine.

Page 44

1        A    Okay.

2        Q    Have you received any formal legal

3    training in your educational background?

4        A    I don't have a JD.  I was the head TA for

5    a constitutional law course that we taught at Duke.

6    There's a professor -- Erwin Chemerinsky -- that

7    I'm told is a leading constitutional law scholar.

8    So I meet with Erwin regularly, and, you know, sat

9    through his courses, administered his exams, all

10   his lectures.

11           So, yeah, spent a lot of time thinking

12   about constitutional law in the context of Erwin's

13   instruction.

14       Q    Were you --

15       A    But --

16       Q    Sorry.

17       A    Yeah.

18       Q    Were you --

19       A    But I wasn't a -- I was not enrolled in

20   the Duke JD program.

21       Q    Were you a TA then in your undergrad

22   years?

Page 45

1        A    No.

2        Q    That was in your --

3        A    This is in grad school.

4        Q    This is at --

5        A    It was --

6        Q    -- where Duke --

7        A    -- at the -- this was in grad school as a

8    Ph.D. student.

9        Q    How long did you serve as Professor

10   Chemerinsky's head TA?

11       A    I believe that was in the fall.  Let's

12   see.  It might actually be here somewhere.

13           (Witness looked at document).  Yeah, it

14   was spring of 2008.

15       Q    Okay.  And that was -- well, what class

16   was that?  Do you remember the title of the class?

17       A    Yeah, we called it, Liberty, Equality,

18   and the American Constitution.

19       Q    Was it a first-year of constitutional law

20   class, or an upper level common law class?

21       A    The -- so it was not a -- it was taught

22   jointly with the political science department, so

William E. English, Ph.D.

9/13/2019

Washington, DC

Page 13 (46 - 49)

Page 46

1 it was a -- class that was made available to

2 undergrads. We had some grad students who would

3 take it.

4 Q So this was not a class in law school,

5 this was in the -- this was affiliated with the

6 poli-sci department?

7 A Right. We actually used the same text

8 and syllabus, but --

9 Q And was -- at the time, was Professor

10 Chemerinsky a law professor?

11 A He was, right.

12 Q Would you say that that work as a TA with

13 Professor Chemerinsky in that class is your only

14 exposure to legal training?

15 A It depends exactly what you mean by legal

16 training. The -- so, you know, I -- I'm a -- a

17 political scientist by training. We obviously

18 spend a lot of time thinking about the history of

19 American political thought, about -- debates around

20 the constitution about the origins of judicial

21 review.

22      Again, that's -- these are what I'd

Page 47

1 say -- you know, courses that are -- and ideas

2 foundational for law. I -- I had not taken the

3 standard contracts course or the -- I -- I think a

4 lot of technical minutia at Harvard. I spent five

5 years at Harvard's ethics center. And we were

6 actually located administratively under the law

7 school.

8      So my boss is a guy named Larry Lessing,

9 who -- and the -- I was actually technically a

10 lecturer at Harvard Law School when I co-taught a

11 course with Larry. And there were -- you know,

12 I -- I think I would do a variety of activities,

13 but the Harvard Law School, and some seminars and

14 stuff like that.

15      But the -- this -- I would not consider

16 myself a lawyer. And -- and I'm sure there's many

17 minutia areas of the law that you would not want me

18 doing your housing contract.

19 Q Do you consider yourself an expert in

20 constitutional law?

21 A I'd consider myself informed --

22 Q Uh-huh.

Page 48

1 A -- with regard to constitutional debates,

2 both at their founding and as well as some of their

3 history and development.

4 Q Right. But do you hold yourself out as

5 an expert for hire in issues of constitutional law?

6 A I don't really hold myself out for an

7 expert in hire in -- I -- I -- and since I don't

8 have any website advertising the -- you know,

9 anything like that, the -- I would think it --

10 well, no, I've never advertised myself as a

11 constitutional law expert.

12 Q Do you consider yourself qualified as an

13 expert to opine upon issues of constitutional law?

14 A I do think I'm qualified to opine about

15 issues of let's say constitutional reasoning.

16      And I mean some sense, you know, you

17 know, the con -- you know I was just at these -- I

18 was just at this confirmation two days ago where we

19 had a very eloquent speech by the director of the

20 National Endowment for the Humanities, calling, as

21 part of their founding documents, you know, the

22 Constitution is the heritage of everyone in the

Page 49

1 United States.

2      And, you know, as somebody who spent much

3 of his certainly graduate career in dealing with

4 history of the American political development, I --

5 I -- I would say I'm informed enough about the

6 Constitution to at least reflect on its, you know,

7 principles and its -- its relationship to a variety

8 of American -- both, you know, legal and political

9 debates.

10 Q But just to be clear, you testified that

11 you've never taken a formal law class, I think you

12 said in contracts.

13      Have you ever taken a formal law class in

14 basics of constitutional law?

15 A I've only been a TA. I haven't been a

16 student in it.

17 Q Okay. I asked you about whether you

18 consider yourself an expert in constitutional law.

19 And you said you'd consider yourself to be an

20 expert in constitutional reasoning.

21      Could you articulate that distinction --

22 A Yeah.

Page 50

1    Q   -- for me a little bit better?

2    A   Sure.  So -- so at Harvard -- Harvard has

3    a program in constitutional government, run by

4    Harvey Mansfield there.  And the -- it is, I would

5    say, one of the major sub area -- one of the major

6    sub fields of American politics, which is one of

7    the four main sub fields of political science, is

8    what's sometimes called American political

9    development and constitutional studies.  And that

10   has been a major interest of mine.

11        And -- and it's a question of -- first,

12   as a political question, which are what are the

13   aims of the Constitution and it's, you know,

14   founding configuration and the ideals that animated

15   it, what were the nuances administratively that it

16   set up in how government should function and work.

17   There's also a history to how it developed, how did

18   our -- we get our amendments, what was the impacts

19   of different amendments, how those've been

20   interpreted.

21        So these matters of -- of both

22   theoretical reasoning and argument, these matters

Page 51

1    of -- of history and development, are certainly

2    within the wheelhouse of political science.

3    They're certainly things that myself and -- and my

4    teachers have been very interested in.  And I'm

5    aware there's -- there's plenty of practitioners

6    in, you know, legal fields that have a variety of

7    sub interests and expertise and -- and bill for

8    that, depending on those levels of expertise.

9        My interests in the Constitution have

10   always been, I'd say, scholarly interest, interest

11   in their principles, interest in their

12   implications, interest in their -- in the relevance

13   to policy.  So I'm sure there's some sub areas of

14   constitutional law and interpretation that -- that

15   I would not be qualified to think about.  But there

16   are many that -- that actually are very, you

17   know, serious and long-standing interest to me.

18        MR. DAGUE:  Just off the record for a

19   second.

20        (Discussion off the record)

21        MR. DAGUE:  Back on the record.

22   BY MR. DAGUE:

Page 52

1    Q   So just to delve a little bit deeper into

2    that.  The last thing you said is there are some

3    subparts of constitutional law that certainly you

4    don't consider yourself to be educated or an expert

5    in; is that fair, a fair character --

6    A   I didn't say educated.  I said an ex --

7    I -- there are issues on -- you know, there are --

8    I'd say issues on Fourth and Fifth Amendment

9    questions that I know are extremely complex, legal

10   histories behind them.  And, you know, there are

11   other people I would refer you to if you wanted

12   a -- a thoughtful opinion on that.  There's a --

13   other areas that I think have been pretty central

14   to my interests.

15   Q   Is it fair to say that you have more of a

16   generalized policy knowledge of the Constitution,

17   but if you delve into perhaps the nitty-gritty of

18   what is taught in a constitutional law class,

19   that's where you may not have as much familiarity?

20        And I am happy to --

21   A   That --

22   Q   -- give you an example, if it makes it

Page 53

1    easier to answer.

2    A   Sure.  Why don't you give an example?

3    Q   Okay.  So if -- if I were to ask you

4    whether you consider yourself an expert in the

5    levels of scrutiny that the Supreme Court has

6    applied to various fundamental rights, would that

7    be something you could -- you know and are

8    comfortable with?

9    A   Yeah, I had to teach that --

10   Q   Okay.

11   A   -- for Chemerinsky all the time.

12   Q   Okay.  So --

13   A   Umm --

14   Q   Sorry.  Don't mean to cut you off --

15   A   Yes.

16   Q   -- on that.  Go ahead.

17   A   So -- so that -- but I'm -- there have --

18   I'm sure there's -- the more I learn about any

19   academic field is the more proliferation of sub

20   fields and sub areas.  And so something like levels

21   of judicial review, yeah, that's standard stuff.

22   Q   Okay.

Page 54

1      A   But I -- I'm -- I'm -- I'm sure there are
2  some subspecialties, some areas, that I'm not an
3  expert in.
4      Q   Fair enough.
5          Are there any other types of law other
6  than constitutional law that you consider yourself
7  to have the same level of expertise in as
8  constitutional?
9      A   No, although I studied a lot of D.C.
10 permitting process, but --
11     Q   Do you regularly conduct legal research
12 as part of your professional scholarly research
13 work?
14     A   I -- I collaborated with Larry Lessing on
15 some projects that might touch on legal research.
16 But now, no, there's no longer, you know --
17     Q   Have you ever formerly opined on any
18 scholarly work or in a capacity as an expert as to
19 the constitutionality of a law or regulation?
20     A   Not in detail.
21     Q   Would you consider that type of an
22 opinion to be within your field or degree or area

Page 55

1  of expertise?
2      A   I certainly think someone who has a Ph.D
3  in political science who has, you know, studied and
4  thought deeply about the Constitution, its origins,
5  its history, its development, could opine with some
6  expertise and knowledge about certain areas.
7      Q   As part of your preparation for issuance
8  of the expert report in this case --
9      A   Uh-huh.
10     Q   -- Defendants' Exhibit 1, did you conduct
11 any legal research into the subject areas that you
12 opined upon in this case?
13     A   Yeah, so I -- I went back and, you know,
14 on the issues of scrutiny, you know, wanted to
15 think about how this stuff has been looked at in
16 the past, certainly issues of privacy also, the --
17 there's always the hot social debates in some forms
18 these days.
19         But, yeah, I -- I did spend some time
20 looking up some of the more recent history of some
21 of the cases and decisions that had guided just
22 the -- the standards which seem -- we seem to, you

Page 56

1  know, currently have inherited on some of these
2  issues.
3      Q   And just let me dig a little bit deeper
4  on that.
5          Would that be -- would that constitute
6  case law research or general kind of Google
7  searching for more general concepts of the law,
8  status of the law?
9      A   Yeah, I didn't crack open my old case law
10 book with -- that Erwin had given me, but the --
11 I'd say, you know, Google may -- may make light of
12 it, but you can -- you can read -- actually access
13 quite a bit on Google these days.
14         So yes, I -- I looked into -- and I think
15 I even cite, you know, this -- this important
16 decision from the '70s, thinking about the -- also
17 these issues of how -- how can groups be suspected
18 or scrutinized, be singled out as a group, which,
19 you know, relates a little to the privacy but also
20 it relates to all sort of issues of, you know,
21 people's prerogatives against -- under search and
22 seizure.

Page 57

1          And so, yeah, I -- I -- in the scholarly
2  manner that I would for a lot of other research, I
3  went online and made -- and -- and tried to make
4  sure I was informed of some of the -- the latest --
5      Q   Sure.
6      A   -- developments and arguments in these
7  areas.
8      Q   Did you conduct Lexus or Westlaw-type
9  searches for this project?
10     A   There were a -- just two or three
11 Lexus-Nexus-type searches, yeah.
12     Q   Now, you said a minute ago -- I just want
13 to circle back.
14         MR. DAGUE:  And, Barbara, I promise we're
15 getting towards a break.
16 BY MR. DAGUE:
17     Q   Did you conduct the Lexus or Westlaw
18 searches, or was that done by a TA or someone else?
19     A   The -- I -- at one point, there was a --
20 I had a -- research assistant, an undergrad
21 actually, that helped me look up some of the --
22 some of the historical cases.

Page 58

1      But the -- yeah, at least -- and I can
2  think of at least two occasions where I tried to
3  search at my house.  But I couldn't get in because
4  I wasn't on -- I -- I wasn't on the -- the virtual
5  private network, so I had to go back to campus to
6  complete my search so I could actually view.
7      Q    So that research system helped you on
8  this project?
9      A    It actually -- it -- it wasn't in the
10 context of this -- I -- I hadn't brought the
11 research assistant on for this project.  It was
12 somebody who had access to a library at one point.
13     Q    You did mention at one point that -- a
14 few minutes ago that you have some expertise or at
15 least have studied the D.C. permitting process.
16     A    Yeah.
17     Q    Is that -- is that what you testified to?
18     A    Yeah, that -- that was said somewhat in
19 gist about areas of legal expertise.  I -- I have
20 spent an inordinate amount of time -- I had
21 somebody come -- just look -- just small
22 construction projects on my house, so -- I -- I

Page 59

1  meant that partially in gist.
2      Q    Okay.  So -- okay.
3      A    Yeah.  And by permitting there, I meant
4  construction permits.
5      Q    Construction permit, yes.  I just wanted
6  to follow up.
7          MS. CONNELL:  Much more complex.
8          THE WITNESS:  Yeah.  Yeah.
9  BY MR. DAGUE:
10     Q    Do you consider yourself to be an expert
11 in Second Amendment law specifically?
12         I know I asked you about constitutional
13 generally.  I want to just hone in on Second
14 Amendment.
15         MR. DAGUE:  And Barbara, I promise we're
16 getting towards a break.
17         THE WITNESS:  So I may have to ask you to
18 define your meaning of expert.  And I'll -- I'll
19 just preface this by saying part of my interest in
20 social science has been a skepticism, at least
21 within Ph.D. social scientists, of various claims
22 to expertise where, you know, very informed,

Page 60

1  important people have often been wrong about
2  things.
3          And so I've always thought of myself as
4  somebody who wants to bring, you know, the most
5  rigorous arguments, do the most background
6  research, and be part of a conversation.  I would
7  say I have a -- an interest in Second Amendment
8  law.  And I've read a lot about it.  I thought
9  about it in the context of Erwin Chemerinsky's
10 course a few years ago.  It's an area of interest.
11         I don't know if -- if you -- if people
12 give out licenses to be experts in the Second
13 Amendment law.  I'm certain there are people who
14 are more expert than I am who, you know, are -- are
15 more familiar with the -- case law development,
16 its background, but it's certainly an area that I
17 have, I'd say, a -- both interest and extensive
18 reading and familiarity with.
19     Q    Okay.  And I may have asked you this in
20 different terms, but have you ever been retained as
21 an expert or to provide an expert-type opinion,
22 other than this case, on the Second Amendment or an

Page 61

1  issue that abuts the Second Amendment?
2      A    So I have -- I have not been retained
3  specifically to be a -- a Second Amendment expert.
4  I have, however, offered expert witness in cases I
5  think that deal with issues related to the Second
6  Amendment.
7      Q    All right.  That's a good stopping point.
8  We'll get into that.
9          MR. DAGUE:  Five, ten minutes.
10         (Recess)
11         MR. DAGUE:  Back on the record.
12 BY MR. DAGUE:
13     Q    All right, Dr. English, we ended the --
14 right before our last break, we started talking
15 about prior expert service.  And I'd asked you
16 about prior expert service into Second Amendment --
17 cases involving the Second Amendment.
18         And I believe you testified that you do
19 have some prior expert -- or expert testimony in
20 those fields, although not directly related to the
21 Second Amendment; ask that fair?
22     A    That is correct.  What I was asked to

Page 62

1   opine on was not specifically a legal question.  It
2   was, I'd say, data questions.
3        Q    Okay.  And was one of those matters a
4   California case recalled Rupp versus Becerra?
5        A    That is correct.
6        Q    And did you serve as a paid expert in
7   Rupp versus Becerra?
8        A    No.
9        Q    No?  Did you serve as an expert?
10       A    I did, yes.
11       Q    And were you not paid?
12       A    That's correct.
13       Q    That was a volunteer pro bono expert?
14       A    Yeah, so my -- I had been nominated for
15   this position which required Senate confirmation.
16   And there's a very extensive, elaborate financial
17   disclosure process.  And I turned in my forms.  And
18   at that point, would require getting them back from
19   the Senate committees.  And it would have set
20   things back six months.
21        So the -- the question in that case was
22   actually a very -- a very narrow and specific one

Page 63

1   that -- it struck me as not something that would
2   take a lot of time and effort.  And so that one, I
3   did not receive, even ask -- even ask for payment,
4   because of the restrictions I had on having any
5   undisclosed financial.
6        Q    What was the narrow question, if you
7   recall, in that case?
8        A    The narrow question was estimating the
9   number of AR-15 rifles that had been produced and
10   sold in recent years.
11       Q    And who -- which side of that case did
12   you serve as an expert on for?
13       A    Right.  So it was the side challenging
14   the state's ban on these weapons.
15       Q    Do you remember, was it an entity or an
16   individual who was challenging the state's ban on
17   those types of weapons?
18       A    I -- I don't fully remember.  I believe
19   it was a variety.  I think it was a number of
20   plaintiffs.
21       Q    And were any of those plaintiffs that
22   you -- if you recall, were any of those plaintiffs

Page 64

1   gun advocacy organizations?
2        A    I don't recall.  I -- I don't recall.
3        Q    In that case, were you contacted by
4   counsel to serve -- a counsel to serve as an
5   expert, or were you contacted by an organization?
6        A    I was contacted by counsel.
7        Q    And it was not counsel -- either of the
8   Coopers, correct?
9        A    It was not either of the Coopers.
10       Q    Was it -- well, who was the counsel, if
11   you recall?
12       A    I believe it was a counsel in California
13   that had reached out to me.
14       Q    I know you didn't charge for that; is
15   that right?
16       A    That's correct.
17       Q    But did you keep any records as to how
18   much work you did on that, even though you weren't
19   charging?
20       A    I did not keep close records on that.
21       Q    Can you estimate how much time you spent
22   on that matter?

Page 65

1        A    Probably 80 hours or so.
2        Q    And can you estimate how much you would
3   have charged for those services had you charged?
4        A    Oh, so I believe -- this is the first
5   time -- this is the first time I had ever been
6   contacted for a case, so I -- the -- the next --
7   maybe charged $250 an hour, so I guess you can do
8   the math on that.
9        Q    Sure.
10        Did you issue a report in that case?
11       A    I did.
12       Q    And was it styled as an expert report?
13       A    It was an expert report.
14       Q    Did you testify in a deposition in that
15   case?
16       A    I did.
17       Q    And did you ever have to testify in open
18   court in that case?
19       A    No.
20       Q    Do you know the status of that case
21   currently?
22       A    I don't.

Page 66

1    Q   Do you know if the case is closed?

2        Has anyone contacted you to let you know

3    that your services are done?

4    A   I don't believe I've been contacted.

5    Q   What was your research task in that case,

6    if you can summarize it?

7    A   Specifically to estimate the number of

8    AR-15-styled rifles in circulation and, you know,

9    using a variety of data sources to try to just get

10   some handle of, you know, what a -- I guess these

11   are at stake in the case.  They want to know how

12   many of things are there.

13   Q   And was it just how many there are in

14   California, or nationwide?

15   A   It was nationwide.

16   Q   And was there available data points that

17   you relied upon in your conclusion?

18   A   Yeah, so there's -- there's both the

19   AMFER -- the American Manufacturer of Firearms

20   Report, AMFR, that the BATF collects.  And those

21   have a variety of, you know year by year, company

22   by company, how many pistols, how many rifles,

Page 67

1    either re -- there's some estimation might still

2    need be done on sub types.

3        There also -- some market research had

4    been done by independent people.  There's a variety

5    of survey things, ask people how many they own of

6    these.  So there are a variety of data sources that

7    you could use to triangulate that and a few

8    different means.

9    Q   And did you find the available data

10   compelling?

11   A   What -- what do you mean by compelling?

12   Q   Did you find it developed enough to base

13   an opinion upon?

14   A   Yeah, so the -- you know, in -- in the

15   social sciences, we often think of, you know, what

16   are your margins of error or what are your, you

17   know, degrees of uncertainty.

18       And what gave me some confidence is that

19   using many of these different sources, they were

20   all producing numbers that were broadly consistent

21   with one another.

22   Q   Uh-huh.

Page 68

1    A   So, you know, estimates had to be -- had

2    to -- had to, you know, be made on a few of those.

3    But, yeah, the -- I was pretty confident in the

4    conclusions I came to.

5    Q   Did you have to extrapolate from the data

6    to come to a conclusion?

7    A   You might be -- some -- so extrapolation

8    can have a very technical meaning.  That -- that

9    may not be the right term to use here.

10   Q   Okay.

11   A   I would say there -- you know, there

12   were -- I -- and what was nice about the

13   manufacturing data -- and you -- you -- you could

14   sometimes have either lower bounds or higher

15   bounds.  So in all of the -- what I did there, I

16   tried to make the most conservative -- which is an

17   underestimate -- and there -- you know, I -- it's

18   possible there seems to be more than I -- I

19   estimated in that.

