# Exhibit 7

William E. English, Ph.D.
9/13/2019
Washington, DC
Page 62 (242 - 245)

Page 242

1  Q   Okay.

2  A   Yeah, ability to discriminate.  By

3  discriminate here, I mean, you know, pool different

4  people amongst partisan affiliations, both of what

5  they associate for themselves and, you know --

6  Q   Right.

7  A   -- for the co-partisans and the

8  anti-partisans.

9  Q   So -- but this study doesn't talk about

10  discrimination against licensed gun owners

11  specifically, right?

12  A   No.  Just discrimination against people

13  you would associate with the NRA logo.

14  Q   Right.  Or -- or -- right.

15     So discrimination based upon association

16  with the NRA logo, right?

17  A   That's correct.

18  Q   Okay.  So this study, just to be clear,

19  it doesn't include any evidence or data of

20  discrimination against individuals who are gun

21  owners who that publicized as a result of Section

22  400, right?

Page 243

1  A   So PL 400 is not mentioned in this.  All

2  it's establishing is that those who are identified

3  with a group like the National Rifle Association

4  experience discrimination by anti-partisans or

5  opposite partisans.

6  Q   Right.  But are you drawing then an

7  analogy -- a direct analogy between people who

8  support the NRA and people who own legal permitted

9  handguns?

10  A   Yes.  My suggestion is that the National

11  Rifle Association is associated with people who own

12  guns.

13  Q   Right.

14  A   In people's minds.

15  Q   But isn't it fair to assume that the

16  NRA -- people who discriminate against the NRA have

17  distinct and diverse problems with the group beyond

18  the ownership of a licensed permitted gun?

19  A   Say it again.

20  Q   Sure.  Are --

21  A   Is it impossible to --

22  Q   -- are you --

Page 244

1  A   -- just the first part of that question,

2  if I --

3  Q   Yeah, I mean.  Let me back up.  Because

4  it's a little bit hard to articulate.

5     This study, in your testimony, talks

6  about partisan discrimination or discrimination

7  based on partisan belief, right?

8  A   Uh-huh.

9  Q   Yes?

10  A   Partisan, say ident -- identification.

11  Q   Partisan identification.  I think that's

12  a better way to say it.

13     And as part of that, the authors used the

14  NRA logo and received certain reactions on a

15  partisan basis to the NRA logo; is that fair?

16  A   Yes.

17  Q   Okay.  And what I'm trying to assume is

18  that you are then extrapolating and saying that the

19  NRA logo -- the reaction and discrimination of the

20  NRA logo can be equally applied to individuals who

21  own licensed handguns because of some sort of nexus

22  you believe between handguns and NRA -- and the

Page 245

1  NRA?

2  A   Right.  So my claim, which I actually

3  think is fairly uncontroversial, is that people

4  perceive -- again, the public's perception is that

5  the NRA has something to do with firearms.  And

6  that in that same way, looking at somebody as being

7  on record as being a gun owner might elicit a

8  similar judgment or reaction as finding out that

9  person was associated with the NRA.

10  Q   Uh-huh.

11  A   So, yeah, the operative word being

12  "firearm," which -- again, I don't think this is

13  terribly controversial, that the National Rifle

14  Association is associated with firearms.

15  Q   Do you think that New Yorkers as a whole

16  assume that every individual who owns a licensed

17  handgun are members of the NRA and discriminate

18  against them equally?

19  A   There's two parts to that question.  The

20  first question, if I understood you:  Do I think

21  members of the public in New York assume all

22  handgun owners are NRA numbers?  It wouldn't

**Page 246**

1 surprise me if they think of them similarly.  It's

2 not obvious to me that they would believe with

3 certainty they have card-carrying NRA memberships

4 in their wallet.

5       But it is my opinion that people would

6 believe that those who are associated with the NRA

7 might also be those who are gun owners.

8    Q    And isn't it possible that people's

9 associational reaction to the NRA logo in this

10 study were more based upon the NRA's positions with

11 respect to assault weapons and their hard-line

12 position with respect to no background checks,

13 rather than ownership of a licensed permitted gun?

14    A    I suppose that's speculation.  And -- and

15 it's partly a question of -- again, you're not

16 asking necessarily about what we think, but what

17 about the average member of the public thinks.

18       And what this seems to show is -- well,

19 there's, again, two things important, is this issue

20 of say gun affiliation is identified, whether you

21 like it or not, with a partisan affiliation.  That

22 seems uncontroversial, that when people see the NRA

**Page 247**

1 logo, they are grouping it with a certain larger

2 political identity.  So that seems to be rather

3 uncontroversial.

4       Now, the -- the larger speculation:

5 Could it be the case that a sophisticated person is

6 able to distinguish and disambiguate certain policy

7 positions by the NRA and not group every gun owner

8 in America just with that, and have more animus

9 towards the NRA?  Sure.

10       Do I think that's what the average

11 run-of-the-mill American thinks?  I think they

12 would associate the NRA logo with gun owners.

13    Q    Okay.  Yeah.  I mean I think what I'm

14 suggesting is that the NRA itself elicits a

15 partisan response because it's the NRA, that is

16 different and not necessarily associational to the

17 response that is elicited by someone who owns a

18 legal handgun.  I think you're lumping them --

19    A    Yes.

20    Q    -- together.  And I'm wondering, is that

21 the -- is that -- what the basis is of lumping them

22 together.

**Page 248**

1       I think you've answered the question.

2    A    Yeah, that -- that seems like an obvious

3 association to me.  And I think it -- it would need

4 some serious argument to present evidence that

5 people don't think of gun owners as aligned with

6 the NRA.

7    Q    That's interesting.  Because on the -- on

8 the Democrat side, they used the Greenpeace logo.

9       Do you see that, on page 3 of Exhibit 3?

10    A    That's correct.

11    Q    And, similarly, I'm wondering -- I mean

12 so they're suggesting in this report that -- what

13 is Greenpeace?  Do you know what Greenpeace is?

14    A    Sure.

15    Q    It's an advocacy group that supports

16 environmental rights and environmental changes?

17    A    That's correct.

18    Q    Okay.  So what I'm suggesting when I'm

19 reading and thinking is that -- does someone who --

20 in the community who is -- conducts themselves in a

21 "green" manner, are they discriminated against in

22 the same way that someone who wears a Greenpeace

**Page 249**

1 T-shirt is, or is it -- is the association with

2 Greenpeace, and that's what's -- and that's what

3 the discrimination is based upon --

4    A    Right.

5    Q    -- not the underlying conduct?

6    A    Yeah, so, again, to be clear in the

7 context of this study, first of all, what's being

8 done with these logos this is -- is part of a -- a

9 so-called implicit association test.  And one thing

10 it's trying to -- and what -- what actually people

11 are doing is they're on this computer.  And they're

12 trying to respond essentially with two buttons when

13 something comes on the screen, and for different

14 segments of it.

15       One segment will say every time you see a

16 good word, press this button.  Or any time you see

17 a Democrat logo, press this button.  And any time

18 you see a bad word or a Republican, press this

19 button.  And these things are going in quick

20 succession.  People are trying to press buttons and

21 associate as quickly as they can.  And it turns out

22 that unconsciously people are much better

Page 250

1 associating "good" with the things that they
2 already agree with.
3      So at the end of the day, this is --
4 these stimuli are used to try to calibrate people's
5 innate allegiance and identity with -- and, again,
6 there's you know, the various stimuli here. And
7 then, once that's been established, the question
8 is: How do they treat, you know, co- or
9 anti-partisans or independents?
10   Q   Right.
11   A   And I think what this study -- I think
12 that this study establishes two things very well.
13 One, that a gun organization clearly has salience
14 for political identity, and that political identity
15 itself is something people are willing to
16 discriminate upon.
17      MR. CHUCK COOPER: May I just interject?
18      MR. DAGUE: Okay.
19      MR. CHUCK COOPER: Yeah, at some point
20 soon --
21      MR. DAGUE: Yep.
22      MR. CHUCK COOPER: -- if we could grab a

Page 251

1 break here.
2      MR. DAGUE: Yeah. Sure. Yeah. Yeah,
3 two minutes. Yep.
4 BY MR. DAGUE:
5   Q   Do you know whether political party
6 affiliation is publicly accessible information in
7 New York?
8   A   I would assume if you actually choose to
9 register for a party it is.
10   Q   Okay. So would your opinion be that the
11 disclosure of that information, based on this
12 study, carries with it the same risk of
13 discrimination?
14   A   It -- well, there's two considerations.
15 One is you don't have to affiliate. You can still
16 vote. So you might think of it, you know, a kind
17 of opt-in system, where, you know, if it were the
18 case that certain gun owners thought there was some
19 public utility and they wanted to be part of this,
20 I have no objection to a -- a voluntary wish to
21 publicly disclose or put a sign on your front door,
22 whatever. So -- so I would say the -- the

Page 252

1 voluntariness matters a lot, that you can still
2 access the underlying right without actually having
3 to make that public disclosure and identity.
4      The other thing is that there's a
5 population imbalance here. It's one thing to be in
6 a state that's say 50/50, 60/40. But I -- you
7 might ask and speculate: Would it be more
8 controversial in New York to be associated with --
9 I don't know -- the state of Texas or more
10 controversial to be associated with the NRA? And
11 in some sense -- I mean I -- I suspect the politics
12 here is a proxy for a whole bunch of things people
13 might discriminate against. If I had to guess, my
14 guess is, you know, so there's gonna be some
15 average here, things are -- which, again, more or
16 less polarizing. My guess is that probably it's
17 gonna be more polarizing than simple identity,
18 but --
19   Q   Okay. You just testified about the
20 voluntariness. Voluntariness might be an
21 important -- important factor in balancing these
22 rights.

Page 253

1      I asked you earlier with respect to
2 voluntariness as it related to the contract --
3 contracting an STD or mental hygiene -- or mental
4 health. And you were not willing to say that.
5      What's the distinction there, the
6 voluntariness of owning a gun as distinct from the
7 voluntariness of aligning with a policy party, so
8 you find that as a salient factor in the privacy,
9 but you don't find the voluntariness of owning a
10 gun versus the voluntariness of contracting --
11   A   Yeah.
12   Q   -- schizophrenia to be a salient factor?
13   A   So let's be clear about the -- the nature
14 of the voluntary action that's being discussed
15 here. I think the -- the -- one important test is
16 whether or not you can exercise some right without
17 having to submit yourself to forms of invasion,
18 forms of privacy.
19      And what seems to be very important in
20 the -- in the voting case, first of all, under no
21 circumstance can the actual details of your vote be
22 disclosed. Second of all, you cannot be prevented

Page 254

1  from accessing the ballot box if you don't

2  voluntary disclose your -- your party identity.

3       So it's -- now there's another set of

4  issues.  There's other reasons for the integrity of

5  the electorial system for primaries where you might

6  require public disclosure for a very narrowly

7  tailored purpose; again, which is not putting up

8  a -- an absolute barrier to your exercising that

9  right.

10      So it strikes me that there are -- there

11 are obvious distinctions here.  And, actually,

12 voluntariness isn't maybe even the most important

13 one.  But it's -- you know, at baseline, are we not

14 placing barriers to the access of the -- to the

15 access -- to the exercise of fundamental rights.

16      MR. DAGUE:  Okay.  Let's take a break.

17      (Recess)

18      MR. DAGUE:  All right.  So let's go back

19 on the record.

20 BY MR. DAGUE:

21   Q   Welcome back, Doctor.

22   A   Thank you.

Page 255

1    Q   Okay.  So we're talking about these

2  factors that you opined are potential harms to

3  handgun owners as a consequence of disclosure.  And

4  we talked about burglary, discrimination,

5  stigmatization, and ostracism, and the prevention

6  of law-abiding citizens -- which we were talking

7  about last -- who wish to acquire a gun but won't

8  because of the public disclosure.

9       Do you know what percentage of New York

10 residents who own a licensed handgun are Democrat

11 versus Republican?

12   A   I do not.

13   Q   Is that a statistic that you looked into

14 at all in the preparation for this report?

15   A   No.  And I'm not sure it's the most

16 relevant statistic, either.  My -- my bigger

17 question would be:  What are the perceptions

18 amongst the public?

19      You know, because oftentimes public

20 perceptions don't track reality perfectly.  But

21 really, the question here is what's -- what's the

22 effectual truth of people's perceptions and

Page 256

1  their -- how they actually act on those.

2    Q   Do you know where Doe Number 2 resides in

3  New York?

4    A   I'm sorry, do I --

5    Q   Do you know where Doe Number --

6    A   Where?

7    Q   -- resides in --

8    A   No, I don't know where.

9    Q   Do you know which county he resides in?

10   A   I do not.

11   Q   Do you know anything about the politics

12 of Putnam County New York?

13   A   I don't.

14   Q   Do you know if that area is predominantly

15 conservative Republican or liberal Democrat?

16   A   I don't.

17   Q   Okay.  Do you know anything about the

18 partisan divide generally in New York between

19 Upstate and Downstate?

20   A   I generally know that Upstate, at least

21 in my perception, is -- tends to be more rural,

22 more Republican; Downstate, more Democrat, more

Page 257

1  colloquially liberal.

2       I -- I have heard, too, I guess, some

3  statements that Governor Cuomo made that seemed

4  to -- that you -- targeting the NRA by name -- and

5  saying -- I'm paraphrasing -- something like --

6  something -- NRA isn't invited here or isn't

7  welcome here or -- so I -- I'm aware that there's

8  political divides in New York.  And I'm aware

9  sometimes gun issues are part of those policy --

10 partisan divides.

11   Q   Are you aware of whether the Safe Act in

12 New York received any public admonition, or

13 admonition from the public?

14   A   I'm sorry, admonition from --

15   Q   The public.

16   A   When you say "the" public, what do you

17 mean?

18   Q   Well, let's say this.

19      Do you are -- you aware of whether the

20 passage of the Safe Act was criticized by some

21 members of the public in New York, or whether -- or

22 is it your belief that it was readily accepted by

Page 258

1 everyone?

2   A   Well, I -- I don't know any piece of

3 legislation that's readily accepted by everybody.

4   Q   Good point.

5   A   But I -- I at least witnessed -- I

6 witnessed criticisms from different angles on both

7 the right and the left.

8   Q   And do you know if it received -- fair to

9 say it received some considerable degree of

10 negative public response?

11   A   Again, I'm not sure.  Considerable, I --

12 I witness at least -- there were some criticisms

13 that I came across about it.

14   Q   Do you know if the negative public

15 response was more profuse in Upstate New York

16 versus Downstate New York?

17   A   I don't know the specifics and -- or I

18 couldn't quantify who and where it was most pro or

19 anti about the actual law.

20   Q   Do you know where Putnam County, New

21 York, geographically falls in the Upstate/Downstate

22 New York continuum?

Page 259

1   A   I -- let me see.  The -- I looked up

2 Westchester, Rockland, and I -- I -- at one point I

3 looked up Putnam.  I -- I don't associate it with

4 the far Upstate New York.

5   Q   Okay.  When you say far Upstate New York,

6 you mean --

7   A   Like Buffalo, the --

8   Q   You don't associate it with the Canadian

9 border?

10   A   The Canadian border.

11   Q   But do you consider Putnam to be Upstate

12 or Downstate, if you have an opinion?

13   A   The -- I'm -- I -- I looked at many maps

14 of this.  And I'm forgetting exactly the location

15 of Putnam.  But I -- I think about it in the

16 broader, you know, New York City general area.  I

17 forget where you all draw the lines in your Upstate

18 and Downstate borders.

19   Q   So beyond the article, your feelings and

20 position with respect to the article in Exhibit 3

21 that we marked, and petitioner Doe's -- Doe Number

22 2's articulation of concern with respect regarding

Page 260

1 ostracism, do you have any other data to support

2 your claim that registered gun owners feel

3 discriminated as a result of public disclosure?

4   A   The only thing I would add to that are

5 colloquial conversations I've had with, you know,

6 various gun owners over the years, many --

7 particularly in urban environments -- who are

8 hesitant to let their ownership, participation in

9 shooting sports -- their ownership of guns or

10 participating in shooting sports be public

11 knowledge precisely for those same reasons that are

12 articulated by I guess Doe 2 in this case.

13   Q   Is your opinion on this front informed by

14 the concern you articulated earlier with respect to

15 tenure at Georgetown and political affiliation with

16 gun advocacy?

17   A   Well, there -- yes.  I think also --

18 there's also some social circles where these

19 issues, which are partisan in the general public,

20 are maybe hyper-partisan.  And so I could imagine

21 there being -- I mean to use a -- an analogy, you

22 know, microclimates, you know, you know, particular

Page 261

1 areas or -- or clubs or social circles where these

2 are bigger deals than others.

3   Q   The colloquial conversations you've said

4 you've had over the years, were those with New

5 Yorkers, or do you not recall?

6   A   Yeah, I don't recall.

7   Q   Okay.  Have you ever been to Upstate

8 York?

9   A   Uh-huh.

10   Q   What part?

11   A   Yes, I have.

12   Q   What parts of wonderful Upstate New York

13 have you been?

14   A   Buffalo.

15   Q   Okay.

16   A   Principally Buffalo.

17   Q   Okay.

18   A   I'm sure I've driven through other parts,

19 but --

20   Q   Well, just for the record, us real

21 Upstaters consider Buffalo to be western New York,

22 so --

Page 262

1    A   Oh, I didn't know how many divisions

2  there are.

3    Q   Oh, there's a lot of divisions.

4    A   Okay.

5    Q   All right.  Let's jump ahead to page 5 of

6  your report.

7        At the bottom of that page -- still

8  looking at Exhibit 1 -- you talk about this concept

9  of doxing, D-O-X-I-N-G.

10       Do you recall that --

11   A   Yes.

12   Q   -- opinion?

13       Okay.  And you talk about defining doxing

14 as the intentional public release onto the internet

15 of personal info about an individual by a third

16 party, often with the intent to humiliate,

17 threaten, intimidate, or punish.

18       Is that your understanding of what doxing

19 is?

20   A   The -- that's a definition offered by

21 David -- David Douglas.

22   Q   Okay.

Page 263

1    A   I think that gets to the heart of the

2  most pernicious forms of doxing.

3        Now, there's a few words in there I think

4  that could be expanded.  So, yes, sometimes it's

5  the intentional public release.  Sometimes it's

6  the -- you know, others intentionally releasing

7  data that was maybe intentionally publically

8  released.  So I mean there's -- there's little

9  aspects of that --

10   Q   Okay.

11   A   -- definition, some of them are the

12 intents might be broader than simply humiliation or

13 threatening.  But the -- the basic gist, the

14 essence of it, I think is well laid out in that

15 short sentence.

16   Q   Okay.  Now, do you have any data

17 suggesting that a licensed gun owner -- handgun

18 owner in New York has been subject to doxing as a

19 result of PL 400?

20   A   Well, as I mention in the report, I take

21 it the entire incident that involved the

22 publication of these actual records by a newspaper

Page 264

1  up there strikes me as sort of doxing on a mass

2  scale; that is, that publicly released all these

3  names of individuals or addresses.

4    Q   Okay.  So you consider the term "doxing"

5  to include the public release of information that's

6  publicly available by a media source; is that fair

7  to say that's your definition of doxing?

8    A   It could include that.

9    Q   Doesn't doxing, as defined in your own

10 report, by Mr. Douglas, include an intent to

11 humiliate, threaten, intimidate, or punish the

12 identified individual?

13   A   It -- it can.  As I noticed just a few

14 sentences ago, I -- that could be understood more

15 broadly, which I explicitly stated.  But it also

16 wouldn't surprise me if there were interest at the

17 newspaper who actually perhaps even intended to

18 have some of those things happen to gun owners.

19   Q   Is that a pure speculation?

20   A   It strikes me as psychologically

21 plausible.

22   Q   Well, okay.

Page 265

1    A   So it's speculative.

2    Q   Okay.  So it's psychologically --

3    A   But that's --

4    Q   -- plausible and --

5    A   -- but -- but this is -- again, this is a

6  problem with doxing.  So there's a convenient,

7  plausible deniability of, oh, you know, we outed

8  somebody who was homosexual.  We outed someone who

9  was a gun owner.  We outed somebody as an Borg

10 recipient (phonetic).  We didn't mean them any harm

11 by that, is the claim that can always be made.

12       So I -- the first thing about doxing,

13 it's -- it's not, in my opinion, so much about

14 intent as likely effect.

