UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN DOE NO.1; JOHN DOE NO. 2; and NEW
YORK STATE RIFLE AND PISTOL ASSOCIATION,
INC.,

                                        Plaintiffs,

                    - against -

PUTNAM COUNTY; and MICHAEL C.
BARTOLOTTI, in his official capacity as County Clerk
for Putnam County,

                                        Defendants,


STATE OF NEW YORK ATTORNEY GENERAL,

                                        Intervenor.

---

No. 16-CV-8191 (KMK)


**MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR
ATTORNEY GENERAL'S MOTION TO PRECLUDE PLAINTIFF'S PROPOSED
EXPERT EVIDENCE PURSUANT TO FED. R. EV. 702 and 703**

LETITIA JAMES
Attorney General of the State of New York
28 Liberty Street
New York, New York 10005
(212) 416-8965
Monica.Connell@ag.ny.gov
Harris.Dague@ag.ny.gov

MONICA CONNELL
HARRIS DAGUE
Assistant Attorney General
      *Of Counsel*

# TABLE OF CONTENTS

Page

**Preliminary Statement**……………………………………………………...…………………1

**Facts**……………………………………………………………………………………………2

**Argument**………………………………………………………………………………………4

    **THE ENGLISH REPORT SHOULD BE EXCLUDED BECAUSE
DR. ENGLISH HAS NO RELEVANT SPECIALIZED EXPERTISE
OR EXPERIENCE AND HIS REPORT IS NOT BASED ON
RELIABLE IDENTIFIED DATA, OR A RELIABLE, RELEVANT
OR EVEN COHERENT
METHODOLOGY**……………………………………………………….....4

    **A.  Standard**…………..……………………………………………………….5

    **B.  Dr. English Lacks the Necessary Training, Expertise or
Specialized Knowledge Necessary to Render his Opinions
Admissible Under Fed. R. Ev. 702 and 703**…..………………………………6

        1.  Dr. English Offers Purported Expert Legal Opinions Without Any
Legal Expertise, Training, or Specialization……………………………………6

        2.  Dr. English Offers Expert Opinions Relating to the Intersection
of Domestic Violence and Firearms Laws and Policy But Has
No Specialized Training, Experience or Knowledge in this Field…………………9

        3.  Dr. English Opines About the Need for Information on Gun Ownership
in Relation to Suicidal or Troubled Youths But has No Training,
Expertise or Experience in Any Relevant Discipline to Support his Opinions……10

        4.  Dr. English Offers Opinions in Other Areas in Which He has No
Valid Training, Expertise or Experience to be of Assistance to the Court………...11

    **C.  The Court Should Additionally Preclude Dr. English's Expert Evidence  Because
His Opinions Are Not Based Upon Facts, But Rather Unsupported Assumptions,
and He Has Not Applied Any Reliable Methodology in Conducting His Cost-
Benefit Analysis or Other Conclusions**………………………………………13

**Conclusion**…...……………………………………………………………………20

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256 (2d Cir. 2002)………………………..5

Bee v. Novartis Pharm. Corp., 18 F. Supp. 3d 268 (E.D.N.Y. 2014)……………………………..4

Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993)………………………passim

Gen. Elec. Co. v. Joiner, 522 U.S. 136 (1997)………………………………………………………..5

In re Zyprexa Products Liability Litigation, 489 F. Supp. 2d 230 (E.D.N.Y. 2007)……………...6

Kuhmo Tire Co. v. Carmichael, 526 U.S. 137 (1999)……………………………………..6, 13, 20

Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736 (2d Cir.1998)…………………4

Raskin v. Wyatt Co., 125 F.3d 55 (2d Cir.1997)……..………………………………………...4

State v. United Parcel Serv., Inc., 2016 WL 4735368, at *3 (S.D.N.Y. Sept. 10, 2016)…………4

### Statutes and Rules

Federal Rules of Evidence 702…………………………………………………....2, 5, 6, 13, 18

Federal Rules of Evidence 703………………………………………………………2, 6, 13, 18

Penal Law 400.00………………,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,,…………………………………..Passim

Intervenor Letitia James, as Attorney General of the State of New York ("Intervenor" or "Attorney General") respectfully submits this memorandum of law in support of her motion to preclude the proposed expert evidence submitted by Plaintiff John Doe # 2 ("Plaintiff") in support of his motion for summary judgment.

## Preliminary Statement

Plaintiff has proffered the rebuttal expert report of William English, Ph.D. ("English Rep.") in support of his motion for summary judgement.  Declaration of Harris Dague ("Dague Decl.") in Support of Summary Judgment, Ex. 13[1].  In his 22-page report, Dr. English offers numerous opinions on a variety of topics.   But most of his opinions are in the service of a novel cost-benefit analysis he claims to have performed to assess the constitutionality of Penal Law § 400.00(5).  This statute, law in New York for sixty years, provides that the name and address of firearms licensees will be deemed public records unless the licensee applies for and receives one of a number of available exemptions.