20       But the -- I was -- yeah, I'd say fairly

21   confident that it's gonna be in -- you know, within

22   the range -- within the, you know, ranges.  I'd say

Page 69

1    yes in that.  And I'd be -- I'd be very, very, very

2    surprised if it was below -- significantly below

3    what I concluded.

4    Q   Okay.  So -- and, yeah, forgive me for

5    maybe not using the right technical terms.

6        But in that case, you had some data

7    points, but you didn't have a final -- there's no

8    final number of these, so you had to -- you had to

9    estimate, based on the data points you had, and you

10   came up with an estimate; is that right?

11   A   Yes.  And to be clear, the -- I mean I'm

12   trying to think of what you might need to compare

13   that to.

14       I -- I guess the only way to know this

15   number is to get every American in the United

16   States who own one of these things or multiple of

17   these things to, you know, verify publicly under

18   oath that they -- this is how many they own.  So

19   I -- I don't have that, I suppose.

20   Q   Right.

21       So the -- in that case, the actual number

22   of AR-15-style weapons, is un -- is immeasurable,

William E. English, Ph.D.
Washington, DC

Page 70

1  fair?

2       The actual hard number is immeasurable,

3  would require some estimation, right?

4     A  I would not use the term "immeasurable."

5     Q  Okay.

6     A  Because that -- so there -- there's --

7  there's a few distinctions you could make.  So

8  there's a classic distinction, say, in econometrics

9  between risk and uncertainty, risk being

10  something -- you know, we know there's a 60 percent

11  chance this is going to happen.  And you can use

12  that information.  It doesn't mean it's gonna

13  happen, but you're able to estimate.  Whereas

14  uncertainty is you have no idea what the percentage

15  is at all.

16       And so I -- we're definitely not in a

17  position here of uncertainty.  It's not -- now, the

18  deal is, yes, we're dealing with -- with estimates,

19  but they're estimates that are pretty tightly

20  bounded, estimates that there's very good evidence

21  for.  And this is a case of literally everything in

22  the social sciences we deal with:  Everything is an

Page 71

1  estimate.

2     Q  Right.

3     A  Everything.

4     Q  Right.  Because in that case, short of

5  conducting a personalized census of every American

6  in the country that was reliable, certainly you

7  could not come up with a -- and even that might not

8  be reliable, but --

9     A  Even our census is based on a variety of

10  inferential --

11     Q  Right.

12     A  -- conclusions.

13     Q  So short of going to everyone's home,

14  knocking on the door, completing a complete search

15  of their home, you need to estimate in that case;

16  is that fair?

17     A  Yes.

18     Q  Okay.  Now, did you serve as an expert

19  witness in another case involving firearms in

20  Vermont?

21     A  Yes.

22     Q  Okay.  When was that?

Page 72

1     A  That was this summer.

2     Q  This summer of 2019, or --

3     A  Yes, this summer of 2019.

4     Q  Okay.  And can you -- do you remember the

5  name of that case?

6     A  I don't.

7     Q  Do you remember who retained you?

8     A  It was Cooper & Kirk.

9     Q  Okay.  Chuck and Davis?

10     A  No.  It was actually Pete.

11     Q  Okay.  Another lawyer with the firm?

12     A  Another lawyer with the firm.

13     Q  And do you remember, were you paid for

14  that --

15     A  I was --

16     Q  -- engagement?

17     A  -- paid for that.  I'd been -- I -- I'd

18  been cleared by that point.

19       MR. CHUCK COOPER:  And just, Counsel, to

20  complete the record, it's Pete Patterson, our

21  partner here at the firm.

22       MR. DAGUE:  Thank you.

Page 73

1  BY MR. DAGUE:

2     Q  And do you recall the issue that you were

3  asked to opine on as an expert in the Vermont case?

4     A  Yes.  It was to understand the commonality

5  of ownership of magazines that had been recently

6  banned in a -- by a Vermont law.  And this law

7  permitted magazines to continue to be owned that

8  had been purchased before the date that the law

9  went into effect.

10       And the -- what I was asked to do in this

11  case was to estimate how many people in Vermont own

12  these.  And there's a broader question:  Are these

13  commonly owned; and how common are they?

14     Q  Yeah, and maybe I am just not

15  understanding.

16       And when you say the commonality of

17  ownership, does that mean you were asked to est --

18  to explore the commonalty between owners, or how

19  common ownership was?

20     A  So how common ownership was, because

21  that -- you know, you -- you want to both estimate

22  how many of these things are owned, but, you know,

Page 74

1  is -- is it a million owned by one person, or is
2  it, you know, owned by this percent of the
3  population.  And -- and so I was trying -- the
4  distribution of ownership as well as not always
5  just how many are in circulation.
6       Q    Do you remember who -- well, do you
7  remember if you served as an expert on behalf of
8  the plaintiff or the defendant in that matter?
9       A    Right.  So this was a -- the people
10  challenging the law in Vermont.
11      Q    Okay.  And do you remember what the
12  Vermont law being challenged dictated?
13      A    Yeah.  So, in brief, it -- it allowed
14  prior ownership, but banned the sale of magazines
15  that -- for pistols, I believe it was 15 or above,
16  or maybe -- maybe above 15; and rifles, it was
17  above 10.
18      Q    When you say above, you mean the number
19  of --
20      A    Number of --
21      Q    -- rounds?
22      A    -- rounds, yes.

Page 75

1       Q    All right.  Did you issue a report in
2  that case?
3       A    I did.
4       Q    Do you remember if the -- you said the
5  party challenging the Vermont law.
6            Was that an individual or was that an
7  organization or a collection of the two?
8       A    Don't recall.
9       Q    Okay.  Do you remember if the NRA or a
10  regionalized or local offshoot of the NRA was
11  associated with or affiliated with the party
12  challenging the Vermont law?
13      A    I don't know or recall anything about any
14  involvement with the NRA.
15      Q    Did you -- in your course of retainer and
16  service in that case, did you have any contact with
17  the plaintiffs or the party challenging the law?
18      A    No.
19      Q    Is it fair to say that your conversations
20  and activity in the case was through the law firm
21  of Cooper & Kirk then exclusively?
22      A    Exclusively, yes.

Page 76

1       Q    Did you issue a report in that case?
2       A    Yes.
3       Q    Okay.  Did you testify in a deposition in
4  that case?
5       A    No.
6       Q    Do you know if -- did you testify in
7  court in that case?
8       A    Nope.
9       Q    Do you know if the matter is resolved?
10      A    I don't know.  I don't believe it is.
11      Q    Okay.  And that was just this past
12  summer, so --
13      A    Yes.
14      Q    -- a few months ago?
15      A    Yes.
16      Q    Okay.  In that matter, you have been paid
17  and/or are currently being paid, fair?
18      A    Yes.
19      Q    And do you know -- and I won't hold you
20  to a dollar figure -- an estimate of how much
21  you've been paid in that case to date?
22      A    I -- I wanna say it was around $20,000.

Page 77

1       Q    And in that case, you were asked
2  ultimately to estimate the commonality of ownership
3  of certain magazines; is that -- is that a fair
4  articulation?
5       A    Yes.
6       Q    And I'd like to ask you with respect to
7  the California case and the AR-15.
8            Was there sufficient data in your mind to
9  arrive at an estimation?
10      A    I was very -- fairly confident in the
11  estimation arrived at.
12      Q    What type of data did you use in that
13  case to arrive at that estimation?
14      A    So I contracted with a professional
15  survey firm to survey residents of Vermont.  And
16  they executed the survey.  We got a good response
17  rate, and asked survey respondents a variety of
18  questions about, you know, their ownership, and so
19  based the record on those responses.
20      Q    So was the survey -- in very general
21  terms -- I don't need the specifics of it -- but
22  was it generally geared towards determining if the

Page 78

1  residents of Vermont owned these particular types

2  of magazines?

3      A   Yes.

4      Q   Okay.  And again, in that case, you had

5  to -- you had to make some sort of estimation to

6  ultimately arrive at your ultimate conclusion,

7  right?

8      A   Sure.

9      Q   Okay.  Meaning there was no central

10  repository that you could go on to get a 100 per

11  conclusive determination of how many of those

12  particular magazines were sold and/or owned in

13  Vermont at the time, right?

14      A   That's right.  But I would just point out

15  that having worked also with data maintained by

16  state repositories, I'm not sure I would trust,

17  honestly, the quality of those more than a high --

18  a high quality survey, so --

19      Q   Sure.

20      A   Yes, there's always, you know, a --

21  there's an inference involved in this reasoning,

22  but it's not, again, that if a state has a

Page 79

1  repository, you're no longer dealing with questions

2  of data integrity or inferential conclusions.

3      Q   Right.  And in that case, you did issue a

4  report that included a conclusion as to how many of

5  these particular magazines you were studying you

6  believed were owned in Vermont, right?

7      A   That's correct.

8      Q   Okay.  Are those the only two cases that

9  you've served in an expert capacity involving gun

10  issues?

11      A   Yes.

12      Q   With the exception of this case --

13      A   Yeah.

14      Q   -- currently?

15      A   Yeah.

16      Q   Do you have any --

17          MR. DAGUE:  We can go off the record for

18  one second.

19          (Discussion off the record)

20          MR. DAGUE:  Okay.  Back on the record.

21  BY MR. DAGUE:

22      Q   Doctor, I want to ask you about your

Page 80

1  personal associations with advocacy groups.

2          Do you currently have any association

3  with a gun advocacy group right now?

4      A   So when I turned 18, my father gave me a

5  life membership in the NRA, which I assume still

6  works.  But to my -- I don't believe I am actively

7  involved in either with them but -- and I can't

8  think of any other agency or activist group.

9      Q   Okay.

10      A   I don't recall any others.

11      Q   Okay.  You don't -- do you pay dues

12  currently as a result of that lifetime membership?

13      A   I do not.

14      Q   Okay.  Do you pay dues to any activist

15  group, Second Amendment or otherwise?

16      A   I don't believe I do, no.

17      Q   Are you on any boards of directors?

18      A   I sit on the board of a nonprofit

19  educational institution in Cambridge,

20  Massachusetts.  It sits on the right -- just on the

21  border of Harvard's campus.

22      Q   What's that called?

Page 81

1      A   It's called the Abigail Adams Institute.

2      Q   And what does the Abigail Adams Institute

3  advocate for?

4      A   So they're not an advocacy group.  They

5  are an educational group.  They -- their -- our

6  main -- well, we do two purposes.  One is we try to

7  be a convening place for people who have

8  specialized disciplinary knowledge, to come

9  together and ask big questions.  And we also try to

10  supplement the humanistic education of

11  undergraduates in the greater Boston area.  So

12  we'll run reading groups and a -- host lectures,

13  summer seminars.

14      Q   What does humanistic education mean?

15      A   So humanistic -- think about the

16  humanities, about what it means to be human, about,

17  you know, great question of what makes life worth

18  living, read great texts, Plato and Aristotle and

19  Shakespeare and think about the nature of the human

20  condition.

21      Q   Uh-huh.  You should invite your -- you

22  should have invited them to this eight-hour

William E. English, Ph.D.

Washington, DC

9/13/2019

Page 22 (82 - 85)

Page 82

1 deposition today.

2    A   Oh, they would have -- you know.

3    Q   It's riveting, right?

4        MR. CHUCK COOPER:  This certainly isn't

5 what makes life worth living.

6 BY MR. DAGUE:

7    Q   So lifetime member of the NRA through a

8 gift when you were 18, fair?

9    A   Yes.

10   Q   Any family members, members of the NRA or

11 any Second Amendment advocacy group other than, I

12 assume, your father?

13   A   Yeah, he's -- he's deceased.

14   Q   Okay.

15   A   I don't know if he bought one for my

16 brother.

17   Q   Okay.

18   A   But I'm -- to my knowledge, nobody in my

19 immediate family is involved in any of these

20 advocacy --

21   Q   And where are you geographically from

22 originally, Doctor?

Page 83

1    A   So I grew up just in Rockville, Maryland,

2 just at the end of the Red Line here.

3    Q   Okay.  It's the home of NIH, right?

4    A   That's right.  We've got -- NIH is up

5 there and --

6    Q   Right.  Right.

7        Setting membership aside, are you a donor

8 to any organizations, advocacy organizations?

9    A   I don't recall any donations that I made.

10   Q   Any of your immediate family donors to

11 any advocacy groups that you know of?

12   A   Not that I know of.

13   Q   Do you own a firearm yourself?

14   A   I do.

15   Q   Okay.  And what type of firearm do you

16 own?

17   A   So I own at least -- I'm trying to

18 think -- three pistols, two shotguns, and one

19 rifle.

20   Q   Okay.  And are you a resident of the

21 District of Columbia or Maryland or Virginia?

22   A   So I'm a resident of the District of

Page 84

1 Columbia; however, I do not own those -- keep those

2 firearms in residence here.

3    Q   Okay.  Do you keep them in residence in

4 another state?

5    A   In another state.

6    Q   Okay.  And do you have a permit -- in the

7 state that you maintain those firearms, do they

8 require a permit for any of those firearms?

9    A   They do not.

10   Q   Okay.

11   A   Which is part of the reason that they're

12 there.

13   Q   Right.

14       Are you a hunter?

15   A   Yes.

16   Q   Are you a sports shooter?

17   A   Yes.

18   Q   Do you consider your ownership of those

19 weapons to -- for your purposes as a hunter or a

20 sports shooter, or for another purpose?

21   A   I have also in the past used them for

22 defense, home defense, when I lived in different

Page 85

1 states.

2    Q   What do you hunt?

3    A   Depending on the year and likelihood of

4 getting out, deer, waterfowl, small game.

5    Q   When's the last time you got out?

6    A   January.

7    Q   2019?

8    A   2019, yes.

9    Q   So it's not particularly frequent?

10   A   Well, hunting season doesn't really --

11 hunting season basically ends for almost everything

12 in January.

13   Q   Okay.

14   A   There's a spring turkey season.  But if

15 these days things are busy, I might get out two,

16 three times a year.

17   Q   Do you shoot skeet?

18   A   Years ago I did.  I haven't probably for

19 a decade now.

20   Q   Do you have children?

21   A   No.

22   Q   Okay.  You mentioned having used firearms

William E. English, Ph.D.                                                    9/13/2019
Washington, DC
Page 23 (86 - 89)

Page 86

1  in home defense situations in the past; is that
2  fair?
3      A   Yes.
4      Q   And has that been multiple times or just
5  once?
6      A   Well, when I lived in states where it was
7  less legally fraught, I would have a firearm
8  available, as it were, you know, in my home --
9  house.
10     Q   Okay.
11     A   There was one incident where I actually
12 possessed it and brandished it to somebody who was
13 trying to gain access to my house.
14     Q   How long ago was that?
15     A   Oh, that would have been probably 11 or
16 12 years ago.
17     Q   You said brandished; you didn't have to
18 fire the weapon --
19     A   No.
20     Q   -- during that --
21         Was there an arrest or criminal complaint
22 made as a result of that?

Page 87

1      A   Police were called.  They recognized the
2  person as somebody who they received other
3  complaints about in the neighborhood.  They -- I
4  pointed the direction that he ran.  And I don't
5  believe they found him that evening.  I know they
6  picked up, over the course of the next few months,
7  two or three people.  I don't know if they ever got
8  that guy.
9      Q   Okay.  Would you agree with me that
10 issues surrounding gun ownership and generally the
11 Second Amendment have become hotly contested in
12 America over the last 10, 15 years?
13     A   Yes.
14     Q   Would you agree with me that I guess even
15 before that, it was a hotly contested issue; but
16 over the last 10, 15 years it's become even
17 increasingly so --
18     A   Yes.
19     Q   -- is that fair?
20     A   Yes, that's fair.
21     Q   Okay.  Have you ever heard of the term
22 "the gun debate"?

Page 88

1      A   I'm sure, yes.
2      Q   Okay.
3      A   It might have been phrased different
4  ways, but --
5      Q   Sure.
6      A   -- yes.
7      Q   Let me ask you this way, just from a kind
8  of vocabulary perspective.
9          If I use the term "the gun debate" to
10 summarize this hotly contested debate with respect
11 to the Second Amendment and gun ownership, is that
12 something you'll understand me to generally mean
13 the -- kind of the immense state of American
14 argument over that issue?
15     A   Yes, although I would say that the gun
16 debate probably meant -- means something different,
17 depending on what year you're asking about it.
18     Q   Sure.
19     A   So there was a gun debate in the '90s.
20 There's been, I'd say, multiple gun debates.  And I
21 suppose there's always some gun debate ongoing.
22     Q   If I use the term too generally during

Page 89

1  the course of questioning, just let me know and
2  we'll --
3      A   Sure.
4      Q   -- we'll try to hone in on that.
5          Do you have an ideological position with
6  respect to the American gun debate?
7      A   What do you mean by an ideological
8  position?
9      Q   Well, do you have a firm belief or way of
10 thinking with respect to the central issues that
11 are discussed in the country with respect to gun
12 ownership, gun rights, things of that nature?
13     A   And by firm, just to make sure that I
14 understand, you -- you mean?
15     Q   Well, I mean I -- I guess it would be a
16 question of degrees.
17         I mean do you consider yourself to have a
18 strong position with respect to the American gun
19 debate?
20     A   Huh.
21     Q   Or a deeply held position?
22     A   I'm not sure any of these terms capture

William E. English, Ph.D.
9/13/2019
Washington, DC
Page 24 (90 - 93)

Page 90

1 the -- I would say I have a concern about the
2 American gun debate, that I worry it often doesn't
3 capture the range of concerns, the analysis, that I
4 think is appropriate to thinking through the
5 important issues and tough issues.
6        So I would say my -- my position is I
7 would say I -- I have some skepticism towards, you
8 know, certain sorts of arguments that have been
9 made. I have to say sometimes from both sides in
10 the way -- the way that's sometimes, you know,
11 construed as -- as having partisan sides, although
12 I would note it -- there seems to be many
13 dimensions of these debates as well.
14        It's -- there's some things where it's
15 not clear that there's just one side. There might
16 be multiple sides.
17        So my -- I'd say my concern historically
18 on gun debate, I've worried that we're not doing --
19 we're not getting the debate we deserve.
20    Q   Okay.
21    A   That the debate neglects important
22 information, the range of issues. So I would say

Page 91

1 that's -- I would say -- you know, it would be
2 appropriate to say I've had historical skepticism
3 towards the -- the depths of the debate.
4    Q   So when you say worried we don't get the
5 debate we deserve, is that -- is that because you
6 believe that the debate issues have been kind of
7 simplified or politicized?
8    A   Well, there's two things. Certainly
9 there's that.
10        But Steven Pinker at Harvard is a
11 distinguish psych -- professor of psychology there.
12 And he was recently asked: What do you think is
13 the biggest problem with the world today?
14        And his answer was interesting. He said,
15 I think we don't do -- we -- we -- we make
16 decisions because of anecdotes rather than because
17 of data. And then he goes through a lost list of,
18 you know, people are terrified of things that
19 happen at vanishing small rates. And they don't
20 realize that, you know, sending their kid to school
21 in a car is actually pretty dangerous compared to
22 those other things.

Page 92

1        And he -- you know, he made out points
2 about the war on terror. He made the points about
3 all sorts of domestic policy. And -- and I think
4 Steven Pinker's right. And it's -- he -- it's
5 important that he's a psychologist. And there --
6 there is something I think deeply ingrained in our
7 psychology where we do reason from anecdotes, from
8 things that are visible to us to, you know, things
9 that elicited visceral responses. And that's part
10 of being human.
11        I think one concern in the gun debate is,
12 you know, there are certain things that are seen
13 and that elicit, you know, strong and, you know,
14 reasonable emotional response. But then there's
15 also questions of, you know: Well, what's the
16 ultimate policy evidence? What's gonna save the
17 most lives, protect the most people?
18        And that's where this is part of my
19 entire position in social science. You know, we
20 just don't lead with our intuitions, and all sorts
21 of debates about health policy, about, you know,
22 traffic policy. You know, it requires research.

Page 93

1 And let's see, really, when you look at the
2 numbers, what's gonna be, you know, the best
3 outcome for the most people? What's gonna keep
4 people safest?
5        So I'd say that as a social scientist,
6 I'd had a -- you know, an interest in the gun
7 debate to say: How do we -- how do we get this
8 right? How do we attend to data, you know, and
9 able to cordon off the, you know, visceral
10 reactions we have to see what's really gonna make
11 the most sense for keeping people safe and that
12 sort of thing.
13    Q   You mentioned the -- the partisan divide,
14 I think is the term you used.
15        Do you consider the, quote/unquote, gun
16 debate to be strictly a partisan issue or a --
17    A   What'd you mean?
18    Q   -- partisan divide?
19    A   What'd you -- and when you say strictly a
20 partisan issue --
21    Q   Well, do you consider the gun debate in
22 partisan terms?

William E. English, Ph.D.