15   Q   Okay.

16   A   And so my -- my concern here is the --

17 the likely effect of this information.  It seems to

18 have the power.  And many people, indeed, my

19 understanding, is were alarmed and outraged by

20 this.

21   Q   Under your --

22   A   But not alone, I guess, in worrying about

Page 266

1  the effects.

2      Q   Under your definition of doxing, wouldn't

3  that not -- wouldn't that include a newspaper's

4  reporting of a criminal arrest that's public

5  information?  Couldn't that be construed as doxing,

6  under your interpretation of doxing?

7      A   All right.  So the underlying question

8  would be whether this is a -- you know, whether

9  there's a legitimate interest here.

10     And -- and it's in -- even on the doxing

11 front -- so many of the debates that have come up

12 with regard to doxing:  Defamation, sometimes

13 there's even a different standard for say public

14 individuals, for, you know, people who are in the

15 spotlight, politicians, and, you know, what the

16 standards that accrue to them and the standards of

17 private citizens.

18     The -- it seems to me in the -- in the

19 criminal case, there might be a legitimate reason

20 for that sort of information to be publicly

21 available.

22     Q   Okay.

Page 267

1      A   Because they've committed a crime.

2      Q   So I just want to be clear so that I

3  understand your interpretation of doxing.

4      Do you believe, based on your knowledge

5  of doxing, that the newspapers' release of the

6  information available under public -- Penal Law 400

7  was an incident of doxing?

8      A   I would describe it as being a -- a

9  species of doxing, you know, understanding that

10 doxing can be more or less severe, greater or fewer

11 consequences.  But yes, I think it's -- that's

12 certainly -- you know, it's part of that framework.

13     Q   Okay.  Outside of that publication that

14 you believe to be a species of doxing, do you have

15 any evidence or data of any other New York gun

16 owner -- gun owner in New York licensed handgun

17 having been doxed with information gleaned from PL

18 400?

19     A   So in my review of various news releases

20 and some of the controversy surrounding this law,

21 I -- I do recall casually coming across incidents

22 where people -- I believe some of them may have

Page 268

1  actually been citing from the database that the

2  newspaper published, but saying things like:  Did

3  you know your neighbor -- bla, bla, or maybe --

4  maybe one of them was a public official.

5      But I -- I vaguely recall there being

6  instances of people, you know, citing this

7  information in public for a -- drawing attention to

8  individuals.

9      Q   Okay.  And you said you vaguely recall

10 coming across that information as you researched

11 for this report; is that right?

12     A   Yes.

13     Q   And do you recall the source of that

14 information?

15     A   No.  These were a -- a bunch of newspaper

16 articles I was reading, some public fora where

17 things were being discussed there.  I read a lot --

18     Q   All right.

19     A   -- of Newsweeks and --

20     Q   If you have -- if you pulled that

21 information and preserved it, we'll follow up.  We

22 would ask for a disclosure of that so we can --

Page 269

1      A   Sure.  I might have to search a little

2  bit, but --

3      Q   Okay.

4      Okay.  I'm going to jump ahead in your

5  report to page 8, when you turn your attention to

6  Dr. Zeoli.  Okay.  I want to direct your attention

7  to the first paragraph under Dr. Zeoli's report and

8  concerns.  So it's -- well, the second full

9  paragraph on that page.

10     Do you see that?

11     A   Yes.

12     Q   Okay.  And you say, Dr. Zeoli speculates

13 that the disclosure required by PL 400 could

14 potentially help reduce intimate partner homicides.

15     Do you see that?

16     A   Yep.

17     Q   And you criticize Dr. Zeoli's conclusion

18 as poorly speculative.

19     Do you see that?

20     A   That's correct.

21     Q   Okay.  And, actually, this speculative

22 criticism, the speculative nature in your opinion

Page 270

1  of both Zeoli and Sege's reports is one -- fair to
2  say one of the chief criticisms that you opine with
3  respect to their reports?
4      A   That's correct.
5      Q   In your professional studies and
6  publication of research material, have you ever had
7  to formulate a conclusion or an expert opinion
8  without a hundred percent certainty of data?
9      A   Sure.
10     Q   And have you ever had to theorize, based
11 on limited data, a conclusion?
12     A   Sure.
13     Q   Fairly common in your field to both
14 theorize?
15     A   I think it's common in every field.
16     Q   So when you offer your expert opinion
17 with respect to the possibility of future burglary,
18 discrimination, stigmatization, and ostracism
19 without firm data demonstrating that those had
20 actually occurred, was that you speculating as to
21 potential harms from this law?
22     A   That is one of many potential harms.

Page 271

1  And -- and I'll note the nature of the speculation
2  here is it's also worth considering the
3  denominator.  So we know that there's 16 in 2015,
4  16 intimate partner homicides committed with guns.
5  I -- I'm assuming the number of burglaries in New
6  York, and firearms burglaries, is probably more
7  than that.
8          And so, you know, any time, you know,
9  we -- we kind of -- we estimate, we're always
10 thinking about what are the magnitude of our
11 estimations.  And the -- so it'd be a -- a research
12 project one might conduct, maybe some day with the
13 help of New York.
14         But the interesting thing is if there are
15 16 instances here, one thing that's neat about that
16 there's -- it's actually a relatively limited set
17 of data you might investigate to determine if any
18 of these circumstances fit that particular
19 description or the particular scenario.
20         And so that was part -- partially was the
21 interest in me to -- you know, it seems a
22 relatively small targeted thing which you might

Page 272

1  have dug up some more evidence.
2      Q   And how many incidents of burglary did
3  you find again respecting -- or with respect to
4  individuals that were burglarized for guns based on
5  information gleaned from public law 400?  Penal
6  Law.  I'm saying "public."
7      A   Right.  Yeah, so, again, that wasn't the
8  objective of my report, which was fundamentally to
9  evaluate the claims made about public safety by
10 Zeoli --
11     Q   Right.
12     A   -- Sege, and Hamilton.
13     Q   Well, what I'm trying to get at is you're
14 criticizing them for speculating based only, you
15 said, is 16 instances of domestic violence; but you
16 speculated potential burglaries and discrimination
17 based on zero incidents that you found of those
18 things; is that fair?
19     A   Again, it's a question of where does it
20 figure into the larger equation of valuation.  It
21 seems to me that the burden of their claim is:
22 What justifies this law?  What -- what is the --

Page 273

1  you know the main argument one could marshal?
2          And in my evaluation, I'm trying to
3  evaluate their claim.  They're claiming this thing.
4  And I'm also trying to say, you know, what else
5  might be in the equation.  What -- what else might
6  you want to be concerned about.  First, we need to
7  evaluate the -- the positives that they think this
8  law is going to contribute.  Then at least take
9  account -- at least recognize the range of
10 negatives.
11         And so, yeah, within the scope of this
12 inquiry, within the scope of the argument here, you
13 know, this could have been a hundred-page report.
14 There's plenty -- I mean there's so many things to
15 include on that cost side.  But my primary focus
16 was to evaluate their claims about the benefits of
17 this law.  And it was -- seems conspicuous to me,
18 or surprising even, how -- how weak the data was on
19 supporting the benefits of these laws.
20     Q   But, Doctor, again, you proposed this
21 cost benefit analysis.  And you populated the
22 fields on the cost benefit analysis.  And you -- no

Page 274

1 one else -- had offered that the costs of this are
2 potentially: Burglary, based on public disclosure;
3 discrimination, stigmatization, ostrazation,
4 doxing. But you've testified here today that you
5 have no data or evidence to suggest that those have
6 actually happened, based upon public disclosure
7 Section 400.
8      So what I'm trying to get at is you're
9 criticizing these three reports for speculation,
10 when you've engaged in actually worse speculation
11 because you have no evidence to support any of
12 these theories.
13     A   All right, so it's not worse speculation.
14 What I've speculated are a range of concerns, many
15 different vary, you know, and significant. Again,
16 which might be subject to -- to great
17 investigation. And, again, these are gonna be
18 balancing off.
19      Well, what needs to be balanced off? We
20 need to establish in the first place what the
21 benefits are. Those are, I have to say, close to
22 zero in evaluating these reports.

Page 275

1      So it's partly the -- the burden of
2 evidence to balance out, that I need to bring to
3 the table, is really commensurate with the evidence
4 that they are presenting in the first place. And
5 so actually -- I mean the weight of evidence you
6 need about, you know, speculation that's not well
7 documented, you know, is itself, you know,
8 sufficient to be fairly speculative, fairly broad.
9      And I -- I want to at least flag the
10 range of concerns that one might have about this
11 law. And, you know, I -- I think these are pretty
12 compelling.
13      But, again, it has to be balanced off in
14 first and foremost the strength of their arguments.
15 And what they're bringing to the table to begin
16 with is -- is awfully slight to begin with. So,
17 again, I -- I -- I -- you know, if all I need to
18 overcome is their burden of speculation, that's a
19 irrelevant (phonetic) of burden.
20     Q   Doctor, what manner could a victim of
21 domestic violence -- or in what manner, say, could
22 an individual report having used PL 400 to find out

Page 276

1 that a handgun was owned by an intimate partner?
2     A   Well, I -- presumably, you know, the
3 courts themselves -- these might be on record,
4 right. I -- I -- I don't know the full workings of
5 domestic courts. But when one comes to seek a
6 protective order, I assume people give reasons or
7 evidence. And I note already that even if there's
8 a concern about violence, that that itself might
9 trigger a protective order.
10      But, you know, this is one of those areas
11 I -- again, you can correct me, if our legal system
12 doesn't track what people actually write down in
13 seeking a protective order, but presumably that
14 sort of stuff would be on record somewhere.
15     Q   Well, if a woman had a concern with
16 respect to a domestic relation she was having and
17 used public law 400 to find out about that
18 individual's ownership of a handgun, does she have
19 to report that?
20     A   I would assume it would make her case
21 stronger if she's petitioned a judge for --
22     Q   I'm not talking about petitioning a

Page 277

1 judge.
2      I'm just saying if someone used that
3 vehicle to get the information, they don't have to
4 report that anywhere, do they?
5     A   There's a lot of things they may not have
6 to report. It would strike me as really bizarre if
7 no one ever did report it, if it was actually a
8 useful piece of information in establishing a
9 threat that would actually result in a restraining
10 order.
11     Q   Well, someone could report the result of
12 the finding, but they don't necessarily have to
13 report how they got the information in any
14 capacity, do they?
15     A   Not necessarily. It would be interesting
16 to -- I mean presumably you all must have access to
17 data, too, to see how many people are querying
18 these things on a regular basis.
19      So, right, at least the count -- whoever
20 is in control of these, I'd love to know how often
21 these are queried. Because that must be a matter
22 of public record for sure. And we could just -- I

Page 278

1  mean how many parents -- you must have access to
2  that. How many parents in New York -- how many
3  people in New York are making these with queries
4  outside of journalists, I'd love to know.
5       Because we could get at some of that,
6  couldn't we?
7    Q   I don't know the answer to that question.
8    A   Okay.
9    Q   I don't think there is an answer to that.
10   A   Are FOIA's not a record?
11   Q   Doctor, I'm not being deposed here.
12   A   Okay. Sorry.
13   Q   Let me ask you this.
14      If someone used PL 400 and it resulted in
15  a domestic violence incident being averted because
16  they had the information, there'd be no way to
17  quantify how -- how that -- there'd be no way to
18  quantify that information, would there, because you
19  can't collect data on something that didn't happen,
20  right?
21   A   The way you typically study that is in a
22  comparative analysis. So you ask, for example: If

Page 279

1  these things are queried at different rates in
2  different counties, is that reducing our domestic
3  violence burden if we compare to different states
4  over time?
5       You know, there are ways to get at that.
6  But it's a good first order of concern. And, yeah,
7  there's -- there's a variety of comparative
8  analyses you might perform to try to see: Are
9  these things making a difference over time? And
10  what from what I could tell, New York is actually
11  pretty similar to almost all states in New England.
12   Q   How many incidents of a parent finding
13  out information through public law -- through PL
14  400 and avoiding, based on the information, an
15  unintentional injury or death would not ever be
16  known, would it?
17      It is immeasurable, isn't it?
18   A   You would think New York would have such
19  a lower rate than all the other places in New
20  England, and yet it doesn't.
21   Q   Okay.
22   A   So we -- we can conduct comparative

Page 280

1  analysis of the law. And as I noted in my report,
2  we can analyze the states bordering New York. We
3  can look at similar demographics. First of all,
4  these things are extraordinarily rare, period.
5  And, secondly, New York is really on par with the
6  rest of New England, so --
7    Q   But you can't get at information -- you
8  can't collect data from an incident that didn't
9  happen, because it was averted.
10   A   But that should show up in comparative
11  analysis.
12   Q   But you --
13   A   It is not being averted in other states.
14  And the quest -- well, the question is: What's the
15  difference between these two states and the periods
16  when the law goes in effect, if there's periods
17  when there's more querying?
18      Again, it's a hard to thing to study
19  because these things almost never happen.
20   Q   Uh-huh.
21   A   And, in fact, I couldn't -- I -- I could
22  not find a single incident where it was a

Page 281

1  registered legal handgun at a playmate's house that
2  caused this, in all of New England when I was
3  looking.
4    Q   Right. Did --
5    A   I'm sure -- and I'm sure it maybe --
6  maybe it exists somewhere.
7    Q   Did you -- what type of searches did you
8  conduct to look for that situation?
9    A   So I -- I describe them in my report.
10   Q   Right. And is that pages -- well, let's
11  see -- 16?
12   A   (Witness looked at document). So starts
13  on 15.
14   Q   Okay. And you describe the searches that
15  you conducted to try to find incidents of legal
16  handgun, unintentional injury or death --
17   A   Yes.
18   Q   -- from playmates?
19   A   So I focused on -- on death --
20   Q   Okay.
21   A   -- as mentioned earlier. I'm able to
22  find a few cases.

Page 282

1  Q   Uh-huh.

2      A   They concern either illegal guns, in

3  terms of there's -- there's nothing that fits

4  that -- the very specific scenario that Dr. Sege

5  hypothesizes might be systematically averted.  And

6  now it's possible there's -- there's a long record

7  we don't have, particularly in the early years, the

8  range of online documentation.

9      It wouldn't surprise if me if sometime,

10  somewhere this is happening.  But it is very seldom

11  and very rare.  And, again, we're not seeing a huge

12  difference here between other states.

13  Q   How did you conduct your searches?  Were

14  they Google searches?  What did you look at?

15  A   So as I mentioned on page 15, I searched

16  a database maintained by the Gun Violence Archive.

17  According to its website, Gun Violence Archive is a

18  not-for-profit corporation formed in 2013 to

19  provide online public access to accurate

20  information about gun-related violence in the

21  United States.

22      There was also an Associate Press in USA

Page 283

1  Today Network.  They did a similar study.  And

2  they -- they used the Gun Violence Archive.  But

3  they went beyond it.  I could -- there were cases

4  nationally in other states.

5  Q   Yeah.

6  A   Again, they -- they weren't exactly that

7  scenario, but there -- there are cases of a

8  licensed handgun being used.

9      The playmate scenario, I think -- I

10  believe still eluded me, which is just to say

11  there -- from a -- from a standpoint of policy

12  evaluation, if this is really moving the needle,

13  it's hard to evaluate when you have such low

14  numbers to begin with.  But even then, I didn't see

15  a big difference between New York and other

16  neighboring states.

17  Q   Right.

18      Do you believe that, as you said, you

19  could not find a single reported case over the last

20  20 years of accidental handgun death of a child

21  that corresponds to Dr. Sege's hypothesis?

22      Do you believe that that's -- that hasn't

Page 284

1  happened over the last 20 years?

2      A   In New York?

3  Q   Yeah.

4  A   Oh, I -- as a betting man, I'm -- if --

5  if you do this long enough, I'd have to -- I have

6  to assume maybe somewhere -- you know, enough --

7  rare things eventually, if you take a long enough

8  time -- you have to think of the population.  It's

9  20 million people.  It's 20 years.  It might have

10  happened somewhere.  Maybe it happened a few times.

11  It's just hard -- it's just seems kinda hard to

12  find.

13  Q   Yeah.

14  A   I don't -- I would be surprised if it

15  happened hundreds of times, thousands of times.

16  Q   What did you search?  Did you use search

17  terms:  Accident shooting within ten of death or --

18  A   Now, searching now, are you referring

19  to --

20  Q   When you say here that you were not able

21  to find a single reported case in the last 20

22  years, I'm just curious as to what search terms you

Page 285

1  used.

2      Yeah, other than the website, did you

3  conduct any just general searches of --

4  A   So --

5  Q   -- what you --

6  A   -- so let's just get -- yeah, so, again,

7  two things that we can talk about here.  One is

8  account of accidental handgun deaths.  And there, I

9  can first look at the CDC numbers.  And those are

10  tracked over this 19-year period.

11      I can then also look at -- you know,

12  there's some concerns expressed by Dr. Sege.  If

13  you accept his estimations, it's about twice as

14  many.  You can still use the CDC data if it -- if

15  the rates are at least staying the same, you can

16  say, well, what would it be if you had these higher

17  numbers.

18      So the first round of estimates are just

19  asking about accidental handgun deaths.  And that's

20  using government data and also Sege's own data.

21  Then there's this additional question of, well,

22  what about accidental handgun deaths at a

William E. English, Ph.D.

Washington, DC

9/13/2019

Page 73 (286 - 289)

Page 286

1   playmate's house and with illegal -- illegal

2   firearm. I'm just trying to, you know, understand

3   the actual scenarios.

4         And so that is a series of, you know,

5   first the gun violence archives; secondly, the

6   Associated Press, USA Today Network, you know,

7   perform some other Google searches. And as I said,

8   there -- there are cases. Predominantly they

9   concern illegal firearms.

10  Q   All right.

11  A   Let's see how many.

12  Q   Would you -- when you were searching, did

13  you encounter a December 28th, 2010, incident that

14  happened in Wilton, New York, a shooting death of a

15  12-year-old, while playing at a friend's home,

16  using the playmate's father's registered handgun?

17  A   I did not uncover that one.

18        MR. DAGUE: Mark that for the record as

19  D-4.

20        (Discussion off the record)

21        (Defendants' Deposition Exhibit No. 4 and

22        5 marked for identification.)

Page 287

1   BY MR. DAGUE:

2   Q   All right. Doctor, we're going to wait

3   for those copies.

4   A   Sure. Sure.

5   Q   Let's talk about some other issues.

6         Look at page 9 of your report. And I'm

7   looking at that middle paragraph, which I guess is

8   kind of the first full paragraph on that page,

9   where you're looking at Dr. Zeoli's statistics with

10  respect to individuals that were killed in New York

11  by DV incidents.

12        Do you remember that paragraph?

13  A   By DV, this is the -- the second main

14  paragraph?

15  Q   Yeah. It begins, a detailed examination

16  of --

17  A   Yes. Right.

18  Q   -- intimate -- yes.

19        So in this paragraph you talk about what

20  you believe are inaccuracies in Dr. Zeoli's

21  statistics, in part, right?

22  A   Slight inaccuracies.

Page 288

1   Q   Okay.

2   A   And even -- probably not Dr. Zeoli's

3   fault, because she's citing another paper.

4   Q   Right, Diez --

5   A   Diez --

6   Q   -- paper, right?

7   A   -- right.

8   Q   Zeoli obtained her numbers from Diez

9   article from 2017, right?

10  A   That's what she reports.

11  Q   And you say in here that Diez got her

12  number from the advocacy group Everytown, right?

13  A   That's what she -- that's what Diez

14  reports.

15  Q   Okay. And then you claim in this

16  paragraph that Zeoli's/Diez's figures of 76

17  domestic violence homicides in 2015 are actually in

18  conflict with the New York State reported numbers,

19  right?

20  A   I did observe that, yes.

21  Q   And it's actually from 76, which was --

22  Diez/Zeoli number is 264, which is the number that

Page 289

1   you proffer from New York, right?

2   A   Correct.

3   Q   Did you have a chance to read Dr. Zeoli's

4   deposition testimony following her deposition

5   before your deposition?

6   A   I did not.

7   Q   Okay. Do you know that Diez actually

8   gleaned her numbers from the FBI supplemental

9   homicide reports, not from Everytown?

10  A   That's plausible. There were -- either

11  Diez or someone in that paper, I believe, does make

12  reference to having received this -- at least some

13  of the data, from Everytown.