According to Dr. English's "cost-benefit" analysis, New York's stated interests are not "important" enough to outweigh the cost to gun owners' privacy until the State can demonstrate that more minors or domestic violence victims have died as a result of handguns than have died from AIDS over the last 30-years.  Dague Decl. Exs. 6-7 [Deposition of William English ("English Dep.")]  at 159-163.

Q [AAG Dague]: What I'm wondering is by proposing that [cost-benefit analysis], you must have a line where you believe the benefits outweigh the cost.  And what is that line that the state would have to hit for you to change your opinion?

A [Dr. English]:  Sure.  So if it – if it saved more lives than had died from AIDS over the last 30 years, then it would at least be above the standard that we've already

---

[1] To avoid redundancy of filing, Intervenor relies on the same exhibits filed in support of Intervenor's Motion for Summary Judgment.  Specifically, this memorandum of law cross-cites to Dague Declaration Exs. 1-13, and Zeoli, Hamilton and Sege Declarations exhibit A. Should the Court prefer Intervenor to refile these declarations and exhibits separately in support of this motion, Intervenor will comply.

stated.  It at least has to exceed that standard. Id. [161:7-18]

…

Q [AAG Dague]:  So in order for you to change your opinion, the State would have to demonstrate that on a national level that more people have died from domestic – just died – from domestic violence and/or unintentional gun deaths of children than how many died from AIDS over the last 30 years to justify this law, is that fair?

A: [Dr. English]:  I would say at least – so this is a – a lower boundary, at least, given our existing legal – yeah. Id., pp. 162-63.

Under Dr. English's unique approach, almost no public safety laws would pass constitutional muster.

Dr. English, who identifies himself as a political scientist, is not an expert in any field or subject which would be of help to this Court and his lack of expertise demonstrably undercuts his conclusions and opinions.  In reaching his extraordinary position on the costs and benefits of § 400.00(5), he has not followed any acceptable methodology, ignored inconvenient facts and has relied upon unreasonable assumptions.

For these and other reasons set forth below, it is respectfully submitted that Dr. English's proposed expert opinion does not meet the reliability standard under *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993) and Rules 702 and 703 of the Federal Rules of Evidence ("Fed. R. Ev.").

## **FACTS**

Plaintiff mounts a facial constitutional challenge to New York's Penal Law § 400.00(5) which mandates that unless an applicant or possessor of a firearms license (a "licensee") qualifies for one of an enumerated list of exceptions, the licensees name and address will be a "public record."

New York State has proffered evidence and expert opinions that making the names and addresses of license holders public records, with appropriate exemptions, advances important

government public safety interests.  These include helping the state address firearms related homicides, accidental shootings, and suicides in children; reduce firearms-related domestic violence; promote an open government and allow for appropriate review of government action in regard to firearms licenses; and as comprising part of the State's intricate regulatory structure relating to firearms that the Legislature has determined  "must be the cornerstone of a safe society". See, e.g., Dague Decl. Ex. 10 [New York Sponsors Memorandum, 2013 S.B. 2230]; see also https://www.nysenate.gov/legislation/bills/2013/s2230 (last accessed 3/10/2020) [New York Bill Jacket, 2013 A.B. 2230] ("In the wrong hands, guns are weapons of untold destruction and heartbreak: family and community members are taken from us in an instant; mass shootings shatter our sense of safety in public spaces; street crimes plague our neighborhoods. Nationwide, gun violence claims over 30,000 lives annually. While the Second Amendment protects the right to keep and bear arms, the Supreme Court has said that that right is "not unlimited.")

As set forth below, the State proffered distinguished and experienced experts in child safety and injury, firearms use in domestic violence, child protection in the law and open government as part of its evidentiary proffer.

In rebuttal, Plaintiff has identified Dr. English.  Dr. English is not an expert in any relevant field.  He has no developed expertise or specialized knowledge in any discipline that would be helpful to the Court in this matter and follows no recognized or reliable methodology that would meet the standard for admissibility.  It is respectfully submitted that given the lack of foundation, expertise and methodology upon which to base his many opinions, Dr. English's report is of little use or merit and should be disregarded by this Court.

## ARGUMENT

## THE ENGLISH REPORT SHOULD BE EXCLUDED BECAUSE DR. ENGLISH HAS NO RELEVANT SPECIALIZED EXPERTISE OR EXPERIENCE AND HIS REPORT IS NOT BASED ON RELIABLE IDENTIFIED DATA, OR A RELIABLE, RELEVANT OR EVEN COHERENT METHODOLOGY

On a motion for summary judgment, a court may only consider admissible evidence.  Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir.1998). Thus, it is appropriate for district courts to resolve questions of the admissibility of expert evidence on summary judgment and exclude the same if it is inadmissible under the Federal Rules of Evidence and the framework articulated in Daubert and its progeny.  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir.1997); Bee v. Novartis Pharm. Corp., 18 F. Supp.3d 268, 299 (E.D.N.Y. 2014).  Intervenor now moves pursuant to preclude he opinions of Dr. English in their entirety.