Washington, DC

9/13/2019
Page 25 (94 - 97)

Page 94

1     Do you -- do you believe that it's a
2  Democrat versus Republican issue exclusively, or do
3  you believe there are people on each side of the
4  debate who necessarily aren't advocating due to
5  political reasons?
6     A   So there's two things.  To say one, I can
7  just -- I can show you polling data.  I can show
8  you the political psychology of it.  It's -- and
9  that stuff will tell you that it's perceived in
10 partisan terms.  And that's just -- that's just the
11 way others -- that's the way it is perceived
12 amongst average Americans.
13    Your second part of your question seems
14 to be asking a -- maybe a slightly different
15 question, which is, you know:  Are there
16 interesting people with things worth saying across
17 the political spectrum?  I think, you know, sure,
18 that may be the case, and often is the case.  It'd
19 be surprising to me if it were, you know, strictly
20 not the case.
21    But I think that there's no doubt that
22 the -- the average American voter perceives this as

Page 95

1  being a central access in a great amount of
2  partisan division.
3     Q   Do you have a personal opinion with
4  respect to the issue of universal gun -- universal
5  background checks prior to gun purchase?
6     A   Do I have a personal -- I can't say I've
7  looked into this in great detail.  The -- every so
8  often I read an article first of all apprizing me
9  of what exactly the current law is, which as I
10 often find is misrepresented, sometimes in news
11 articles.
12    For me, at the end of the day, I'd want
13 to evaluate the very -- whatever very specific
14 proposal is being made.  So even to ask the
15 question, you know, are you for universal
16 background cheeks, I just want to know how -- what
17 do you mean by that?  How would that be executed?
18 What would it look like in practice?  Then I could
19 have an opinion about it.
20    Q   Okay.
21    A   I says it's a -- I think it's an open
22 question, an interesting question.  I would just

Page 96

1  want to know -- let's think about the details of
2  how it works in practice, and then we can evaluate
3  it.
4     Q   Okay.  So fair to say you don't have a
5  blanket position on that particular issue; you need
6  to see details and know the entire specifics of the
7  issue before you would make a determination?
8     A   Yes.
9     Q   How about -- do you have a personal
10 position on United States citizens' access or right
11 to access automatic assault weapons?
12    A   I -- I guess by position, are you saying
13 an -- an opinion on it or a --
14    Q   Yeah.  Yeah.
15    A   Yeah, my opinion is it's not something --
16 I guess I haven't thought about it much.  It's not
17 something that particularly concerns me, you know,
18 so I don't have strong feelings about it.
19    Q   How about a position or opinion on laws
20 limiting gun access to individuals named on
21 terrorist watch lists, is that something you've
22 given any thought to or have an opinion on?

Page 97

1     A   Yeah, I would want to see the -- the
2  details on any proposal:  How does it work?  Who's
3  on it?  How do you get off?  What are the standards
4  of use?
5     Q   How about same question with respect to
6  the issue that's come up recently with respect to
7  accessibility to bump stocks, are you familiar with
8  the term "bump stock"?
9     A   Right.  Yeah, again, I haven't thought a
10 lot about bump stocks.  I've certainly never seen
11 or used one.  I have -- again, I'd want to see the
12 details.  I don't know how easy these things are to
13 make to begin with.  I don't know how many -- so
14 I'd want to see the details.
15    Q   Do you think individuals that have felony
16 convictions should have access to firearms in the
17 United States?
18    A   My inclination is I think they should
19 not.
20    Q   Okay.  Do you think individuals who have
21 been adjudicated with mental health problems should
22 have access to guns limited in any way?

Page 98

1    A   I'd want to hear the details, but it's

2  possible.

3    Q   Okay.

4    A   Depending on the proposal.

5    Q   And how about with respect to individuals

6  convicted or adjudicated of domestic violence

7  crimes?

8    A   Again, I'd have to hear the details.

9    Q   Fair enough.

10       In preparation for issuance of this

11  report, Defendants' Exhibit 1, did you study New

12  York's -- New York state's entire gun paradigm or

13  entire system of gun laws?

14    A   I certainly studied many gun laws in New

15  York, but I -- I don't think it could be possible

16  for me to be surprised by how many gun laws New

17  York has on the books that I -- that might exceed

18  even that search.  So I certainly did research laws

19  in New York, the -- the history and development of

20  those laws.

21       I know your code is very long.  And I

22  know these issues have long been a concern in this

Page 99

1  state, so I can say certainly with the -- the laws

2  that I thought were relevant to this case, I looked

3  into.

4    Q   Okay.  And sitting here today, do you

5  remember which laws those were that you considered

6  relevant that you looked into?

7    A   So primarily those cited in my report.

8    Q   Okay.  And as you sit here today, do you

9  recall any gun law -- New York gun laws that you

10  looked into that were not cited in the report that

11  I should know about?

12    A   So I -- one thing I was interested in is

13  when were the origins of some of these laws.  You

14  know, a lot of searching I did, I -- I couldn't

15  tell you for sure, I couldn't recall the range of

16  stuff I looked at.

17       (Sotto voce discussion between counsel.)

18  BY MR. DAGUE:

19    Q   Sorry.  Sorry, Doctor.

20       Would you consider yourself generally

21  familiar with how New York State regulates a sale

22  or a transfer of firearms, in light of your work on

Page 100

1  this case?

2    A   So what's complicated here is I'm aware

3  of there's an ongoing recent controversy and

4  litigation pertaining to these very issues.  And so

5  certainly I'm -- I looked into them, beginning with

6  my understanding that this is a fast-changing

7  landscape, particularly in regarding storage and

8  transport.

9       So I -- I would defer to others, if those

10  are your particular concerns, for the latest legal

11  take, but -- yeah, so at a broad level.

12    Q   Okay.  Are you familiar at all with the

13  New York Safe Act?  Is that something you looked

14  into during your preparation for this case?

15    A   So I believe, if I'm -- if I'm -- I may

16  have misremembered this, but I believe that the

17  Safe Act, that was actually responsible for

18  amending the process by which you might seek an

19  extension for harassment.

20    Q   Are you familiar with any other elements

21  of the Safe Act other than the elements related to

22  Penal Law 400 that are the focus of this lawsuit?

Page 101

1    A   No, I primarily focused on the aspects of

2  the Safe Act relevant to this case.

3    Q   Okay.  Are you aware of any recent

4  amendments to Penal Law Section 400.00(5)?  Is that

5  something you looked into in preparation for this

6  case?

7    A   Can you repeat the 00, which one?

8    Q   Yeah, 00(5).

9    A   I'm gonna read it one more time in full.

10    Q   Yeah.

11       (Sotto voce discussion between counsel.)

12  BY MR. DAGUE:

13    Q   Okay.  So -- sorry.

14       Are you aware of any recent amendments or

15  changes to Penal Law 400.00(5)?

16    A   I am -- by recent, you mean -- could you

17  just say the --

18    Q   How about --

19    A   -- time period?

20    Q   -- how about within the last 30 days?

21    A   No.

22    Q   Okay.  Okay.  Do you have a personal

Page 102

1  opinion or belief about how New York regulates sale
2  or transfer of guns, other than your opinions set
3  forth in the report?
4      A   Not particularly.
5      Q   Okay.  So you don't have a generalized
6  feeling that New York is too strict or too liberal
7  with respect to guns?
8      A   The -- what I learned from my expert
9  preparation on this particular question raised many
10  other questions for me about say the -- the
11  benefits, rationals.  But, no, that was not my
12  focus in this case, so I don't have a -- a
13  well-developed position on the -- the wider regime
14  for controlling guns in New York.
15      Q   Could you expand upon that a little bit,
16  about what -- what other questions were raised as
17  you did research into this particular issue?
18      A   Well, so I -- I'm aware of I guess
19  ongoing litigation that had concern for a while the
20  transport of a gun.  And my understanding is that
21  there was a -- after many years, there was a last
22  minute change that the -- a legislative change or

Page 103

1  bureaucratic change on that.
2      So it struck me that there had been a
3  history of some controversy about when and under
4  what circumstances somebody could even transport a
5  legally possessed firearm.  And so I'm aware of
6  that controversy, but that wasn't my focus here.
7      Q   Okay.  Based on your focus and research
8  here, do you have a -- did you develop a belief as
9  to how New York's gun laws fit in among other state
10  laws, other states' laws?
11      A   So, actually, when I had to research not
12  for this case but for the estimation of AR-15
13  manufacturing sales, the -- New York was a state
14  that came up as having -- I was aware that there
15  were at least different jurisdictions in New York
16  where ownership of certain guns is more difficult
17  or more restricted.
18      Q   Yeah, you testified earlier that you
19  maintain your personal guns in a state that is -- I
20  think you used the term "less fraught"; is that --
21      A   Yes --
22      Q   -- is that --

Page 104

1      A   -- less --
2      Q   Yeah.
3      A   -- I -- I will use it now.  Less fraught
4  with legal difficulties.
5      Q   Okay.  And what does that mean, less
6  fraught with legal difficulties?
7      A   When I arrived in the District of
8  Columbia three years ago, they had still not
9  updated their firearms permitting system as had
10  been required by law.  There's a certain point they
11  required four hours of instructions at a place -- I
12  think there was one gun store in the District that
13  you were allowed to buy guns from.  There were
14  instruction requirements that very few people could
15  fulfill.
16      There was actually, at that time, a
17  requirement that you notify -- if you wanted to
18  register a firearm, first call up the police,
19  notify them that you were going to bring a firearm
20  into the District.  As soon as they had I guess
21  acquiesced to that notification, you were then to
22  drive specifically to the office, then bring the

Page 105

1  firearm into the police station, hoping that your
2  coming was properly heralded.
3      It -- it struck me as a -- a system that
4  was ripe with inconsistencies and unclarities.  And
5  actually a lot has happened even in the last few
6  years to try to at least bring some procedural
7  clarity.  But the -- the -- the risks of running
8  afoul of a ever-changing, ambiguous, and -- and
9  burdensome permitting process, just seemed like the
10  sensible thing to do was to not be armed in D.C. --
11      Q   Okay.
12      A   -- given those risks.
13      Q   Can you tell me what your understanding
14  of Penal Law Section 400.00(5) is?
15      A   So --
16      Q   (5)(a), I'll --
17      A   Yeah, so the -- I mean the part relative
18  to this case was that, essentially, to have a
19  handgun legally owned in New York, there is a
20  requirement for this handgun permit.  And the
21  specific question of this section is whether
22  that -- the application and detail should be a

William E. English, Ph.D.                                                    9/13/2019
Washington, DC                                          Page 28 (106 - 109)

Page 106

1  matter of public record.

2  Q    And with respect to -- well, let me back

3  up real quickly.

4     And for vocabulary purposes, are you fine

5  with me referring to this section as "Penal Law

6  400," for the course --

7  A    Sounds --

8  Q    -- of this depo?

9  A    Great.  We'll --

10  Q    Okay.

11  A    -- consider that, yes.

12  Q    I might even call it PL 400.

13  A    Sure.

14  Q    Okay.  If you have any questions, if I'm

15  referring to a specific subsection, just let me

16  know.  But generally, I'll use "Penal Law 400."

17     Do you know, under PL 400, how this

18  material is publicly accessible?

19  A    My understanding -- well, right now, my

20  understanding is an injunction.  But, historically,

21  I believe it required something analogous to a

22  FOIA-type request.

Page 107

1  Q    Okay.  And you said you understand that

2  currently there's an injunction on the law; is that

3  your --

4  A    My understanding is there's some -- at

5  the current point, some restriction, I believe

6  pending the outcome of this sort of -- these sort

7  of cases and objections.

8  Q    Okay.  And your understanding of the --

9  the public access of this law is that it's through

10  a FOIL; is that fair?

11  A    It's something analogous to that.  You'd

12  have to in -- in -- historically, you would

13  inquire --

14  Q    Yeah.

15  A    -- and could ask for that information.

16  Q    And do you know under this law, PL 400,

17  what information specifically is publicly

18  accessible from FOIL?

19  A    So my understanding, which comes more

20  from a newspaper of both initial reports of

21  controversies, is that things that could be

22  disclosed would include the person's name, the

Page 108

1  person's address, and even the -- the type of gun.

2  Q    Is that your current understanding, that

3  the public disclosure is name, address, and type of

4  weapon?

5  A    Again, my current understanding is that

6  it's under an injunction and this is inaccessible.

7  Q    Okay.

8  A    So I -- it's interesting, having had

9  other experience reaching out to officials for

10  public records, I've also experienced enormous

11  disparity -- procedural disparity in what a

12  secretary decides to fax you, what they decide to

13  disclose.

14     So I'm not also certain about, in

15  practice, which different counties or, you know,

16  might -- how they might respond to these requests

17  and whether there's complete regularity in their

18  actual practices.

19  Q    Right.  And I'm just trying to delve

20  into, you know, your knowledge of injunction aside

21  or disparities in application.  I'm just trying to

22  get a baseline sense as to what your belief is as

Page 109

1  to what info is deemed public under PL 400 --

2  A    So --

3  Q    -- if someone makes --

4  A    -- yeah --

5  Q    -- a FOIA request.

6  A    -- so my understanding is the name for

7  sure --

8  Q    Yes.

9  A    -- and that historically people have been

10  able to access, at least some circumstances,

11  address as well as type of gun.

12  Q    Okay.

13     MR. DAGUE:  I know that you guys got to

14  order lunch.  I'm going to wrap up.  We're going to

15  go out.  Give me three minutes.  I'll wrap up.  And

16  then we can take a break and you can -- is that

17  fair?

18     MR. CHUCK COOPER:  We can make an order

19  and then continue.

20     MR. DAGUE:  Yeah, yeah.  Because we've

21  been going for about an hour anyway, so it's a good

22  time for a break.

Page 110

1 BY MR. DAGUE:

2     Q   Do you know when this law, PL 400, was

3 codified into law in New York?  Is that something

4 you looked into?

5     A   Yeah, my recollection was like in the

6 '60s.

7     Q   Okay.  And do you know if its original

8 codification included the exemptions?  Well, strike

9 that.  Let me lay a foundation.

10        Do you know if the current law contains

11 exemptions s?

12    A   Right, so it -- it contains exemptions

13 which we -- I believe we mentioned earlier.  It

14 came out of that Safe Act and the controversy

15 partly tied, in my understanding, to the -- some of

16 the initial controversy the newspapers caused.  So

17 there are exemptions now that can apply if you

18 swear that you meet certain standards, one of

19 them -- well, yes.  So the answer is yes.

20    Q   Okay.  And let me just tee that up for

21 you.

22        What are the exemptions, to your

Page 111

1 knowledge?

2        And, again, not a quiz.  Just trying to

3 get your knowledge as --

4     A   It's actually there in my report.  Let me

5 just turn to it.

6        Okay.  I will just read from page 3.

7     Q   Okay.

8     A   Specifically an applicant requests a

9 public records exemption if, A, quote, the

10 applicant's life or safety may be in danger by

11 disclosure.

12    Q   Doctor, hold on for one second.  Just for

13 her --

14    A   Yes.

15    Q   -- sanity --

16    A   Yeah.

17    Q   -- why don't we just say we'll direct --

18 fair to say that your understanding of the

19 exemptions is contained on page 3 of your report?

20    A   Yes.  Now, my -- just as a footnote to

21 that, I believe there are also some exemptions that

22 are gonna apply to law -- people who've had prior

Page 112

1 law enforcement experience.  And -- and that can

2 also be a factor here.

3        But for the purposes of the question of

4 this case, the relevant exemptions are noted there

5 on the case on top of page 3.

6     Q   Okay.

7        MR. DAGUE:  Let's go off.

8        (Recess)

9        MR. DAGUE:  Okay, Doctor, back on the

10 record.

11 BY MR. DAGUE:

12    Q   And understand you're still under oath,

13 obviously.

14        I want to turn your attention to your

15 report, which has been marked in the matter as

16 Defendants' Exhibit 1.  Now, just in terms of

17 laying kind of the ground rules here, I intend to

18 walk through portions of this report throughout the

19 deposition.  What I'd like to accomplish is I will

20 direct your attention to the specific part of the

21 report that I intend to ask you about.

22    A   Uh-huh.

Page 113

1     Q   I do not anticipate or expect you to

2 regurgitate this thing from memory.

3     A   Gotcha.

4     Q   If I'm asking about a portion and you

5 don't know where it is or if there's other parts

6 that you think are relevant, let me know.  But

7 that's my goal, is to point you in the direction,

8 so -- okay.

9        Do you have a copy of Exhibit 1 in front

10 of you?

11    A   I do.

12    Q   Okay.  I want to just briefly point your

13 attention to the first paragraph here where you

14 say --

15        MR. DAGUE:  And, Barbara, for your

16 edification, we'll be reading from this somewhat.

17 I will provide you with a copy of this at the end.

18 BY MR. DAGUE:

19    Q   The first paragraph, I have been asked to

20 evaluate the reports submitted by Dr. Zeoli --

21 Z-E-O-L-I -- Dr. Sege -- S-E-G-E -- and

22 Dr. Hamilton -- spelled as it sounds -- in support

William E. English, Ph.D.

9/13/2019

Washington, DC

Page 30 (114 - 117)

Page 114

1  of New York's defense of Penal Law 400, which makes
2  the name and address of any person granted a
3  handgun license a public report.
4      Do you see that?
5      A  I do.
6      Q  Okay.  Now, I want to ask you a little
7  bit about the scope of your task here.
8      A  Uh-huh.
9      Q  Were you asked to opine with respect to
10 the constitutionality or legal viability of PL 400,
11 or were you asked to simply rebut the reports of
12 Zeoli, Sege, and Hamilton?
13     A  I was asked to rebut -- to evaluate the
14 reports.  The challenge, though, is as a -- a
15 social scientist, when I evaluate public policy,
16 you know, at the highest level you can think
17 that -- of this as a -- a cost benefit analysis.
18 So I need to ask, you know, what are the -- the
19 potential benefits of this law, the most likely
20 benefits.  And those are substantially what those
21 three reports are arguing about.
22     But to -- to even evaluate those

Page 115

1  arguments in a larger policy, you might say, well,
2  what are the costs on the other -- you know,
3  what -- what are the downsides.  So, you know, if
4  this potentially could save one from child's life
5  every century, that could be a benefit, again, but
6  at what price.
7      And so the -- the beginning part of this
8  report is my attempt to just understand what's
9  the -- the universe we're considering in terms of
10 cost and benefits, who might be adversely affected
11 by this law, you know, to what degree are the
12 benefits that the doc -- the three doctors arguing
13 for stand up to scrutiny.
14     And so to be clear in answering your
15 question, my -- my primary purpose is to evaluate
16 their arguments.  But that evaluation, in -- in my
17 opinion requires thinking about the -- the -- the
18 terms of the cost and benefits in the sort of
19 widest scope.
20     Q  Okay.  And I guess what I'm wondering is
21 partially answered.
22     Were you asked to take a de novo or clear

Page 116

1  review or new review of this law from your field of
2  expertise, or were you asked to look at the law
3  through the lens of the three expert reports
4  provided with that?
5      A  I was asked to evaluate the three expert
6  reports.
7      Q  Okay.  And the report itself is entitled
8  "rebuttal report."
9      A  Uh-huh.
10     Q  Do you see that?
11     A  That's right.
12     Q  What does that mean?  Why did you entitle
13 it "rebuttal report"?
14     A  I thought that's what we're supposed to
15 entitle these reports.
16     Q  Okay.
17     A  That -- that was totally proforma.
18     Q  Fair enough.
19     MR. DAGUE:  Just off the record for a
20 second.
21     (Discussion off the record)
22 BY MR. DAGUE:

Page 117

1      Q  Were you asked to provide -- were you
2  asked by counsel to provide an assessment of the
3  constitutionality of PL 400?
4      A  I was asked to evaluate the three expert
5  witness reports.
6      Q  Okay.  Do you believe in the course of
7  your evaluation of the three expert reports that
8  you provided an opinion as to the constitutionality
9  of this law?
10     A  I certainly had many questions that arose
11 regarding constitutionality.  And -- and,
12 specifically, just to lay out what I'm trying to do
13 and why these questions arose, if -- if we're to
14 think about the cost of this law, the question --
15 one question for me is:  You know, what are other
16 similar circumstances, analogous circumstances,
17 other -- I mean I take it, you know, this law is --
18 is impinging on an enumerated right in the
19 Constitution.  There are many enumerated rights in
20 the Constitution.
21     So as a test case, you know, how are
22 other rights, Constitutionally enumerated rights,

Page 118

1  protected and what deference is given the
2  protection of privacy surrounding those rights.
3  And so it -- for me, it's part and parcel of this
4  cost benefit analysis.
5       You know, thinking about, on the one
6  hand:  What are the -- what other things are like
7  this?  How do we evaluate those things?  And, you
8  know, the Constitution's obviously the -- the
9  reference point for those analogs.  And, you know,
10  what are the potential -- you know, what are --
11  what are -- if there are for those other protected
12  rights, you know, strong barriers, what's the
13  rationale behind those barriers?  How do we think
14  about the cost to violating them.
15       So I -- the Constitutional analysis I do
16  here I think raises my questions about the
17  constitutionality of this law.  But my purpose was
18  to explore this in -- in the context of
19  establishing the potential costs.
20    Q    Okay.
21    A    The potential and actual costs of this
22  law.