14  Q   And do you know that Dr. Zeoli testified

15  that actually the FBI supplemental homicide reports

16  are the gold standard for this type of statistics

17  because they're updated on a monthly basis, based

18  on talking to different jurisdictions?

19  A   It's interesting that made -- two things

20  to say. There are certain sorts of data for which

21  I would think the FBI's more reliable. But,

22  second, it sounds like what you're telling me the

William E. English, Ph.D.

Washington, DC

Page 290

1 New York State's own report is not to be trusted on

2 this.

3    Q   Well, I'm not sure I'm telling you that.

4        What I'm telling you is --

5    A   Is erroneous.

6    Q   -- is that -- do you know that Dr. Zeoli

7 testified that the FBI supplemental homicide report

8 was more accurate than the State of New York's

9 report, as it's supplemented on a monthly basis?

10    A   That strikes me as a plausible claim for

11 her to make.

12    Q   Sure.

13    A   I'm not certain it's true.  We -- I can

14 investigate that.  But if New York State gave

15 erroneous data, then I would certainly defer to

16 whatever the accurate data is.

17    Q   Sure.  And you do a -- were you aware of

18 the FBI supplemental homicide report when you

19 addressed the data and numbers in this paragraph?

20    A   I'm aware of its existence.

21    Q   Okay.  And did you check the FBI

22 supplemental data to determine if the figure you

Page 291

1 use for 2017 that you base some of your conclusions

2 on, of 59 domestic violence homicides, did you

3 check the FBI data to determine if that was

4 actually accurate?

5    A   Since this is a New York State case, I

6 checked the New York State's published numbers of

7 record.

8    Q   Okay.

9    A   I figured New York State could be trusted

10 for data integrity.

11    Q   Sure.

12    A   And maybe I'm mistaken about that.

13    Q   And if the number -- obviously, if the

14 numbers changed based on the FBI, your conclusion

15 or at least your opinion with respect to the data

16 may change; is that fair?

17    A   I would want to make sure the FBI is, in

18 fact, a more reliable source.

19    Q   Sure.  But I guess what I'm saying as

20 kind of a noncontroversial proposition is you're

21 looking at a number.  And you're -- of 59.  You're

22 rendering some analysis of that number.

Page 292

1        And if you were to determine that there

2 was -- that number was different either lesser or

3 higher, based on a more reliable source if you made

4 that determination, then your opinion may change or

5 at least may alter somewhat?

6    A   Certainly.  And I'm somewhat comforted by

7 the fact that even the numbers Dr. Zeoli reported

8 still are pretty low.

9    Q   Okay.  So in that bottom of that

10 paragraph, you talk about the different numbers,

11 the percentages of the 59 DV homicides in 2017.

12        Do you see that testimony?

13    A   Correct.

14    Q   And you talk about 48.5 percentage of the

15 59 were you -- were completed using a knife, a

16 cutting instrument, or a blunt object.

17        Do you see that?

18    A   That's correct.  Yes.

19    Q   And then that 16 of the 59 intimate

20 partner homicides were -- involved firearms, right?

21    A   That's what New York State reported, yes.

22    Q   Okay.  And is it your position that the

Page 293

1 27.1 percent of all intimate partner homicides in

2 2017, 27.1 is an insignificant number?

3    A   What do you mean by insignificant?

4    Q   Well, is it your position that 27.1

5 percent is not significant -- is a nonsignificant

6 amount of -- or excuse me, a nonsignificant

7 percentage of intimate partner homicides that they

8 shouldn't be considered?

9    A   So significance has a -- has a technical

10 meaning within statistics.  I think I understand

11 your -- your larger question here, which is not

12 about that technical meaning.

13        My main point in -- in calling attention

14 to this is to observe that, in fact -- you might

15 have -- one might have thought, from Dr. Zeoli's

16 testimony, that guns are by far the implements most

17 often used in domestic partner homicide.  And I was

18 surprised myself to find that -- how rarely they

19 were used compared to something as commonplace as

20 knives.

21        And so it's -- I'm not claiming these 16

22 deaths aren't important.  They are indeed a tragedy

Page 294

1 that -- but to point out that actually the
2 preponderance of homicides -- domestic violence
3 homicides in New York appear to be actually
4 executed with a -- a knife or cutting instrument.
5    Q   Right. Now --
6    A   And which, yes, raises all sorts -- all
7 sorts of questions, it seems to me.
8    Q   Well, let's focus on that.
9        Page 10, the second full paragraph
10 begins, Curiously, Dr. Zeoli says nothing about the
11 role of knives in intimate partner violence,
12 despite the fact that they are the most commonly
13 used intimate partner homicide instrument in many
14 states.
15       Do you see that?
16    A   That's correct. Yes.
17    Q   Okay. Now, I just want to ask you about
18 this.
19       You say here -- again, Doctor, looking at
20 page 9 -- that the -- New York's own report notes
21 that a knife, a cutting instrument, or a blunt
22 object was used more frequently, in 47.5.

Page 295

1        Now, you would admit that that statistic
2 includes three different instruments of -- of death
3 there, right: A knife, a cutting instrument, and a
4 blunt object, right?
5    A   The distinction between a knife and a
6 cutting instrument I suppose is slight. But, yes,
7 there's blunt object that's included as well.
8    Q   Okay. So if you -- if you do the math on
9 47.5 divided into thirds, assuming that the third
10 was knives, a third was blunt object, and a third
11 was some sort of other cutting instrument, that
12 would actually be a lesser figure than 27.1, right?
13    A   Yeah, I have no reason to believe those
14 are thirds.
15    Q   Well --
16    A   But the --
17    Q   -- well, of course, but --
18    A   -- and the main point, I should say, I --
19 I guess these are technicalities that don't --
20 aren't material at all to my larger point, which is
21 it seems, if I'm to understand, a blunt object
22 is -- I don't know, a -- a bat or a -- you know,

Page 296

1 who knows what, broomstick or -- these seem to be
2 common, everyday objects.
3        And interestingly, you know, whether you
4 think there's an important distinction between
5 them, they are responsible for more deaths in
6 aggregate than guns.
7    Q   Now, you say, in that same paragraph on
8 page 10, that knives are the most commonly used
9 intimate partner instrument for intimate partner
10 homicide instrument in any many states.
11       Do you see that?
12    A   Yes.
13    Q   What do you mean by many states, in that
14 paragraph?
15    A   Yes, so if you actually go to -- I
16 believe it was -- it's either the Diez -- it might
17 be the -- oh, The Annals of Internal Medicine --
18    Q   Uh-huh.
19    A   -- article that I cite there. They
20 actually do a breakdown of states.
21       And it's interesting, they had -- a lot
22 of -- there are a handful of states where the --

Page 297

1 whatsoever designation you want to call it:
2 Knives, the blunt instruments, both, either -- and
3 they show up as the more frequent -- it's often in
4 states that have relatively low rates of each.
5        So there -- you know, there are certain
6 states that might only have -- the small states
7 might only have three domestic violence incidents,
8 or -- you know, or something. And if you have two
9 guns and one knife, well, all of a sudden it's
10 twice as many.
11       But I observed, in looking at that, there
12 are -- are I believe a majority, was my estimate,
13 of states that actually recorded in this category
14 of say common household knives, blunt objects, that
15 those are the -- the most used.
16       MR. DAGUE: Okay. I'm going to mark
17 Exhibit 6.
18       (Defendants' Deposition Exhibit No. 6
19       marked for identification.)
20 BY MR. DAGUE:
21    Q   Okay. I'm going to hand you what's been
22 marked as Exhibit 6.

Page 298

1   A   (Witness looked at document).

2   Q   I just ask you to familiarize yourself on

3   that document, Doctor.

4       And while you're doing that, I'll just

5   note for the record that Defendants' Exhibit 6 is a

6   copy of a research paper issued by Carolina Diez in

7   2017.  And it's entitled, State Intimate Partner

8   Violence.  And it goes on with a subtitle, but I

9   won't put that on the record.

10      (Discussion off the record).

11  BY MR. DAGUE:

12  Q   And I'm going to direct you to specific

13  portions of that.

14  A   Yep.  Oh, do you have the Diez piece as

15  well?

16  Q   What do you mean by that?

17  A   The -- the other report by Diez, et al.,

18  2017, that has some statistics relevant to this.

19  Q   I don't know -- well, I don't have it

20  with me, no.

21  A   You don't?  Okay.

22  Q   Is there another piece to this?

Page 299

1   A   Yeah, so the -- well, you have the

2   records, yeah.

3   Q   Okay.  So, Doctor, just to refamiliarize

4   ourselves, we were talking about -- something.  And

5   I lost myself.

6       We were talking about your contention in

7   your report that knives -- as you say on page 10 --

8   are the most commonly used instrument in intimate

9   partner homicides in many states.  And I believe

10  you said that a minute ago you thought it was the

11  majority of states.

12      I've just offered Defendants' Exhibit 6,

13  which I'd like to show you.  And I'd like to direct

14  your attention to appendix table number 2.

15  A   Yep.

16  Q   Okay.  Firearm -- it's entitled,

17  Firearm-related and total IPH rates in 2015.  And

18  I'd like to point your attention to the third

19  column over, Ratio of firearm-related to total IPH

20  rate percentage.  And I will note for the record

21  that "IPH" is used throughout this article to stand

22  for intimate partner homicides.

Page 300

1       Now, Doctor, I would like for you to tell

2   me if you had seen this data when you rendered the

3   conclusion that knives are the most common used in

4   intimate partner homicides in many states, and when

5   you just said it was the majority of states?

6   A   Right.  So I -- I looked at both this but

7   also the -- the piece we had just mentioned by Diez

8   in 2017.  And as I noted in my report on this

9   piece, there are -- there are actually some

10  discrepancies here.

11      So in New York, you'll see they report

12  the numbers 39.6.  And as I believe I point out

13  the -- the rate reported by New York State was

14  actually 35.9.  What I think went on is that they

15  estimate -- they -- I think they did the first

16  column first.

17      So they -- they estimate these as rates

18  per hundred thousand.  But, unfortunately, that

19  gets some -- again, we're dealing with very small

20  numbers here.  And so they issued these decimal

21  points, you know, with two significant digits.  And

22  I believe that that explains some of the

Page 301

1   discrepancies.

2       I know when they multiply those out by

3   state-based populations and -- and counts --

4   because even with New York's own data, the New York

5   data here is not -- I mean New York State's own

6   reported data does not match up with the data they

7   reported here.  And I believe it's in Diez's piece

8   that I used as the evidence for here.  But I'm --

9   I'm happy to look at these numbers.

10      So like a few things to point out --

11  Q   Hold on one second, Doctor.

12      Is there a separate article by Diez other

13  than this article from 2017 that's titled, State

14  Intimate Partner, and authored by Carolina Diez?

15  A   No, that's one I'm referring to.

16  Q   Okay.  So Exhibit 6, is this the one that

17  you -- is this the one that you used in your

18  report?

19  A   So cite both -- I cite both of these in

20  my report, Diez's piece, as -- oh, this is the --

21  Q   This is --

22  A   Yeah, so this is the Diez one.

Page 302

1   Q   Right.

2   A   So -- yeah, so I read a few reports on

3   intimate partner violence, in addition to New York

4   State's own report.  The --

5   Q   So is there another Diez report that you

6   refer --

7   A   No --

8   Q   -- to or --

9   A   -- no --

10  Q   -- is this the Diez that --

11  A   -- this is the Diez report.

12      Diez, by the way -- actually, Diez has

13  authored many reports on this.  And I may have read

14  multiple reports by her.  I flagged concerns with

15  the statistics on this.  On the third account,

16  there are many states that are below 50.  There are

17  many states that are above 50.  Eyeballing it here,

18  it may be closer to 60/40.  The -- and we can count

19  those up.

20      One thing that's also worth paying

21  attention to here is also in the population level.

22  For example, you know, Maine has a hundred

Page 303

1   percent -- a hundred percent of intimate partner

2   homicides were committed by handguns.  There were

3   two of those.  Then you can look at, you know, some

4   states that have much larger numbers.  And, you

5   know, New York's one of those.

6   Q   Well, Doctor, let me ask you, you said

7   you think it's closer to 60/40.

8       I did a count here.  And I'm coming up

9   with nine states of the 50 listed that are below 50

10  percent, meaning that all the other states,

11  except -- with the exclusion of Hawaii, South

12  Dakota, and the nine -- Hawaii, South Dakota, there

13  just seems no data to have been offered.  So that

14  only nine of 48 states in this case was the

15  handgun, not the --

16  A   Yeah.

17  Q   -- majority instrument used in the DV

18  death.

19  A   Yeah, again, I've already noted that some

20  of this data does not correspond with -- it's

21  inflated.  So New York's own reported -- own

22  state-reported things are actually -- what is

Page 304

1   it? -- about 4 percent less.

2   Q   Right.

3   A   A lot of these are at 50 percent.  I did

4   look in the -- in the surrounding area, places like

5   New Jersey, Connecticut, New Ham -- Massachusetts.

6   Q   Right.

7   A   And -- and in all those cases, these --

8   these numbers were inflated, which I attributed, I

9   believe, to their rounding errors in trying to

10  reduce it first per one hundred thousand.

11  Q   Do you understand now, based on the

12  testimony and questions I asked you, that the

13  numbers aren't inflated; they were actually taken

14  in the Diez report from the FBI's supplemental

15  homicide reports, which Dr. Zeoli considers to be

16  more accurate than New York State's own report?

17  A   I would invite further scrutiny of both

18  the FBI and the New York report to figure out which

19  one is, in fact, more accurate.

20  Q   Sure.

21  A   There is also some discrepancy, I should

22  add, between what counts as domestic partner

Page 305

1   violence and intimate partner violence.

2   Q   Is that something you looked into?

3   A   So, is it -- as you might expect,

4   intimate partner violence and homicide is a more

5   general category.

6   Q   Uh-huh.

7   A   So there's -- and, again, the --

8   Q   But you used intimate partner homicide in

9   your report, don't you?

10  A   So there's some -- I believe New Jersey

11  was a state where they -- for example, in their

12  reports -- well, only report domestic depart --

13  domestic partner.

14  Q   Uh-huh.

15  A   So there are some states which you have

16  to -- based on what they publicly report, I looked

17  at that.

18  Q   Now, the --

19  A   The same -- oh, go on.

20  Q   If the data, as you claim was slightly

21  inflated, do you believe that would change this

22  conclusion in the Diez, that only nine states -- in

Page 306

1  only nine states firearms were not the majority
2  instrument used?
3      A   I observed as many states -- you know,
4  there's states like Colorado that are 50.7.
5  There's states at 54. There seemed to be a number
6  of states -- and there's another state at 54, 53,
7  57, another 45.9. So -- here's a 51.
8      Yeah, look, a lot of these states are
9  near this 50 percent, if things are inflated like
10 they were in New York, apparently by a few
11 percentage points, the -- what struck me -- and
12 I -- to be candid, I expected the gun owners to be
13 way higher.
14     Q   Now --
15     A   And when I actually looked into this,
16 I -- I -- it was -- it struck me how infrequent
17 guns were used in homicide, where I would've --
18 even when I first read Zeoli's report, I just
19 assumed this was, you know, by far the most
20 prevalent means of death in -- in --
21     Q   Well --
22     A   -- violence all --

Page 307

1      Q   -- let's talk --
2      A   -- across the --
3      Q   -- about --
4      A   -- board.
5      MR. CHUCK COOPER: Let him --
6  BY MR. DAGUE:
7      Q   I'm sorry. I was just trying to speed
8  things up for all of us.
9      A   Sure.
10     Q   I apologize.
11     Do you have anything else --
12     A   No.
13     Q   -- you want to offer?
14     Okay. Let's talk about that a little
15 bit. Because what we're looking at here in this
16 chart is that these numbers represent that -- say,
17 pick a state -- for instance, Alaska -- that 60.3
18 percent of all IPHs, intimate partner homicides,
19 were involving instrument with a gun.
20     Now, the other 40 -- roughly 40 percent
21 involved potentially all other means, all other
22 instruments, right?

Page 308

1      A   Right.
2      Q   Okay. So in that case, we're not talking
3  about a 60/40 split between two instruments. We're
4  talking about a gun being 60 percent, and all other
5  instruments being 40 percent.
6      In that case then, isn't the gun the vast
7  majority of the instrument used in that state, most
8  likely?
9      A   Yeah, so in that state, it looks like
10 eight people were killed by guns and four were
11 killed by other means.
12     Q   And I appreciate that. But that wasn't
13 my question.
14     What I asked is -- we're looking -- that
15 number of 60 represents all of the guns --
16     A   Uh-huh.
17     Q   -- versus all the other instrument -- in
18 fact, all information on this table --
19     A   Uh-huh.
20     Q   -- these numbers in this category three
21 that we're looking at.
22     That's all the guns; and then everything

Page 309

1  else that's not included in the hundred percent is
2  every other instrument, right?
3      A   Potentially.
4      Q   Yeah.
5      A   And it -- some states produce -- produce
6  statistics with great granularity, and some don't.
7      Q   Right. In light of this table, in the
8  Diez -- the 2017 Diez, do you still believe that
9  knives alone are the most commonly used intimate
10 partner homicide instrument in the majority of
11 states, or would you like to amend that conclusion?
12     A   I would actually love to be able to --
13 it's one thing I'm going to look into. Because I
14 believe I referenced that there were other studies
15 I came across that reinforced that conclusion.
16     I notice here, my -- my -- I would say
17 my -- my underlying concern, my underlying point,
18 I'm happy to say, is not safely shifted from this,
19 which is to say firearms consist of less than I
20 would have expected of intimate partner homicides.
21 I would love the opportunity to look further into
22 the specific details.

Page 310

1    But particularly in Northeastern states,
2  it does seem to be the case that they are the --
3  the minority. And I would welcome the chance to --
4  to further, with greater resolution, examine some
5  of these other states.
6    Q   Doctor.
7    A   I've seen deflecting -- conflicting
8  information on.
9    Q   Are they, in New England states, the
10  minority, though?
11    And that's what I'm trying to get you
12  to -- to answer, is that if say in New York it's
13  39.6 percent and the rest of the field is every
14  other instrument, and if you take into account
15  every other instrument, wouldn't, in all
16  likelihood, the 40 percent guns represent the
17  majority of the instruments used versus every other
18  instrument possible?
19    A   Well, you're also asking an interesting
20  question, which you might ask on a per capita --
21  right now, there's a question whether you even
22  account for this by state or by population. So the

Page 311

1  question -- you know, you might say the states with
2  the largest populations -- many of which are in the
3  Northeast -- obviously, Texas, Califor -- Texas,
4  California, would be other important ones -- on a
5  per capita basis, what percentage are constituted
6  by guns versus others.
7    The -- the overall point which I wanted
8  to make is still even if you accept this data --
9  which, again, I -- I found documented cases, at
10  least in New York, the numbers don't line up. Even
11  if you accept this data, guns still are responsible
12  for surprisingly to my estimation, relatively less
13  of intimate partner homicides than I would have
14  expected. I would've thought, based on Dr. Zeoli's
15  testimony, that these were, you know, 80, 90, 95,
16  98 percent, that this is -- this is the problem
17  that drives domestic partner homicides.
18    It's interesting that so many -- so many
19  states are between this say 40 and 60 percent. Am
20  I -- am I accurate, that that -- that for sure
21  constitutes the majority, between 40 and 60 percent
22  here?