### A.     Standard

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Under the principles of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and the Federal Rules of Evidence, a court's inquiry into whether an expert's testimony is admissible "includes a review of (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact."  State of New York v. United Parcel Serv., Inc., 2016 WL 4735368, at *3 (S.D.N.Y. Sept. 10, 2016) (Forrest, J.).  In assessing the

reliability of a proposed expert's testimony, courts focus on "the indicia of reliability identified in [Fed. R. Evid.] 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods' and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.' " Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702 and discussing Daubert).[2] "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Id. at 267.

Moreover, in assessing how an expert applied his or her methodology, there must be an understandable and logical link between data and the expert's conclusions. "[C]onclusions and methodology are not entirely distinct from each other . . . . [N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) (upholding district court's exclusion of expert's testimony on basis that studies on which expert relied failed to support his conclusion).

---

[2] The Supreme Court has also "identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique 'can be (and has been) tested,' (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation,' and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." Amorgianos, 303 F.3d at 266 (quoting Daubert, 509 U.S. at 593-94) (citations omitted). In addition, as the Second Circuit explained, "the Daubert inquiry is fluid and will necessarily vary from case to case." Id. As discussed in text, in this case, a number of factors, specific to the issues before the Court, and the nature of the inquiry here, render the English Report unreliable.

**B.      Dr. English Lacks the Necessary Training, Expertise or Specialized Knowledge  Necessary to Render his Opinions Admissible Under Fed. R. Ev. 702 and 703.**

After determining whether a proposed expert has the requisite qualifications, the admissibility standard set forth in Rule 702 imposes a two-fold task of ensuring that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Daubert, 509 U.S. at 597.   In Kuhmo Tire Co., the Court extended Daubert's general holding to testimony "based on 'technical' and 'other specialized' knowledge." 526 U.S. at 141. Thus, because the Court's "gatekeeping" obligation applies equally to all types of expert testimony, the Court must make certain that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kuhmo, 526 U.S. at 152. "Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case" can serve as "grounds for rejection of expert testimony." In re Zyprexa Products Liability Litigation, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007).

While Dr. English has impressive academic credentials, he fails to meet the criteria for admissible evidence because he lacks the scientific, technical, or other specialized knowledge necessary to help the Court resolve the cross-motions for summary judgement.  Further, he proffers opinions on topics in which he lacks any expertise which demonstrably undermines the opinions he proffers.  This Court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152.

In addition to other evidence, the State proffered three expert witnesses in this case: Dr.

Robert Sege, a board certified pediatrician, a specialist in pediatric injury prevention, member of the American Academy of Pediatrics, and co-lead author of the AAP's position on firearms and children; Dr. April Zeoli, a doctor of public health and a nationally recognized expert in the intersection of domestic violence and firearms policies; and Prof. Marcia Hamilton, an expert on constitutional and child safety-related law as well as open government related issues.  Plaintiff proffered the report of Dr. English in rebuttal to all three experts.  But Dr. English has no developed expertise or specialized knowledge in any field that would be helpful to the Court in this matter or meet the standard for admissibility.

### 1. Dr. English Offers Purported Expert Legal Opinions Without Any Legal Expertise, Training, or Specialization.

Dr. English offers varied and far ranging expert legal opinions.  For example, he opines about the meaning, interpretation and application of the term "harassment" in Penal Law § 400.00(5)'s catchall exception. According to his report:

> handgun permit applicants who wish to obtain an exception because of concerns about 'unwarranted harassment' would have to establish, at least, that they believe they will be subject to stalking, fear of physical attack, or repeated attempts to alarm and seriously annoy them and then, further, that these forms of harassment are 'unwarranted.' This is a high bar, and the law is not clear as to what counts as sufficient reasons to believe that one will be subject to these legally defined forms of harassment."

Dague Decl. Ex. 13 (English Rep. at 3).  He then uses this assumption upon which to base his extraordinary cost-benefit analysis which is at the heart of his report.  But Dr. English admittedly "assumes" that the use of "harassment" in the catchall exception to Penal Law § 400.00(5)(b) means the offenses of Harassment in the 1st or 2nd degrees. See Id.; Dague Decl. Exs. 6-7 (English Dep. pp. 379- 380) ("I searched New York law, harassment, definition, and his is what came up"; "Q: And so you conclude that the definition of harassment in the first degree and harassment -- or harassment in the second degree is the definition of the term "harassment" used in Penal Law 400;

is that correct? A: That is my assumption.").

Dr. English admittedly does not know if that is the interpretation the State or any court has embraced. Id. (English Dep. p. 380).  Indeed, he has no legal training or basis, and had performed no legal research, to opine on this topic.  Id., pp. 394-95; 412-413.  Asked whether the catchall exception called for a licensee to state his or her subjective belief, Dr. English seemed to agree but, despite having offered an opinion on the meaning of the law in his report, noted "I'm not a lawyer... It's unclear to me what exactly constitutes -- as a lay person reading this language, it seems to involve asserting some belief that one of these conditions obtain… So I'm not a lawyer. It struck me as an unclear definition." Id., pp. 410-12.