Page 119

1    Q    Okay.  So in your analysis, you believe
2  you uncovered some constitutional questions, but
3  did you answer those questions through this report?
4    A    So I -- I -- this report is fundamentally
5  about evaluating Dr. Zeoli, Dr. Sege, Dr. Hamilton.
6  It strikes me there are deep constitutional
7  concerns, which -- which I've out -- outlaid here.
8    Q    Okay.
9    A    I can tell you, at least in the context
10  of my evaluation, the -- the claimed benefits of
11  this law I found extraordinarily uncompelling,
12  which then has to be weighed against what are --
13  what are the costs.  And if the costs, as I laid
14  them out in those first few pages, strike me as --
15  as, you know, fairly substantial.
16    Q    Okay.
17    A    But the constitutional reasoning is -- is
18  instrumental to trying to understand and evaluate
19  the arguments of the other three experts.
20    Q    And I just want to be clear so that I
21  understand the full scope of this --
22    A    Uh-huh.

Page 120

1    Q    -- are you or are you not offering an
2  expert opinion as to the constitutionality of PL
3  400?
4    A    Yeah, that's beyond the scope of what I
5  was asked to do.
6    Q    Okay.  Are you or are you not offering an
7  opinion with respect to the legality of PL 400, or
8  is that --
9    A    And I --
10    Q    -- beyond the scope?
11    A    I'm not a lawyer.  I'm -- what I'm
12  offering here is an evaluation of the three expert
13  witnesses' claims.
14    Q    Okay.  All right.  Let's look at the
15  third full paragraph on page 1 of the report if we
16  could.
17       I'm going to direct your attention to the
18  second sentence of that paragraph that reads, Even
19  if parents and victims of domestic abuse did
20  systematically avail themselves of the information
21  provided by handgun license records -- and there is
22  no evidence that they have -- the incidents and

Page 121

1  scenarios that the authors wish to prevent are so
2  rare that handgun ownership is not a useful risk
3  indicator for the purposes they propose,
4  particularly on a cost benefit basis.
5       Do you see that?
6    A    Yes.
7    Q    And you wrote that, correct?
8    A    Yes.
9    Q    Okay.  When you use the term "rare" with
10  respect to domestic violence and unintentional
11  handgun death, what do you mean in this context by
12  the term "rare"?
13    A    Right.  For all of these things, it's
14  useful to consider to consider these in saying in a
15  broader context of things that I think we're
16  familiar with.  So if -- if I were to ask you, you
17  know:  Are you concerned about the threat that a
18  bathtub poses to your child or other people's
19  child?  Are you concerned about the threat that
20  cars pose?  Are you concerned about the threat that
21  your medicine cabinet poses?
22       And if I were to tell you, well, whatever

William E. English, Ph.D.

Washington, DC

9/13/2019

Page 32 (122 - 125)

Page 122

1 concerns you have about that, the deaths caused by
2 handguns in order of magnitude less -- 40 times
3 less, something like that, then I would say, well,
4 rare compared -- compared to these other daily
5 things we interact with, apparently without great
6 concern, which still do present some risks, even
7 compared to those, these are much, much less likely
8 to occur, incidents regarding handguns in the two
9 scenarios outlined.
10 So "rare," I think in -- you know, you're
11 going about your average, everyday life, you know,
12 some things are likely, some things are unlikely.
13 You know, a lightening strike I think is rare. In
14 the U.S., something like 30 to 60 people are killed
15 by lightening each year. I think that's a rare
16 event. Something like 50 or 100 kids are killed by
17 handguns accidentally each year.
18 So I mean if -- if you think lightening
19 strikes are rare, which, you know, pardon me, if
20 lightening strikes killing someone is rare, I'm
21 trying to, you know, say what other common familiar
22 items do we identify in the world and how we think

Page 123

1 about their prevalence risk, you know, rarity,
2 and -- and so, yeah, rare in the common parlance,
3 it seems to me these events --
4 Q Okay.
5 A -- are pretty rare.
6 Q Do you consider the use of a handgun in
7 the perpetration of a domestic violence -- a
8 domestic violence incident to be rare on the order
9 of a lightening strike?
10 A It's -- there's -- it's slight -- at
11 least in New York, it's slightly more prevalent
12 than lightening strikes on a yearly basis.
13 Q How about on a national level? Do you
14 consider it to be akin to the rarity of a
15 lightening strike just in a domestic violence
16 context?
17 A In a domestic violence context, yeah,
18 it's more common than lightening strikes, you know,
19 less common than many other things, but --
20 Q Okay. And do you -- with respect to the
21 use of handguns and unintentional deaths of
22 children, do you consider that to be rare, in the

Page 124

1 same order as lightening strikes --
2 A It --
3 Q -- in New York?
4 A -- it -- it turns out, nationally, it's
5 about as rare as a national (sic) -- as a
6 lightening strike. In New York, it's much rarer.
7 Q And how about the use of unintentional
8 handgun injuries, not the deaths among children, is
9 that rare, on the order of lightening strikes?
10 A That's more than lightening strikes.
11 Q Okay.
12 A But I -- I -- the -- I -- the statistics
13 I've seen on injuries and the multiples compared to
14 deaths would place it above lightening strikes.
15 Q You mentioned, you know, like incidents
16 that maybe have a higher measure of probability,
17 like you mentioned use of cars --
18 A Uh-huh.
19 Q -- bathtub safety, things like that,
20 right?
21 A Uh-huh.
22 Q You understand that those things are

Page 125

1 regulated as well; there are laws with respect to
2 transportation?
3 A You need law for a bathtub permit? Can
4 you --
5 Q Sure. But I'm asking --
6 A Yeah.
7 Q -- about vehicles --
8 A Yes. And I'm -- I'm sorry --
9 Q -- specifically.
10 A -- my students, often I ask them to see
11 how it's -- so regulation is something we talk
12 about a lot in the business school. And it's often
13 this blanket concept.
14 Q Uh-huh.
15 A And so it is -- obviously, we have
16 various sorts of regulation for a lot of different
17 things.
18 Q Right. And we have laws directed at the
19 safety of children in automobiles, right?
20 A Uh-huh. Yes.
21 Q So we have laws that are directed at the
22 use of safety harness or car seats in vehicles for

Page 126

1  children, right?

2  A  Right.

3  Q  And your anticipation that those laws

4  were created, in part, for the children's safety?

5  A  Right.

6  Q  Okay. And we have laws about the use of

7  illicit drugs and/or alcohol when operating a motor

8  vehicle; is that right?

9  A  That's correct.

10  Q  And would you agree with me that those

11  laws were, in part, put in place for the safety of

12  individuals on the road?

13  A  Yes.

14  Q  Okay. Now, we've talked a little bit

15  about the distinction between numbers in New York

16  versus nationally.

17  And what I'm wondering is, in your

18  opinion, would a state like New York be able to

19  observe national trends and national data when

20  creating or justifying a law, or are they limited

21  to domestic trends and numbers only?

22  A  Well, I think it would depend.

Page 127

1  Q  Okay. What would it depend on?

2  A  Well, it would depend on the reasons New

3  York had in thinking these trends would extrapolate

4  to New York. So I -- you know, if they're getting

5  worse and worse winters in Colorado, you know, and

6  maybe the -- winter is getting worse nationally but

7  you're getting worse in one region, you'd wanna

8  know is this a West Coast phenomenon. If it's not,

9  then the East Coast should also be thinking about

10  it.

11  Q  Okay.

12  A  It'd just -- I mean it'd have to be in

13  the details --

14  Q  Yeah.

15  A  -- of whatever --

16  Q  So, I mean, but generally, do you believe

17  that if there's an epidemic of something going on

18  nationally or in other another, that a state

19  legislature would be permitted to take that issue

20  up in law to try to avoid spread of the epidemic in

21  their state?

22  A  Yeah, but, again, it would depend on

Page 128

1  exact -- you know, it'd depend on the nature of

2  that epidemic, what caused it to spread, what

3  reasons you have to think it is gonna spread. You

4  know, the -- the devil is certainly in the details

5  there.

6  And the argument would have to be made

7  on -- on why, I suppose, New York thinks that

8  whatever is going on in Hawaii or whatever is

9  something that's relevant for understanding of

10  threats we might face here.

11  Q  Okay. In that same section of the

12  report, looking in paragraph three, page 1, you use

13  the term "risk indicator," and say, Handgun

14  ownership is not a useful risk indicator for the

15  purposes that they propose.

16  A  Uh-huh.

17  Q  Do you see that?

18  A  Yep.

19  Q  What do you mean by the term "risk

20  indicator" in that context?

21  A  Yeah. So the -- so the question is: Is

22  this knowledge, in asking about this, going to be

Page 129

1  systematically useful? And, you know, you can

2  think about it in the context of lightening

3  strikes. So I'm -- I'm a parent. I'm gonna drop

4  off my kids at a playmates' house. And maybe every

5  time I do that, I should formally ask them, Are you

6  gonna let the kids play outside if it begins to

7  rain?

8  We can have every parent asking that

9  every single time. Be kinda bizarre to. Because,

10  first of all, like there's a commonsense

11  expectation. Like generally, for the most part,

12  kids are probably gonna come inside because they

13  don't wanna get wet. And parents are probably

14  gonna, you know, be sensible and ask the kids to

15  come inside. It gets crazy. People -- parents are

16  gonna ask the kids to come inside if it gets crazy

17  outside.

18  But even if kids were to linger outside a

19  little longer, there -- there is a chance that they

20  would get struck by lightening, but it's a very,

21  very small chance. And so the question is: Would

22  it be worthwhile for parents to be systematically

Page 130

1  concerned, for them to lose sleep over concerns
2  that their kids will even get struck by lightening,
3  for them to be asking at every engagement what your
4  weather plans are gonna be.
5        And the -- the claim I'm making here is
6  be -- because -- if these incidents are so rare,
7  you know, probably you should spend your time
8  asking about, you know:  How many bathtubs are
9  there in the house?  Are they gonna have restricted
10 access to those bathtubs?  Anyone gonna be, you
11 know -- I mean there's a lot of other things we
12 could worry about.
13       So the question is, you know:  Are -- we
14 have finite time, resources.  Of the -- the
15 thousand things that might harm a child at a
16 playmate's house, you know, what -- what are gonna
17 be the most important things, the most valuable
18 things to ask about, to inquire about.
19       And my claim here is that, you know, as
20 risk indicators go, evidentially this, at least
21 statistically, is pretty low on a -- on a long list
22 of things.  So -- so I don't -- I don't -- wouldn't

Page 131

1  fault parents, and I think they're probably being
2  pretty sensible, if they aren't obsessing over
3  this, if they aren't asking about it at every
4  playmate's date.
5        There's an interesting question, if they
6  do really care about it, even whether this law is
7  well suited to that -- and we can talk about that
8  later --
9    Q   Doctor, do you think it would be
10 irrational for a parent to inquire of a playmate
11 whether they planned on taking a child inside
12 during a lightening storm, when they were dropping
13 their son or daughter off at that home?  Would that
14 be an irrational question to ask?
15   A   If -- if it's -- if it's -- I think
16 psychologically it performs a very useful function.
17 And if -- if you had any -- any, for some reason --
18 I -- I do think it would be a kind of odd thing to
19 ask every parent everywhere and every time.  If
20 there were some specific concern you had, you knew
21 lightening storms were coming in.  You knew the
22 parents often let the kids play without any

Page 132

1  supervision, sure, that might be a reason to ask
2  the question.
3    Q   Right now, with a lightening storm coming
4  in, that would be something that you would have --
5  you would be able to determine in advance if it was
6  coming in, right?
7    A   Not around D.C.  They -- they --
8    Q   Well, you could check on apps, right?
9    A   You can.  I -- again, if you live in
10 D.C., we -- we get storms on a very random basis --
11   Q   Right.
12   A   -- throughout the summer, sometimes
13 blocks away.
14   Q   Well --
15   A   But I take it, yeah, there's -- there's
16 some things you might think you can plan with some
17 foresight.
18   Q   But you would have, theoretically, access
19 to information that you could check on the presence
20 of lightening in the area when you're dropping a
21 child off for a play date?
22       It'd be something that's not -- not

Page 133

1  restricted in any way, right?
2    A   Sure.
3    Q   Right.  And same thing with your bathtub
4  analogy:  You would be able to assume that someone
5  has a bathtub in the home; isn't that right, when
6  you drop the child off?
7    A   Well, it depends.  Maybe.
8    Q   Fair to say most -- a large percentage of
9  American homes have a bathtub somewhere in the
10 home?
11   A   Probably.
12   Q   Okay.  But with a handgun, a parent
13 dropping them off, there's no way they can check a
14 weather map to determine if there's a handgun in
15 that home, right?
16   A   Again, the -- the question would be
17 whether it would be valuable to know the -- if you
18 follow the weather analogy -- again, I think in --
19 almost every day in the summer in D.C. there's a
20 chance of a -- thunder somewhere.
21       And my overriding claim is it would -- it
22 would actually probably be a waste of parents' time

William E. English, Ph.D.                                    9/13/2019
                    Washington, DC                      Page 35 (134 - 137)

Page 134

1 to constantly obsess over that potentiality
2 because, in fact, this is such an extraordinarily
3 rare event.
4         That aside, if you had any specific
5 reason to think that there really, for some -- you
6 know, there's some tell, something that made you
7 concerned, we might entertain what's the best way
8 to get that information that you'd like to know,
9 whether there is a handgun.
10        And, you know, as I note in my report,
11 the peculiar way this disclosure is structured is
12 it's not clear they would even give you reliable
13 information about that. So it -- obviously, it
14 doesn't cover long guns. It doesn't cover those
15 who have exemptions. It doesn't cover --
16   Q   Right.
17   A   -- you know, all these people. Illegal
18 guns, which it turns our, as far as we can tell,
19 account for most accidental shootings that I could
20 document.
21        So it -- it might be as bad, actually,
22 for a parent to think they were -- you know, if

Page 135

1 there were some reason for concern -- you think the
2 lightening storm, proverbial lightening storm might
3 be a risk. I guess the worst thing would be to --
4 to look at a weather map that was wrong 50 percent
5 of the time.
6         So I -- I --' I take the line of -- of
7 reasoning here. Again, I think it's probably not
8 something parents should be systematically
9 concerned about, that it's --
10   Q   Now, you've -- you've introduced this
11 concept of obsessed, of obsession, the parents
12 having an obsession. I believe you said lose
13 sleep.
14        I'm wondering, where does that come from?
15        Because Dr. Sege and -- well, Dr. Sege
16 and Dr. Hamilton, Professor Hamilton, they don't
17 talk about an obsession with this fact. They talk
18 about a parent being concerned, and using this tool
19 as a way. But you -- you've introduced obsession.
20        Is that -- where does --
21   A   Oh, I --
22   Q   -- come from?

Page 136

1   A   -- all I'm suggesting is that it would --
2 in fact, when you look at statistics, be a little
3 weird, you know, if you were strictly statistical
4 reasoners.
5         I mean on the other side of this, maybe
6 parents should be a lot more concerned about
7 bathtubs. Maybe they should be a lot more
8 concerned about, you know, if there's -- there's
9 matches in a house. Maybe -- I mean clearly if you
10 think they should be asking about handguns, they
11 should be asking about matches and stuff like that,
12 too, which are much more dangerous. You know,
13 literally more than -- on magnitude, more
14 dangerous.
15        So I -- I think it's reasonable that
16 parents aren't concerned about dozens, maybe
17 hundreds, maybe thousands of things that pose --
18 pose a greater threat to their child. But if they
19 had a reason for concern, okay. We can ask that
20 question, whether this law is well tailored to even
21 address whatever residual concerns they have.
22        But yes, as a general matter, it strikes

Page 137

1 me as something that parents shouldn't particularly
2 lose sleep about unless there was some particular,
3 you know, reason that they had to think this was a
4 particular liability.
5         MR. CHUCK COOPER:  Harris?
6         MR. DAGUE:  Yes?
7         MR. CHUCK COOPER:  I just want you know
8 that the lunches have arrived.
9         MR. DAGUE:  Okay.
10        MR. CHUCK COOPER:  So if -- you know,
11 whenever you're at a --
12        MR. DAGUE:  Yeah, I'll try to find a good
13 spot in a few more minutes.
14 BY MR. DAGUE:
15   Q   I'm just trying to get a full handle on
16 this risk indicator concept --
17   A   Yeah.
18   Q   -- you talk about here in paragraph one.
19        Am I too simplistic to read this as when
20 you say, The incidents and scenarios that the
21 authors wish to prevent are so rare that handgun
22 ownership is not a useful risk indicator for that

Page 138

1  purpose?

2       I mean are you suggesting that handgun

3  ownership is not a risk indicator for a domestic

4  violence incident that involves a handgun?

5       Am I --

6  A   Well --

7  Q   -- reading that --

8  A   -- a legal --

9  Q   -- improperly?

10 A   -- pardon me, legal -- legally disclosed

11 and permitted handgun ownership.

12 Q   Uh-huh.

13 A   And it turns out, actually -- if you

14 think, you know, I wanna know whether or not

15 somebody is a risk for this -- so we have this one

16 population.  We'll call them handgun permit owners.

17 So what's the likelihood they're gonna be involved

18 with this?  Well 9,999 out of 10,000 of them

19 will -- will not be.

20      And so it turns out you have this group,

21 99.9 percent of them are not gonna be involved with

22 this sort of stuff.  And you wanna say, well, we're

Page 139

1  gonna burden them, scrutinize them, because there's

2  this less than .01 percent that if they're abiding

3  by the law, might have -- be more likely to break

4  this other law.

5       So, yeah, my point -- I mean just as a

6  matter of statistics here, do -- does the fact that

7  I know somebody's a handgun owner a good predicter

8  of whether they're going to commit a crime?  No.

9  No.

10 Q   But is the fact that someone's a handgun

11 owner a good predictor that if they do commit a

12 domestic violence using a handgun, they have a

13 handgun?

14 A   A legally owned handgun.

15 Q   A legally owned handgun, that's right.

16      But is that a good indicator of the fact

17 that they have a handgun if they commit --

18 A   Probably --

19 Q   -- that crime?

20 A   -- not.  I didn't run the numbers for

21 here.

22 Q   Sure.

Page 140

1  A   But you all -- undoubtedly, your state

2  agency could look at this.  I would love to know

3  what percentage of handgun homicides were of

4  legally owned and registered handguns.  That would

5  be interesting thing for you all to pursue.

6  Q   Now, you derive this -- you state in your

7  report 99.99 percent of gun-owning households will

8  not have a child accident or an intimate partner

9  violence -- sorry, a child accidently killed or an

10 intimate partner violence.

11      Where do you derive those 99 percent

12 figures from?  Where is that --

13 A   Yeah.

14 Q   -- data culled from?

15 A   The -- I actually noted in my report.

16      (Witness looked at document).  So we

17 have -- I'm not sure where it is.

18      Ah.  Page 10.

19 Q   Okay.

20 A   So we have these -- the number is 16

21 firearms homicides in New York.  New York has about

22 19.5 million residents.  So that's meaning that out

Page 141

1  of those 19 million residents, so 16 out of 19 --

2  out of 1. -- pardon me, 19.5 million residents,

3  there's an incidence rate of .0000008.

4       And you do the -- the simple arithmetic

5  there.  And it means that -- I have estimated

6  earlier there's -- from what I could tell from

7  newspaper reports, a few hundred thousand people,

8  apparently, that own these, so --

9  Q   Did you look into just deaths, or did you

10 look into injuries on both fronts, domestic

11 violence and accidental childhood injuries --

12 A   Yeah.

13 Q   -- when you derived those numbers?

14 A   So that is for the -- the -- this is

15 specifically in the context of Zeoli's rebuttal.

16      Now, it turns out, if I run the same

17 numbers with the handgun deaths of children, notice

18 those numbers are much, much rarer than the

19 domestic violence homicides.  And the -- the --

20 it's a rounding error that isn't gonna move that at

21 all.

22 Q   Yeah, what I asked is -- you -- you keep

Page 142

1  referring to homicides.

2      And what I asked is did you -- did you

3  look at injuries --

4      A   Ah.

5      Q   -- not just homicides?

6      A   I didn't look at injuries.  Dr. Zeoli

7  didn't focus on injuries; she focused on homicides.

8  And I was rebutting her on that.

9      Q   Did Dr. Sege look at injuries?

10     A   He -- I believe he may have mentioned

11  this briefly, although he, as well, focused

12  primarily on homicides.

13     Q   In that same section, you talk about cost

14  benefit analysis.

15     And you referred to that a few times in

16  your testimony already, right?

17     A   Uh-huh.

18     Q   Now --

19     A   Yes.

20     Q   Yes.

21     You started to describe what you mean

22  generally by cost benefit analysis.

Page 143

1      What is the cost -- define the cost in

2  the cost benefit analysis that you conducted in

3  this case.  What's the --

4      A   Right.

5      Q   -- cost mean?

6      A   So the -- the cost I focused on were the

7  costs that the expert witnesses focused on.  So

8  Dr. Zeoli and Dr. Hamilton, you know, focused their

9  reports on this cost of homicide, the -- that was

10  the -- the cost that I was myself rebutting.