Page 312

1    Q   Doctor, you're talking about inaccuracies
2  in the Diez numbers. I would just note -- I'd ask
3  you, look at page 10 of your report.
4    A   Uh-huh.
5    Q   You've actually relied on the Diez report
6  in your report to provide information and data you
7  used to reach your conclusions, isn't that right?
8    A   Noted in my report my own concerns about
9  the inflation of those numbers, yes.
10    Q   Right. So you, on one hand on page 9,
11  note your concerns about inflation of the numbers;
12  but then on page 10, in your first full paragraph,
13  and further in this, you rely on the Diez -- Diez
14  report to fuel and support your own conclusions;
15  isn't that right?
16    A   And just to clarify, I -- I say on page
17  10, not page 9 -- I express my concerns about the
18  inflated statistics, which I note don't agree with
19  New York State's own reports.
20    And, again, in the context of my argument
21  here, the argument is simply that New York looks
22  the same as other states in the Northeast. And as

Page 313

1  long as the inflation is -- as long as the mistakes
2  they're making -- if they're mistakes -- are -- are
3  constant, than they might still be useful for
4  comparison purposes.
5    So I -- I don't have reason to believe
6  that they only messed up New York and didn't mess
7  up others. But if you're making it -- if it's a
8  similar inflation mistake that's going with
9  rounding errors from estimating pop -- per 100,000,
10  then estimating times population. That should be a
11  relatively symmetric set of rounding errors.
12    So the main point here is simply, look,
13  New York looks the same as the rest of New England.
14    Q   Right.
15    A   In fact, actually, New York, just to call
16  your attention, this is slightly worse on some of
17  these -- some of the gun homicide numbers. So
18  it -- it doesn't seem like this law is
19  distinguishing New York in its low intimate partner
20  violence numbers compared to its New England peers.
21    Q   Now, just to be clear once again -- you
22  keep using this -- your -- your opinion is that the

Page 314

1  numbers in Diez and Zeoli are slightly inflated.

2      But I've just explained to you that

3  Dr. Zeoli testified that they are not inflated;

4  they're actually used from a more reliable source,

5  in her opinion, the FBI supplemental, so --

6      A  Yeah.

7      Q  -- just to be clear about --

8      A  And just --

9      Q  -- the record.

10     A  -- just to be clear, I'm -- I'm only --

11 I'm relying on New York State's own.

12     Q  Right.

13     A  -- published reports.

14     Q  Right.  So I just want to go back to

15 this.

16     Based on the Diez report, which you rely

17 upon, in part, in your records, in your expert

18 report, based on table 2, appendix table 2, which

19 show only 9 of 50 states have the use of

20 instrumentality of a gun, for IPH, less than 50

21 percent, do you want to amend your conclusion that

22 most -- that many states -- and as you testified,

Page 315

1  the majority of states -- use knives as the most

2  common instrumentality for IPH?

3      A  I will amend it to say at least many

4  states.

5      Q  Okay.

6      A  And I will look into this.  Because I

7  think there may be data quality issues that are

8  driving some of these discrepancies.  But I'll be

9  happy to amend it to "many" for right now.

10     Q  Is 9 of 50 "many," in your estimation?

11     A  The -- well, one out of five, that seems

12 many.

13     Q  Okay.

14     A  It's certainly more than -- well, the --

15 the -- I mean we're talking about 16 out of 20

16 million.  You know, 9 out of 50 seems like many.

17     Q  Okay.  Before I forget and/or we run out

18 of time, let's look at Exhibits 4 and 5.  All

19 right.  So there's the two originals.

20     A  Ah, yes.  Right.

21     (Witness looked at document).

22     Q  And you can read those.  I'm going to

Page 316

1  just direct your attention to certain portions.

2      And while you're reading them, I will

3  quietly tell the court reporter that we have marked

4  as Defendants' Exhibit 4 a seven-page article from

5  the poststar.com newspaper, dated December 28th,

6  2010.  And that was Exhibit 4.

7      Defendants' Exhibit 5 is a five-page

8  newspaper article from an online article from the

9  NBCNewYork.com news network.  And that's dated --

10 let me see if I can find the date.  August 3rd,

11 2017.

12     Have you had a chance to review those

13 documents?

14     A  I have.

15     Q  So we were talking about these.

16     They were marked in the context of your

17 conclusion on page 16 of your report that said,

18 Ultimately I could not find a single reported case

19 over the last 20 years of an accidental handgun

20 death of a child that corresponds to the

21 hypothesized scenario that Dr. Sege believes.

22     And it goes on from there.

Page 317

1      I just want to direct your attention to

2  Exhibit 4, first, when looking at the first page of

3  that.

4      And I note that it reads, Police have

5  charged a 12-year-old boy with manslaughter and his

6  56-year-old father with endangering the welfare of

7  a child in connection with the shooting death of

8  12-year-old Nicholas Naumkin of Wilton last

9  Wednesday.

10     And it goes on to specify that Naumkin, a

11 seventh grade student, was visiting a classmate at

12 a residence when the two boys were left alone in

13 the residence for more than three hours.  They

14 found a handgun and ammunition in the father's

15 bedroom.

16     And on the next page it says, The

17 handgun, which is registered to 56-year-old Edward

18 O'Rourke, was unloaded and sat in a holster in the

19 man's bedroom.

20     So would you agree with me that this

21 article meets the qualifications set forth in

22 Dr. Sege's hypothesis about accidental gun death,

Page 318

1 handgun deaths of children in New York state?

2  A  Yes.  You found one case.

3  Q  Okay.  Great.

4      I'd also like to direct your attention to

5 Defendants' Exhibit 5.  And I note that this is an

6 article from 2017.  And I note that in this

7 article, a Long Island teen playing with a loaded

8 gun with friends accidentally shoots and kills

9 himself.

10      In this article, A 15-year old boy

11 accidently shot and killed himself while playing

12 with a loaded gun at a friend's house Wednesday

13 evening, police on Long Island said.

14      And I'll note that on the second page it

15 says, Police say a retired county correction

16 officer lived in the home where the boy shot

17 himself, and the gun was owned by a licensed pistol

18 holder.

19      Do you see that?

20  A  I do.

21  Q  And would you agree with me that that

22 second article, Defendants' Exhibit 5, meets the

Page 319

1 qualifications set forth by Dr. Sege?

2  A  So in two ways it does not.

3  Q  Okay.

4  A  Well, one way it obviously does not.  The

5 second way, it's open to question.

6      Sege focused on ages zero to 14.  And the

7 entire discussion of children was a discussion of

8 that age group.  I notice this was a 15-year-old

9 boy, so I -- technically, it's not within Sege's

10 definition.

11      Interestingly, I notice he's a -- a --

12 was a former corrections officer.  And my

13 understanding is that many former law enforcement

14 have availed themselves of exemptions.  It'd be

15 interesting to know whether this gentleman had an

16 exemption from public disclosure.  I -- you know,

17 that's an open question.  You all can answer that.

18      But -- but I have to say, this is -- I

19 wonder if -- if this is -- how many others you

20 found.  Because I'd be actually very surprised

21 that -- if this is only one, a case you found.

22 Presumably, you had access to -- to many, many

Page 320

1 records.

2      So this could be -- this is, I think, a

3 really valuable, productive role for the State to

4 play, if we want to get good estimates of this

5 stuff.  And I would welcome all the evidence you

6 have to help us properly count these events.

7  Q  I'd like to ask you a question.

8      You said that you believed Dr. Sege

9 limited his research to children under 14.

10      Do you --

11  A  At -- at --

12  Q  -- remember --

13  A  -- different times, he invokes different

14 age -- yeah, at different points in his exposition,

15 position he uses different age ranges.

16  Q  Right.

17  A  And I make very explicit in my analysis

18 which age range I'm considering.

19  Q  Right.  And Dr. Sege does not limit his

20 report exclusively to children under the age of 14.

21      Did you have a chance to read Dr. Sege's

22 deposition testimony in this case?

Page 321

1  A  I did not.

2  Q  And if you didn't read that deposition

3 testimony, did counsel advise you that during that

4 deposition Dr. Sege was asked by counsel to define

5 what he meant by "children" throughout his report;

6 and that he meant anyone under the age of 19?  Did

7 you -- were you familiar with that testimony?

8  A  Well, I'm -- that's -- I'm not familiar

9 with that testimony.  He certainly does, at one

10 point, group ages 14 and under --

11  Q  Right.

12  A  -- in his written remarks.  And as a

13 matter I think of larger analysis here, if your

14 concern -- it strikes me as different types of

15 concerns, that a -- a child below the age of

16 reason, a toddler finding a gun, that seems to be

17 one sort of scenario.

18      A -- you know, those aged 15 and other

19 (sic), people who are able and licensed to hunt in

20 many states, you know, people who might be involved

21 in crime, it strikes me as the -- you know, what an

22 accidental death -- the types of accidental deaths

Page 322

1 that might happen in different age ranges are of --
2 actually, kind of -- we need to disaggregate the
3 types of concerns that you might have there.
4     And so, yeah, my analysis, consistent
5 with what Sege identifies in his state -- in his
6 report, as a zero to 14 range, is explicitly what I
7 say I confine my analysis to.
8     Q   Do you believe that parents of 15-, 16-,
9 17-, and 18-year-olds do not have an interest in
10 learning if their children's playmates have guns to
11 the same extent that children -- the parents of sub
12 14-year-olds do?
13     A   I suspect, based on memory and
14 observation, that parents of 15-, 16-, 17-year-olds
15 are -- are lucky if they even know who their kids
16 are playing with.
17     Q   And --
18     A   And so I observe that there's much more
19 agency at that level.  You know 16-year-olds can
20 drive.  So I get if -- if the entire argument here
21 is that parents are exercising tight control, I
22 understand that for a toddler.  Or I understand

Page 323

1 that for a first-grader.  The idea that this
2 mechanism is gonna exhort -- exert enormous
3 preventive control at the age of 16, 17, 18, I
4 think is a stretch.
5     Q   Now, did you cut off your review of data
6 for children under 14 because there are
7 considerable more number of incidents involving
8 children above the age of 14, from 1999 to 2017,
9 pursuant to the data you cited in footnote 19 on
10 page 13?
11     A   On page 19?
12        (Witness looked at document).  So two
13 things.  One is in the way that ages are binned on
14 the CDC website, zero to 14 is a -- a bin.
15        So it's a -- it's natural that Dr. Sege
16 would use that as a category.  It also makes
17 conceptual sense.  You know, I mean under 14, you
18 are largely -- you are certainly more in your
19 parents' control, certainly at least till the end
20 of middle school and whatnot.
21        And it strikes me that there is an
22 important conceptual distinction between, say,

Page 324

1 those in high school, those who have a license to
2 drive, those who, you know, have a -- a great deal
3 more agency and also capacity to reason at that
4 age.
5        So, again, it strikes me that the overall
6 argument of Dr. Sege is an argument about parental
7 control, exercise of parental control.  And the
8 hypotheses scenarios he seems to be particularly
9 concerned of are, you know, kids playing at other
10 houses on play dates with playmates.
11        It strikes me it's a very different
12 argument about what you can do with 16-, 17-,
13 18-year-olds from a parental standpoint.
14     Q   But Dr. Sege, in his report, didn't limit
15 his conclusions to children under 14.  In fact,
16 he -- he cites statistics that deal with
17 adolescence -- children in adolescence, younger
18 than 20 years, and unintentional firearm-related
19 injuries.
20        So what I'm wondering is was your cutoff
21 at 14 based on your interpretation of Sege's
22 report, that that was his focus, or was that based

Page 325

1 upon your own determination that -- that 14 was
2 kind of -- that zero to 14 was the more relevant
3 category?
4     A   Well, yeah, it's the -- the mechanism at
5 the heart of his argument is parents exerting
6 control.  I -- it -- it beggars, let's say,
7 credulity, to think that -- well, as you said, it
8 goes to up to year -- 20 years old, that your 17-,
9 18-, 19-year-olds are, you know in the tight grip
10 of their parents who are determining every house
11 they visit.  Come on.
12        The argument -- the mechanism he lays out
13 is one of parent -- parents vetting the playmates
14 of their children in the zero to 14 category,
15 which, again, he does specifically use.  So it
16 seems to me the appropriate thing to evaluate for
17 that mechanism.
18     Q   So was it your contention that parents
19 don't monitor their 15-, 16-, and 17-year-old's
20 whereabouts or that they shouldn't?
21     A   My contention is that their capacity to
22 is much diminished, and that if Sege's argument is

Page 326

1 particularly one about parental control, it seems
2 to be one that's primarily towards what we think of
3 as children.
4    Q    What's the demarcating line between 14
5 and 15 years old then?  Why a line between those
6 two numbers?
7    A    You could ask the Centers for Disease
8 Control.  I mean, intuitively, colloquially, I
9 would think, though, the difference between
10 grade -- or middle school and high school.  And all
11 these responsibilities.
12        What, age 15 you can start driving.  Age
13 15 -- I mean we recognize this is society, right.
14 A driver's license is -- effectively, learner's
15 permits begin at age 15.  There's all these
16 responsibilities that begin in your high school
17 years.  You reach capacity on reason.  You can give
18 consent in all sorts of ways.  This isn't an
19 arbitrary distinction.
20    Q    Doesn't the data actually demonstrate
21 that in reality adolescents are considerably more
22 at risk for unintentional firearm-related injuries?

Page 327

1    A    I think adolescents are considerably more
2 at risk of every type of injury.  What the data
3 doesn't show --
4    Q    Go ahead.  I'll follow up.  I'm sorry.  I
5 didn't mean to cut you off.
6    A    Let me qualify.  Many types of injuries,
7 it strikes me -- accidental injury increase in
8 adolescents.  But, again, it's -- it's -- what's
9 the mechanism.  The hypothesized mechanism whereby
10 this is gonna be preventing all these, Sege's did
11 not make a compelling, nor have I heard a
12 compelling way, which this is gonna save
13 18-year-olds from visiting the friend's house their
14 parents don't approve of.
15    Q    No, I -- I was just noting, because your
16 cutoff -- well, strike that.
17        Look at your footnote 19, would you agree
18 that individuals 15 and above have a, based on
19 these data, a 16 times more rate than individuals
20 zero to 14 of unintentional gun injury, based on
21 the CDC data you cite?
22    A    Yeah, again, we're talking all

Page 328

1 individuals.  So we're not just talking the 15 to
2 18 or 15 to 20 range.  So we're also talking, what,
3 five times the population?  Right?  Just to be
4 clear.  Right?  We're -- so zero -- you know, zero
5 to 15 -- what do people live to these days, 80s?
6 So my question -- so it seems to me your question
7 is what is -- is the distribution roughly even
8 between age groups, and the --
9    Q    Yeah, maybe I'll -- let me articulate.
10        MR. CHUCK COOPER:  Go ahead and finish
11 your answer.
12        THE WITNESS:  So, yeah, and again, maybe
13 you can rephrase your question.
14 BY MR. DAGUE:
15    Q    Yeah.
16    A    The -- so this is -- you know, if you
17 would've thought it were just broke down by age
18 group, you might expect -- 15 divided by 80 or 90,
19 to be in that group, and yet it turns out -- and --
20 and, again, the entire argument is that this is
21 gonna save the lives of children.
22        So it turns out that most of these

Page 329

1 accidental handgun deaths are occurring in people
2 age 15 and older.  It doesn't seem like there's an
3 epidemic of child violence, you know, playmates,
4 toddlers, over at their -- other people's houses.
5 To a degree -- and, again, we're talking about
6 small numbers.  Right?  15 people.  I believe more
7 people than that have died on bicycles in New York
8 City over the -- since the beginning of this year.
9 These are small numbers.
10        But, yes, it doesn't surprise me that
11 adolescents -- and I -- I would speculate people
12 probably in their early to mid 20s suffer accident
13 rates at higher levels than toddlers.  But just
14 simply to say that toddler probably -- the child
15 under their parents' control problem is probably
16 not the right way to think about this law being
17 effective.  Because there's little evidence that --
18 that even in that hand -- that group, much is going
19 on.
20    Q    Okay.  So let me go back to the question
21 I actually asked.  I was looking at your footnote
22 19.

Page 330

1    A   Uh-huh.

2    Q   And in that, you state that the number of

3  accidental handgun deaths in New York from '99 to

4  2017 was 16; and the number of accidental handgun

5  deaths of those age 15 and above was 15?

6    A   That's correct.

7    Q   Okay.  So is that number from 15 to what,

8  to 20, or is that --

9    A   Oh, 15 --

10   Q   -- number 15 --

11   A   -- to death.

12   Q   That's what I was trying to figure.

13   A   Sorry.  Sorry.  I didn't understand that

14 question.  15 to death.

15   Q   That's what I was trying to figure out.

16 Right.  Thank you.

17       Now, you mentioned the bicycle thing.

18 And you reference that in your report.  And you

19 talk about that at page 10, at paragraph 3, if I

20 recall.  In the paragraph that starts "curiously,"

21 you're making a comparison between the intimate

22 partner homicide rates and the number of bicycle

Page 331

1  deaths in New York City alone over the last seven

2  months.

3       And you state, Over the last seven

4  months, 14 people have been killed on bicycles in

5  New York City alone, but I am aware of no

6  initiatives to restrict or control bicycle

7  ownership.

8       Okay.  Do you see that?

9    A   I do.

10   Q   Did you do any research into New York

11 bicycle laws before that opinion?

12   A   I didn't, although I noticed since I

13 wrote that, more recently, I believe there is some

14 discussion in New York to find ways of controlling

15 your bicycles in the city or something like that.

16   Q   And are you aware of bike helmet laws?

17   A   I am aware they exist in many locations.

18   Q   And are you aware of -- that New York has

19 a bicycle helmet law?

20   A   It would not surprise me.

21   Q   And are you aware of bicycling while

22 intoxicated laws?

Page 332

1    A   I'm aware that they exist in many

2  jurisdictions.

3    Q   And would you believe that those laws

4  were created, in part, to protect bicycle owners in

5  operation -- injury or death while operating the

6  bicycle?

7    A   It sounds plausible.

8    Q   Okay.  And would you agree that those are

9  both -- those -- those laws alone would both

10 constitute initiatives by New York to restrict

11 bicycle use -- (unintelligible).

12   A   Wait, wait.

13   Q   I'm sorry.  Would you agree that both of

14 those laws would constitute initiatives by New York

15 State to restrict bicycle use in light of dangers

16 posed?

17   A   To make clear, what I say in that

18 sentence, I'm aware of no initiatives to contradict

19 the control -- or restrict or control bicycle

20 ownership.

21   Q   Uh-huh.

22   A   So I know you introduced the term "use"

Page 333

1  there.  And I wanna be clear --

2    Q   Right.

3    A   -- that that wasn't part of my initial

4  claim.  I -- I am still aware of no initiatives

5  that restrict use.  So are you pointing to me any

6  that restrict use -- I mean, pardon me, that

7  restrict --

8    Q   Owner.

9    A   -- ownership?

10   Q   Right.  And --

11   A   So --

12   Q   -- well --

13   A   -- there's not on that, but you're

14 saying -- for the record, I would certainly support

15 laws that say you can't be shooting firearms while

16 intoxicated.

17   Q   Right.

18   A   That would seem a reasonable restriction

19 of use.  But what I'm discussing here is ownership.

20   Q   Are you claiming that -- that PL 400 is a

21 restriction on ownership?

22   A   Yes.  The claim is that this could

William E. English, Ph.D.
Washington, DC

Page 334

1  provide reason for citizens not to seek ownership
2  because of the burdens that disclosure placed on
3  them.
4      Q    But in the same way, couldn't law about
5  wearing a helmet with a bicycle preclude ownership
6  of a bicycle?
7          The law itself has nothing to do with
8  ownership; your claim is that the downstream effect
9  could chill someone's right to ownership; isn't
10 that right?
11     A    It's not clear to me why that would
12 restrict ownership.  It might restrict use in some
13 places, but --
14     Q    Okay.  Your claim is that PL 400 --
15     A    Uh-huh.
16     Q    -- restricts ownership of guns because
17 people will be afraid to own guns in light of the
18 effect of --
19     A    Uh-huh.
20     Q    -- 400, right?
21     A    Right.
22     Q    Okay.  So you would agree that PL

Page 335

1  400 itself on its face is not a law that restricts
2  ownership, it's the downstream effect of it that
3  you hypothesize may affect ownership, right?
4      A    It has a -- it can dramatically increase
5  the cost of ownership to a person, the personal
6  cost that they will pay if they seek to have a
7  legally owned firearm.
8      Q    Right.  And by the same token, laws
9  affecting guns or -- or excuse me, bicycle safety
10 could have the same downstream effect, and,
11 therefore, be interpreted as impinging on ownership
12 in the same manner as you hypothesize --
13     A    You'd have --
14     Q    -- here --
15     A    -- to make --
16     Q    -- right?
17     A    -- the argument -- if bicycle helmets
18 cost $1,000, I could see that sort of argument.
19 You know, I take it there are no laws out there
20 that require guns to be sold with a, say, trigger
21 lock.  Those seem to be not -- not -- in -- in no
22 order of magnitude near the kind of burden we're

Page 336

1  talking about here.
2          So helmet laws, again, they govern use,
3  not ownership.  But unless there's some prohibitive
4  cost there, it's not clear to me that that analogy
5  holds.
6      Q    Okay.  So you're -- just to be clear,
7  your contention is that PL 400 is a law that
8  restricts ownership of a gun?
9      A    It raises the burden, it raises the costs
10 of seeking legal ownership.  And for people that
11 don't want to bear those costs, that's -- that is a
12 form of -- of -- it's a barrier.
13     Q    Right.  And --
14     A    It's a --
15     Q    -- you don't --
16     A    -- barrier to ownership.
17     Q    New York's motorcycle helmet law would
18 raise the cost --
19     A    Motorcycle?
20     Q    -- of owning -- yes, motorcycle.
21     A    A motorcycle?
22     Q    Yeah.