Dr. English simply lacks the fundamental education, training, and experience to proffer this or other expert opinions in the law.  When asked if he has had formal legal training, English admits that he does not have a Juris Doctor degree, but asserts that he "was the head TA" for one semester in 2008 for an undergraduate constitutional law class taught by Erwin Chemerinsky – of whom he notes "I'm told is a leading constitutional law scholar." Id. pp 44-46. When asked whether that was his only exposure to legal training, Dr. English responded that "It depends exactly what you mean by legal training. …I'm a political scientist by training." Id.  Dr. English opines on the constitutionality of § 400.00(5) but when asked "[d]o you consider yourself an expert in constitutional law?" responded "I'd consider myself informed." Id., pp. 47-48, see also pp. 49-54.

He discusses the "high bar" under New York law to obtain an exemption from public disclosure and a "lack of clarity" that could subject an applicant for an exemption to criminal sanction. Dague Decl. Ex. 13 (English Rep. pp. 3).  But he is utterly unfamiliar with the process of applying for or obtaining an exemption, who licensing officers are, the forms used, the information solicited and knows of no one who has been subject to such a criminal sanction.  Dague

Decl. Exs. 6-7 (English Dep. pp. 407-408, 401).  Dr. English's legal opinions are undercut and

undone by his lack of expertise, education or specialized knowledge in this field.[3]

    2.  **Dr. English Offers Expert Opinions Relating to the Intersection of Domestic Violence and Firearms Laws and Policy but Has No Specialized Training, Experience or Knowledge in this Field**.

Intervenor's expert Dr. Zeoli is one of the nation's leading experts on the intersection of

domestic violence and firearms law.  See Zeoli Declaration Ex. A.  at 1.  Dr. Zeoli offers opinions,

for example, on why it can be important for a victim of intimate partner violence to have

knowledge of whether his or her abuser has a firearms license, both to increase the chances that

they will be able to bear their burden to prove the necessity for a firearms restriction in an order of

protection and to assess the risk of danger should an abuser newly obtain a handgun. Id., pp. 2-3.

Dr. English endeavors to rebut these opinions as part of his experiment in assessing the

costs and benefits of the law.  Dague Decl. Ex. 13.  Dr. English offers opinions about intimate

partner, or domestic violence, the process for applying for an order of protection and whether it

would benefit of the victim of domestic violence to be able to determine if an abuser likely has a

handgun.  See Id. pp. 12 ("the benefits that Dr. Zeoli claims are advanced by Penal Law

---

[3] This last failure is particularly significant.  Penal Law 400.00(5)(b) provides that the State Police must make a form which allows a gun licensee or applicant to request an exception mandating that his or her name not be made public and offering the licensee or applicant "an opportunity to specify the grounds on which he or she believes his or her application information should not be publicly disclosed."  The State Police form – which is itself confidential and non-public under Penal Law 400.00(5)(d) – provides such a space, a literal blank where, if an applicant is not certain whether he or she qualifies for an exception, they can lay out their concerns and let the licensing officer decide.  "Upon receiving a request for exception from disclosure, the licensing officer shall grant such exception, unless the request is determined to be null and void" under subdivisions (b) or (c) of Penal Law §400.00(5).  Accordingly, an applicant like Plaintiff, can lay out their concerns about their community and retaliation, censure, stigma, discrimination, etc. and indicate that they are not certain whether the same constitutes unwarranted harassment but that they believe their information should be maintained as confidential.  Their license is maintained as confidential while the request is pending and, if it is denied, they are entitled to seek review pursuant to Article 78 of the New York Civil Practice Law and Rules and the information remains confidential during the pendency of that proceeding.  See Penal Law § 400.00(5)(g).  Dr. English opines about the danger posed to an applicant for an exception if it is determined that they misstated their asserted basis for the catchall exemption, but he admitted the standard for the catchall exemption is "subjective" (English Dep. p. 410), therefore an applicant need not face the risk and danger he posits.  There is simply no basis for his assertion.

§400.00(5)(a) - namely, the ability of petitioners for an order of protection to determine whether a defendant has a handgun license - can clearly be secured without making the names and addresses of all licenses holders a matter of public record. Given that this is the case, it is my opinion that no important governmental objective is served by the disclosure requirements of Penal Law §400.00(5)(a), at least with regard to intimate partner violence.").

But Dr. English has no relevant expertise in the domestic violence field nor does he use any reliable or sound methodology in reaching this conclusion. Dague Decl. Exs. 6-7 (English Dep. pp. 391) ("I do not consider…myself an expert in domestic violence, reporting psychology"); 416 (denying knowledge regarding the use of legally possessed firearms in domestic violence or the increased mortality associated when a firearm is present in a domestic violence incident).   He admittedly has no experience or expertise in orders of protection, in obtaining a firearms restriction, or on who would have access to forearms ownership information in that context.   See, Id., (English Dep. pp. 349-50).   Accordingly, his assessments are based upon speculation and guesswork.