11     The -- and accidentally, I had -- I have

12  seen injury rates and -- and injury rates are

13  multiples, not orders of magnitude more.  So the --

14  even looking at injury rates, we're again talking

15  a -- a very small deviation from the overall

16  picture.  So I'm -- I'm happy to take those into

17  account.  That -- that doesn't change the overall

18  analysis.

19     Q   So the cost in your cost benefit analysis

20  is the -- is the number, the statistics and data

21  dealing with homicides in the DV context or the

22  child unintentional accidental death context,

Page 144

1  right?

2      A   Yes, the cost I'm evaluating are those

3  ones that were identified by the original expert

4  witness reports.

5      Q   Okay.  And what's the benefit portion of

6  that equation, in your research?

7      A   Ah.  Okay.  To clarify, so we're -- it

8  depends which side you're looking at, whether

9  you're considering the cost of it, so the -- the --

10  their claim is that the cost of not having this law

11  would be having these homicides.  You can flip that

12  around and say the benefits of having this law

13  would be preventing these homicides.

14     So when I initially set out this

15  discussion, my -- you think of the law as the

16  positive thing here you're -- you're asking about.

17  The benefit, pun -- putative benefits of that law,

18  I take it from their reports, are you save lives,

19  that we were just talking about.

20     From my perspective, when I think about

21  the cost of the law, I'm asking what are the --

22  what are the costs to the hundreds of thousands of

Page 145

1  handgun owners who have their -- their privacy

2  violated, have their details disclosed.

3      So -- so we can -- we can think in the

4  broadest terms of the law what are the -- the puted

5  (sic) benefits to health and safety, to homicide

6  rates and that sort of thing; what are the costs to

7  those who are burdened by this disclosure regime.

8      Q   When you looked at the DV issue -- and

9  when I say DV --

10     A   Domestic violence --

11     Q   -- you understand that?

12     A   Yeah.

13     Q   Okay.  Shorthand.

14     When you looked at the DV issue, the

15  benefits discussed by Dr. Zeoli, you looked at the

16  homicide rates with respect to DV incidents?

17     A   That's correct.

18     Q   Did you look at -- and I think I asked

19  you this -- either the injury rates and/or did you

20  look at the rates of nonphysical harms caused by

21  weapons, handguns -- excuse me --

22     A   So --

William E. English, Ph.D.
9/13/2019
Washington, DC
Page 38 (146 - 149)

Page 146

1   Q  -- handguns in the context of DV -- so
2   terrorizing, threatening, things of that nature --
3   did you look at any data with respect to that?
4       A   I didn't look at that, nor did I look at
5   the benefits of domestic abusees using firearms to
6   defend themselves, brandishing firearms to defend
7   themselves. I know there's a sub literature on
8   that. I -- you know, it's interesting question.
9   And it's actually not obvious to me whether the
10  cost or benefits are more on either side. I -- I
11  know there's many documented cases of people who --
12  women who've been abused using handguns in their
13  defense.
14      So there's tertiary questions here that
15  they weren't flagged by the initial reports as
16  the -- any of their concerns. Further analysis
17  could look at what are the residual benefits to
18  domestic abusees, as well as potential, you know,
19  injury costs --
20  Q   But you --
21  A   -- on either side.
22  Q   -- would you agree with me that if you

Page 147

1   set up a cost benefit scale, the only value to the
2   scale is if good information goes into the scale,
3   correct?
4       A   It's a question of priorities importance.
5   Death seems to me the biggest question here.
6   Q   Right.
7   A   How many deaths can you prevent is a big,
8   important question. There are injuries. Again,
9   now you might get, you know, serious injuries,
10  slight injuries, fear. The questions get more
11  complicated: How you gonna value, how you're gonna
12  weigh those, how you gonna get the quality of the
13  discrimination that's worthwhile.
14      So, yeah, there's interesting questions
15  to be pursued here. That's --
16  Q   But --
17  A   -- again, and it's on both sides. So
18  there's a certain symmetry here. I don't know all
19  the benefits of handgun ownership to abusees. I
20  don't include that. Now, that might be difficult
21  to get to, again difficult to weigh.
22      But what I wanna make sure is -- in this

Page 148

1   equation is, you know, what are the most -- the
2   most serious concerns, the ones identified by the
3   expert witness reports. Clearly death is a -- is
4   an enormous -- you know, something you're not --
5   you're not gonna heal from. That's a -- you know,
6   a fundamental huge issue. And how do we evaluate
7   those. And this is -- this is the fundamental
8   thing that I'm weighing.
9       You know, it'd be -- it could be
10  worthwhile drilling down more of those. You're
11  gonna get less resolution, though, the more you try
12  to account for things that are much harder to
13  measure and register.
14  Q   Right. But if you're creating the cost
15  benefit analysis -- and it is your cost benefit
16  analysis that you created through this report -- if
17  you didn't include the benefits that were
18  specifically highlighted by Dr. Zeoli and Dr. Sege
19  and Professor Hamilton's reports, then isn't that
20  thumbing the scale on your analysis insofar as
21  Dr. Zeoli specifically mentions both homicides,
22  injuries, and this concept of threat, which you

Page 149

1   discuss is the threats that cause, you know,
2   emotional damages to victims of domestic violence,
3   and Dr. Sege specifically addresses injuries?
4       So if you take these out of the equation,
5   are you, like I said, thumbing the scale --
6   A   No, no --
7   Q   -- on your cost --
8   A   -- no.
9   Q   -- benefit scale?
10  A   No. Just to be clear, the things you're
11  talking about, first of all, pale in comparison to
12  death.
13  Q   In -- in what regard, though, pale in
14  comparison? Severity or --
15  A   Yes, I --
16  Q   -- finality?
17  A   -- I -- if -- if I give you the question:
18  Would you rather have a loved one killed or have a
19  loved one injured?, is that a real -- it strikes me
20  that that's -- we think severity importance, death
21  is more serious than injury.
22      We have to consider if we're gonna take

Page 150

1  an injury, how are you discriminating different
2  types of injury, different severity.  But the --
3  the larger picture here is these are -- these are
4  small error bars around a really, really, really
5  small number to begin with.
6      So we can even hypothesize -- again,
7  we're not taking into account -- the point is,
8  there's gonna be error on both sides.  And we're
9  not taking in account the value as defensive uses
10 of firearms by -- by domestic abusers.  So we can
11 stipulate there's gonna be some err on either side.
12 It may be 99.9993 or 92 or 97.
13     I mean you're arguing here about, you
14 know, can we get more resolution on this extremely
15 small number, which the -- the question is, you
16 know, how -- is -- is it gonna tip the scale of the
17 larger analysis.  And --
18     Q  But how do you know that?
19     I mean where is your data that -- where
20 is the data in this report that suggests that that
21 number would only move from 99.99 to 99.93 if you
22 included all of the harms discussed by Zeoli and

Page 151

1  Sege?
2      I mean do you have data to support that
3  figure, or is that just a guess at this point in
4  your part because you haven't looked at it?
5      A  I would love to get access to that data,
6  which New York State actually collects but doesn't
7  permit the public to access.  So that would be --
8  that would be wonderful, even as a researcher, to
9  obtain that.  But New York State has decided that
10 that sort of contact data regarding domestic
11 abusers shouldn't be publicly available.  Because,
12 apparently, there's a privacy interest that abusers
13 have.  So I can't get access to that data.
14     Incidentally, though, the court's can,
15 which also domestic abusees can in the context of
16 the court hearings.
17     Q  Well, Dr. Sege accessed data with respect
18 to injuries and with respect to injuries --
19     A  Over children.
20     Q  -- accidental guns over children.  So
21 that information, at least, was accessible.
22     But you didn't look at that, is that

Page 152

1  fair?
2      A  I -- I looked it, and deemed this
3  inconsequential.  And if we're talking about
4  multiple again, not orders of magnitude.
5      Q  Okay.  And then just to be clear, though,
6  when you throw out numbers of 99.93 or 94, that's
7  just a guess on your part; you don't have any firm
8  data at this point to support that --
9      A  No --
10     Q  -- right?
11     A  -- no, even -- even if you accept the --
12 the -- if you wanna include again injuries of
13 unknown severity, which is even what Dr. Sege's
14 publicly available data shows, so, you know, you
15 can have somebody grazed.  You can have somebody
16 lose an arm.  And it's a question of, again, how
17 you're gonna weigh that all consistently.
18     The -- even if you're gonna accept
19 multiples there, you're still talking -- I mean I
20 had to round -- I mean it's nine -- it's -- it's
21 actually 99.999 -- something like 4.  You're not
22 gonna -- you're not gonna get the movement even

Page 153

1  with that statistic, if you're adding in, you know,
2  those multiples that are injured or whatnot.
3      Q  Well --
4      A  So that's what -- what gives me
5  extraordinary confidence in these estimates, is
6  we're -- we're talking about -- you're talking
7  about rounding errors.  The overall picture is the
8  same.
9      Q  Why not include them, if the rounding
10 errors for -- at least for completeness of your
11 analysis?
12     A  The -- the precisely the problem is it's
13 very difficult to evaluate.  It's difficult both to
14 evaluate the defensive value of these guns to
15 domestic abusees.  It's also difficult to evaluate
16 the severity of injury to know if we're comparing
17 apples or oranges.  Death count is pretty clear.
18 And it's what the opposing expert and supports
19 focused on.  It was the -- the main claim that they
20 made.
21     And it turns out, upon scrutiny, not only
22 are the numbers a little lower than some of them

Page 154

1 suggested, but when you look at the larger context,
2 we're talking about vanishing these small number of
3 incidents in the context of, you know, many other
4 risky things that we deal with in everyday life.
5    Q   Did you consider the data that over
6 20,000 American children under 19 present for care
7 in an emergency room for a firearm-related injury
8 on an annual basis?
9    A   Yeah, and what was the age again?  I just
10 want to hear that.
11    Q   Under 19.
12    A   Under 19.  No.  And that's partly
13 because -- well, it's a difficult question, how to
14 consider an 18-year-old who goes to the emergency
15 room for a gunshot or for gun violence.
16    Q   Uh-huh.
17    A   We're -- we're not talking about -- well,
18 we could be talking about many things at that
19 point.
20    Q   Okay.  And when you talk about severity
21 of those potential injuries, did you ever encounter
22 a statistic that shows that over 50 percent of

Page 155

1 children who are hospitalized with firearm-related
2 injuries are discharged from the hospital with a
3 permanent disability?  Is that something you
4 considered?
5    A   Nope.
6    Q   Okay.  And when you talk about the
7 magnitude -- and I believe you posed the question
8 of, you know, would you rather a -- someone -- a
9 loved one be -- sustain a fatality or an injury,
10 did you contemplate the cost and/or possibility of
11 a life-long disability when you did your statistics
12 and considerations for this report?
13    A   No.  I focused on deaths.
14    Q   Okay.  And we can agree, though, that
15 while death is certainly more final, a permanent
16 disability is fairly severe as well, with orders of
17 magnitude, correct?
18    A   It is -- permanent disability is
19 certainly a bad thing.
20    Q   Okay.
21    A   Not only did I not account for that, I
22 didn't account for the value of definitive use of

Page 156

1 firearms, which, of course, would be a big thing to
2 consider on the other side.  But given the
3 difficulties of estimating that and vetting
4 those -- that with great accuracy, I decided not to
5 put that on the scale on the other side as well.
6    Q   Right.  What I'm wondering, Doctor, is
7 that this is your analysis.  You're the one who
8 created the cost benefit analysis paradigm.
9        So that was your decision not to include
10 the defensive values, correct?
11    A   Yeah, precisely for the reasons I just
12 said.
13    Q   Okay.
14    A   If there's -- if there's enormous
15 difficulty and controversy about measuring, but --
16 but we have some confidence that we at least
17 understand the order of magnitude that could be on
18 either side, this is not a -- a concern at all for
19 my overall --
20    Q   Okay.
21    A   -- analysis and conclusions.
22    Q   So just to be clear, it was your decision

Page 157

1 to limit the benefit side of the equation to just
2 fatalities in both DV and the pediatric realm, and
3 to exclude injuries and/or potentially other
4 nonphysical injuries in the DV context, correct?
5    A   It was indeed my decision to focus on
6 facilities, which are -- are measurable and
7 transparent, and to exclude both the potential
8 positive value of the defensive use of firearm as
9 well as potential negative value of -- of injuries
10 that are accounted for in different ways.
11    Q   Okay.  And just to be clear, are you not
12 a -- do you consider an expert in domestic
13 violence?
14    A   No.
15    Q   Okay.  Are you familiar with the
16 psychological, nonphysical ramifications from
17 domestic violence at all?
18    A   I'm aware there's a literature that
19 examines it.
20    Q   Okay.  And are you aware that threats
21 and/or badgering have a psychological harm to
22 domestic violence victims as well as physical

Page 158

1  injury?

2    A  I am.

3    Q  Okay.  Now, you --

4      MR. DAGUE:  And I'll be done in a few

5  minutes.

6      MS. CONNELL:  I was going to say, the

7  poor guys over there.

8      MR. DAGUE:  I know.  I know.  But I have

9  one -- thanks.

10  BY MR. DAGUE:

11    Q  Now, you proposed this cost benefit

12  analysis.

13      And what I was wondering is by proposing

14  that, how many incidents of domestic violence

15  involving a licensed handgun would you need to see

16  to determine that the benefits outweigh the costs,

17  in real numbers?

18    A  It depends on many other things.  I'd

19  need to see what regime was enforcing that.  I'd

20  need to see -- I mean how -- there's a lot of other

21  questions that would go into figuring, to making

22  that determination.

Page 159

1    Q  Yeah, but, Doctor, you've proposed the

2  cost benefit analysis.  And you've said that you

3  have made a determination that this law doesn't tip

4  the benefits above the cost.

5      So what I'm asking you is -- and you say

6  99 --

7    A  Ah.

8    Q  -- .99 --

9    A  Yeah.

10    Q  -- what I'm wondering is where's the line

11  and --

12    A  Oh, yeah, well --

13    Q  -- what's the percentage?

14      What's the percentage?

15    A  The number, or the percentage?

16    Q  Well, what's the percentage?

17      What would you have to see for you to

18  be -- determine from a statistical data expertise

19  that the benefit outweighs the cost?

20    A  Well, we actually haven't talked yet

21  about the -- the ben -- the other side; that is,

22  what's -- what's at stake.

Page 160

1      So, again, I try to think analogously,

2  like how many lives could we save if we required

3  everybody who has a -- an STD that's communicable

4  to be publicly registered.  That number's probably

5  huge.  So I'm just trying to think, you know,

6  what -- we don't allow that.  But clearly -- I

7  mean, you know, at a certain time in certain

8  cities, certain places, that might have saved, oh,

9  I don't know, ten -- a hundred -- hundreds, maybe

10  thousands, tens of thousands of lives.

11      So I'd -- I'd have to think about it

12  because -- yeah, there's a lot of invasions of

13  privacy that I think could potentially save a lot

14  of lives.  I'm not sure how many people, for

15  example, I'd -- like how many HIV patients I would

16  require to be publicly disclosed if I knew it would

17  save, you know, "X" many lives.  I'd have to think,

18  give more thought to that.

19    Q  Doctor, I appreciate the discussion on

20  STDs and -- and AIDS, but -- but I'm talking about

21  this case.  And I'm --

22    A  Uh-huh.

Page 161

1    Q  -- talking about your proposed cost

2  benefit and your data.

3      And what I'm wondering is you have opined

4  that the cost does not out -- the benefit does not

5  outweigh --

6    A  Uh-huh.

7    Q  -- the benefits articulated by Zeoli,

8  Sege, and Hamilton do not outweigh the costs.  And

9  what I'm wondering is by proposing that, you must

10  have a line where you believe the benefits outweigh

11  the cost.

12      And what is that line that the state

13  would have to hit for you to change your opinion?

14    A  Sure.  So if it -- if it saved more lives

15  than had died from AIDS over the last 30 years,

16  then it would at least be above the standard that

17  we've already said.  It at least has to exceed that

18  standard.

19    Q  Okay.

20    A  So that would be, you know --

21    Q  Okay.

22    A  -- significant.  But we've already said

William E. English, Ph.D.

Washington, DC

9/13/2019

Page 42 (162 - 165)

Page 162

1 we won't allow, say, in other courses of the law,
2 invasions of privacy to save that many people. So
3 it would have to at least exceed that, I would
4 think, if we're gonna be consistent legally --
5 Q   Okay.
6 A   -- thinking about the cost and benefits
7 of privacy invasion.
8 Q   Okay. So that's the line, that the line
9 is over the last 30 years, the State would have
10 to --
11 A   Now, that's.
12 Q   -- demonstrate --
13 A   -- on a national level.
14 Q   On a national level?
15 A   Yeah, I think, yes.
16 Q   Okay. So in order for you to change your
17 opinion, the State would have to demonstrate that
18 on a national level that more people have died from
19 domestic -- just died -- from domestic violence
20 and/or unintentional gun deaths of children than
21 how many died from AIDS over the last 30 years to
22 justify this law, is that fair?

Page 163

1 A   I would say at least -- so this is a -- a
2 lower boundary, at least, given our existing
3 legal -- yeah.
4 Q   Okay.
5 A   However, just be clear here, there's also
6 a claim -- and this would have to be substantiated
7 as well -- that disclosure actually prevented these
8 things.
9 Q   Right.
10 A   So I -- we're assuming we're stipulating
11 for this thought experiment that say public
12 registry of those with a communicable disease would
13 help people know not to say engage in behaviors
14 that might transmit that unwittingly. And so,
15 again, that's a -- that's a big caveat.
16 Q   Right.
17 A   But, again, I would think, you know,
18 that's a good public policy question, when there's
19 all these other areas of our law where we -- we --
20 it doesn't even concern us that we don't allow
21 invasions of privacy, even though it -- it seems
22 like it would save all these lives.

Page 164

1         And so, again, I'm saying as a minimum
2 standard, well, at least would have to be bigger
3 than, because you've already established a
4 pretty -- you know, a strong precedent there.
5 Q   Okay.
6         MR. DAGUE:  All right. I've kept you
7 guys from your lunch long enough. Let's take -- do
8 you want to do a half hour, come back at 1:00,
9 1:05?
10         MR. DAVIS COOPER:  We're fine with that.
11         (Whereupon, at 12:34 p.m., a
12         luncheon recess was taken.)
13         A F T E R N O O N  S E S S I O N
14         (1:10 p.m.)
15 Wherupon,
16         WILLIAM ENGLISH, Ph.D.,
17 was recalled as the witness and, having been
18 previously sworn, was examined and testified
19 further as follows:
20         EXAMINATION BY COUNSEL FOR DEFENDANTS
21         CONTINUED
22         MR. DAGUE:  Okay. Back on the record.

Page 165

1 BY MR. DAGUE:
2 Q   Welcome back, Doctor.
3 A   Thank you.
4 Q   I'm going to direct your attention to
5 page 2 of your report, Defendants' Exhibit 1. And
6 looking at that first paragraph, the paragraph that
7 begins "finally."
8 A   Uh-huh.
9 Q   So in the second sentence you say, First,
10 there are many indicators of risk that are much
11 more predictive of the outcomes that these authors
12 want to avoid.
13         Do you see that?
14 A   Yes.
15 Q   All right. And I wanted to ask you a
16 couple follow-ups on that.
17         What are the many indicators that you
18 reference here?
19 A   Yeah, so harking back to where we left
20 off, so disease, that could be an indicator of
21 risk. You know, people have disease, people who
22 haven't been vaccinated.

William E. English, Ph.D.

9/13/2019

Washington, DC

Page 43 (166 - 169)

Page 166

1    Q   I -- yeah.

2    A   And just to finish this, the outcomes

3 these authors want to avoid. They want to avoid --

4 so outcomes these authors want to avoid is how,

5 that -- the sentence proceeds. Death is a bad

6 thing. We want to avoid a death. Okay. There are

7 many indicators of risk, things like disease

8 indicators that are pretty predictive of some

9 really bad out -- health outcomes, death, you know,

10 injury, disease. And yet even in those cases where

11 the risks are much more -- are higher and more

12 directly linked, the State does not make a matter

13 of public record.

14    Q   Okay. Let's dig in on this a little bit

15 more.

16      So you're saying that there are other

17 indicators of risk other than handgun -- licensed

18 handgun ownership that are more predictive of the

19 outcomes of these authors --

20    A   Uh-huh.

21    Q   -- Zeoli, Hamilton, Sege -- want to

22 avoid --

Page 167

1    A   Yes.

2    Q   -- right?

3      So you said disease, but I -- is that a

4 mis -- is that a misnomer?

5      I mean is disease -- disease is -- would

6 disease be a risk indicator in this context of

7 avoiding unintentional shootings or avoiding use of

8 handguns for domestic violence?

9    A   Just to be clear, this may be a

10 misunderstanding of rhetoric here.