Page 337

1          New York's motorcycle helmet law would
2  raise the cost of owning a motorcycle; and in
3  the -- so in the same token, it could potentially
4  restrict control or ownership of a motorcycle --
5      A    The question --
6      Q    -- right?
7      A    -- is question is how much does it -- the
8  relevant question is, by how much?  How large is
9  this cost?  So it might cost me five minutes to
10 fill out a form.  That might be a reasonable cost.
11 It might cost me $10 to get a bike helmet.  In the
12 scheme of things, that might not be a prohibitive
13 cost.
14         If it cost me my social standing or a job
15 or like my wife can't get into this club, well,
16 that -- now we're -- now we're talking a much
17 higher level.  So it -- for me, the question is:
18 How large are these costs; and what's the potential
19 damage accrued from them?
20     Q    You talk about the cost of costing me a
21 job or my social standing.
22         Do you have any data evidence to support

Page 338

1 there's a single individual in New York who has

2 lost a job or their social standing because of

3 information disclosed on a PL 400?

4       A   So if you asked me the same thing about

5 racial discrimination --

6       Q   That's not what I asked you, Doctor.

7       A   But I -- I -- so here's what I would say.

8 The evidence that I think is compelling on that

9 front is -- is the evidence that I cited --

10      MR. DAGUE:  Off the record.

11      (Recess)

12 BY MR. DAGUE:

13      Q   I'm going to ask the court reporter to

14 read back the last question, and give you an

15 opportunity to fully respond to that.

16      (The reporter read the record as

17      requested.)

18      THE WITNESS:  The evidence I have is

19 about unconscious bias, which is hard to measure.

20 But no, I do not have a documented case that you

21 just referred to beyond those complaints.

22 BY MR. DAGUE:

Page 339

1       Q   Okay.  Thank you.

2       Now, not to go backwards too far, but we

3 had some discussion of kind of the age ranges with

4 respect to children.

5       Do you remember that?

6       A   Right.

7       Q   And just to clarify the record, do you

8 have any expertise in developmental -- childhood

9 development or development --

10      A   No.

11      Q   -- on age ranges?

12      I'm turning pages.  That's a good sign.

13      Okay.  I want to direct your attention to

14 page 10 of your report at the third paragraph.

15 Again, we're talking about the role of knives and

16 intimate partner violence.  And we looked at the

17 Diez study before, so we're going to go back to

18 that.

19      But you draw the comparison between

20 knives and firearms, as used in what I've called DV

21 throughout this, what you've called intimate

22 partner violence.  And I believe what Dr. Zeoli

Page 340

1 calls IPH, or intimate partner homicide.

2       So did you offer some testimony and a

3 report with respect to knives as they relate in

4 that?

5       A   Yes.

6       Q   Okay.  Now, does New York require permits

7 to purchase knives?

8       A   Not to my knowledge.

9       Q   Do you know of any states that requires

10 permits to purchase knives?

11      A   Not that I know of.  There may be some

12 that -- for insurance, but --

13      Q   Sure.

14      A   -- not that I know of.

15      Q   Okay.  Do you have any idea of how many

16 domestic homes own a knife?

17      A   I would expect that many, if not most.

18      Q   Right.

19      Fair to estimate the number would be

20 close to a hundred percent?

21      A   That sounds reasonable.

22      Q   Okay.  And, obviously, that would be

Page 341

1 because knives have some utility in the home for

2 cooking or other additional purposes, fair?

3       A   Yes.

4       Q   Okay.  So your position, as stated here,

5 drawing an analogy between knives and guns, is it

6 fair to say that requiring permitting or public

7 release of the owners of knives would be of no

8 relevance because everyone would be on that list?

9       A   I think this is an excellent point.  And

10 I agree precisely in the way you say that.  So if

11 99.99 percent of knife owners are not the source of

12 problems, it would be uninformative to take a

13 population that's so large and specifically require

14 disclosure, when most of those clearly aren't gonna

15 be used in harmful ways.

16      MR. DAGUE:  Could you read that back for

17 me?

18      (The reporter read the record as

19      requested.)

20 BY MR. DAGUE:

21      Q   Did you -- in any of the data you looked

22 at, was there any information respecting the

Page 342

1  mortality rate of domestic violence incidents

2  involving knives versus domestic violence incidents

3  involving guns?

4      A   Not that I recall.

5      Q   Okay.  Do you know if that was discussed

6  by Diez at all?

7      A   I don't recall.

8      Q   Would you expect there to be a

9  considerable difference in mortality rate in those

10  incidents, or do you not have an opinion as to --

11      A   You know, I don't know.

12      Q   Okay.  On page 11 of your report,

13  paragraph 2, you talk about the use of the domestic

14  incident report in -- that police have access to.

15      Do you see that?

16      A   Yes.

17      Q   Do you know how those domestic incident

18  reports are completed?

19      A   Say more --

20      Q   Sure.

21      A   You mean by hand or --

22      Q   Well, yeah, that's a good point.

Page 343

1      How is that instrument used by a police

2  officer?  Do you know?

3      A   Briefly, my understanding is that there's

4  a system that New York City uses, I believe.  And

5  then there's a system the rest of the state uses.

6  I think -- I don't know if they have different

7  names or whatever.  But I believe this refers to

8  what the majority of New York State uses.

9      There's been attempts the last few years

10  to -- to make sure this is both comprehensive

11  and -- and well updated.  So I believe there exists

12  now this electronic database.  And I know at least

13  that they can be queried by those within the law

14  enforcement community.  And I can imagine many uses

15  for it.

16      Q   Okay.  Do you know when a police officer

17  in New York fills out a DIR, a domestic incident

18  report, if they have access to gun ownership

19  information at their -- at that time?

20      A   I mean just to make sure I understand the

21  question, so you're saying so they come to a house.

22  They adjudicate some incident.  It's after the

Page 344

1  fact.  And now they're filling it out.  I would

2  expect -- although I do not know -- that a police,

3  if they wanted to query, when they approach the

4  house, whether it has a handgun permit, that that

5  would be feasible.  I don't know the protocol the

6  police have.

7      Q   Do you know if the police fill that out

8  just based on observational evidence when they're

9  filling that out at the scene?

10      A   So if I recall, I looked at the actual

11  form.  And I believe there are some things that

12  have notes and may -- or maybe this is an

13  accompanied form.

14      But it's to the effect of, you know --

15  this may not be the language, but like estimate or

16  based on your observation.  And so it -- there --

17  it is a relatively -- there's many things that they

18  can report.  And so I would imagine they reported

19  to the best of their ability.

20      Q   Okay.  Do you know if police at the time

21  when they fill out the DIR have access to the PL

22  400 records?

Page 345

1      A   I -- I don't.  But I would assume law

2  enforcement could query handgun ownership records

3  if they wanted to.

4      Q   Okay.  Now, at the bottom of 11 onto 12,

5  you talk about this DIR registry as a comparator to

6  PL 400.

7      Do you see that, that testimony in your

8  report?

9      A   Yes, as a resource for domestic violence,

10  yes, it seems --

11      Q   Okay.

12      A   -- like it could serve similar purposes.

13      Q   Now, you posit that we have a -- here, we

14  have a clear case of the State collecting

15  information that directly pertains to DV, and which

16  could be a material value in anticipating and

17  avoiding intimate partner violence.

18      Do you see that?

19      A   Yes.

20      Q   Okay.  But now in Dr. Zeoli's hypothesis,

21  in the situation she proposes, the -- the DV victim

22  already knows that the individual is a perpetrator

Page 346

1 of domestic violence, right?

2    A   Just to be clear, there are two sorts of

3 arguments I'm making here. One is: What sort of

4 knowledge would be useful to help prevent domestic

5 violence? And it strikes me that there are

6 circumstances. If I'm meeting somebody online, I

7 want to decide to make -- romantically involved

8 with them. It seems like it would be extremely

9 useful if I could look up to see if they have a

10 record of domestic abuse, because there is evidence

11 that people are repeat abusers.

12        So the only claim I'm making here is that

13 a repository like this seems to me it would be

14 extraordinarily valuable, even for screening

15 romantic intimate partners. And it's -- you might

16 think surprising, given how important Dr. Zeoli and

17 others say it -- domestic -- what a big problem

18 that is, that the public can't avail themselves of

19 that information.

20        But on the specific of guns, yes, I -- I

21 agree these are two separate issues.

22    Q   Okay. And that's what I was just driving

Page 347

1 at, is I think we agree that --

2    A   Yeah. Sorry.

3    Q   -- maybe Dr. Zeoli would be in favor of

4 the public release of information.

5        But with respect to the hypothesis that

6 she's put forward, the DIR would not necessarily be

7 helpful to the woman or man who already knows their

8 domestic partner is a perpetrator of DV, and now

9 wants to find out if they have a gun; is that fair?

10    A   That's fair. And my understanding is

11 that the law would allow you to request a handgun

12 restriction even on the basis of knowledge of

13 suspected past DV.

14    Q   Explain that to me. I'm not sure I

15 followed.

16    A   So I believe I -- I cited here the

17 conditions for seeking an order of protection.

18 The -- and I apologize, just to make sure I quote

19 here correctly.

20        (Witness looked at document). So the

21 respondent must have inflicted physical injury or

22 threatened to use a deadly weapon or dangerous

Page 348

1 instrument or the court must find substantial risk

2 that they use or threaten.

3        So it strikes me as if you know someone's

4 violent, that in itself could be evidence to get

5 this. I guess the second question is: Could a

6 petitioner still be able to access these records

7 themself and being public, and could they just go

8 to the report?

9    Q   Access -- and we're talking about the --

10    A   The -- the --

11    Q   -- DIR --

12    A   -- yeah, the -- or pardon me, the -- both

13 the DIR, but also like the -- the PL 400. You

14 know, is there any reason that it has to be public.

15 Couldn't just petitioners access that?

16    Q   You hypothesize -- or you discuss in here

17 that -- another manner.

18        I believe you said a less invasive manner

19 of getting the PL 400 information would be for a

20 court or a law enforcement to get that information;

21 is that right?

22    A   Right.

Page 349

1    Q   Okay. Now, would you accept that a

2 victim of DV who is seeking a protective order may

3 not want to put their exclusive faith in the

4 justice system or the police, they may want to

5 check for themselves to determine that they're

6 livelihood and safetyhood (sic) -- or safety is

7 taken care of, and not rely upon a judge?

8    A   Just make sure I understand --

9    Q   Sure. Sure.

10    A   -- it would be the same underlying

11 database in either case, right?

12    Q   Sure. Yeah.

13    A   So I guess it's unclear to me why I guess

14 FOIA-ing the request would be any more or less

15 reliable than actually going to an officer of the

16 law who could type in electronically and have

17 immediate access. So I -- I agree, but it's the --

18 it's the same underlying data. I don't understand

19 why one would be -- it seems to me actually the

20 court would probably be more reliable if there's

21 some conduit for that, rather than having to go do

22 the FOIA thing.

Page 350

1  Q  But as it presently exists, is there a
2  conduit for that?
3      A  Not that I know of.  It seems a trivial
4  technological ability to set it up.
5      Q  Right.  But as we exist in the current
6  situation, if a victim of DV wanted this
7  information so he or she could file a protective
8  order application, there is no current mechanism
9  for that person to be confident that the court
10 could get the information via some sort of conduit
11 or technological system, right?
12     A  That would surprise me, but perhaps that
13 is the case.
14     Q  Okay.  If you don't mind, go back to page
15 10 of your report.
16     A  Sure.
17     Q  The first full paragraph the first
18 sentence says, Although Dr. Zeoli is not aware of
19 any evidence that order-of-protection petitioners
20 have searched for and used handgun license
21 information, and this information has historically
22 not been easy to search.

Page 351

1      Do you see that?
2      A  Yes.
3      Q  What did you mean by, This information is
4  not historically easy to search?
5      A  Historically, my understanding is, you
6  would have to fire a -- file FOIA-like request.  It
7  could be a delay.  It's some difficulty to figure
8  out how to do that.  Whereas if you were in one of
9  the counties that had the journalist disclose his
10 database, it's as easy as getting on your computer
11 and Googling.  I mean it takes a few seconds.
12 Relatively easy to access.
13     Q  Okay.  I want to turn our attention to
14 page 12 of your report and beyond, looking at
15 Dr. Sege's -- your points with respect to Dr. Sege.
16     So, again, one of your main concerns and
17 conclusions attacks with -- strike all that.  It's
18 getting late.
19     One of your main criticisms of Dr. Sege's
20 report is that he speculates as to whether parents
21 have used PL 400 for information with respect to
22 gun ownership; is that fair?

Page 352

1      A  Yes.
2      Q  Okay.  Again, I think I may -- we may
3  have touched on this briefly, but where would such
4  information ever be available, respecting whether
5  parents have used PL 400 to find out information
6  and then put it into effect?
7      A  Very briefly, it seems two options.  One,
8  since he's working with the State, presumably he
9  had asked the -- the -- wherever -- the counties
10 that possess this information:  How many requests
11 do you get each month, each year?  And if it turns
12 out that number is really, really low, well, it'd
13 be a hard argument to make that this is being
14 systematically used on a mass scale.
15     But then, and the second would be this
16 sort of comparative analysis.  You know, if he had
17 some evidence that New York, you know, had
18 different rates of -- dramatically from different
19 neighboring states.  But I -- I -- I -- it would be
20 fascinating to actually know the number of
21 inquiries by county, because they must have those
22 records somewhere.

Page 353

1      Q  Okay.  So in order to -- you think if --
2  if someone requested a county-by-county basis
3  how many times a FOIL request had come in under PL
4  400, they could get a sense as to how many times it
5  was being used by parents, or just how many times
6  it was being used in general?
7      A  Well, being used in general.  And,
8  presumably, parents are gonna be at least a subset
9  of that.  And if it's a hundred thousand, that
10 means you could try to estimate the subset.  If
11 it's ten, it's harder to make the larger argument
12 about its public value.
13     Q  Okay.
14     A  Historically, at least.
15     Q  On page 12 again, looking at the next
16 paragraph, you're discussing Dr. Sege's hypothesis
17 that PL 400 could be used by parents to find this
18 type of the information out in order to hopefully
19 counsel or avoid sending their children to
20 playmates' homes.
21     And you say, quote, However, if a parent
22 does want to know if a household in which his or

Page 354

1  her child might play has a firearm, the parent can
2  always just ask.
3      Do you see that?
4      A   Right.
5      Q   Okay.  Now, if a parent were to take that
6  advice and just ask, how would the parent know if
7  the respondent was being truthful?
8      A   Right.  One assumption I guess that I
9  begin with is that parents aren't dropping their
10  kids off at randomly selected houses, but there
11  will be some social connection and knowledge and
12  basis of -- of trust.  So it strikes me that we're
13  already talking about social circumstances in which
14  the reason somebody might have to lie are gonna be
15  less than picking a random person off the street.
16      You know, you could imagine, too, still a
17  function if -- if a -- if a person felt awkward
18  about that or didn't want to talk about it, it
19  would still flag to them that, hey, there's a
20  particular concern there; even if you're not
21  truthful, go and double-check and make sure it's
22  locked.

Page 355

1      And so it strikes me there's -- there's a
2  lot of value in that question, both as a signal as
3  well as a -- a straight-forward inquiry.  And I'd
4  like to say if it -- if -- again, it's an estimate,
5  but if only 50 percent of say guns are covered by
6  these disclosures to begin with, I'm speculating,
7  but I think you'd get a more truthful rate of
8  response just from parents.
9      Q   Can you think of any reason why a parent
10  who might be asked that question in that situation
11  might lie?
12      A   Yeah, sure.  Social stigma, being worried
13  about what the other parent will think.
14      Q   Right.  And your own testimony in this
15  report was that you believe that social stigma,
16  ostrazation -- to the extent that's a word --
17  discrimination --
18      A   Sure.
19      Q   -- are viable concerns from individuals
20  in the community --
21      A   Yes.
22      Q   -- right?

Page 356

1      Okay.  So if a parent asked a playmate's
2  parent -- excuse me, if a parent asked that
3  question of a playmate's parent, you could foresee
4  there are circumstances based on the threat of
5  discrimination and others, ostracizing, where the
6  parent might lie and not be truthful and disclose
7  to the parent that there is, in fact, a gun in the
8  home?
9      A   It's possible they would lie.
10      Q   Okay.  So with the threat of lying, what
11  other recourse would the parent have to determine
12  if there is a gun in the home other than asking the
13  parent and anticipating a truthful answer?
14      A   Yeah, so I -- I think the -- the question
15  itself still has its value by signaling concern.
16  And it can be a -- a reason for a parent to -- to
17  double-check to make sure this doesn't become an
18  issue.  So there's that value.  If the parent -- if
19  the initial parent thinks the other's being
20  evasive, that might be reason for suspicion.
21      And if the -- I mean I guess -- and
22  eventually, the parent would have to think even

Page 357

1  with the probability of lying, what are the chances
2  of this -- what are the -- what are the chances of
3  this really being a problem.  Based on everything
4  else I know, is it more like lightening?  Is it
5  more like -- I think some of these sessions --
6  sessions going on.  So yeah, they'd have to use
7  their best judgment.
8      Q   Okay.  And you understand that Dr. Sege's
9  position is that in that type of case, PL 400
10  provides the parents another mechanism to check the
11  math, if you will, of the parent who they asked; is
12  that --
13      A   A --
14      Q   -- do you understand that to be his
15  position?
16      A   A -- a type of partials mechanism, yes.
17      Q   Okay.  Now, do you understand that
18  Dr. Sege also opines that asking that question, in
19  his experience as a pediatrician, could be
20  difficult or awkward for parents?
21      A   Yeah.  I agree that -- that sounds right.
22      Q   Okay.  And do you understand that it's

William E. English, Ph.D.