3.  **Dr. English Opines About the Need for Information on Gun Ownership in Relation to Suicidal or Troubled Youths But has No Training, Expertise or Experience in Any Relevant Discipline to Support his Opinions.**

Dr. English opines about efforts to minimize suicides in children, indicating that he does not understand the focus on guns in these situations and minimizing the need to include identifying access to guns in regard to troubled children.  Dague Decl. Ex. 13 (English Rep. 12-13); see also Dague Decl. Exs. 6-7 (English Dep. p. 387) ("I think troubled kids should get attention regardless of whether there is a gun in their house.").   But in making such argument, he ignores the fact that the information provided under Penal Law § 400.00(5) is identified by Intervenor's experts as one tool in a toolkit to allow parents, school personnel and others to address this serious problem.

Worse, Dr. English openly admits that he has never studied and is not an expert in the field of suicide prevention nor the use of firearms in suicide, nor in studying children with emotional disturbances.   Dague Decl. Exs. 6-7 (English Dep. pp. 373-374).   His opinions and testimony thus display a shocking lack of understanding of the unique and dangerous role that firearms play in juvenile suicides.   See, e.g., Sege Declaration Ex. A. at 2 (noting that the available means for a suicide attempt matter as approximately "90% of suicide attempts using a firearm result in death, far higher than" other methods and that suicide is often an impulsive act, as almost 90% of people who survive an attempt do not ultimately die from suicide. Because a "suicide attempt is often particularly impulsive among children, youth, and young adults," it is of crucial importance to reduce access to legal means to a young person in crisis.); Hamilton Declaration Ex. A at 2 (Noting that suicide is the second leading cause of death of American youth, a function of the lethality of guns as a medium, and that a study of suicide attempters and completers demonstrated that "75% of the guns used were stored in the residence of the victim, friend, or relative (Grossman et al., "Gun Storage Practices and Risk of Youth Suicide and Unintentional Firearm Injuries", JAMA Pediatrics, 2005).").   Once again, Dr. English's lack of relevant study and experience render his proffered opinions unreliable.

### 4. Dr. English Offers Opinions in Other Areas in Which He has No Valid Training, Expertise or Experience to be of Assistance to the Court.

Dr. English's report is replete with other examples of his opining about issues in which he lacks expertise. While offering opinions based upon his understanding of New York's firearms-related laws, Dr. English did not know for sure, for example, whether firearms licenses have to be renewed, who licensing officials are, how to apply for an exception under Penal Law 400.00(5); how a licensing official would know if a licensee had been convicted of an offense or involuntarily committed out of state; or what federal law if any made it illegal to possess a firearm following an

involuntary commitment.  See Dague Decl. Exs. 6-7 (English Dep. pp. 400-405, 407-08).  His lack

of knowledge of New York's regulatory framework thus undercut his assessments of § 400.00(5).

Dr. English admits that he contests Prof. Hamilton's conclusions in his report. Id. (English

Dep. pp. 377).  While offering the expert conclusion that Penal Law 400.00(5) should not survive

because its costs outweigh its benefits, Dr. English largely ignored the State and Prof. Hamilton's

points about the benefits of having access to open government information, particularly where

information pertaining to firearms-related violence has been limited, and ignored evidence of

instances where public disclosure laws have been used appropriately to monitor firearms licensing.

Dr. English would nether clearly admit nor deny that he considers himself to be an expert in open

government.  Id. (English Dep. pp. 392-393) ("I would say I'm somewhat familiar with that

movement…I know more than most academics about it… I'm familiar with people who work in

…open government."). Although aware of some "limitations on types of research that some

agencies can fund" relating to the causes of gun violence, such as the Tiarht and Dickey

Amendments,[4] Dr. English was unaware of the origins of such limitations or prohibitions and was

not familiar with important federal provisions in this regard.  Id. (English Dep. pp. 394-95).  He

was not familiar with and had not studied articles cited by Prof. Hamilton, although he "may have

glanced at them."  Id.  Neither Dr. English's intellectual curiosities nor his acquaintance with

---

[4] The Dickey Amendments are federal provisions which have, controversially and for more than 20 years, limited federal funding to the Centers for Disease Control which might be used to promote gun control, chilling gun violence research.  Allen J. Rostrum, *The Dickey Amendment on Federal Funding for Research on Gun Violence: A Legal Dissection,* Am J Public Health. 2018 July; 108(7): 865–867 (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5993413/).  They were recently somewhat tempered. Id. The Tiarht Amendments are similarly well known and controversial federal provisions which prohibit, except in narrow circumstances, the Bureau of Alcohol, Tobacco and Firearms from releasing firearms trace data, which may be used by localities, researches and others to study gun violence.  See, e.g., Leigh Ann Caldwell, *ATF under fresh Hill scrutiny in the wake of mass shootings* (https://www.nbcnews.com/politics/congress/atf-under-fresh-hill-scrutiny-wake-mass-shootings-n1041026).  Dr. English lacked familiarity with these controversial and well-known provisions which have impacted gun violence related research and, some assert, chilled gun-related speech.

people who work in this discipline, particularly given his failure to even read relevant material cited in a report he purports to rebut, render him qualified to opine in this field.