11    Q   Yeah.

12    A   I'm saying as a general matter, there's a

13 lot of things these authors would probably agree we

14 want to avoid. Some of them are specifically, you

15 know, things their reports are aimed at. You know,

16 death and injury is -- Sege's a doctor. He

17 probably wants to prevent disease. But that's --

18 maybe -- it's you're reading less -- more into this

19 than I intended.

20      I'm saying clearly there's also the bad

21 outcomes these authors agree to, sometimes

22 explicitly, in the very reports I'm citing. And

Page 168

1 it's interesting that even on matters of risk that

2 are highly predictive of those, there are many

3 instances where we believe they -- we shouldn't

4 violate privacy to try to mitigate those risks,

5 because we think privacy has a -- a value of

6 importance.

7    Q   Okay. And so just so I'm clear, we're

8 talking about this is -- you're making a general

9 statement here as to risk indicators. You're

10 not -- you're not saying that there are more apt or

11 relevant risk indicators that the authors of the

12 reports didn't look at that equal or result in

13 these outcomes they discuss.

14      That's not what you're saying?

15    A   I -- you know, it's not a narrowly

16 construed -- I'm not talking just about gun stuff

17 here.

18    Q   Oh.

19    A   I'm saying as a general matter, there's

20 all sorts of risky things in our society.

21    Q   Okay.

22    A   Clearly, these people, you know, care

Page 169

1 about death and injury. And for some reason, we --

2 we don't violate privacy even when it might be

3 useful to prevent some of those.

4    Q   Okay. Now, you mentioned disease.

5      Is this a reference to your discussion of

6 AIDS and STDs?

7      Is that the -- are you thinking the same

8 concept there?

9    A   Same concept. I mean you can think about

10 it in terms of vaccines. You can -- I mean you can

11 think about quarantines and flu season. You know,

12 there's many, many ways --

13    Q   Right.

14    A   -- in which you could think of public

15 health concern that we have that we protect --

16    Q   Now --

17    A   -- privacy.

18    Q   -- wouldn't you agree with me that

19 applying your cost benefit analysis in these -- in

20 quarantines, that the -- the cost of a quarantine

21 would be considerably greater than the cost at

22 issue here, which is the public availability

Page 170

1  through FOIL of individual's names?

2    A   Just be -- I'm -- I'm listing many sorts

3  of examples here.  I'm --

4    Q   Yeah, that's --

5    A   -- just giving --

6    Q   -- fine --

7    A   -- you a --

8    Q   -- I'm just -- I'm just digging in on one

9  them, which you --

10   A   It would depend on the nature of the

11  quarantine.

12   Q   Okay.  Would you generally -- would you

13  ever find a physical quarantine of an individual

14  less restrictive than their name being publicly

15  available through FOIL?

16       Can you think of a situation where that

17  would happen?

18   A   I'd have to think about the details of

19  it.  Generally and for the most part, physical

20  restraint, I would think would be worse than

21  publishing names.

22   Q   Now, these risk -- these indicators of

Page 171

1  risk or risk indicators that you talk about, are

2  all of those addressable through some sort of

3  public disclosure?

4       The examples --

5    A   So --

6    Q   -- that you're --

7    A   -- so I --

8    Q   -- thinking of.

9    A   -- think, you know, some are, so --

10   Q   All right.

11   A   Yeah, so my point -- my point is as a

12  general matter here.  Again, I'm just saying

13  there's a lot of that outcome that we'd want to

14  avoid.  There's various risk indicators.  We can

15  think of different ways of dealing with that risk.

16  We seem to have high bars.  Certainly there are

17  some instances where disclosure might be a way to

18  mitigate that.

19   Q   Uh-huh.

20   A   We -- we don't pursue.

21   Q   Do you find -- and you've mentioned AIDS

22  or -- or STDs.

Page 172

1       Do you find, as a general matter, the

2  concept of publicizing individual's names based

3  upon their medical condition more or less

4  problematic than publicizing an individual's name

5  who owns a gun --

6    A   Well --

7    Q   -- via FOIL?

8    A   -- it would depend.

9    Q   Okay.  What types of factors would it

10  depend upon?

11   A   Oh, there's type of medical condition,

12  how communicable it is, whether somebody had

13  responsibility in acquiring it, or whether it's

14  curable.  I mean that's just the tip of the

15  iceberg.  I'm -- I -- I could -- possibly many,

16  many factors --

17   Q   Right.

18   A   -- would influence that kind of decision.

19   Q   Now, is there a fundamental distinction

20  between those two comparators, in the fact that --

21  say for STDs, or mental health, as you mention in

22  your report, that those are generally nonvoluntary

Page 173

1  or things that you obtain non-voluntarily versus a

2  gun, which is a voluntary action to purchase?

3    A   Well, I mean STDs I suppose it begs the

4  question, you know.  Potentially -- I mean you --

5  you could make it into something that you'd have

6  more voluntary control over precisely through

7  disclosure.  And, you know, again, you could

8  imagine many different circumstances, some of which

9  there is some foreknowledge, some which there is

10  accepted risk.

11       So -- so, yeah, I think the -- and same

12  thing with mental illness.  It turn -- I mean much

13  of it's inherited.  There's also things one can do

14  to develop psychosis, you know, drugs and whatever.

15  So clearly there's a variety of reasons somebody

16  might be in -- in these various states.  But the --

17  not always the obvious or the case that

18  voluntariness distinguishes it.

19   Q   Do you find that the infringement in

20  privacy would be greater for publicizing

21  individuals who have a nonvoluntary medical

22  condition than for publicizing names of individuals

Page 174

1  who have voluntarily decided to purchase a handgun?

2    A  It depends.  It depends.  Like I think --

3  I mean, again, I'm trying to think of test cases,

4  analogies.  You know, it's -- somebody could, you

5  know, voluntarily get an abortion, I suppose.

6    Q  Let me pose a specific hypothetical.

7    A  Uh-huh.

8    Q  Maybe that'll help.

9       Would you find that publicizing the name

10  of an individual who has schizophrenia and lives in

11  the community is more of an infringement on privacy

12  than publicizing the name of someone who

13  voluntarily decided to apply for a handgun permit

14  and purchase a handgun?

15    A  Again, I might like a few more details

16  about who this person is concerning why -- what --

17  their group home, what's going on there.  But as a

18  general matter, I would say both strike me as

19  inappropriate.  I'm -- I'm not sure how to rank

20  their inappropriateness.

21    Q  Sure.

22    A  But without further information, it's

Page 175

1  hard to --

2    Q  Okay.

3    A  -- you know, compare what -- compare

4  these.

5    Q  So do you believe that the voluntary or

6  involuntary nature of the risk factor has any

7  bearing on the disclosure of the factor?

8    A  Yeah, it strikes me, as a general

9  principal, it's -- it's totally unclear.  I, you

10  know, can voluntarily not vaccinate my kids.  I

11  suppose that's a choice.  You can also imagine that

12  being very useful information for public health

13  officials.  And that can also be very embarrassing

14  from a -- a public opinion perspective.

15       You know, there's various others'

16  behaviors that are -- clearly are voluntary.

17  Decisions to get an abortion are voluntary.  It

18  also might have a variety of implications for

19  public, you know, shame or -- or scrutiny.  And so

20  I -- the voluntariness isn't obvious to me how

21  that -- I think it -- it's just gonna be a

22  case-by-case situation.

Page 176

1    Q  Now, you say that there are many

2  indicators of risk that are much more predictive of

3  the outcomes that the authors want to avoid, but

4  the State does not, as matter of public policy,

5  make those public.

6       Is it your position that because there

7  are other -- there are risk factors that the State

8  doesn't make public that the State shouldn't make

9  any risk factors public?

10    A  No, I'm not making a -- a claim that

11  that's -- it's that narrow.  I'm observing,

12  however, that we clearly do protect privacy in all

13  these other domains.  And as a standard, it's worth

14  comparing what's -- what's different or the same.

15  And it just strikes me as -- as something worth

16  consideration.

17       What is the standard upon which we think

18  it's okay to, you know, invade privacy in various

19  ways?  How are those to be weighed off?

20       And -- and I'm just observing that there

21  are all sorts of places where we seem to have very

22  high standards in that regard.

Page 177

1    Q  Right.  But the ones I had asked you

2  about, the other -- the other areas that we -- that

3  we believe that New York State or other governments

4  protect, despite being a risk factor, you would

5  agree with me that those -- there are distinctions

6  between those and ownership of a handgun?

7    A  No.  What do you -- what --

8    Q  Okay.

9    A  -- what do you mean?

10    Q  So that --

11    A  And -- and maybe, yeah --

12    Q  Yeah.

13    A  -- I'm just not sure.

14    Q  Right.

15    A  I haven't heard any yet.

16    Q  The ones you talked about, specifically

17  mental health and STDs --

18    A  And vaccines and abortion.

19    Q  Right, but let's just focus on those two

20  for now.  I'll get to --

21    A  Okay.

22    Q  -- vaccines --

William E. English, Ph.D.
Washington, DC
9/13/2019
Page 46 (178 - 181)

Page 178

1    A   Sure.

2    Q   -- and abortion.

3        But you would agree with me there are

4    fundamental distinctions on both sides between

5    having a mental health issue and voluntarily owning

6    a gun, right?

7        I mean there are distinctions; these are

8    not necessarily analogous privacy interests; is

9    that right?

10   A   No, it's not clear at all.  I mean the --

11   the underlying question is in what sense are they

12   analogous and what sense are they not.  I mean, you

13   know, by definition, they -- these are different

14   topics.  So that's sort of a truism, a tautology.

15   The question now is in what sense are they similar

16   and in what sense are they different.

17       You know, and -- and the claim here is

18   that there's many things, at least on this question

19   of threats to public health and safety.  In fact,

20   the -- the concerns are more severe.  And so I

21   guess the -- it begs a question of:  In what

22   respects do you think the privacy interests are

Page 179

1    different?  And it's -- it's not clear to me on the

2    face of it, from anything you've said, that these

3    are different in a relevant way.

4        I mean the voluntary thing, I think that

5    doesn't go very deep or far.  I don't know if

6    there's something else you've touched on.  Maybe

7    I've missed it.  But it's -- no, it's not obvious

8    to me at all that these aren't -- are not

9    appropriate comparisons.

10   Q   Okay.  So your point with risk factors

11   is -- would you agree that just because we, as a

12   society, cannot legislate to avoid all risk factors

13   doesn't mean that we don't attempt to legislate to

14   avoid some risk factors; is that fair?

15   A   At a -- at a level distraction, yeah, the

16   argument needs to be made how severe are the

17   consequence, what can we prevent through this, and

18   what are the downsides or costs.  And it just

19   strikes me that there's a host of instances where

20   privacy is very important, very sacrosanct,

21   protected in law.

22       And so the -- I guess the -- the prima

Page 180

1    facie question is are these many examples in

2    context, why would privacy not be important in this

3    context.

4    Q   In that same section, that same paragraph

5    on 2, you go on to, I think, articulate what you

6    just said somewhat, when you state, The state has

7    clearly recognized that the potential benefits of

8    publicizing sensitive information must be weighed

9    against the cost to privacy, and our legal system

10   has set a high bar in that regard.

11       Do you see that?

12   A   Yes.

13   Q   What's the high bar that you're talking

14   about there?

15   A   I mean the -- the examples I've just

16   mentioned, that it -- it's interesting there, you

17   know.  You almost have to, you know, think about --

18   well -- well, if you think about the range of

19   things that we actually might be able to protect if

20   we disclosed, you know, all sorts of issues of

21   privacy.

22       I would love to know how much alcohol

Page 181

1    somebody bought last week.  I'm sure that would

2    predict all sorts of risk factors.  I'd like to

3    know if they smoked.  I'd like to know -- you know,

4    you -- as a -- you know, somebody who works in

5    public policy, I could come up with a long list of

6    things which are -- we know it's -- normally take

7    for granted that are matters of privacy, that you

8    could imagine if it were open to public disclosure,

9    we could have all sorts of nice benefits that would

10   allow us to -- to scrutinize, penalize, you know,

11   avoid others and maybe different -- so --

12   Q   Let me dig in, because I'm not -- maybe I

13   just didn't articulate what I was looking for.

14   A   Uh-huh.

15   Q   It may be a little more simpler even.

16       When you say the legal system has set a

17   high bar, are you referencing a legal standard?

18   Are you referencing a Supreme Court precedent?

19       What are you -- what are you talking

20   about when we talk about a legal system high bar?

21   A   Sure.  Yeah.  So in -- in two senses.  In

22   a colloquial sense, generally for the most part,

William E. English, Ph.D.
Washington, DC

9/13/2019
Page 47 (182 - 185)

Page 182

1  I'd say American citizens think highly of their
2  right to privacy.
3      In a more legal context, Supreme Court on
4  one -- more than one decision has viewed rights of
5  privacy as actually -- I mean windows into -- you
6  know, even enormous areas of law.  You can think of
7  the right to choose, the right to contraception.
8  Fundamental aspects of law that they recognize as
9  the privacy interest being the legal wedge, the, as
10 it were, normative, ethical legal argument that has
11 propped up those legal decisions.
12     So it's like colloquially Americans care
13 about privacy.  You know, obviously, this is
14 figured into, you know, different legal precedents
15 and decisions.
16     The -- my claim is, I think, probably --
17 you know, it makes more sense to consider in just
18 as the general sense.  I'd say there's a -- an
19 expectation that many American citizens take for
20 granted that their privacy interests outweigh a lot
21 of states' interests when it comes to regulating
22 their personal behavior.

Page 183

1   Q   You would agree with me, though, that the
2  law treats privacy in all contexts differently,
3  though; is that fair?
4   A   As I -- yeah, as I mentioned in earlier
5  discussions, I -- I always want to hear about the
6  context --
7   Q   Right.
8   A   -- before I can make a clear judgment.
9   Q   But you would agree with me that there's
10 no one foundational law of privacy that applies
11 universally to every privacy interest; is that
12 right?
13  A   That seems to be true of almost every
14 legal concept --
15  Q   Right.
16  A   -- you've ever articulated.
17  Q   But you have a lesser privacy interest in
18 say your garbage than you do in your healthcare; is
19 that fair?
20  A   Potentially, yeah.
21  Q   Okay.  And so the law does recognize
22 distinctions between application of privacy rights;

Page 184

1  I mean that's fair, right?
2   A   Of course.
3   Q   Okay.  And the law would value some
4  privacy rights over others, right?
5   A   Sure.
6   Q   Okay.  So when you talk about this high
7  bar in the legal system, you're talking about that
8  more colloquially; you're not referencing a
9  particular level of scrutiny or anything in that
10 regard, right?
11  A   I -- I did not intend it with any -- a
12 particular legal meaning.  Actually, just add that
13 also being familiar with all sorts of data requests
14 from government, even stewards of government
15 information take privacy in the research context
16 extremely seriously.  And so there's all -- I mean
17 they're also very high -- I mean very specific
18 legal standards within research ethics that protect
19 privacy as well.
20  Q   You go on in that paragraph to talk
21 about -- you say, Second, the law is not well
22 tailored to the supposed aims articulated by these

Page 185

1  reports.
2      Do you see that?
3   A   Yep.
4   Q   Now, what do you mean by well tailored in
5  that context?
6   A   Yeah.  So as I have already argued, I
7  think that it would be ill-advised for parents to
8  be particularly concerned about what are
9  extraordinarily rare occurrences and risks.
10 However, even if a parent had some reason, some
11 particular concern about a playmate or -- and they
12 really wanted to know whether a gun was in a
13 household, then the question is:  Well, what's
14 the -- the best way for them to obtain that
15 information?
16     And, conspicuously, this law in question
17 doesn't cover long guns, which as I note later in
18 the report -- actually, in the Northeast in
19 particular -- injure children, for example, at much
20 higher rates than handguns.  And, again, that's in
21 many Northeastern states that don't share -- share
22 New York's law.

Page 186

1    And it's a case it's not gonna track
2  people who have exemptions.  It's not gonna track
3  illegal firearms, as I document also in this
4  shortly later.  Many of the New York incidents, if
5  not most, if not all, involve illegal -- I'd say
6  most involve illegal firearms.
7    So the law -- if -- if this were its
8  purpose, you know, either what Dr. Zeoli or
9  Dr. Sege or Dr. Hamilton says, it doesn't seem like
10  as our legislate -- this doesn't seem how the --
11  how -- that the law was crafted in a way that would
12  accomplish that aim in a most comprehensive and
13  effective manner.
14    Meanwhile, I think that -- and this is in
15  the background -- are there other ways to get to
16  the information, concerns expressed particularly by
17  Dr. Zeoli and Dr. Sege.  And in both cases, it
18  seems like yes.  There actually -- if you were
19  really concerned -- and, again, I think it's
20  extremely rare that there are genuine concerns
21  here.  If you were concerned, there are other ways
22  to get at this information with great reliability,

Page 187

1  without public disclosure, and in more informative
2  manner.
3    Q   Would you be more comfortable with this
4  law if it applied equally to long guns and didn't
5  have exemptions in it in terms of its --
6    A   On -- on this narrow point, it would --
7  it would at least make sense that -- there -- there
8  would be some more coherent rationale rather than
9  what strikes me as more of an ex post attempt to
10  rationalize it.  And -- and so at least with regard
11  to that second point, it would -- it would kind of
12  make more logical sense.
13    Q   Uh-huh.
14    A   The -- the remaining concern, though,
15  would be those who have exemptions wouldn't be
16  revealed; and the most serious concern, really, is
17  you're not getting at illegal firearms, which,
18  again, seem to predominate particularly accidental
19  firearm deaths.
20    Q   So you believe that if the law included
21  long guns and didn't have exemptions, it would be
22  more tailored to the aims articulated in these

Page 188

1  reports, even though it would, in your estimation,
2  infringe upon more privacy rights?
3    A   Oh, sure.  That's exactly the -- I mean
4  the -- the privacy rights are gonna be there
5  regardless.  Clearly, there's a heightened problem
6  if they have twice as much disclosure, as it were.
7  But the State would have a much easier time
8  constructing a sort of, you know, coherent
9  rationale for the law.
10    Q   Right.
11    Do you know if New York regulates or
12  requires permitting long guns?
13    A   It does not require permitting to buy
14  long guns, at least it -- it may in certain
15  jurisdictions.  I'm not sure what it's like in
16  Manhattan.  But my understanding, in most of the
17  state it does not.
18    Q   Uh-huh.  And do you agree with me that
19  the -- it is -- under PL 400, it is the permitting
20  of the handgun that actually triggers the public
21  disclosure, right?
22    A   Correct.

Page 189

1    Q   And long guns are not permitted in New
2  York, so they don't come under the auspices of PL
3  400, right?
4    A   Right.  There would be sales records,
5  but --
6    Q   Right.  But they're not permitted, which
7  is the triggering event --
8    A   Right.
9    Q   -- right?
10    A   Right.
11    Q   So in order for them to be included for
12  the law to be more well tailored, New York would
13  have to expand its gun laws to include permitting
14  of long guns, right?
15    A   Well, not necessarily.  As I said, you
16  could simply have sales records.
17    Q   And do you know if the State has access
18  to those types of sales records of --
19    A   I would --
20    Q   -- long guns?
21    A   -- I would presume not.
22    Q   I want to go back to this term "well

Page 190

1 tailored" that you use.

2     Do you know that term from concepts that

3 you've studied in the past?

4     A    Yes. So it is -- it is a -- a term that

5 is sometimes used in -- with regard to levels of

6 scrutiny.

7     Q    Uh-huh.

8     A    And the -- it struck me as -- as apt,

9 both in that technical sense and in a kind of

10 general sense to ask, you know. Because it's an

11 interesting question: Does this actually

12 accomplish those aims which these experts have

13 claimed it would? Is it -- is it set up to do that

14 in a sort of effective, efficient, and meaningful

15 way?

16     Q    Okay. But when you use the term "well

17 tailored," are you opining on the legal

18 constitutionality of the tailoring of this law, or

19 something else?

20     A    That's above my pay grade. I'm saying --

21 making a point that -- say as a social scientist,

22 if I asked: Is this giving me the information that

Page 191

1 these experts are claiming is what you would want

2 if you actually thought that these things were a

3 serious problem, which could be resolved through

4 this information?

5     And it seems clear to me that there are

6 huge gaping problems with the -- you know,

7 comprehensiveness is that this law, which makes it

8 hard to claim this is exact -- this is what its

9 justification is.

10     Q    Okay. So you would agree with me that

11 the concept of whether a law is well tailored or

12 properly tailored from a constitutional law

13 perspective, that's -- that's within the province

14 of the judge or the jury who make a determination,

15 right?

16     A    I -- I'll leave that to the legal -- the

17 lawyers or the judges --

18     Q    All right.

19     A    -- to determine.

20     Q    When you talk about the use of -- when

21 you talk about this tailoring concept and you talk

22 about long guns and the exemptions, did you rely on

Page 192

1 any data in making your determination that long

2 guns are used considerably in these types of

3 injuries or domestic violence incidents?