Washington, DC

9/13/2019

Page 91 (358 - 361)

Page 358

1  Dr. Sege's position that in light of the potential
2  awkwardness of that question and the fact that the
3  awkwardness results in people not asking it, that
4  PL 400 provides parents with a non-awkward
5  mechanism to try to find that information out?  Do
6  you understand that to be his position?
7      A  I understand the argument, yes.
8      Q  Okay.  And do you disagree with that
9  position?
10     A  Briefly, yes, I have a -- a number of
11 concerns.  One is:  How much of an issue really is
12 this?  And, again, if I had to ask ten questions
13 that I thought were relevant to the safety of the
14 average child, I don't think this would make that
15 top ten list.
16     Q  Okay.
17     A  So I think -- that's just from a risk
18 perspective.  Secondly, I do think if there's an
19 existing social circumstance, that's gonna mitigate
20 a lot of that social stigma concern.  You have some
21 existing relationship.  But I understand the
22 argument.  I just think it's extremely small

Page 359

1  numbers we're talking about.  And the value of this
2  is very hard to document.
3      Q  Okay.  You said that there -- this type
4  of question wouldn't register as the top ten
5  questions you would be interested in in terms of
6  child safety in this type of context.  Obviously, I
7  know your reason and colloquialism.  I'm not gonna
8  ask you to provide me ten.
9          But can you give me a sense as to what
10 those would be?
11     A  Yeah, things like, you know:  Are you
12 gonna be driving anywhere?  Are they gonna wear
13 seatbelts?  If it's a younger thing, do they have
14 a -- a safety -- whatever -- harness?
15         I mean literally, if I have to put things
16 above this, things like:  Are there matches in the
17 house?  Where do you keep your knives?  Where are
18 the -- can people get to the bathtubs without you
19 observing them?  Are they gonna be playing outside
20 on a -- you know, in a period of lightening?
21         You know, there's -- you can -- again,
22 I'm -- I'm -- right now, I'm just trying to think

Page 360

1  of things whose risk is approximate or greater.  On
2  a practical note, I could probably think of some
3  more, you know --
4      Q  Sure.
5      A  -- standard things you might ask.  Maybe
6  medicine in the closet and that sort of thing.
7      Q  Now, would you blame a parent for asking
8  any or all of those questions when they drop their
9  child off at a playmate's home?
10     A  I wouldn't blame them for asking any of
11 them.  If you're asking all of them, I might worry
12 that there's some anxiety issues, that maybe this
13 isn't a totally, you know, statistically reasonable
14 thing for people to be too worried about.
15         But there are specific circumstances that
16 might make you more concerned about certain of
17 these things.  And there are possibly -- you know,
18 it could be a -- certainly to allay concerns,
19 something a parent might ask.
20     Q  Just because something is statistically
21 less likely to happen, does that mean that parents
22 should be not be concerned about it in this

Page 361

1  context?
2      A  I mean as a social scientist, yeah,
3  that's my claim.  And this is Steven Pinker's
4  claim.  He says we have all these anxieties about
5  things that are actually really unlikely.  But
6  there's a lot of things in life that are actually
7  more likely.  You know, you should get a flu shot.
8  And you should be worried about certain things.
9          And I understand the psychology of this
10 and why, you know, we're not always wired to think
11 in statistical ways.  But, yeah, I really don't
12 think this is -- this should be a major concern.
13     Q  Would you expect a parent -- or excuse
14 me.  Strike that.
15         Would you find it more practical for a
16 parent to ask parents of a playmate about the
17 vaccination history of the children in the home as
18 opposed to the possession of a firearm?
19     A  It strikes me that there are some
20 similarities between those two, in the sense that
21 they're both potentially stigmatized activities.
22 They both, you know, do have potential -- you know,

Page 362

1 some risk attached to them. So I could imagine
2 them being things that parents are concerned about
3 and questions they might ask.
4    Q   In your opinion, does a law have to
5 address a considerable harm in order for it to be
6 constitutional or legally valid?
7    A   I think it has to be answered in the
8 context of a -- a cost benefit analysis. So I need
9 to know the magnitude of the harm, but I also need
10 to know the magnitude of the cost. And so it's
11 hard to say in the abstract.
12    Q   I mean don't we have many laws in this
13 country that -- that address which things on the
14 whole are smaller risks than potentially other
15 things?
16    A   And sure, that makes a great amount of
17 sense, if the cost of doing so is also really
18 small.
19    Q   Okay. I'm thinking about -- in recent
20 years, I'm thinking about a rule towards banning
21 vaping.
22    A   Right.

Page 363

1    Q   Based upon some allegorical information
2 of, you know, anecdotal -- excuse me, anecdotal
3 information or maybe scientific information, a very
4 small --
5    A   Allegorical may be right.
6    Q   Yeah.
7       -- are very small numbers of injuries and
8 deaths?
9    A   Yeah.
10    Q   But isn't that very common in the United
11 States, where -- where the law -- or excuse me,
12 where we issue -- where a law is created even
13 though the harm is not proportionate?
14    A   I'm no fan of smoking, but the vaping
15 laws just seems to me, at least what I've heard,
16 you know, it -- it's obviously indefensible and
17 stupid from an economic perspective.
18       There -- there may -- I'm trying to think
19 if there's anything more analogous that would be
20 easier to defend. But, yeah, it's -- again, I'm
21 not an expert in this, but it strikes me as -- as
22 potentially very costly. And we don't yet know, in

Page 364

1 my mind, exactly what these harms were. As you
2 say, they seem to be small and anecdotal.
3       So that's something where I'd like -- I'd
4 just -- I'd like to hear the arguments on both
5 sides and evaluate that evidence.
6    Q   Yeah, and this kind of goes back to what
7 I was asking at the beginning with respect to the
8 cost benefit analysis.
9       And I guess what I'm wondering is how do
10 you quantify, in your field of expertise, where the
11 line is? Okay.
12       And -- and if you apply it to our
13 particular circumstances, how do we quantify, in
14 your mind, in your expertise, where we draw the
15 line, where the -- is it -- is it numeric? It is
16 number of deaths? Is it the -- the severity of the
17 public's reaction to the amount of deaths? The
18 injustice from the amount of deaths?
19       I mean where do we draw that line
20 numerically?
21    A   I think the argument needs to be made on
22 a case-by-case basis. And just a very quick

Page 365

1 digression. You know, in -- with my students,
2 we'll talk about the effect of -- the Department of
3 Motor Vehicle's transportation -- has to make
4 estimates on the value of human life and traffic
5 laws; and we put the red light here, ten more
6 people die. If we raise this -- if we brought the
7 speed limit down to 20 miles an hour everywhere in
8 this country, we could undoubtedly save countless
9 lives.
10       And I -- I don't mean this as a joke.
11 It's like you just think through it. And you're
12 like: Of course. You would save all these lives.
13       There would be a cost. And it's -- it's
14 not -- it's a difficult -- I mean you really think
15 about that. And I think it just -- it ends up
16 being a case-by-case circumstances. We have so
17 many automobile deaths in this country. There's a
18 clear solution: Everyone drives 20 miles per hour.
19 We need to hear the arguments for what are the real
20 costs and what are the real benefits.
21       And I think of it as it being very
22 particular to the case.

William E. English, Ph.D.
Washington, DC

9/13/2019
Page 93 (366 - 369)

Page 366

1    Q   Would you agree with me that generally,
2  as a society, we value children's lives higher than
3  adult lives?  Is that a fair assumption?
4    A   They had big debates of this at the
5  Harvard's ethics center.  And I know philosophers
6  who are on every side.  But I -- I will admit to
7  you a general premise, that I think people talk --
8  hold in higher esteem children's lives, yes.
9    Q   Okay.  So -- you know, and what I'm
10 trying to get at is in this cost benefit analysis
11 we were talking about kind of cold numbers of there
12 just aren't that many incidents, in your opinion,
13 of this happening.
14       What I'm wondering is do you factor in
15 the fact that there is a considerably higher degree
16 of public outrage or protection over children that
17 may be involved in this, even if the numbers are
18 lower?  Is that part of your equation?
19    A   Yes, I -- I totally grant there's a
20 psychology to this.  And I think I understand the
21 psychology you're pointing to.  And -- and one can
22 understand, it's a visceral nature and why people

Page 367

1  feel this way and why sometimes, you know, that
2  mobilizes people more.
3       And I think the only challenge is we --
4  we really do need to think about the big picture
5  and just go beyond our initial reaction.  But yes,
6  these are all valid questions and concerns.
7    Q   Okay.  All right.  So in your report, in
8  the Sege section, where -- I'm looking at page 14.
9  And I'm going to -- I'm looking at the bottom of
10 the first paragraph, talking about kind of
11 comparator statistics from the CDC during the same
12 period in New York, talking about transportation
13 accidents, fire and smoke inhalation, deaths,
14 accidental drownings, submersion, falling deaths,
15 poisoning, and drug deaths.
16       So I believe -- or let me ask you:  Why
17 are you citing those statistics?
18       What point do those make in this report?
19    A   Yeah, I'm trying -- I'm trying to
20 understand the magnitude of the incidents we're
21 talking about in context of other familiar everyday
22 items, activities.  And, you know, first ask, you

Page 368

1  know:  What's our both legal and social
2  understanding of those harms?  What do we do about
3  them?  How concerned are we about them?  And ask,
4  you know:  In -- in comparison then, you know, how
5  does that make sense of -- you know, if the
6  magnitude of the harms by the -- the handful of
7  these that happened, then, you know, what should be
8  our appropriate proportional response to those as
9  well?
10    Q   So -- and what I'm wondering is you --
11 you cite those, but obviously you're aware that
12 there are laws and regulations and county
13 restrictions that relate to each one of those,
14 fair?
15    A   Sure.  Yes.
16    Q   Okay.  So those are areas that there are
17 clearly a problem, based on the CDC numbers; but in
18 light of the problem, the State or the localities
19 have taken efforts to address the problem, right?
20    A   Yes.  And many of those efforts are
21 understandable and reasonable.  And you might still
22 ask:  Why don't we take more efforts?  104 children

Page 369

1  falling is too much, isn't it?  Three hundred --
2  I'll -- I'll stop.  But, yes, I -- exactly,
3  everything you just said is right.
4    Q   Right.  So I mean, you know, looking at
5  the statistic, you say 50 children died of
6  poisoning by drugs; 50 children is not a
7  particularly large number of children when you look
8  at the entire population of New York state; is that
9  fair?
10    A   Yes.  A small number.
11    Q   Okay.
12    A   Percentage-wise, yes.
13    Q   Percentage-wise.  But the state still
14 takes active steps and has laws and regulations and
15 other things in place to address poisoning -- yeah,
16 to address or redress poisoning by drugs and
17 alcohol of children, right?
18    A   Yes.
19    Q   All right.
20    A   And many of those, in their particulars,
21 might be fine.  Certainly we could ban alcohol, and
22 it would save even more lives.  And the question is

Page 370

1 where do you draw the line of reasonable versus
2 unreasonable.
3    Q   Okay.  Now, do you understand that both
4 Dr. Sege and Dr. Zeoli, their opinion is that PL
5 400 is one tool in a potential arsenal that
6 includes multiple tools that could be accessed or
7 used to address their underlying concerns?  Do you
8 understand that?
9    A   Yes.
10   Q   Okay.  So the fact that there could be
11 other laws or other manners to address their
12 concerns, does that mean that the law that they're
13 articulating as one tool should -- naw, strike that
14 question.  Sorry.
15       Just because there's other avenues or
16 mechanisms to address a problem, does that mean
17 that you don't take steps or measures to address it
18 in other ways?
19   A   I think you're articulating a valid
20 point.  I think one concern you might have is that
21 parents might also get a false sense of safety
22 if -- you know, if they were to say, oh, if I just

Page 371

1 go to this database, I'll learn all the gun
2 holders' names and I'll be fine.  And to the degree
3 they really care about that, there's also a danger
4 on that side.
5       But as a matter of general principle,
6 what you just said is right, you might have various
7 tools.
8    Q   And I appreciate using the word
9 "articulate," because I didn't feel particularly
10 articulate.  You're being generous at 5:30 at
11 night.
12   A   No, no.
13       MR. DAGUE:  Give me a few to go over my
14 stuff --
15       MR. DAVIS COOPER:  Sure.
16       MR. DAGUE:  -- talk to Monica.  Let's see
17 where we are.  I mean I think in terms of time,
18 we're 30 to 45 minutes out, is my guess.
19       (Recess)
20       (At which point Mr. Dague switched, and
21       Ms. Connell began asking the questions.)
22 BY MS. CONNELL:

Page 372

1    Q   Dr. English, we were introduced earlier.
2 I'm going to question you for a little bit now --
3    A   Okay.
4    Q   -- with counsel's gracious consent.
5       MS. CONNELL:  Thank you, gentlemen.
6 BY MS. CONNELL:
7    Q   So I would like to talk to you about some
8 of the issues in your report that Mr. Dague has not
9 questioned you on yet.
10      First, have you studied -- do you
11 consider yourself an expert in suicide?
12   A   No.
13   Q   Are you an expert in the use of firearms
14 in suicide?
15   A   No.
16   Q   Do you have any experience studying
17 children with emotional disturbances?
18   A   No.
19   Q   Children in domestic violence situations?
20   A   No.
21   Q   Do you consider yourself an expert in
22 child safety?

Page 373

1    A   No.
2    Q   Is it your position that knowledge of
3 whether a handgun is accessible to a child would
4 not be helpful information for child safety
5 purposes?
6    A   By -- let me just clarify.  What do you
7 mean by "accessible" here?
8    Q   Meaning a child could gain possession of
9 a firearm.
10   A   And by "could," you mean is able to?
11   Q   Yes.
12   A   Yes.  The knowledge of whether a child
13 is, in fact, able to would be -- could be useful.
14   Q   Okay.  Do you agree that gun violence is
15 a problem in the United States?
16   A   Could you say what you mean by "problem"?
17   Q   Do you think it's a public health problem
18 in the United States?
19   A   And just to be clear, by "public health
20 problem" -- maybe I can put it this way.  I would
21 like to see deaths of all kinds decreased.  I think
22 that's a -- starting assumption of my social

Page 374

1 scientist's work. There are some problems where
2 there's low-hanging fruit, where part of the
3 scandal is there's -- there's things we can do I
4 think that are easy and cost-effective and
5 efficient. And if the problem is easy to solve --
6 and that's part of the scandal.
7      I would like to see fewer gun deaths.
8 It's an area where I, unfortunately, think there's
9 not a lot of low-hanging fruit. So it's an area
10 that -- again, like traffic deaths, like disease
11 deaths, of course I could like to see them go down.
12 And it's part of being -- my interest in social
13 scientists. So as a general research problem,
14 it's -- it's worth studying. I'm not of the
15 opinion there's a lot of low-hanging fruit that
16 would easily address it.
17     Q   Are you familiar with studies regarding
18 the rate of violence -- firearms-related violence
19 in the United States as opposed to other
20 industrialized --
21     A   Yes.
22     Q   -- nations?

Page 375

1      And do you know what those studies
2 generally indicate?
3     A   We own a lot more firearms than other
4 countries. And we also have a lot more deaths as a
5 result of firearms.
6     Q   And injuries?
7     A   And injuries, yes.
8     Q   And crimes committed with firearms, yes?
9     A   Yes.
10    Q   Do you agree that the Government may have
11 a legitimate interest in reducing the effects of
12 gun violence?
13    A   Oh, sure. I think if there's a way to
14 reduce gun violence that is effective, efficient,
15 doesn't trample on rights, sure, it'd be great to
16 have less gun violence.
17    Q   So Dr. Hamilton opined that the
18 Government has a compelling interest in advancing
19 child safety.
20      You saw that in her report, right?
21    A   Right.
22    Q   And you don't take issue with that

Page 376

1 statement, do you?
2     A   Of course, a government, if it's
3 feasible, should do everything it can. But, of
4 course, one needs to evaluate the actual proposals.
5     Q   I'm talking -- when I say compel, I'm
6 using a legal term of art, when I say "compelling
7 interest." She cited some case for it. I didn't
8 notice you addressing that in your report.
9      Do you take issue with the fact that the
10 United States Supreme Court has recognized that
11 states have a compelling interest in safeguarding
12 the health of children?
13    A   Yeah, in some sense I -- I think it's a
14 rather nonprovertial (sic) -- controversial claim.
15 The controversy comes in how one does that.
16    Q   So you don't take issue with that point,
17 that the United States --
18    A   As a general --
19    Q   -- Supreme --
20    A   -- principle --
21    Q   -- Court has --
22    A   -- it'd be --

Page 377

1     Q   -- stated that?
2     A   -- good to have less firearms violence.
3 And the Government has an interest in that, sure.
4     Q   No, no, I -- my question --
5     A   A compelling --
6     Q   -- is about --
7     A   -- interest, yes.
8     Q   Yes. Thank you.
9      And that courts have recognized that this
10 interest is so compelling that sometimes the states
11 may take steps even if it impacts another
12 Constitutional right?
13    A   In the abstract, yes.
14    Q   Okay. Did you review the cases that
15 Professor Hamilton cited?
16    A   Which cases are you referring to?
17    Q   For example, in New York versus Ferber
18 and its progeny?
19    A   No.
20    Q   Earlier today we talked about some cases
21 that you did cite. And I'm not sure I got -- I
22 heard the answer to this question.

Page 378

1    Did you yourself research and pull those
2  cases that are cited in your report?
3    And by cases, I mean like legal cases.
4    A   And just to make sure I understand you,
5  for example, you mean, for example, the 19 --
6    (Witness looked at document).  I'm sorry.
7  So U.S. versus Brignoni-Ponce, 1975.
8    Q   I think you cited more than one case.
9    Did you pull them yourself from Lexus or
10 Westlaw?
11   A   I don't recall citing another case.
12   Q   Okay.  How did you get your hands on U.S.
13 versus Brignoni?
14   A   By the internet.  And that was a publicly
15 available excerpt of parts of that case.
16   Q   In the context of your work on this case,
17 did you do any legal research?
18   A   What do you mean by legal research?
19   Q   I mean searching statutory law or case
20 law.
21   A   So I certainly am -- am researching and
22 citing, for example, the language of Penal Law 400

Page 379

1  dot, dot (5)(a), the definition of harassment in
2  New York.  I suppose that would constitute
3  researching the law, or some law.
4    Q   And did you pull -- for example, did you
5  get those statutes yourself from the internet?
6    A   Yes.
7    Q   And any case law that you cited, you,
8  yourself, procured?
9    A   Yes.  I don't know -- I'm trying to think
10 if there's any other things I cited here between --
11 oh, so and -- like New York's labor law, Section
12 21(d), I found that as well on the internet, so
13 yes.
14   Q   So you, yourself, how did you come across
15 the definition of "harassment" for the purposes of
16 Penal Law 400?
17   A   I searched:  New York law, harassment,
18 definition, and this is what came up.
19   Q   And so you conclude that the definition
20 of harassment in the first degree and harassment --
21 or harassment in the second degree is the
22 definition of the term "harassment" used in Penal

Page 380

1  Law 400; is that correct?
2    A   That is my assumption.
3    Q   What do you base that assumption upon?
4    A   You speak the English language.  It
5  seemed like the law was defining a term called
6  "harassment."  And here was an instance of it's
7  being defined, and it's -- it's sort of ordinary --
8  I guess ordinary language.
9    Q   Do you know if New York State has taken
10 the position that the definition of harassment in
11 the first degree or harassment in the second degree
12 is the definition of harassment in Penal Law 400?
13   A   I do not.
14   Q   Dr. Hamilton opined about the special way
15 gun violence may affect children.
16   For example, her report addresses not
17 just deaths, but physical injuries, correct?
18   A   That's correct.
19   Q   And also mental or emotional harms,
20 correct?
21   A   That's correct.
22   Q   And even educational outcomes; is that

Page 381

1  correct?
2    A   Yes.
3    Q   Do you disagree with her positions as to
4  the effects of gun violence on children in those
5  ways?
6    A   Two brief things to say.  I would not
7  doubt that being subject to gun violence is bad for
8  a variety of reasons, including those enumerated.
9    My two concerns would be, one, how
10 prevalent and widespread are these incidents and
11 harms.  And, second, again on the other side of the
12 balance sheet, how many people suffer fear because
13 they are not able to defend themselves; how many
14 people have a home invader they're not able to
15 defend themselves against, how many -- I guess -- I
16 suppose there's other things to take into
17 consideration, but I agree those things are worth
18 considering.
19   Q   Okay.  And you don't disagree that those
20 could be the effects on children of gun violence:
21 Exposure to --
22   A   It can be, yes.