Here, it is clear that Dr. English, does not have the requisite qualifications required by the admissibility standard set forth in Rule 702. <u>Daubert</u>, 509 U.S. at 597. Given the examples above, it cannot be said that in his expert opinions, Dr. English "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kuhmo</u>, 526 U.S. at 152. Accordingly, on this ground alone his opinions should be rejected.

**B.   <u>The Court Should Additionally Preclude Dr. English's Expert Evidence Because His Opinions Are Not Based Upon Facts, But Rather Unsupported Assumptions, and He Has Not Applied Any Reliable Methodology in Conducting His Cost-Benefit Analysis or Other Conclusions.</u>**

Dr. English's conclusions are also subject to preclusion because he has simply not applied any reliable methodology to support them. He is an example of an <u>ipse dixit</u> expert: his opinions are based on generalized intelligence and strong beliefs on certain subjects and are "expert" and true because he says that they are. But a closer look at his report and opinions reveal that he has ignored inconvenient facts, relied upon unsustainable assumptions, created impractical and inapplicable standards and tests, and otherwise utterly failed to meet the admissibility criteria for expert evidence.

Dr. English attempts to attack the constitutionality of Penal Law § 400.00(5) and the validity of Intervenor's three experts using a unique, unreliable and *ad hoc* "cost benefit" analysis. English uses his questionable assessments to reach the incredulous and callous premise that unless § 400.00(5) "saved [at least] more lives than had died from AIDS over the last 30 years" it cannot pass constitutional muster. Dague Decl. Exs. 6-7 (English Dep. 161-163); <u>see also</u> Dague Decl. Ex. 13 (English Rep. pp. 1, 2).

Dr. English purports to weigh the costs and benefits of the § 400.00(5) to reach his

conclusion that the law is not constitutional, but he lacks any recognized reliable methodology, bases his opinions on assumptions, cherry picks information, blithely dismisses or diminishes the effects of gun violence, and ignores evidence that weigh against his preferred outcome.  Thus, even if his personal cost benefit analysis methodology were reliable and scientifically acceptable (which it is unquestionably not), his application of it was so flawed that it must be rejected.

For example, Dr. English weighed the "costs" of the law in terms of a loss of privacy. But to weigh this factor, he relied upon his conclusions and assumptions about what and how the exemptions from public disclosure are interpreted and applied. He opines that

> handgun permit applicants who wish to obtain an exception because of concerns about 'unwarranted harassment' have to establish, at least, that they believe they will be subject to stalking, fear of physical attack, or repeated attempts to alarm and seriously annoy them and then, further, that these forms of harassment are "unwarranted." This is a high bar, and the law is not clear as to what counts as sufficient reasons to believe that one will be subject to these legally defined forms of harassment. This lack of clarity can create dangers for applicants seeking exemption under this clause, because if the applicant is deemed to have knowingly provided false information as part of the exemption request, he or she can be subject to penalties.

Dague Decl. Ex. 13 (English Rep. p. 3).  For the reasons set forth in the accompanying Intervenor Memorandum of Law in Support of Motion for Summary Judgment, there is no reliable basis for Dr. English's assertion regarding the meaning of the law.  But in addition, as set forth, supra, Point B(1), Dr. English has no formal legal training, did no real legal research, did not know whether and how New York had interpreted the exemptions, did not know how one applies for an exemption, who makes the determination, or whether anyone had ever been subject to such punishments.   Thus, his assertion that obtaining an exemption is a "high bar" is utterly unsupported.

Dr. English opines that licensees whose names were disclosed would be at greater risk of

burglary.  Dague Decl. Exs. 6-7 (English Dep., p. 199).  When asked for the basis for this belief, he cited "common sense," and two instances where gun shops outside of New York were burglarized by having vans driven into them.  Id. at 199-202.  English was opining about a possible negative effect of the challenged statute without having performed even rudimentary research on the same.  He does not know of any incident where a burglar used Penal Law § 400.00(5).

Dr. English argues that increasing political partisanship which could lead to "discrimination, stigma, and ostracism" in the Plaintiff's community, at work, and economically should gun ownership become publicly known.  Dague Decl. Ex. 13 (English Rep. pp. 2, 3, 4). Dr. English's formulation of this potential "cost" of the statue fails for a number of reasons.  First, if Plaintiff believed this to be true, he could easily qualify for an exemption under Penal Law § 400.00(c).  Additionally, Dr. English did not know whether this argument had any application to the facts of this case. He was totally unfamiliar with any negative consequences that Plaintiff Doe No. 2 actually experienced, observed or feared should gun ownership become known.  He had never spoken to Plaintiff and had not read Plaintiff's deposition.  Dague Decl. Exs. 6-7 (English Dep. pp. 12, 218, 256-57, 415, 420-21, 424-425, 426-27).  Other than Plaintiff's testimony, Dr. English's opinion that Penal Law 400.00(5) would make firearms licensees fear discrimination if their names were made public, Dr. English cited one article on partisan divides and "colloquial conversations" with gun owners over the years.  Id. pp. 259-61.