4     A    Injuries and deaths. So, yes, as I cite

5 in my report -- and these are numbers that the --

6 are obtainable through the CDC. And let me just

7 find the page for you.

8     (Witness looked at document). So this

9 comes in a few ways. On page 1 4 I note from CDC

10 data. And we learn that slightly less than half of

11 accidental firearms deaths among children are due

12 to the handguns.

13     And then if you turn to -- on page 1 7.

14 Again, you say -- where you stated in -- some terms

15 up top, Substantial percentage of accidental

16 firearms deaths of children 50.3 percent, according

17 to CDC records. This is also -- same is true of

18 child suicides by firearms.

19     And then I proceed in the next paragraph

20 to also look at long guns involved in these, and

21 looking at the entire Northeast, looking at other

22 states like New Jersey, Connecticut, Massachusetts,

Page 193

1 and noting that New York isn't particularly

2 different than these other states which don't have

3 these disclosure requirements.

4     Q    Right.

5     The data you looked at with respect to

6 long guns exclusively deals with fatalities; is

7 that right?

8     A    That's correct.

9     Q    Okay. So you don't -- or do you have

10 data that you're aware of that discusses the use of

11 long guns in accidental shootings of children that

12 resulted in injury?

13     A    No. But I have no reason to believe that

14 the percentages would be disproportionate, you

15 know.

16     Q    Okay. How about do you have data that

17 you relied on that talks about the use of long guns

18 in domestic violence incidents that result in

19 injury and not death?

20     A    Nope.

21     Q    Okay. And do you have data that you

22 relied on about the use of long guns in domestic

Page 194

1 violence incidents involving nonphysical threats or
2 non -- or threats that do not result in physical
3 injury?
4    A   Nope.
5    Q   You also talk about -- in addition to
6 long guns, you talk about the law not including the
7 exemptions; the individuals who are exempted,
8 right?
9    A   Uh-huh.
10   Q   Do you have -- did you rely on any data
11 as to how many individuals were -- that would have
12 qualified but -- but for an exemption?
13   A   No.
14   Q   Okay.  So if there's no data on that
15 point, would it be fair to say that you would be
16 theorizing that including those individuals that
17 are exempted would make the law more well tailored?
18   A   So there's two parts to that sentence.
19 I'm not sure how they connected to one another.
20   Q   Sure.
21   A   So I don't know the exact number of
22 people granted exemptions.  And the question was,

Page 195

1 given that --
2    Q   Right.  I mean you have no data that
3 suggests supporting the conclusion that including
4 exempted individuals in the calculation would
5 impact the results that Sege, Zeoli, and Hamilton
6 want to avoid?
7    A   There's a lot to things to say in that
8 sentence.  One, I don't have any data that this law
9 at all is impacting the outcomes they want to
10 avoid.  That already is a -- is a claim that I
11 think is very hard to substantiate.
12       The more basic point on this issue of
13 comprehensiveness, however many exemptions have
14 been issued, these places -- these households have
15 guns.  So if you think there's a compelling state
16 interest that this is really valuable for
17 protecting children, you know, why should there --
18 those people be exempted; why should their privacy
19 be protected.
20       You know, it's just asking a -- I mean
21 may -- maybe nobody's ever applied for this
22 exemption.  I guess the State would know.  But

Page 196

1 assuming they did, the question would be:  Do not
2 Dr. Zeoli's and Dr. Sege's arguments apply equally
3 to them, if you think this is really a value for
4 safety?
5    Q   Do you agree with the law's inclusion of
6 exemptions?
7    A   It's interesting.  The exemption I see is
8 a halfway house that it -- clearly, the outrage
9 that followed the -- I believe the newspapers'
10 exposé.  As a political science it's really
11 interesting to me to see how vociferous the outrage
12 was and how quickly it resulted in actual
13 legislative change.  Like that -- that was -- that
14 must've been pretty substantive.
15       It -- it strikes me as this attempt to,
16 on the one hand, validate that there's a real
17 concern here to the privacy of gun owners.  Like
18 this is genuine and people are, you know,
19 potentially threatened in a variety of ways.
20       But then the actual mechanism devised
21 here in this standard of, quote/unquote,
22 harassment -- which has a very specific legal

Page 197

1 meaning in New York -- I think was a -- an attempt
2 to evade the real underlying question.  I think
3 I -- I view it as a Band-Aid that doesn't really
4 address the underlying injury, but it may, in the
5 meantime, pacify or satisfy certain constituencies
6 that were adversely affected.
7       So like in a -- it's a small step in a
8 better direction for those people who fit certain
9 exemptions, but it really doesn't address the
10 underlying problem.
11   Q   You mentioned -- you talk about the
12 disclosure and the outrage following the disclosure
13 leading to changes in the law.
14       Is that what you had said?
15   A   I -- I -- I observed that everything
16 seemed to be happening in relatively compressed
17 time span here.
18   Q   Okay.
19   A   I don't know the agenda the legis --
20 maybe -- presumably has been people -- on people's
21 mind for a while.  So I don't know the precise
22 timeline.

Page 198

1    But it struck me both that there was

2  relatively significant public outcry, and that one

3  way or the other there was a -- a legislative

4  attempt to address what was apparently perceived to

5  be a deficiency in the law. I -- I think it -- it

6  didn't -- it wasn't a sufficient way to address it.

7    Q  So, yeah, I'm just trying to understand

8  your concept of the timing of the Safe Act and the

9  amendments to include the exemptions.

10    Is it your belief that the Safe Act

11  was -- that the Safe Act came about and these

12  amendments happened as a result of the outrage of

13  the newspaper's public disclosure of this

14  information or -- or --

15    A  No, I -- I was only suggesting that --

16  that these were all part of, I think, a -- genuine

17  issues of concern, so either that -- you know, you

18  might think there's a lot of pent-up anxiety about

19  this. The newspaper is one match that lights that.

20    It wouldn't surprise me if there were

21  long-standing existing concerns that also found

22  their way legislatively into this separate than

Page 199

1  that -- separate from that of even before that.

2    Q  Let me direct your attention to the

3  bottom of page 3 of your report, the paragraph --

4  last paragraph of that page that begins "however."

5    Do you see that?

6    A  Uh-huh.

7    Q  All right. You say in that paragraph,

8  The many harms that handgun license holders could

9  suffer as a consequence of disclosure that do not

10  rise to the level of harassment, for example,

11  license holders could be targeted by burglars

12  seeking to steal firearms, or subject to

13  discrimination, stigmatization from their

14  communities, and ostracism from social circles.

15    Do you see that?

16    A  Yes.

17    Q  And that's your opinion, right?

18    A  That is.

19    Q  All right. Now, what data did you rely

20  upon to come to the conclusion that license holders

21  could be targeted by burglars seeking to steal

22  firearms, or subject to discriminations,

Page 200

1  stigmatization, or ostracism?

2    A  Sure. So two things to say. First, some

3  of this is a matter of commonsense. There is --

4  you know, Willie Sutton, the famous bank robber,

5  when he was apprehended by the FBI was asked: Why

6  do you rob banks? And his answer was: Because

7  that's where the money is.

8    And so if -- if guns are use -- you know,

9  if these are valuable things, if they are desired

10  by criminals, you know, if New York does a good job

11  of keeping it out of the hands of criminals, the --

12  it -- it stands to reason, I don't think you need

13  a -- a Ph.D in social science to -- to think this,

14  that, you know, publicizing locations of these

15  valuable things might result in being targeted.

16    And, actually, as I was writing this,

17  locally here in the Maryland, in PG County. And

18  then I believe a second one was in Montgomery

19  County, we actually had two burglars where people

20  drove their vans into gun shops at night and went

21  in and looted the gun stores. And so I -- it -- it

22  struck -- it strikes me as -- it strikes me as --

Page 201

1  as we do have evidence that guns are targeted by

2  criminals. This would provide a map that would be

3  used for criminals.

4    And to answer your second part of the

5  question, so the -- this question of stigmatization

6  and ostracism, you know, that's partly formed by

7  some of the research I cite on, you know, some

8  modern issues and polarization, political

9  psychology, that suggests that there -- not only is

10  there the potential for explicit, but, in fact, it

11  appears widespread implicit bias against partisans

12  but also bias that's particularly linked and

13  associated to people's association with gun,

14  gun-owning activities.

15    Q  All right. Let's look at the burglary

16  issue first, then we'll talk about discrimination

17  and the ostracism.

18    Isn't the exact opposite also possible?

19    You say, Publicizing the locations of

20  guns could lead to burglaries.

21    Isn't -- it is just as possible that the

22  notice -- the knowledge of the presence of the gun

Page 202

1  would dissuade the burglar?  Isn't that also a
2  logical --
3      A   Yeah, well, if I was a logical burglar, I
4  would wait outside the door in the morning until
5  the person went to work.  So I -- I think you're
6  right.  You -- you definitely want to plan home
7  invasions when nobody is at home.
8      Q   Okay.
9      A   So -- so I think it does the burglars two
10  things.  There's something valuable here.
11  Definitely don't go there when the homeowner is
12  there.
13      Q   Now, this law, as you testified earlier,
14  I believe it's been around since 1960, right?
15      A   Uh-huh.
16      Q   Sometimes in the '60s?
17          Were you able to find any single incident
18  of this law being used to result in the
19  burglarization of someone's handgun from their
20  home?
21      A   So I didn't look.
22      Q   Okay.  You didn't look.  But you did

Page 203

1  theorize that this could be a clear harm to a
2  handgun license holder.
3          Why didn't you look at that if you opined
4  that it could be a harm?
5      A   Well, I mean I -- there were two news
6  stories the week I was writing this, locally, that
7  you know, demonstrated the same thing.
8      Q   Well, did those demonstrate the same
9  thing?
10          Those were -- those were -- you said
11  burglaries to gun stores.
12          I mean I'm not a gun burglar, but I would
13  assume that someone would know that there are guns
14  in a gun store, with or without public disclosure,
15  right?
16      A   Yes, burglars target guns.  That --
17      Q   Yeah.
18      A   -- that -- we don't dispute that.
19      Q   But are you likening the homes to guns
20  stores that -- I mean --
21      A   Well --
22      Q   -- your proof for this happing is the

Page 204

1  burglarization of gun --
2      A   Yeah.
3      Q   -- stores?
4      A   So these gun stores had big bars and
5  security cameras.  I think homes are much softer
6  targets.  I would think much more preferred.
7          Now, there's a second part, to answer
8  your question, which may be something worth noting
9  in the general conversation here, which is to my
10  understanding for much of the history of this
11  law -- and this is partly because of changes in
12  technology and -- and, you know, digital access, in
13  effect, in practice, it was fairly hard to access
14  these sorts of documents on a systematic basis.
15          And in some sense, the -- I mean the
16  internet has changed this -- this equation, so I --
17  if you thought about the most fruitful time to
18  study this, as a matter of criminology, I would
19  think there's -- there's an interesting window.
20  But that would require a lot of -- a lot of side
21  research, which is not --
22      Q   How is --

Page 205

1      A   -- in the purview here.
2      Q   -- how is the public information gained
3  under PL 400?
4      A   My understanding is historically you'd
5  have to make an inquiry.
6      Q   And that's through FOIL, we established,
7  right?
8      A   FOIL-like, yeah.
9      Q   Okay.  Now, can you make an anonymous
10  FOIL request, as far as you know?
11      A   I -- I'm not certain.  And we have to --
12  I -- in New York?
13      Q   Sure.  Anywhere.  Can you make an
14  anonymous FOIA or FOIL request in any jurisdiction
15  in this country, as far --
16      A   So it -- it -- technically, you can.  And
17  here's how.  We have aggregators, so -- like when I
18  was at Harvard's ethics center, there's something
19  called "muckrock" up there.  And what they would do
20  is -- I -- you know, much of researchers might want
21  (sic) information about Federal Reserve.  And we
22  would all make a request to "muckrock."

William E. English, Ph.D.

Washington, DC

9/13/2019

Page 53 (206 - 209)

Page 206

1    And they would aggregate these requests

2  into their own journalistic FOIA. So, in effect,

3  yes, actually, you can.

4    Q   Okay. So is it your testimony that it's

5  viable that a home -- the home burglar looking to

6  steal guns would partake in some sort of anonymous

7  FOIL request to get information to locate guns that

8  they could burglarize.

9       Is that a -- is that a reasonable theory?

10    A   Well, it turns out by 2012, they wouldn't

11  have to, because newspapers were publicly

12  requesting this information and publishing online.

13  So all you'd need would be an internet connection

14  and, you know, the ability to -- to search.

15    Q   Uh-huh. But what I --

16    A   Pardon me.  I -- I may have gotten that

17  date -- I see I was mis-citing from the wrong page.

18    Q   Yeah.

19    A   In -- in -- in, you know -- in recent

20  memory, newspapers published this information.

21    Q   Uh-huh. But what --

22    A   Which meant you did not -- anybody could

Page 207

1  access --

2    Q   Yeah, I mean --

3    A   -- this.

4    Q   -- that wasn't the question I was asking.

5       What I was asking is say before the

6  public -- the newspapers' public access, which has

7  happened, as far as we know, once, do you think

8  it's reasonable to assume that a burglar would FOIL

9  information and use that information to burglarize

10  homes?

11    A   It's certainly a potential.  I think it's

12  almost as ridiculous to think that a parent would

13  do it to a playmate.

14    Q   Uh-huh.

15    A   So I -- I find them equally farfetched,

16  if there's a strong barrier.  But I think it partly

17  what prompts these concerns in a digital age is

18  because barriers have been moved.

19    Q   So just to be clear, other than your

20  anecdotal evidence of two gun store burglaries in

21  D.C., do you have any firm data or evidence that

22  suggests that anyone in New York has ever used PL

Page 208

1  400 to gain information to burglarize a home for a

2  gun?

3    A   I did not specifically investigate that.

4  However, I would not be surprised if there were to

5  be more evidence of that than there were of

6  accidental deaths of handguns by playmates visiting

7  a house with a legally registered firearm, which I

8  couldn't find a single incidence of.

9    Q   Is there a reason why you didn't search

10  this before making this -- before opining as to

11  this?

12    A   It struck me as, on the one hand, an --

13  an obvious enough conjecture that anybody could see

14  the value that a criminal might make of public

15  records like were published by the newspaper.

16       On the other hand, to do a really

17  detailed evaluation at -- at one point, I actually

18  did reach out to your criminal justice statistics

19  office, trying to obtain some data.  And it was

20  actually very difficult to get the data.  We have

21  deadlines.  So it could be the subject of a much

22  larger research project.  But the underlying point

Page 209

1  seems to be an obvious one.

2    Q   Did you discover -- did you search for or

3  discover any news articles anywhere in the state of

4  New York that suggested that someone had used PL

5  400 to gain information to burglarize a home?

6    A   We were talking about fears earlier, and

7  the possible fear that a abused spouse or other

8  might fear seeing a gun or knowing about a gun.  I

9  did see documented many gun owners who feared

10  burglaries.  So if you want to, again, include

11  the -- now, it's difficult to measure.  But if you

12  want to include these things on the scales, I -- I

13  think they cut both ways.

14       And, yes, I came across many reports --

15    Q   Okay.

16    A   -- of gun owners who say they felt fear

17  for that particular reason.

18    Q   Did you pull those reports in your

19  research?

20    A   I don't mention it in my --

21    Q   Okay.

22    A   -- things, but I believe they're publicly

William E. English, Ph.D.

9/13/2019

Washington, DC

Page 54 (210 - 213)

Page 210

1 available.

2          MR. DAGUE: We're going to ask for

3 disclosure of any information that the doctor

4 relied upon to that end. Any reports that were not

5 included in here, we're going to ask for that

6 disclosed. And I'll follow up with a letter

7 afterwards.

8 BY MR. DAGUE:

9     Q    Yeah, you mentioned reaching out to the

10 New York State department -- was it DCJS or State

11 Police that you --

12    A    I think --

13    Q    -- reached to?

14    A    -- it was DCJS.

15    Q    Okay.

16    A    And what's that, Department of --

17    Q    Criminal Justice --

18    A    -- Statistics. I believe that's them,

19 yes.

20    Q    Criminal Justice Statics, I think that's

21 the --

22         MS. CONNELL: Services.

Page 211

1 BY MR. DAGUE:

2     Q    Services.

3          And did you personally --

4          MS. CONNELL: No, it's statistics, sorry.

5 BY MR. DAGUE:

6     Q    -- personally reach out to DCJS?

7     A    Yes.

8     Q    Okay. And did you reach out to them via

9 letter, email, or other?

10    A    It was an email.

11    Q    And when did you do that?

12    A    I'd have to go back and check.

13    Q    Okay.

14         MR. DAGUE: We'll call for disclosure of

15 that email or letter that he sends. And I'll

16 follow up with a letter.

17         MR. CHUCK COOPER: Will your question be

18 that he relied on something from that office?

19         THE WITNESS: I did -- I -- I did not

20 obtain any data from them.

21         MR. DAGUE: Right. I'm just interested

22 to determine what the nature of his request was, to

Page 212

1 make a basis of --

2          MR. CHUCK COOPER: Well, he's right here.

3 Why don't you ask him?

4          MR. DAGUE: Well, I --

5          MR. CHUCK COOPER: He's right here.

6          MR. DAGUE: -- I'd seek to verify the

7 credibility that he made this request and sought

8 this information.

9          MS. CONNELL: You guys can object. And

10 then we'll take it up to the judge.

11         MR. DAGUE: I'll put it in a letter.

12 I'll put it in a letter. We will follow up in a

13 letter.

14 BY MR. DAGUE:

15    Q    Okay. What did you ask for from DCJS

16 specifically? Do you remember?

17    A    Yeah, that I -- was on the domestic --

18 off the -- I believe I asked, first of all, for how

19 I could access crime statistics in the two counties

20 that had -- I don't remember how I phrased this,

21 but I was asking them, basically, how do I access

22 crime statistics.

Page 213

1     Q    Okay.

2     A    And are these -- I believe it was a

3 discussion around at the county level, what's

4 reported to the state. At some point that -- in

5 subsequent email, asked about also the -- I think

6 the domestic violence reporting system.

7     Q    Okay. And did --

8     A    But --

9     Q    -- DCJS get back to you?

10    A    They -- yeah, they did. They --

11 initially they said, actually, in a lot of these

12 counties -- and I don't -- maybe it's precincts. I

13 forget how they -- the police stuff is divided.

14 But they said a lot of these things have been

15 switched over to a new reporting system; therefore,

16 they don't have this data at the State level. And

17 I be -- I forget where we ended the conversation on

18 the -- on the domestic violence, though.

19         I think at one point I was trying to

20 ascertain whether I could get access to the -- the

21 domestic violence reporting system. And I either

22 discovered online at a certain point and then

Page 214

1  ceased writing them back or maybe they told me, but
2  the -- the gist of the conversations was the crime
3  reporting for these two counties wasn't probably at
4  a level of resolution or not -- wasn't at the level
5  of resolution that I would have liked, and -- and
6  that it -- that it was gonna take some time to
7  figure out how to query this, so --
8     Q   Okay.  Did you receive any information
9  from DCJS or any other source that suggested that
10 incidents of burglaries in homes rose after the
11 publication of the gun information?
12    A   No, but I would have loved to have looked
13 at that.
14    Q   Okay.  And you didn't look at that
15 because you didn't get information from --
16    A   Yeah.
17    Q   -- DCJS?
18    A   Yeah.  It -- it -- the information was
19 not available at the -- with the amount that -- the
20 amount of information I would have needed in terms
21 of addresses and that sort of thing.
22    Q   Did you go to the county specifically and

Page 215

1  ask for the information from them?
2     A   No.  At that point, the -- it was clear
3  some sorts of information either weren't kept or
4  were gonna be a headache to --
5     Q   Okay.
6     A   -- to get, so I -- I was on time with the
7  deadline, and that seemed like a distraction at
8  that point.
9     Q   Okay.  So fair to say, then, you have no
10 data, no newspaper articles suggesting burglaries
11 targeted based on 400; is that right?
12    A   Yeah, it's only commonsense I'm relying
13 on this.
14    Q   Okay.  And do you have any anecdotal
15 evidence of burglaries in New York happening as a
16 result of Section 400's public disclosure?
17    A   No, I did not investigate that.
18    Q   Okay.  So, you know, it's fair to say
19 that this is based solely on commonsense and
20 speculation?
21    A   Reason, commonsense, sort of -- I'd say,
22 yeah, obvious speculation.

Page 216

1     Q   Okay.  Now, similar question.  We talked
2  a little bit about your other suggestion in the
3  report that apart from burglary, there's this
4  possibility of the subject of the public disclosure
5  being subjected to discrimination, stigmatization
6  within their communities, and ostracism from other
7  social circles.
8        Now, I know you talked about the report
9  or study that you looked at with respect to
10 partisan stimuli.  And we'll talk about that in a
11 minute.
12    A   Uh-huh.
13    Q   But sitting that aside for the time
14 being, did you have any data, aside from the
15 partisan stimuli article that you relied on, any
16 data from other sources that supported this claim
17 that there were individual gun owners who
18 experienced discrimination, stigmatization,
19 ostracism at any point since the law was passed in
20 1960?
21    A   So my understanding is that one of the
22 Plaintiffs actually is worried about this.