Page 382

1   Q   Okay.  Have you studied the cost of gun
2   violence to society?
3   A   I've certainly seen different sorts of
4   estimates.  And, in fact, you know, one thing I'll
5   do in my classes, you know, we'll a little
6   discussion -- we'll look at the cost, for example,
7   cigarettes, the cost of alcohol, both of which I
8   think greatly exceed the cost of guns.  And have
9   interesting debates about, you know:  What -- why
10  do we have them in our society?  What's -- you
11  know, what a reasonable -- you know, cost and
12  benefits are there?
13  Q   And I may be able to --
14  A   Sorry, I --
15  Q   -- save you --
16  A   -- I will --
17  Q   -- some time --
18  A   -- I will --
19  Q   No, no, I --
20  A   Sorry.
21  Q   -- didn't mean to interrupt your answer,
22  but when I say costs, I'm specifically talking

Page 383

1   about dollar value, money that we expend as a
2   society as a result of gun violence.
3   A   I have seen estimates.  I've also seen
4   varying estimates.  And I've -- I am concerned by
5   the variance in those estimates I've seen.
6   Q   Have you, yourself, studied this issue?
7   A   No.
8   Q   I'm going to just, in terms of the
9   question, go back a little bit over --
10  A   Sure.
11  Q   -- some things you may have addressed.
12      So Dr. Hamilton opined that Penal Law 400
13  offers parents and caregivers access to information
14  about whether there was a handgun in the home where
15  their child may go, correct?
16  A   A legally registered handgun, yes.
17  Q   That's right.
18      And that this may help them make more
19  informed decisions about the safety of where their
20  children might present; is that correct?
21  A   That's the idea, yes.
22  Q   Right.  And you disagree with that

Page 384

1   opinion in part because you think the information
2   given by Penal Law 400 is under-inclusive; am I
3   understanding you correctly?
4   A   I'd say, first of all, if it were totally
5   inclusive, it'd be of relatively low statistical
6   value to begin with.  As it happens, it also is
7   under-inclusive.  So it may not ever serve that
8   purpose, but -- and might give people a false sense
9   of security with just that information.
10  Q   Right.  So with that caveat, that you
11  think the numbers are small anyway, in your
12  opinion, Penal Law 400 would be more effective if
13  it included the names of people who possess long
14  guns; is that correct?
15  A   It would be more intelligibly tailored to
16  that supposed purpose.
17  Q   And didn't include the exemptions; is
18  that correct?
19  A   That it would -- yeah, you could make a
20  stronger argument that it's performing that
21  function.
22  Q   Professor Hamilton also stated that Penal

Page 385

1   Law 400 would allow adults to get information about
2   access to firearms in homes where children are at
3   risk; for example, at risk of domestic violence;
4   isn't that correct?
5   A   So I'm trying to recall if that was
6   Dr. Hamilton's point.  And maybe you just said
7   that.  I zoned out.  But I -- I believe that
8   argument was made by one of them.  I don't know --
9   Q   Well, actually --
10  A   Did you say Hamilton?  I'm sorry.
11  Q   Let me actually move on to a different --
12  A   Okay.
13  Q   -- point that I was going to, which is
14  also that -- yeah, she did, in fact -- but it would
15  allow people like teachers, therapists, medical
16  professionals, school administrators, to know
17  whether a child who is at risk of either domestic
18  violence or at risk of harming themselves or others
19  would have access to a firearm, she opined about
20  that; isn't that correct?
21  A   That's my understanding, yes.
22  Q   And you disagreed with that proposition,

Page 386

1  correct?

2     A   Yes.  I had a concern with that, yes.

3     Q   And your concern is that allowing -- that

4  the parents getting -- or these other adults

5  getting information from Penal Law 400 is not the

6  best method to address those safety concerns,

7  right?

8     A   I would add at least two concerns.

9     Q   Uh-huh.

10    A   One is -- so this concern about if in

11  fact these problems are present.  If you fear

12  domestic violence, if you fear suicide, I don't see

13  why you would wait -- well, why only the gun thing,

14  kids in households, get the extra attention.  It

15  strikes me that most of the things we talked about

16  there should trigger flags, with or without guns,

17  particularly given that people might access guns

18  outside of this system.  So I -- I guess on that

19  side, it was unclear to me.

20        And then the other thing was, you know,

21  if it does level -- arise to that level, it just

22  strikes me that the -- it'd -- it'd be fairly

Page 387

1  feasible to have the state and their social workers

2  and their law enforcement, you know, if a request

3  comes in from a teacher, you know, to verify that

4  information, to discuss it.

5        So it strikes me that -- it's not clear

6  to me why that would require public disclosure.

7  But, again, it was like -- I think troubled kids

8  should get attention regardless of whether there is

9  a gun in their house.

10    Q   So if there were a system by which -- for

11  example, mental health professional, could -- who

12  was concerned that someone might present as a

13  safety risk to themselves or others, where they'd

14  have access to a gun, could confidentially report

15  that concern to officials, who could see if that

16  person has a gun license, you would support a

17  system like that?

18    A   The details would have to be expounded.

19  But in principle, it's possible that a system like

20  that might do a much better job at respecting the

21  concerns I have, yeah.

22    Q   Are you familiar with New York's mental

Page 388

1  hygiene laws?

2     A   Not in any depth, no.

3     Q   How about education laws?

4     A   Not in any depth at all.

5     Q   Do you know situations in which an

6  educator or a healthcare provider must report

7  concerns about a child to State officials?

8     A   I would imagine there probably are many.

9     Q   But you don't know?

10    A   No.

11    Q   Okay.  Are you aware of any studies about

12  why people don't necessarily report suspicions of

13  child abuse to authorities?

14    A   I could imagine some.

15    Q   Are you familiar with them, with such

16  studies?

17    A   Studies or -- yeah, I mean I -- my wife

18  is a teacher in D.C. public schools, so I'm -- I'm

19  aware of some of these, yes.

20    Q   Right.  But I'm trying to find out if you

21  would consider yourself capable of rendering an

22  expert opinion in that regard.

Page 389

1        Why would some --

2     A   Oh.

3     Q   -- in regard to why some people would

4  delay or hesitate in making a report to

5  authorities?

6     A   Right.  And just, just to answer the -- a

7  question you also -- as part of that, which is sort

8  of the basis of expertise.  And I should just make

9  clear -- so, for ex -- my two most cited papers are

10  in genetics.

11    Q   Uh-huh.

12    A   I'm not a geneticist.  That's not my area

13  of expertise.  But my area of expertise is

14  evaluating statistical claims.  And the

15  contributions I was able to make is to say, look,

16  here's a statistical problem, and the inference

17  that was drawn.

18        And so the expertise I'm claiming in many

19  of these areas is not that it's my primary form of

20  research, but that I think I'm equipped to evaluate

21  at least often statistical claim to public policy

22  claims.  So I am not an expert in this.

Page 390

1  Q   Sure.

2  A   And my only basis for evaluating this

3  would be to evaluate claims that are made on behalf

4  of the -- the benefits of this law and its cost or

5  statistical in -- in -- issues of inference.

6  Q   Just to go back, though --

7  A   Yes.

8  Q   -- you wouldn't feel comfortable offering

9  an expert opinion -- and you're not offering an

10  expert opinion -- if I understand correctly --

11  about why people are sometimes hesitant --

12  A   Oh.

13  Q   -- to report suspected child abuse to

14  authorities; is that correct?

15  A   That's correct.  This is not in my report

16  or a subject of my report.

17  Q   How about suspicions of domestic

18  violence, do you feel you have an expertise to

19  offer opinions about why people would be hesitant

20  to report suspicions of domestic violence?

21  A   That is not the subject of my report.

22  Q   Do you feel you have an expertise in that

Page 391

1  area?

2  A   It would depend on the question.  But I

3  do not consider my ex -- myself an expert in

4  domestic violence, reporting psychology.

5  Q   Okay.  Do you know if handguns or long

6  guns are used more often in crime?

7  A   I believe handguns are.

8  Q   Do you know why?

9  A   I would imagine they're more convenient.

10  Q   In what way?

11  A   They can be concealed, easier to

12  transport, easier to hide if you're running away.

13  Q   Uh-huh.

14  A   I mean like a variety of reasons, but

15  yes, those would be some.

16  Q   Excuse me one second.  I'm trying not to

17  go over ground we've tread upon already too much,

18  so -- where at all possible.

19      In your report, do you take issue with

20  Dr. Hamilton's citation that 89 percent of

21  accidental shootings of children occur in the home?

22  A   I do not take -- examine or take issue

Page 392

1  with that.

2  Q   Do you consider yourself in expert in

3  open government issues?

4      Do you know what I mean by that?

5  A   You know, it's interesting, when I was at

6  Harvard's ethics center, that was a major

7  initiative of my boss and many colleagues.  So I

8  would say that I am somewhat familiar with that

9  movement.  It's not my -- a core area of my

10  research, but some familiarity.

11  Q   Would you say that you have an expertise

12  in that area?

13  A   I know more than most academics about it.

14  It's not my -- a core area of expertise.

15  Q   I'm not sure that answers --

16  A   Okay.

17  Q   -- my question.

18      Do you feel --

19  A   Again, I --

20  Q   -- competent --

21  A   -- to belabor the point, it -- it -- and

22  academics don't go around wearing the:  I am an

Page 393

1  expert.  It depends on the nature of the case.  But

2  I'm -- I'm familiar with many people who work in

3  expert government -- in open government.  I would

4  not put it as my core research interest, so I would

5  not -- but yeah.

6  Q   Have you undertaken any -- I mean have

7  you published any works on open government?

8  A   No.

9  Q   Have you obtained any degrees relating to

10  open government issues?

11  A   I'm not sure there are any degrees in

12  open government issues, at least called that, so

13  no.

14  Q   Have you undertaken any formal studies in

15  relation to open government issues?

16  A   So I was involved -- I'll say loosely

17  involved with a few projects at Harvard's ethics

18  center examining open government issues.

19  Q   What issues did you examine?

20  A   So one issue was -- and I referenced it

21  earlier -- with "muckrock," the accessibility of

22  government information, having to most efficiently

Page 394

1  do FOIAs, how -- how to -- a public repository with
2  FOIAs, where you might be able to actually get
3  datasets somewhat assembled.
4        There's also a -- some open government
5  stuff on the nature of political donations, trying
6  to have those systematically reported.  There was a
7  group called The Sunlight Foundation out in
8  California who had made some strides with that.
9        We had as a gentleman --
10  Q   I'm sorry, that was strides --
11  A   Some --
12  Q   -- towards --
13  A   -- strides --
14  Q   -- open government --
15  A   -- in -- in -- yeah, in -- so there's
16  enormous problems with the reporting records of --
17  of political nations, everything from people can
18  put multiple addresses, and the names don't match.
19  And there's just technical issues.  But it turns
20  out once you solve them, you can make wonderful
21  maps to connect things that you -- so I --
22  Q   So in some instances, the availability of

Page 395

1  government information can be very useful; is that
2  correct?
3  A   Well, yes.  A lot of information can be
4  useful there.
5  Q   Are you aware of any limitations on the
6  study of the causes of gun violence, imposed by
7  Congress?
8  A   So historically, there have been
9  limitations on types of research that some agencies
10  can fund.  So I'm aware of some controversy with
11  the Centers for Disease Control about whether those
12  can be publicly funded.  I'm also aware of a lot of
13  privacy donations that are quite enthusiastic about
14  funding --
15  Q   Right.
16  A   -- such research.
17  Q   I'm asking you about whether you're aware
18  of any congressional limitations that would impact
19  the ability of social scientists to study the
20  causes of gun violence?
21  A   When you say impact, you mean --
22  Q   Limit.

Page 396

1  A   Limit.  Probably not in the way you mean,
2  but I just want to make sure I understand it.
3  Q   Uh-huh.
4  A   Is there any congressional litigation
5  that would prohibit me, as an academic, from
6  studying certain --
7  Q   No, I'm talking about public funding.
8  A   Oh, public funding.  Okay.
9  Q   Thank you.  That's not -- 
10  A   Yeah, okay.  So I don't know the origins
11  of the current prohibition that CDC has.
12  Q   Okay.  Have you ever heard of the Dickey
13  Amendment?
14  A   Nope.
15  Q   Do you know what the Chart Amendments
16  are?
17        And I may not be saying that correctly,
18  as I --
19  A   I'll just go ahead and say no.
20  Q   Okay.  Are you aware of any researchers
21  who have used identifying information to --
22  identifying information meaning you can follow an

Page 397

1  individual -- to conduct firearms-related research?
2  A   Off the top of my head, I don't recall
3  any.
4  Q   Okay.  Are you aware of any instances
5  where guns licensure information has been used to
6  assess whether licensing authorities are doing
7  their jobs?
8        And by being used to assess, I mean by
9  someone other than the government itself.
10  A   Gotcha.  On an individual basis or --
11  Q   Uh-huh.
12  A   I'm not aware on an individual basis.
13  Q   What about in Professor Hamilton's
14  report, where she cites various press reports that
15  looked at people who were ostensibly licensed to
16  possess guns, but had, for example, a federal
17  disqualifier from gun possession?
18        Do you know what I mean when I say a
19  federal --
20  A   Right --
21  Q   -- disqualifier?
22  A   -- right.  Yeah, the journalist

Page 398

1  investigations.

2      Q     Yeah.

3      A     And what's the question about it?

4      Q     So are you familiar with those instances?

5      A     The -- anecdotically, yes.

6      Q     Did you look into -- strike that. I'm

7  sorry.

8          I didn't notice you addressing those in

9  your report.

10         Did you read those articles?

11     A     I may have glanced at them, but I did not

12  give them any deep read.

13         One thing, my initial thought, one from

14  that is, it seems me, it's a failure of state

15  capacity -- and I refer even, I think worse -- if

16  there's a failure of state capacity on this -- and

17  I think I've -- I've heard of even worse ones on

18  updating year by year, you know, violations and

19  felonies and that sort of thing.

20         And it seems that a -- serious area of

21  concern. It also seems appropriate response would

22  be to actually try to get governments to do a

Page 399

1  better job on that. And the government should have

2  the capacity to audit that internally. But I --

3      Q     So my --

4      A     -- digress.

5      Q     -- question --

6      A     I digress.

7      Q     -- was -- exactly -- whether you had read

8  them. And I think you answered that you glanced at

9  them.

10         But you bring up another issue.

11         Do you know -- have you ever seen an

12  actual official New York gun license?

13     A     I don't believe I have. And -- a handgun

14  license?

15     Q     Yeah, a handgun license.

16     A     Yeah, I don't think I have.

17     Q     Do you know whether you need a license

18  for a long gun?

19     A     My understanding is you do not need to

20  purchase -- you do not need a license to purchase a

21  long gun.

22     Q     Do you know whether --

Page 400

1      A     In -- in -- in New York state generally.

2  I don't know about Manhattan's quarterly nuances.

3      Q     For right now, let's talk about New York

4  State law --

5      A     Right.

6      Q     -- and not any nuances --

7      A     Sure.

8      Q     -- in Manhattan. Okay?

9      A     Uh-huh.

10     Q     Okay. So do you know whether you have to

11  register a long gun?

12     A     My understanding is you do not.

13     Q     Okay. So do you know whether New York

14  State gun licenses have to be renewed?

15     A     My recollection is that there was some

16  controversy about that, actually, in recent memory.

17  And I don't know what the current status of that

18  is.

19     Q     So if someone had a New York State gun

20  license and they were, for example, voluntarily

21  committed in another state, how would licensing

22  officials know about that in New York?

Page 401

1      A     And when you say licensing officials, you

2  mean the -- I guess the county sheriffs or -- or

3  who are you referring to?

4      Q     Do you know who licensing officials in

5  New York are?

6      A     So when I looked into trying to access

7  these records, my understanding was that at least

8  some of them are -- were possessed by the county

9  level. There might also be a -- some -- a state --

10  presumably there would be also a state repository.

11         So your question is: How -- I take it a

12  general question of how might a variety of

13  legitimate concerns about this person's mental

14  commitment be related to relevant authorities?

15     Q     Yeah, be related to relevant authorities.

16     A     Relevant authorities?

17     Q     Yeah.

18     A     So it strikes me that there might be a

19  few different mechanisms. One, depending on the

20  nature of the commitment, if there's -- if there,

21  you know, a -- if there is a reason that would

22  raise a person to be prohibited from buying a gun,

Page 402

1 that's something that could be reflected in the
2 national incident background check system. So that
3 would first present -- that would aim to prevent
4 for future purchases.
5     The next thing one might do is
6 approach -- have law enforcement reach out to -- to
7 family or to friends to ask about these things.
8   Q   What would trigger that?
9   A   I mean if the people who committed this
10 person I guess had some concerns they wanted to
11 share with law enforcement.
12   Q   So it would be voluntary by family
13 members or people who knew the gun licensee?
14   A   Right. And, again, I guess I'm assuming
15 that -- you might have to say more about the nature
16 of the commitment: Is it short-term, long-term,
17 what are they in for, but --
18   Q   Do you know what the federal law is that
19 makes a voluntary commitment a disqualifier from a
20 gun possession?
21   A   I -- I don't know what the latest
22 configuration of that is. I think it's a question

Page 403

1 on the forms. And what I don't recall is if it has
2 a time horizon to it, but --
3   Q   Okay. So if for some reason law
4 enforcement wanted to inquire of licensee, they
5 could. That's one way. Another way is if someone
6 who knows the licensee felt concerned and took it
7 upon themselves to inform --
8   A   Uh-huh.
9   Q   -- licensing officials, that would be
10 another mechanism.
11     You said there were some others, I think?
12   A   Oh, I mean that there would be more
13 fortuitous mechanisms. But I think those would be
14 the primary -- I mean is the person storing their
15 guns at a local gun shop or range, you might reach
16 out to them. You might look at their membership.
17 I mean there's gonna be like, I would imagine,
18 various ways, if there was a acute concern, that
19 law enforcement could try to follow up with the
20 person's circumstances.
21   Q   I'm not asking about acute concern.
22   A   Okay.

Page 404

1   Q   What I'm interested in, sir, is this.
2 You know, one thing Professor Hamilton cited was
3 that making information about licensees public can
4 help in that -- enlist the public and others in
5 helping ensure that licensure is appropriate, and
6 helping making sure that the people who are getting
7 licenses qualify for them, that they can lawfully
8 possess a gun under federal law, and that they
9 maintain that status.
10     So my question to you is: How, for
11 example --
12   A   Right.
13   Q   -- the hypothetical I gave to you is
14 somebody has a New York State license. Take it for
15 me on faith that --
16   A   Uh-huh.
17   Q   -- it might look like a card --
18   A   Sure.
19   Q   -- that they --
20   A   -- sure.
21   Q   -- can present to a law enforcement
22 officer, for example.

Page 405

1   A   Uh-huh.
2   Q   But they'd been involuntarily committed
3 out of state.
4     So how would New York State licensing
5 officials know about that involuntary commitment?
6   A   So it sounds like they wouldn't. I think
7 the larger question, though, is: What are adequate
8 remedies for that? I guess like there's many forms
9 of personal data that I could imagine having
10 enormous State utility.
11   Q   Actually, I'm -- I'm sorry, I'm --
12   A   I understand. Keep going.
13   Q   I think you answered my question. You're
14 going onto something else. So let's see.
15     So do you believe that any gun laws
16 advance public safety?
17   A   Oh, sure.
18   Q   Do you believe that any comport with the
19 Second Amendment?
20   A   Yes, it's possible to have gun laws that
21 are consistent with the Second Amendment.
22   Q   Okay. Like what? What ones do you

Page 406

1 think?

2    A   Oh, I think we -- one was already alluded

3 to.  Handling firearms intoxicated might be a -- a

4 legitimate restriction.  The -- the way the

5 background check system gets aim, and gather

6 information about, say, felons, and enabling that

7 to be used for commercial sale of firearms seems to

8 serve a valid purpose and can be done with a good

9 amount of efficiency.

10    The -- I'm just -- historically, I

11 just -- I know concerns about the current way Class

12 III regs deal with things like automatic firearms

13 will seem -- are reasonable to me.  Let's see.

14 There must -- I'm sure there's a whole host of

15 peculiar things that I would find just fine.

16    Q   Can I go back to -- for a second to your

17 interpretation of Penal Law 400's use of the term

18 "harassment"?

19    A   Uh-huh.

20    Q   So we were talking before, and you opined

21 that the use of the term "harassment" in Penal Law

22 400 has a specific meaning, which you interpret to

Page 407

1 be harassment in the first or second degree; is

2 that correct?

3    A   Yes.

4    Q   Okay.  You further say that there's a

5 lack of clarity that could create dangers for

6 applicants, because if the applicant is deemed to

7 have knowingly provided false information to a

8 licensing official in support of exempting his or

9 her information from disclosure requirements, they

10 can be subject to penalties; is that correct?

11    A   That's correct.

12    Q   And you don't know -- do you know if --

13 actually, let me ask you this.

14    Do you know of anyone who's been subject

15 to such penalties?

16    A   No.

17    Q   Do you know -- have you ever seen --

18 strike that.

19    Do you know how someone applies for an

20 exemption from Penal Law 400?

21    A   I -- my understanding is that now it's

22 something one can seek at the time you seek an

Page 408

1 actual permit.  I don't know how it works right now

2 if you already have a permit.  I presume there's

3 some form of mechanism for that.

4    Q   Okay.  Do you know what the form or

5 mechanism looks like, either for the applicant or

6 for somebody who already has a license?

7    A   I don't recall seeing that.

8    Q   Do you know whether there are a lot of

9 questions asked if someone's seeking an exemption?

10    A   I have not seen that form, no.

11    Q   Do you know who reviews the exemption

12 application?