Dr. English was unaware that Plaintiff concedes that he does not have any firm evidence of exclusion from the garden club or loss of community standing should he be known as a gun owner, [Dague Decl. Ex. 8 Doe Dep. p. 78:8-19]; that Plaintiff acknowledges that community members can be ostracized for many different reasons – including things as trivial as "if you don't have your lawn looking great", [Id. at 80: 10-13]; that notwithstanding an alleged fear of ostracism,

Plaintiff and his wife nevertheless ask about gun ownership before their children have a playdate at an unfamiliar house, [Id., pp. 75-78]; that Plaintiff has friends in his community who are firearms owners have not been ostracized, [Id., p. 68]; that Plaintiff's neighbors, including the widow of noted conservative Roger Ailes, solicited his participation in this lawsuit, [Id., pp. 130, 136]; and that no one has directly expressed to Plaintiff that they would not look too kindly on gun ownership and he knows of no one who spread that sentiment, [Id., p. 78].  Dr. English was similarly unaware of fundamental facts about Putnam County, the county in which Plaintiff resides.  In fact, Dr. English testified that he did not know which County Plaintiff resided in and did not know "anything about the politics of Putnam County".  Id. (English Dep. p. 256).[5]  Thus Dr. English's speculation about the potential "costs" of the statute have no basis and his methodology is not reliable.

Dr. English's methodology for his cost benefit analysis of the statute is unreliable for numerous other reasons.  For example, Dr. English inexplicably excludes everything but firearm deaths from his cost benefit analysis.  His assessment therefore excludes the personal and societal costs of firearms-related physical injuries, maiming, trauma, and threats from his consideration because they "pale in comparison to death."  Id. (English Dep. 145, 146-149).

Even regarding deaths, Dr. English's methodology is not sound.  For example, he argues that the number of youths unintentionally killed by firearms in New York is "vanishingly small"

---

[5] In fact, Putnam County is primarily Republican, home to at least two hunting or hunting and fishing clubs (one of which Plaintiff belongs to, Plaintiff Dep. pp. 132-33), multiple gun rights advocacy groups including the Putnam County Firearms Owners Association (http://www.pcfoa.org/home.html), and Putnam County SCOPE(https://www.facebook.com/PutnamCountySCOPE/); see also https://www.nysrpa.org/putnam-leaders-firearm-owners-continue-fight-against-gun-laws-and-disclosure/.  Most government officials in and for Putnam County are Republican and many have openly spoken out in a negative manner about some State gun laws.  See https://highlandscurrent.org/2017/02/03/county-officials-may-hate-gun-laws-follow/.  In fact, according to a news report, Defendant County Clerk recommended that gun owners take advantage of the  ""opt out" of the disclosure of the information on their permits under a catch-all exemption for anyone" for anyone "who "has reason to believe that he or she may be subject to unwarranted harassment upon disclosure of such information".  Id.  Putnam County passed a resolution to oppose New York's Secure Ammunition and Firearms Act, a gun reform act passed in 2013.  See http://www.nysaferesolutions.com/2013/02/06/putnam-county-resolution-opposing-ny-safe-act/.  Thus Dr. English's assertions of political partisanship and retaliation lack a factual basis here

and that there is only one case of an unintentional gunshot fatality of a child in New York in the last twenty years.  But Dr. English artificially limits his data to NY State only – the NY Legislature is not limited solely to safety issues it observes within its own borders and in fact considered the national toll of gun violence in adopting the SAFE Act.  See https://www.nysenate.gov/legislation/bills/2013/s2230 (last accessed 3/10/2020) [New York Bill Jacket, 2013 A.B. 2230 ("Nationwide, gun violence claims over 30,000 lives annually.")  Further, his figures display a lack of familiarity with data relating to accidental shootings.  Intervenor's expert Dr. Sege relies on CDC data demonstrating at least 115 deaths to children from unintentional fire-arm related injuries in 2017, and he demonstrates that this number is likely significantly higher due to State reporting errors.  See Sege Decl. Ex. A at 2-3.

Dr. English has also largely chosen to ignore open government considerations in his cost benefit analysis.  He blithely rejects the notion that making information regarding firearms licenses public could be useful for various purposes, including ensuring that prohibited persons don't possess gun licenses and that licensing officers are properly fulfilling their obligations.  He suggests that such a justification is speculative and "[i]f it's true that the state systematically fails to follow the law in granting handgun licenses, this would be reason to reform the state, not reason to burden law abiding gun owners."  Dague Decl. Ex. 13 (English Rpt. at 19-20).  In a flight of rhetorical fancy, he argues that Intervenor's expert would not adopt similar logic to "documented cases of abortion providers endangering the lives of women."  Id.