Page 217

1     Q   Uh-huh.
2     A   So there was, you know, prima facie
3  evidence right that there that it was a --
4     Q   What's --
5     A   -- a sincere worry.
6     Q   What's he worried about?  Do you know?
7     A   My understanding -- I -- I have not
8  talked to this individual.  My understanding is
9  there are a variety of ways in which this knowledge
10 might disadvantage someone.  It could in -- in
11 social circles.  It could be people not wanting to
12 invite you to events, people not wanting to be
13 friends with you, people learning something they
14 didn't previously know about you, ostracizing you.
15    Q   And let me focus on Doe Number 1.  I
16 believe that you testified that you believe that he
17 had a worry about this.
18        What I was asking is do you know what Doe
19 1's specific articulation of this is, what his
20 specific concern is?  Do you know that?
21    A   I didn't speak with Doe -- whatever, Doe
22 1 --

Page 218

1    Q    Okay.

2    A    -- or 2 it is.

3    Q    Well, yeah, you just said that you -- you

4  believe that one of the Plaintiffs was worried

5  about this.

6         I was wondering if you know --

7    A    Right.

8    Q    -- in what capacity he's worried about

9  this?

10   A    The -- I don't know all the capacities --

11   Q    Okay.

12   A    -- in which he's worried about that.

13   Q    Did you review his deposition testimony

14  prior to today?

15   A    I don't believe I've seen his deposition.

16   Q    And I believe I misspoke.

17        It's Doe Number 2, right?

18   A    Yeah, that's --

19   Q    Would you be surprised to learn that the

20  extent of Doe Number 2's concern on this front was

21  articulated only to be that his wife would not be

22  included in her garden club if this information

Page 219

1  became public?

2    A    I -- I'm sorry, the first part of it is:

3  Am I surprised that that's the case, or that's --

4    Q    Yeah, that was what he testified to in

5  his deposition.

6    A    That would certainly be consistent with

7  it.

8    Q    Would you be surprised that he said

9  nothing about discriminitization -- discrimination

10  or stigmatization, only the wife not being included

11  in her local garden club?

12   A    It doesn't surprise me.  I mean I -- I

13  don't know this person's background.  The average

14  person on the street wouldn't use the term

15  "stigmatization."

16   Q    Uh-huh.

17   A    I don't think my average student would

18  use that.  But my average student would be really

19  upset if they didn't get to be part of a social

20  club that they found socially meaningful and

21  valuable at Georgetown.

22   Q    Now, other than Doe 2, did you find any

Page 220

1  data to support this claim that individuals have

2  been discriminated, stigmatized from their

3  communities or ostracized from social circles?

4    A    No.  And it'd be very difficult to obtain

5  that data on short order, precisely given, as I'm

6  sure, you know, the -- the many ways that

7  discrimination can be manifested in our society.

8  So I -- I think it's an interesting question that

9  might be pursued.  But it's a complex question,

10  one, difficult in the various ways to -- to -- to

11  measure and get at.

12        You know, like all forms of

13  discrimination -- racial, gender, and otherwise --

14  that we struggle in society to actually document

15  and measure it.

16   Q    Now you talked about that -- remember, we

17  talked about that Vermont case you were involved

18  in?

19   A    Uh-huh.

20   Q    And you conducted a sort of survey in

21  that case?

22   A    Right.

Page 221

1    Q    What -- was there a specific name for

2  that type of survey?

3    A    It was a -- a random survey --

4    Q    I thought you referred --

5    A    -- public --

6    Q    -- to it as something.

7    A    I mean there's a --

8    Q    Right.  Now, that -- that -- could that

9  have been a way to collect data with respect to

10  discrimination, stigmatization, or ostracism is

11  a -- do a survey of gun owners?

12   A    The -- oh, and as gun owners.  Okay.

13  I -- I though you were gonna say a survey of

14  discriminators.

15        It's very -- the problem is, like all

16  forms of discrimination, you'd be subject both to

17  response bias of, you know, either people not

18  wanting -- I mean first of all, the privacy concern

19  that you might, you know, tell a stranger about

20  something which you think can disadvantage you.

21  And so you're -- it's -- it's a -- it's actually a

22  tough question to get at.

Page 222

1    And this -- this is true with like all
2  discrimination research.  You're asking, you know:
3  Hello.  I'd like to talk about the sensitive
4  aspects of your life that we think that might hurt
5  you.  So tell me about those.
6      It's a tough -- it's a tough question.
7  So we -- I wouldn't -- a survey approach wouldn't
8  be my preferred approach to --
9    Q   Okay.
10   A   -- try and get --
11   Q   But tough or not, a survey could be --
12  could be used to try to access the information,
13  right?
14   A   I would think unless -- a survey is more
15  likely than not to get you bad data unless it's
16  very carefully and thoughtfully constructed on this
17  front.  So my concern would be a poorly done survey
18  would be much worse than no survey at all.
19   Q   So would information with respect to this
20  incidence of discrimination, stigmatization, or
21  ostracism have been helpful or interesting to you
22  in creation of this report?

Page 223

1    A   Pardon me?
2    Q   Would information with respect to
3  discrimination, stigmatization, ostracism from
4  social circles have been interesting to you in --
5  in -- if available, for this report?
6    A   What I would have wanted to do -- I mean
7  if -- you know, similar to what was done in that
8  one study -- so there -- the best way to get this
9  would be something like an experiment, where, you
10  know, you could imagine going into a social club
11  that's deciding on its membership or going into a
12  job that's deciding on its employees, and showing
13  them CVs, where half the people -- I don't know --
14  mention their NRA affiliation, half of them don't.
15  See if that actually has an effect on who gets
16  chosen.
17      So I -- survey stuff would really not be
18  ideal for those purposes.  You know, even -- you
19  know, we take extraordinary effort, even in
20  surveys, to ensure non -- anonymity.  You also do
21  all these -- I mean even in reg -- like even the
22  one I did in Vermont, you have all these layers of

Page 224

1  teaser questions, all these ways to make sure
2  you're not getting bias responses.
3      On this stuff, an experiment is much
4  better situated to try to evaluate that.
5    Q   So it's your belief that if you conducted
6  a survey and asked licensed handgun owners if they
7  believed that information -- if information about
8  their ownership got out if they would be
9  discriminated against or ostracized, you believe
10  that they would be hesitant to give you -- to give
11  a surveyor the correct answer on that, because they
12  don't want to talk about discrimination?
13   A   I'm not even sure, in New York, if I ran
14  a survey, I could get people to admit to having a
15  handgun license.
16   Q   Well, you could use public law Section
17  400 to get that information, couldn't you?
18   A   I think they'd distrust me even more if I
19  did.
20   Q   Well, if --
21   A   If I said I found your --
22   Q   -- couldn't you --

Page 225

1    A   -- records --
2      MR. CHUCK COOPER:  Hold on.  Let him
3  finish.
4  BY MR. DAGUE:
5    Q   Go ahead.
6    A   If I said, hello, I dug up these records,
7  which are extremely controversial and many people
8  have said shouldn't be public-available, I'd now
9  like to ask you questions, I think there would be a
10  concern there of:  You shouldn't have my name in
11  the first place; therefore, I'm very suspicious.
12      And so, yeah, yeah, I think it's a --
13   Q   But that --
14   A   -- it's a difficult --
15   Q   -- that wasn't --
16   A   -- thing to ask.
17   Q   -- the question I asked.  I asked if you
18  could use the law to get that information to
19  conduct that survey, not what you think their
20  response would be.
21      Could you use the -- could you use the
22  law to --

William E. English, Ph.D.
Washington, DC

9/13/2019
Page 58 (226 - 229)

Page 226

1   A   But --
2   Q   -- get the information to --
3   A   What I'm telling you --
4   Q   -- could you use the law, public law 400,
5   to access the information to conduct your survey
6   with respect to discrimination, ostrazation, or
7   stigmatization of gun owners?
8   A   I can try to. And that would give me a
9   bad survey with not very good data.
10  Q   And -- and --
11  A   Is my worry.
12  Q   -- you're speculating that that would
13  give you a bad survey, because you didn't conduct
14  the survey, right?
15  A   Well, you wouldn't even -- there's a lot
16  of ways in which you'd want to double-check this,
17  but the concern is -- I mean we can study it
18  through response rates. Yeah, the concern is you'd
19  have both explicitly low response rates and what's
20  sometimes called response bias, even in what people
21  are willing to admit.
22  Q   So having not conducted a study into this

Page 227

1   particular issue, are you aware of anyone who has
2   conducted a survey -- not just in New York, but
3   nationally -- with respect to feelings of
4   discrimination, stigmatization, or ostracism
5   related specifically to licensed handgun ownership?
6   A   I'm not. But to reiterate, I -- I think
7   a survey would be one of the least informative ways
8   to try to get that question.
9   Q   And I didn't -- that question wasn't with
10  respect to just surveys. If it was, I apologize.
11  A   Sure.
12  Q   I asked studies.
13      Are you aware --
14  A   Okay. So --
15  Q   -- about any --
16  A   -- don't --
17  Q   -- any studies --
18      I had asked specifically about studies --
19  A   Right.
20  Q   -- more generally.
21      Are you aware of any studies on that?
22  A   So I don't know of any studies that have

Page 228

1   specifically looked at handgun owners' either
2   beliefs or perceptions about stigmatization or
3   actual experiments that have tried to examine in
4   the field discriminatory effects.
5   Q   Okay. Let's talk about your final
6   sentence on page 3 and top of 4. You talk about
7   another potential consequence for disclosure.
8       You talk about -- you say, Moreover, this
9   may prevent law-abiding citizens who wish to
10  acquire a handgun from doing so, because of a
11  reasonable fear that this information could be used
12  against them in a manner that is not encompassed by
13  the formal definition of harassment in New York.
14      Do you see that?
15  A   Uh-huh.
16  Q   And that's your opinion, right?
17  A   Not only is that my opinion -- that is my
18  opinion.
19  Q   Okay.
20  A   And this brings up a great point, which I
21  forgot to mention, which is partly who you'd want
22  to approach and query in some way is not simply

Page 229

1   those who are handgun owners, but those who want to
2   be handgun owners and aren't.
3   Q   Uh-huh.
4   A   Because, presumably, there's also a
5   population -- I believe Doe 2 is one of these
6   people -- who wouldn't be on your handgun list
7   precisely because they're worried about its
8   effects. So there -- and I don't know how large
9   that population is, but --
10  Q   Right.
11  A   -- presumable many people out there,
12  precisely because of these concerns, aren't
13  becoming handgun owners at all.
14  Q   Well, that was my next question. I mean
15  you said presumably there are many people.
16      Do you know how many there are?
17  A   It's hard to query that, right?
18  Q   Right. So you don't have any data to
19  suggest how many --
20  A   No.
21  Q   -- people there are out there, right?
22  A   No.

Page 230

1    Q   Okay.  Do you have any evidence to
2  suggest how many people that are out there that are
3  suffering from this concern?
4    A   No.  Like -- like many stigmatized
5  activities, there's actually a lot of research on
6  this sort of stuff.  If you want to ask about
7  prevalence of HIV infection, number of abortions
8  sought, you know, all sorts of sensitive --
9  sensitive information.  It's a very difficult thing
10 because your traditional off-the-shelf survey stuff
11 is not gonna give you necessarily the -- the
12 frankness and that you -- that you want.
13   Q   Are you surprised that a law that has
14 been on the books since, as you testified, the
15 1960s, you have no data or hard evidence to support
16 to demonstrate numbers of individuals who are
17 dissuaded from purchasing a handgun because of the
18 law, the public disclosure aspect of the law?
19   A   No.  Of course not.  And there's a very
20 clear explanation for that, is that for most of
21 this history, it is very hard to access these
22 records.  You have a -- a situation with the advent

Page 231

1  of digital technologies, where all of a sudden this
2  stuff, like the newspaper, can be available on a
3  mass scale.  And fairly shortly after that, you
4  have an injunction.  So actually, the -- the window
5  in which this is stuff is happening is pretty
6  limited.
7    Q   Do you know how many handguns -- licensed
8  handguns were sold in New York since the advent of
9  this law in the 1960s?
10   A   I don't.  I mean I estimate, you know,
11 based on those disclosure numbers, how many
12 potentially current handgun permit owners there
13 might be.
14   Q   Well, if you're going to opine about with
15 respect to law-abiding citizens wishing to acquire
16 handguns who won't, don't you think it would be
17 interesting to have looked at the numbers and rates
18 of licensed handguns purchased in New York since
19 the advent of this law over the last 30-plus years?
20   A   I'm not sure that I follow.  Can you
21 suggest --
22   Q   Sure.

Page 232

1    A   -- how that'd be useful?
2    Q   You opine that there are law-abiding
3  citizens who are prevented from purchasing a
4  handgun because of this law.
5        What I asked is:  Do you think that data
6  should have been looked -- you should have looked
7  at data that demonstrated how many handguns have
8  been purchased, and if there's a dip in handgun
9  purchase surrounding amendments to this law or
10 creation of this law?
11   A   Yeah, I think that would be less
12 informative than -- than you may hope.  The -- I
13 would welcome, if New York wants to make available
14 to me, data like that.  You know, similar with the
15 Department of Criminal Justice Statistics.  It
16 occurs to me there are some kind of need to
17 econometric studies one could do.
18   Q   Did you request that data?
19   A   The -- again, I was -- I was -- in those
20 two counties -- I believe it was two counties I
21 inquired about it.  Maybe Rockland and Westchester.
22 I might have inquired about one of them first.  But

Page 233

1  it quickly became evident to me that they did not
2  either possess or were not able to turn over to me
3  the -- the resolution of data that would be needed
4  for what I was looking into.
5    Q   Did you request from those counties --
6  just to be clear, did you request this specific
7  information about with respect to handgun licenses
8  issued during periods of time?
9    A   No.  My -- the -- the flow of work on
10 this was first I wanted to get -- see if I could
11 get crime data by -- actually, with the locale.
12 And the -- the next step would have been to see
13 whether you can -- to delete the handgun owner
14 stuff, where I could have studied its effects on
15 that stuff.
16       So once I realized I couldn't get the
17 data I was hoping for and -- but, again, if -- if
18 New York State wants to provide that data, I'd be
19 more than happy to look at it.
20   Q   Right.  But you would have to request
21 that first.
22       And did you request that from DCJS or

William E. English, Ph.D.
Washington, DC

9/13/2019
Page 60 (234 - 237)

Page 234

1  every county in the state?

2  A  No.  No, that's --

3  Q  Okay.

4  A  -- that was infeasible on the time scale

5  that --

6  Q  Okay.

7  A  -- I was working on.

8  Q  So what data or studies or anecdotal

9  information did you base your conclusion that there

10  are law-abiding citizens who would like to acquire

11  a handgun but are not doing so because of Section

12  PL 400?

13  A  Well, I have the -- the prima facie claim

14  by the Defendant.

15  Q  Uh-huh.

16  A  And then I step back and ask, well, what

17  do we have good research on, on this domain of, you

18  know, concerns about stigmatization, ostracism,

19  adverse impact.  And, of course, you know,

20  generally on discrimination stuff, there's been a

21  lot of interest in these questions.  And we have

22  this study from 2014.  And this is -- this is, you

Page 235

1  know, well before Trump was even -- announced a

2  candidacy documenting political polarization and

3  its effects.

4  And one of the -- I mean bombshell --

5  this is a -- very widening on paper, one of the --

6  the bombshell revelations for this, is the -- the

7  bias that accompanies, you know, partisan and

8  co-partisans and out-group partisans appears to be

9  as severe, if not worse, than racial bias.  And

10  that, in fact, this translates to people's -- it's

11  not only a -- and -- and part of the -- the

12  innovation of this is it's looking at what's

13  sometimes called implicit or -- or you might think

14  of it as unconscious bias.

15  But not only does that exist, as it were,

16  in people's minds, but it also seems to actually

17  affect their real decisions -- their -- their

18  decisions in all sorts of, you know, real world

19  type scenarios.

20  So they have this task of awarding

21  scholarships.  They have these various economic

22  games.  And it's both the case that people are

Page 236

1  willing to reward co-partisans, but also that

2  they're willing to punish partisans, even beyond

3  say independence.

4  And as it happened for this very study,

5  the most discriminate set of stimuli that I could

6  get included the National Rifle Association logo,

7  which, you know, on the surface of it is kind of an

8  interesting finding.  But it also means that the

9  partisan attributions that are very much underlying

10  this animus and underlying the behavior associated

11  with it, has this explicit link to firearms, to

12  firearms affiliation and identity.

13  And I thought this is actually a pretty

14  interesting study to --

15  Q  Let's take a look at --

16  A  -- document some of this.

17  Q  Doctor, you're talking about the Fear and

18  Loathing Across Party Lines study by --

19  A  That is correct.

20  Q  -- Iyengar and Westwood?

21  A  That's right.

22  Q  Okay.  Isn't it true -- you said that --

Page 237

1  you said that this -- some of the most intense

2  partisan feelings was related to the NRA logo,

3  right?

4  A  That's correct.

5  Q  And that's your reading of the study?

6  A  Yes.

7  Q  Okay.  Now, I read the study.  And the

8  way I interpreted that more was that the author

9  selected a -- a set of associational images for

10  R&D.  And one of them they selected was the NRA.

11  And for the Democrats, it was Greenpeace.

12  Do you believe this study concludes in

13  any way that individuals react to the NRA logo

14  specifically, or was that just an associational

15  device they used?

16  A  Right.  Did you read the online material,

17  the -- there's supplemental materials for this?

18  Q  No.  And that's what I'm asking.

19  Where is that --

20  A  Okay --

21  Q  -- in that there, if --

22  A  -- so it --

Page 238

1   Q   -- it exists?

2   A   -- yep.

3   Q   If it exists --

4   A   Yeah, so --

5   Q   -- where is --

6   A   -- it's on --

7   Q   Let me clear it up.

8       So do you believe there is information or

9   materials out there that demonstrate that; and

10  where are they, if so?

11  A   Yeah, so they published -- and this is

12  increasingly done in academia.  They published

13  online supplemental materials.  It's probably about

14  three times as long as the article.  And it's not

15  obvious when you go on the page, but if you search

16  this article and you go to its -- its publisher's

17  page, scroll down.  At the bottom of the page

18  there'll be a thing you can click for supplement --

19  supplemental material.  You have to click that even

20  to enlarge it.

21  Q   Okay.

22  A   Then you click there.  And so they --

Page 239

1   they go -- go through with extraordinary detail

2   everything they do.

3       So before they get to this spot, what

4   they've done is taken ten of these from a -- from

5   a -- a pool of ten possible logos and stuff.  They

6   do pretest, with people from Amazon mechanical

7   turf.  So it's, essentially, a way of getting a

8   cheap, kinda poll of random people.

9       And so they -- so they do -- they test

10  all these different, you know, logos --

11  Q   Okay.

12  A   -- identifications.  And this is a sub

13  selection, which is de fact to -- found to be the

14  most extreme actual identifiers.

15  Q   Okay.

16  A   So yeah.  So that's -- so yeah, that's a

17  good concern.

18  Q   Yeah.

19  A   They address it.

20  Q   Let me just hold you up.  Because we're

21  referring to this.  I think -- let me just mark --

22  A   Yeah.

Page 240

1   Q   -- this --

2   A   Sure.

3   Q   -- and then we have something we can

4   refer to.

5   A   Yep.

6       (Defendants' Deposition Exhibit No. 3

7       marked for identification.)

8   BY MR. DAGUE:

9   Q   Okay.  Doctor, just for the record, I've

10  handed you what's been marked as Defendants'

11  Exhibit 3.  I represent to you that this is a copy

12  from an online version of "Fear and Loathing Across

13  Party Lines" by Shanto Iyengar and Westwood.

14      Just quickly, is this the article that

15  you've relied on in your expert report, excluding

16  the supplemental materials you just referenced?

17  A   That's correct.

18  Q   Okay.

19  A   And I'll -- I'll just also call attention

20  on the last page.  It says, Additional supporting

21  information to be found on the online version.  And

22  then where it also says, Measure and sample

Page 241

1   information are included in supporting information.

2   Q   Okay.  So just to kind of close the loop

3   on this --

4   A   Yes.

5   Q   -- when you were talking about the logos

6   and things, were you talking about the logos in the

7   associational BIAT portion of the study that are

8   found on page 4 of the study?

9   A   Yeah, so the -- like the NRA logo and the

10  Greenpeace logo, these were part of much longer

11  lists of logos which were first pretested to find

12  out which are the most discriminate --

13  Q   Okay.

14  A   -- in -- in, you know, essentially

15  sorting partisan identity and affiliation.

16  Q   Okay.  Now -- so from the supplemental

17  materials, we find out that these eight logos had

18  been whittled down from a larger pool, fair?

19  A   Yes.

20  Q   And they were whittled down based upon

21  severity of reaction in the polling populace?

22  A   Yes.  Yeah.  Yeah.