13    A   No.

14    Q   Do you know whether anyone's responsible

15 for reviewing the exemption --

16    A   No.

17    Q   -- application?

18    Do you know whether -- I'm sorry, did you

19 answer you didn't know of a single instance where

20 someone had faced a penalty in regards to --

21    A   Correct.

22    Q   -- their applic -- okay.

Page 409

1    So when you were discussing the

2 definition of harassment, you said that harassment

3 in the second degree requires that someone engages

4 in a course of conduct or repeatedly commits acts

5 which alarm or seriously annoys such other person

6 and which serve no legitimate purpose.

7    Is that correct?

8    A   That's correct.

9    Q   Okay.  And your opinion here states, A

10 pistol permit licensee would have to have reason to

11 believe that disclosure of their name and license

12 would subject them through repeated acts which

13 alarm or seriously annoy them, and which serve no

14 legitimate purpose, in order to invoke the

15 exemption, right?

16    But may not be able to tell whether such

17 conduct would be unwarranted; is that correct?

18    A   I think you added a few words in there,

19 compared to what exactly I wrote.

20    Q   Uh-huh.

21    A   But I believe the basic gist of that is

22 that they would have to make a claim that they

Page 410

1  believed they're going to be the subject of
2  harassment, as defined by law.
3      Q   So when someone says have reason to
4  believe they may be subject to, that's a subjective
5  standard, isn't it?
6      A   Yes.
7      Q   So if we go back to -- and I just want to
8  make sure I understand your opinion here -- the
9  definition of harassment in the second degree.
10      It says that someone would be --
11  presumably because they possesses a handgun license
12  or a handgun, subject them to repeated acts which
13  alarm or seriously annoy them, and which serve no
14  legitimate purpose, right?
15      A   I think that's the question begged by
16  this law.  Is that the -- I mean I'm not a lawyer.
17  It seems to me these are vague criteria.  It's
18  unclear to me what exactly constitutes -- as a lay
19  person reading this language, it seems to involve
20  asserting some belief that one of these conditions
21  obtain.
22      But yes, my lay understanding is this

Page 411

1  seems a -- a somewhat vague, somewhat subjective
2  thing.  But, yeah, that was what I wanted to
3  observe there.  But it seems that if you say a few
4  things that you would need to warrant or testify to
5  or claim to meet this bar.
6      Q   You mean to meet the bar of harassment --
7      A   Of -- of --
8      Q   -- in the second degree, for example?
9      A   -- of harassment, whatever, yeah.
10      Q   Right.
11      A   Whatever that means.
12      Q   It is your opinion that determining
13  whether someone who's committed harassment against
14  you in the second degree -- assuming that's the
15  appropriate standard --
16      A   Uh-huh.
17      Q   -- for the sake of argument --
18      A   Uh-huh.
19      Q   -- because you have a handgun, that you
20  would have difficulty determining whether that
21  harassment is unwarranted?
22      A   Well, unwarranted, my understanding is

Page 412

1  that that's language in the law itself.  And,
2  again, I -- I don't know exactly what that means.
3  It seems to me there's some ambiguity for a lay
4  reader.  So I'm not a lawyer.  It struck me as an
5  unclear definition.
6      Q   Okay.
7      A   But yeah, my lay reading of that is it
8  seemed you'd have to at least establish what's
9  formally defined as harassment.  And the -- the law
10  also has this "unwarranted" next to that.  And I'm
11  not sure if that's a new standard, extra standard,
12  maybe just goes without saying.  So it was unclear
13  to me.
14      Q   You haven't done any legal research into
15  whether New York adopts harassment in the first
16  degree or second degree as the actual
17  interpretation of harassment in Penal Law 400,
18  right?
19      A   Neither myself or every -- if any handgun
20  permit seeker I guess would have to do research to
21  really know what --
22      Q   But you haven't?

Page 413

1      A   -- what the standard -- no, I haven't.
2      Q   Okay.
3      A   I'm just a -- an ordinary person.
4      Q   Okay.  When -- you were talking about the
5  article you were questioned on earlier regarding
6  partisanship.
7      A   Uh-huh.
8      Q   Do you remember being questioned about
9  that --
10      A   Yes.
11      Q   -- by Mr. Dague?
12      I don't want to revisit it too much, but
13  I want to ask a follow-up question.
14      A   Absolutely.
15      Q   You indicated that it would be reasonable
16  for gun owners to fear that if they are publicly
17  identified as such, they will be the subject of
18  bias, which it could occur in many forms, e.g.,
19  explicit, implicit, social, economic, et cetera,
20  right?
21      A   That's correct.
22      Q   What's an implicit form of bias?

Page 414

1    A  Ah. So you know, I'm thinking of

2 bringing on a new law person to this firm. We're

3 all sitting around the table. Someone looks at

4 their CV, and looks around the table and says, ah,

5 this guy -- or, you know, in some we do -- I don't

6 know, you do background research on people or

7 something. You get their file. And you say, oh,

8 you know, it looks like they own a gun. You know,

9 we don't want one of those nuts.

10      I mean if somebody explicitly said that

11 around the table, explicitly voiced that as a

12 concern, and others took it as a reason for a

13 decision.

14    Q  Uh-huh.

15    A  And I think that that's contrasted to

16 implicit, which I'm happy to talk about as well if

17 you want.

18    Q  Right. No.

19    So I think earlier you acknowledged that

20 part of registration, for example, is public record

21 in New York, correct?

22    A  Right.

Page 415

1    Q  Do you know of any instance where someone

2 has suffered -- in New York I'm talking about --

3    A  Uh-huh.

4    Q  -- violence, or harassment, or

5 discrimination -- well, let me break it down.

6    A  Okay.

7    Q  Violence because of their party

8 affiliation?

9    A  No, I don't have documented experience of

10 that.

11    Q  How about ostracism from their community?

12    A  My only familiarity with that is what

13 Doe -- one of the Doe's said in this case.

14    Q  And you already know that one of the Does

15 said --

16    A  Their --

17    Q  -- because Mr. Dague reported that; is

18 that correct?

19    A  I was -- my -- the specifics, yes. I was

20 under the larger impression he had some concern

21 about this, so --

22    Q  Okay. Do you know what percentage of

Page 416

1 domestic violence assailants legally possess a

2 firearm?

3    A  I don't.

4    Q  Okay. Do you know any domestic violence

5 incident, if a firearm is present, whether that

6 increases the likelihood that that incident will

7 result in a fatality?

8    A  I would imagine almost by tautology its

9 presence should hire (sic) their -- heighten the

10 risk.

11    Q  Have you done any research on that topic?

12    A  I've seen research cited that makes that

13 claim.

14    Q  Okay. And have --

15    A  And I would not -- it would not surprise

16 me if that were true.

17    Q  Okay. How did you calculate the number

18 of New Yorkers who possessed a pistol permit?

19    A  Right. I -- I think I lay out here

20 the -- I wasn't able to come across the actual

21 lists that were published. I think they were taken

22 down. But I read one report that -- here it is, on

Page 417

1 page 7.

2    This one media outlet reported that

3 Westchester County had 16,616 pistol license

4 holders. I looked at the population of a larger

5 county. It -- that suggests approximately 1.7 of

6 the population had handgun licenses.

7    Now there's a question how you

8 extrapolate that to the larger state. And my sense

9 is Westchester is kind of -- you know, it's -- it's

10 not the countryside. It's also not downtown

11 Manhattan. But, you know, if you took the entire

12 state to have this same rate, it'd be something

13 like 330,000.

14    Q  Can I --

15    A  If you take -- sorry --

16    Q  I'm sorry, I'm --

17    A  -- it's --

18    Q  -- going to stop --

19    A  -- it's a --

20    Q  -- you on that --

21    A  -- yeah, page 7. Sorry.

22    Q  No, but I'd like -- that's exactly what I

Page 418

1 wanted to get at.

2 　　Why would you assume -- or on what basis

3 do you assume that outside of New York City other

4 counties have the same rate of licensure?

5 　A　Yeah, so as -- as I note here, I -- I

6 actually offer a -- a range. I say, you know,

7 suppose we essentially exclude all of New York

8 City. And that's a plausible assumption. Say that

9 rates are lower there. And, you know, that would

10 save, you know, at least something like 185,000 if

11 other counties are like that.

12 　　It wouldn't surprise me if some counties

13 are more, some counties are less. Presumably, the

14 State could tell us the exact number, which would

15 be -- which would be great. But it seems on some

16 just plausible estimations on that number, we're

17 probably talking about over 100,000 people.

18 　Q　Right. So you just -- you deem -- I mean

19 I just want to make sure that I understand --

20 　A　Yeah.

21 　Q　-- the basis of this.

22 　　You just think it's plausible to assume

Page 419

1 that you can extrapolate that number to other

2 counties based on what you said in your report;

3 there's no other information that fed that

4 decision?

5 　A　I would say my personal understanding is

6 I would not expect Westchester to be the highest

7 ownership rate. Again, just based on very basic

8 understandings of -- you know, compared to deep

9 Upstate New York and whatnot.

10 　　So these are general estimates, that I'm

11 just trying to figure, you know, what -- if the --

12 and it's very clear. If the rest of the state

13 looks something like Westchester, you know, what's

14 that gonna tell us? And even if you exclude New

15 York, what's that gonna say?

16 　　So, yeah, it's a very broad estimate.

17 And, thankfully, the State I think could tell us

18 exactly how many.

19 　Q　And so I just wanted to --

20 　A　Yeah.

21 　Q　-- just nail this down.

22 　A　Yeah.

Page 420

1 　Q　I'm correct in understanding you just

2 believed that was a reasonable extrapolation,

3 correct?

4 　　You didn't sample any other counties?

5 　A　Right. And just -- just to make clear,

6 what I'm trying to do here is pretty explicit, just

7 to say, as a very ballpark range, you know, if

8 this -- if Westchester is similar to the rest of

9 New York, this is what you would expect. If it's

10 not all New Yorkers, what do you expect?

11 　　So, yeah, you can play with the math or

12 play with the numbers. It seems like, you know,

13 we're -- we're not talking about 16 people. Let's

14 put it that way.

15 　Q　Right. So Mr. Dague was asking you

16 previously about your knowledge of the community in

17 which Mr. Doe Number 2 lives, I think.

18 　A　Right.

19 　Q　I'm going to ask you some -- some other

20 questions.

21 　　It seems to me like you underline -- your

22 opinion is an assumption that New York might be a

Page 421

1 hostile -- I guess a hostile locale for gun owners.

2 　　Does that underlie your opinion?

3 　A　Not necess -- I mean I think -- so just

4 to be clear, the -- the research I'm citing earlier

5 from AJPS is a general population estimate of

6 people they had used. So the -- the kind of

7 baseline here is I'm thinking in general in the

8 United States. And I -- I don't think anything I

9 wrote was premised on particular animus exclusive

10 to New York.

11 　Q　Right. But you're saying that someone

12 could be so afraid of others knowing that they

13 possess a handgun license, that it would chill

14 their decision to get a handgun license, right?

15 　A　I think that's what one of the Doe's is

16 saying, yeah.

17 　Q　Right. Are you saying that, too?

18 　A　Well, that strikes me eminently

19 plausible, yeah.

20 　Q　Is it your expert opinion that that's the

21 case?

22 　A　Doe's claim is a claim that I believe.

Page 422

1   Q   Okay.

2   A   I mean I don't think that individuals --

3   I know reasonably -- that they're lying.  And it

4   seems -- I mean particularly in light of that,

5   which, again, is in 2014.  Eminently reasonable

6   that handgun owners might be concerned about

7   other's perception.  And whether explicitly or --

8   or implicitly, even without them even wanting

9   malice, it would negatively affect them.

10   Q   The -- partisanship, though, is not

11   unidirectional, right?

12   A   What do you mean?

13   Q   Well, it's not just anti gun.  It could

14   be anti people.

15       Like, for example, anti Safe Act is

16   something Mr. Dague brought up, right?

17   A   Right.

18   Q   People could be discriminated against

19   because they belong to a gun safety organization or

20   a gun control organization; is that --

21   A   It's possible.

22   Q   -- correct?

Page 423

1       So I'm just trying to understand why you

2   believe that someone in New York would be subject

3   to this negative effect.

4   A   So just to be clear --

5   Q   Actually, let's make it more specific.

6   A   Okay.

7   Q   And maybe that will help you.

8       What basis do you have to believe, other

9   than what Mr. Dague has reported to you --

10   A   Uh-huh.

11   Q   -- that Mr. Doe said that he would be

12   subject to a negative effect?

13   A   Right.  So I have his own testimony.  I

14   have anecdotally things I've heard from many gun

15   owners themselves.  We have well constructed

16   evidence on a general U.S. sample that people not

17   only reward co-partisans but are -- are willing to

18   go beyond that, to punish partisans of the other

19   side.

20       You know, I mean, look, we have -- we

21   have many debates about discrimination of all sorts

22   in our society.  And I -- I generally believe that

Page 424

1   these forms of discrimination are real.  They're

2   often subtle.  They're -- you know, that -- that

3   just -- it's -- it's not that this is even

4   something that it occurs to me to even doubt or

5   question, the fact that somebody -- not what --

6   that somebody could reasonable and -- and

7   rationally expect or fear this.

8   Q   So are you aware of -- and just to start

9   you out, Mr. Dague had asked you about this.

10       When the Safe Act was passed, it included

11   some of the exemptions that you talked about,

12   right?

13   A   Uh-huh.

14   Q   Are you aware of any other provisions

15   that were enacted as part of the Safe Act?

16   A   So I'm -- yeah, I'm sure there's more

17   than I can recall.  I --

18   Q   You don't have to list them.  I just was

19   wondering --

20   A   Yeah, and I believe there was some

21   controversy about this issue of renewal.  And I

22   don't remember if it was the Safe Act that

Page 425

1   intervened on that.

2   Q   Do you know whether there were counties

3   and localities within New York State that issues

4   official decrees if they wouldn't comply with the

5   Safe Act?

6   A   I -- I vaguely recall running across some

7   discussion of this.

8   Q   Do you know how many did that?

9   A   I don't recall that.

10   Q   Do you know what localities did that?

11   A   Don't recall that.

12   Q   Do you know whether any government

13   officials said that they would comply with the Safe

14   Act?

15   A   I seem to recall some controversy, which

16   I believe was a state legislator who got involved.

17   But I don't remember any detail.

18   Q   Did you look into this issue at all?

19   A   By issue, you mean?

20   Q   Backlash to the enactment of the Safe

21   Act.

22   A   Enough to observe that there was some.

Page 426

1 And it wasn't clear to me the relevance of that to
2 a degree.
3    Q   Did you read any articles about the
4 prevalence of anti Safe Act signs put up on
5 people's yards?
6    A   Anti Safe Act, you said?
7    Q   Signs.
8    A   Oh, signs.  I did not read anything about
9 the prevalence of those signs.
10    Q   Are you familiar with that issue at all?
11    A   The sign debate?
12    Q   Yes.
13    A   I am not aware of the debate about signs.
14    Q   Not a debate.  Excuse me, but --
15    A   Okay.
16    Q   -- that any articles or publications that
17 address vocal opposition to the Safe Act.
18    A   I candidly observed that there had been
19 some controversy.  But no, this was not a deep area
20 of research.
21    Q   Do you know how many New Yorkers belong
22 to the NRA?

Page 427

1    A   I do not.
2    Q   Gun Owners of America?
3    A   I do not.
4    Q   Any other gun or Second Amendment
5 advocacy group?
6    A   I do not.
7    Q   Do you know how many New Yorkers belong
8 to the New York State Rifle and Pistol Association?
9    A   I do not.
10    Q   Do you know Doe Number 2's job?
11    A   I do not.
12    Q   Do you know his age?
13    A   I don't.
14    Q   Do you know anything about his social
15 life, other than the garden club?
16    A   I don't.
17    Q   Okay.
18       MS. CONNELL:  If you give me some time to
19 look through, I can give you --
20       MR. CHUCK COOPER:  Good.  Because we're
21 right up against it.
22       MR. DAVIS COOPER:  Let me see here.

Page 428

1    Yeah, I mean --
2       MS. CONNELL:  Are you guys following it?
3       MR. CHUCK COOPER:  I mean if you tell us
4 what you need, you know, we'll --
5       MR. DAVIS COOPER:  Why don't you think
6 about that.
7       MS. CONNELL:  Why don't you give Harris
8 and I a few minutes.  Thanks.
9       (Recess)
10 BY MS. CONNELL:
11    Q   I just have a couple more questions for
12 you, Doctor.
13    A   Sure.
14    Q   When Mr. Dague was questioning you
15 earlier, you talked about comparisons in gun
16 violence and statistics between New York and its
17 neighboring states --
18    A   Oh, yeah.
19    Q   -- correct?
20    A   Yes.
21    Q   Do you know the rates of gun violence in
22 New York versus say Louisiana or Texas?

Page 429

1    A   I can't name you the specific numbers,
2 but they're lower in New York.
3    Q   Right.
4    A   As are accidental drowning by pools,
5 because New Yorkers own a small fraction of pools
6 in New York as well --
7    Q   Right.  So when --
8    A   -- compared to those states.
9    Q   -- when I get to questioning you on
10 pools, that's going to be helpful --
11    A   Yeah.
12    Q   -- information --
13    A   Yeah.
14    Q   -- but I'm not there yet.
15    A   I hear you.
16    Q   So New York has a lower incidence of gun
17 violence than in those states; is that correct?
18    A   That's correct.
19    Q   Statistically significantly lower
20 incident?
21    A   My belief is -- again, I can't quote you
22 to numbers -- that it has statistically significant

Page 430

1 lower rates of gun violence and lower rates of gun

2 ownership.

3     Q    Okay.  You were talking about doing work

4 in relation to, I think, John Donohue's work; is

5 that correct?

6     A    Right.

7     Q    And that was working on, if I understood

8 you correctly, the binary sort of analyses between

9 shall issue states and other states; is that --

10     A    Yeah, it --

11     Q    -- right?

12     A    -- was basically trying to improve the

13 granularity of the data so you can get more

14 variation to ask more sophisticated econometric

15 questions.

16     Q    Okay.  Have you ever studied the reasons

17 that New York has a lower rate of gun violence than

18 some other states?

19     A    So there's -- it seems to be one obvious

20 reason.

21     Q    I'm not asking one --

22     A    Right.

Page 431

1     Q    -- obvious reason.

2     A    Okay.

3     Q    I'm asking you if you've studied that.

4     A    Only casually, I'd say.

5     Q    Okay.

6     A    I've certainly read things about this.

7 It wasn't the subject of my report.

8     Q    Okay.  Have you ever published on that

9 topic?

10     A    Not on that topic.

11     Q    Okay.

12     MS. CONNELL:  Thank you, sir.  That's all

13 I have.

14

15

16     (Whereupon at 6:20 p.m., the deposition

17 of WILLIAM E. ENGLISH, Ph.D. concluded.)

18

19

20

21

22

Page 432

1         ACKNOWLEDGMENT OF DEPONENT

2     I, WILLIAM E. ENGLISH, Ph.D., do hereby

3 acknowledge I have read and examined the foregoing

4 pages of testimony, and the same is a true,

5 correct, and complete transcription of the

6 testimony given by me, and any changes or

7 corrections, if any, appear in the attached errata

8 sheet signed by me.

9

10

11

12

13

14

15

16

17

18

19

20

21

22 Date              WILLIAM E. ENGLISH, Ph.D.

Page 433

1     CERTIFICATE OF NOTARY PUBLIC

2     I, BARBARA A. HUBER, CSR, the officer

3 before whom the foregoing deposition was taken,

4 do hereby certify that the witness whose

5 testimony appears in the foregoing deposition

6 was duly sworn by me; that the testimony of

7 said witness was taken by me in stenotypy and

8 thereafter reduced to print under my direction;

9 that said deposition is a true record of the

10 testimony given by said witness; that I am

11 neither counsel for, related to, nor employed

12 by any of the parties to the action in which

13 this deposition was taken; and, furthermore,

14 that I am not a relative or employee of any

15 attorney or counsel employed by the parties

16 hereto, nor financially or otherwise interested

17 in the outcome of this action.

18

19

20 BARBARA A. HUBER, CSR
Notary Public, in and for

21 the District of Columbia

22 My Commission Expires:  March 14, 2022

William E. English, Ph.D.                                                    9/13/2019
                        Washington, DC                                      Page 110

Notice Date: 09/18/2019

Deposition Date: 9/13/2019

Deponent: William E. English, Ph.D.

Case Name: Doe No. 1 et al v. Putnam County et al

Page:Line              Now Reads                    Should Read

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____

_____  _____    _____