But this use of firearms licensure information to promote public safety and assess government performance is not speculative.  Public license information has been used in multiple instances to identify and highlight misconduct by licensing officials and instances where dangerous prohibited persons were nevertheless given or retained firearms licenses.  Some of these cases are cited in Dr. Hamilton's report.  See Hamilton Decl. Ex A. at 7-8; see also, e.g., Michael

J. Lambert, Comment, *A Gunman's Paradise: How Louisiana Shields Concealed Handgun Permit Holders While Targeting Free Speech and Why Other States Should Avoid the Same Mistake*, 75 La. L. Rev. 543, 544, 549-52, 576-77 (2014) (noting important press reporting based on public access to gun records, and arguing against Louisiana's law restricting such access); Kelsey M. Swanson, Comment, *The Right to Know: An Approach to Gun Licenses and Public Access to Government Records*, 56 UCLA L. Rev. 1579, 1581, 1590, 1614-28 (2009) (discussing the policy reasons for public access to firearms license information and why "gun records should be a matter of public record"); Mark Elesia, *"Should these Hoosiers have been Allowed to Carry a Concealed Gun in Public?"*, IndyStar.com. (http://www.indystar.com/article/20091011/NEWS14/910110365/Should-these-Hoosiers-been-allowed-carry-gun-public-); Marc Perrusquia, *"Armed and Dangerous: Dozens with Violent Histories Received Handgun Carry Permits,"* The Commercial Appeal, March 12, 2009, //www.commercialappeal.com/news/2009/mar/12/armed-and-dangerous-tennessee-gun-debate-prone/.  This important state law-enforcement interest served by the statute was recognized, for example, in floor discussions of the current version of Penal Law § 400.00(5), New York legislators noted that "allowing public information enlists the public in the enforcement of statutes" such as New York's SAFE Act.  See Dague Decl. Ex. 14 (SAFE Act Assembly Debate at 108-109).

But Dr. English admits that he did not consider these numerous examples.  In fact, he testified that he "may have glanced" at the articles referenced in Prof. Hamilton's report but did not give them a "deep read."  Dague Decl. Exs. 6-7 (English Dep. pp. 397-98).   In short, he hardly considered the important public interest in open government in his cost-benefit analysis.

This Court should reject English's opinions as they fail to meet the reliability standards under Daubert and Fed. R. Civ. P. Rules 702 and 703.   Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993) (FRE 702 requires the court to conduct "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and … properly can be applied to the facts in issue").

In sum, Dr. English's cost-benefit analysis paradigm is unsupported by any published study and he himself testified that he omitted anything but a certain subset of homicides, including non-fatal firearms related victimizations, from his analysis.  Dague Decl. Exs. 6-7 (English Dep., p 156-59).  He further admitted he did not look at the use of firearms to cause injuries, to terrorize, threaten or control in the domestic violence setting, in performing his own cost-benefit analysis in of § 400.00(5) because, according to him, "it's a question of priorities importance. Death seems to be the biggest question here," "[such things as injuries, maiming and psychological impacts] pale in comparison to death."  Id. (English Dep., p. 147-50). When asked specifically for the data that supported his determination of victimization rates, he admitted he didn't have such data.  Id. p. 151.  He did not understand the importance of knowledge about handgun ownership in the domestic violence setting and he did not even seriously consider the use of the §400.00(5)'s data for open government purposes.  Id. (English Dep. 392-395).  Moreover, the English Report focuses on irrelevant issues and facts that were never identified in pleadings in this matter, and which Plaintiff never testified at deposition were at issue.  Indeed, English's Report includes opinions based upon hypothetical outcomes for which there is no factual basis (indeed, the Report opines on problems potentially caused by the law that the sole Plaintiff here actually states were not problems for him).

English's opinions are not the subject of previous research and work he has conducted independent of litigation.  He has not worked in the fields of child safety, domestic violence prevention, open government, or the law.  Instead, his opinions were developed expressly for the purposes of litigation.   Daubert, 43 F.3d at 1317.  English has not developed, researched or published on the topics of the opinions he offers and has not approached the same with the same degree of intellectual rigor or review as an expert would expect in any of the various fields in which he offers opinions.  Kumho Tire Co., 119 S.Ct. at 1176.  It is respectfully submitted that his expert opinions should be excluded.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court grant their motion, and exclude consideration of Plaintiff's proffered expert evidence in its entirety, along with such other and further relief as the Court deems just, proper and appropriate.

Dated: New York, New York
       March 16, 2020

                                Respectfully submitted,
                                LETITIA JAMES
                                Attorney General of the State of New York
                                 Intervenor
                  By:

                                S/ Monica Connell
                                Monica Connell
                                Special Counsel for
                                Second Amendment Litigation
                                28 Liberty Street
                                New York, New York 10005
                                (212) 416-8965

MONICA CONNELL
C. HARRIS DAGUE
Assistant Attorneys General
*of counsel*