UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOHN DOE NO. 1, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:16-cv-8191-PMH-LMS |
| | ) | |
| | ) | |
| PUTNAM COUNTY, *et al.*, | ) | |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| | ) | |
| STATE OF NEW YORK ATTORNEY | ) | |
| GENERAL, | ) | |
| | ) | |
| *Intervenor*. | ) | |

**PLAINTIFF JOHN DOE NO. 2'S MEMORANDUM OF LAW
IN OPPOSITION TO INTERVENOR'S MOTION TO PRECLUDE
PLAINTIFFS PROPOSED EXPERT EVIDENCE**

April 27, 2020

Charles J. Cooper*
David H. Thompson*
Peter A. Patterson*
Davis Cooper*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

* Appearing *Pro Hac Vice*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ...........................................................................................2

ARGUMENT .................................................................................................................3

I.     Dr. English's Report is a "Rebuttal" Report Responsive to the Opinions of NYAG's Expert Witnesses...........................................................................................................3

II.    Dr. English Is Qualified To Rebut the Opinions of Intervenor's Experts. .........................7

III.   Dr. English's Analysis in Rebuttal to the Opinions of the State's Expert Witnesses Is Sound and Reliable. ...................................................................................................... 14

IV.   Dr. English Does Not Offer Legal Arguments or Opinions About the Constitutionality or Any other Aspect of Section 400.00(5)(a)........................................18

CONCLUSION.............................................................................................................23

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                   **Page**

*720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09-CV-7199 (AJN),
 2014 WL 4184691 (S.D.N.Y. Aug. 22, 2014)........................................................3

*Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 211303 (D.Vt. Jan. 18, 2013)..............................5

*Arista Records LLC v. Lime Grp.* LLC, No. 06-CV-5936,
 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ..........................................................8

*Borawick v. Shay,* 68 F.3d 597 (2d Cir.1995)..................................................................14

*Cary Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99-CV-1725 (VM),
 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003).....................................................7, 8

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*,
 769 F. Supp. 2d 269 (S.D.N.Y. 2011)..................................................................22

*Chill v. Calamos Advisors LLC*, No. 15-CV-1014 (ER),
 2018 WL 4778912 (S.D.N.Y. Oct. 3, 2018) ...........................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)...........................................14

*Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420 (E.D.N.Y. 2011)...............................5, 7

*Ebbert v. Nassau County*, No. 05-CV-5445 (FB) (AKT),
 2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) .....................................................22

*Emig v. Electrolux Home Prods. Inc.*, No. 06-CV-4791 (KMK),
 2008 WL 4200988 (S.D.N.Y. 2008)................................................................9, 10

*Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223 (E.D.N.Y. 2014) ....................................9

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
 299 F. Supp. 3d 430 (S.D.N.Y. 2018)..............................................................7, 10

*In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) ...............................15

*In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994) ......................................................14

*In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230 (S.D.N.Y. 2014) ....................................4, 8

*In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531 (S.D.N.Y. 2004) ......................................8

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*,
 *UAW v. OSHA*, 938 F.2d 1310 (D.C. Cir. 1991) ..................................................17

*Ironshore Ins. Ltd. v. Western Asset Mgmt. Co.*, No. 11-CV-5954 (LTS) (JCF),
 2013 WL 2051863 (S.D.N.Y. May 15, 2013) ..........................................................6

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
 103 F.Supp.2d 268 (S.D.N.Y. 2000)......................................................................15

*Joseph S. v. Hogan*, No. 06-CV-1042 (BMC) (SMG),
 2011 WL 2848330 (E.D.N.Y. July 15, 2011).........................................................3

*Keenan v. Mine Safety Appliances Co.*, No. 03-CV-0710 (TCP) (ARL),
  2006 WL 2546551 (E.D.N.Y. Aug. 31, 2006)....................................................................9

*Khairkhwa v. Obama*, 793 F.Supp.2d 1 (D.D.C. 2011).....................................................9

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)............................................15

*Lappe v. Am. Honda Motor Co., Inc.*, 857 F.Supp. 222 (N.D.N.Y.1994) .......................9

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
  No. 11-cv-681 (KBF), 2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015)...............................4, 5

*Matter of Trs. Established under Pooling & Servicing Agreements relating to Wachovia
  Bank Com. Mortg. Tr. Com. Mortg. Pass-Through Certificates, Series 2007-C30*,
  No. 17-CV-1998 (KPF), 2020 WL 1304400 (S.D.N.Y. Mar. 19, 2020) .................................4

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ..........................................9

*New York v. Solvent Chem. Co.*, No. 83-CV-1401C,
  2006 WL 2640647 (W.D.N.Y. Sept. 14, 2006) ...................................................................3

*Nimely v. City of New York,* 414 F.3d 381 (2d Cir. 2005)..............................................7

*Park W. Radiology v. CareCore Nat'l LLC*,
  675 F.Supp.2d 314 (S.D.N.Y. 2009)..................................................................................5

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*,
  691 F. Supp. 2d 448 (S.D.N.Y. 2010)...............................................................................8, 9

*Radiology v. CareCore Nat., LLC*, 675 F. Supp. 2d 314 (S.D.N.Y. 2009) .....................6

*Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997)......................................................22

*Rupp v. Becerra*, 401 F. Supp. 3d 978 (C.D. Cal. 2019) ...............................................10

*S.W. v. City of New York*, No. 09-CV-1777 (ENV) (MDG),
  2011 WL 3038776 (E.D.N.Y. July 25, 2011) ....................................................................6

*Scientific Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851
  (NGG) (RML), 2008 WL 4911440 (E.D.N.Y. Nov. 13, 2008) ...........................................6

 *SEC v. Badian*, No. 06-CV-2621 (LTS) (DFE),
  2009 WL 5178537 (S.D.N.Y. Dec. 23, 2009) ...................................................................6

*Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 457 (S.D.N.Y. 2007) ............................7

*Town of Southampton v. Suffolk County,* 367 Fed. App'x 234 (2d Cir. 2010) ..............14

*United States v. Barrow*, 400 F.3d 109 (2d Cir. 2005) ...............................................5, 6

*United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*,
  80 F.3d 1074 (5th Cir. 1996) ..........................................................................................14

*United States v. Tejada*, 956 F.2d 1256 (2d Cir.1992) ..................................................5

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004).............................................8

*Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67 (2d Cir. 1988) ...............................23

*Washington v. Kellwood Co.*, 105 F.Supp.3d 293 (S.D.N.Y. 2015).................................8

*Yaccarino v. Motor Coach Indus., Inc.*, No. 03-CV-4527 (CPS),
2006 WL 5230033 (E.D.N.Y. Sept. 29, 2006) ...................................................................8, 9


**Rules**

Fed. R. Civ. P. 26(a)(2)(D)(ii) ......................................................................................4


**Other Authorities**

Advisory Committee Notes, 2000 Amendments to Fed. R. Evid. 702 ...................................14, 15

Caroline Cecot & W. Kip Viscusi, *Judicial Review of Agency Benefit-Cost Analysis*,
22 Geo. Mason L. Rev. 575 (2015) .......................................................................16

Duke University's Nicholas School for the Environment ("Cost-Benefit Analysis
for Health and Environmental Policy") https://bit.ly/2S6YDlc.............................16

Notre Dame's Keough School of Global Affairs ("Cost Benefit Policy Analysis")
https://bit.ly/2S6ziro...........................................................................................16

NYU's Robert F. Wagner Graduate School of Public Service ("Cost-Benefit Analysis"),
https://bit.ly/352mSWT .......................................................................................16

University of Chicago's Harris School of Public Policy ("Cost-Benefit Analysis"),
https://bit.ly/2KwNp4W.......................................................................................16

## PRELIMINARY STATEMENT

The Court should deny Intervenor Attorney General's ("NYAG") Motion to Preclude Plaintiff's Proposed Expert Evidence ("NYAG's Motion"). Intervenor advances arguments that fundamentally misunderstand the purpose of Dr. William English's testimony: *that of a rebuttal expert*. In this role, Dr. English applies his expertise and opines on the various errors in the reports of the NYAG's expert witnesses, Dr. Marci Hamilton, Dr. Robert Sege, and Dr. April Zeoli. Thus, Dr. English identifies the critical information overlooked, misinterpretations of data, and erroneous assumptions made by each of these experts to highlight how their conclusions are of little, if any, probative value. The NYAG's misunderstanding of Dr. English's role and the impact of his arguments is a consistent theme throughout its Memorandum of Law In Support of Intervenor Attorney General's Motion to Preclude Plaintiff's Proposed Expert Evidence Pursuant To Fed. R. Ev. 702 and 703, Doc. 116 (Mar. 16, 2020).

Putting this fundamental misconception aside, the NYAG's Motion suffers from more precarious flaws. Dr English is eminently qualified as an expert in public policy, statistical analysis, and methodological integrity. Even the NYAG admits that "Dr. English has impressive academic credentials." Doc. 116 at 6. Nevertheless, the NYAG contends that Dr. English's testimony should be excluded, in its entirety, because Dr. English is admittedly not expert in fields like "children with emotional disturbances" and "suicide prevention." *Id.* at 11. This view belies the NYAG's fundamental misunderstanding of Dr. English's role as a rebuttal expert and a willful ignorance of the importance and effectiveness of his testimony.

The NYAG contends that Dr. English employs a "unique, unreliable and *ad hoc* cost 'benefit analysis'" to "attack the constitutionality of Penal Law § 400.00(5) and the validity of Intervenor's three experts." *Id* at 13. As we demonstrate below, analyses that weigh the pros and

1

cons of public policy decisions are *de rigueur* for public policy makers and those who advise them. Indeed, cost-benefit analysis of this sort is a universally accepted standard of how public policy decisions are devised, evaluated, and judged.

The NYAG also contends that Dr. English offers impermissible legal opinions. Dr. English does no such thing. The lack of legal analysis in Dr. English's expert report, combined with his repeated denials that he is offering legal opinions during his deposition, eliminates any doubt that Dr. English's testimony is not directed to legal conclusions or the constitutionality of Section 400.00(5)(a), but rather an analysis of the opinions and conclusions of the NYAG's experts.

The lack of merit to the NYAG's arguments is addressed in detail below. Accordingly, Plaintiff John Doe No. 2 ("Doe 2"). submits that the NYAG's Motion should be denied in its entirety.

## STATEMENT OF FACTS

Although Doe 2 has maintained from the beginning of the case that expert testimony is not necessary, or even helpful, to resolving the purely legal issue at the heart of this case, the NYAG proffered three experts in defense of Penal Law Section 400.00(5)(a), Dr. Sege, Dr. Hamilton, and Dr. Zeoli. In response, Doe 2 retained Dr. English to provide rebuttal expert analysis of the State's expert opinions. Doe 2 retained Dr. English because he is a distinguished and experienced expert in the fields of public policy, statistical data analysis, and methodological integrity. Thus, Dr. English is well positioned to evaluate the methodological underpinnings of the NYAG's experts conclusions and their opinions on the ultimate issue in this case: Whether Penal Law Section 400.00(5)(a) is substantially related to the public safety interest that, according to the NYAG's experts, it is designed to serve.

Dr. English's analysis of the data and other evidence offered by the State's experts in support of their opinions, and of the costs and alleged benefits of the public disclosure requirement, is sound, and it compellingly shows that there is no relationship—let alone a substantial relationship—between Section 400.00(5)(a)'s public disclosure requirement and the public safety interests it is alleged to serve.

**ARGUMENT**

### I.   Dr. English's Report is a "Rebuttal" Report Responsive to the Opinions of NYAG's Expert Witnesses.

By asserting that the Court should exercise its "gatekeeping" function in this case, the NYAG is "essentially asking [the Court] to gate-keep expert testimony from [itself]." *Joseph S. v. Hogan*, No. 06-CV-1042 (BMC) (SMG), 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011). By doing so, the NYAG fails to understand that "*Daubert* and its progeny . . . do not apply straightforwardly in the context of bench trials," *720 Lex Acquisition LLC v. Guess? Retail, Inc.*, No. 09-CV-7199 (AJN), 2014 WL 4184691, at *10 (S.D.N.Y. Aug. 22, 2014) (internal citations omitted), in which "there is no possibility of prejudice[ ] and no need to protect the factfinder from being overawed by 'expert' analysis," *Chill v. Calamos Advisors LLC*, No. 15-CV-1014 (ER), 2018 WL 4778912, at *6 (S.D.N.Y. Oct. 3, 2018) (citation omitted). Thus, "unless the disputed evidence is wholly irrelevant or so speculative as to have no probative value," this Court may freely receive the evidence and disregard it later if it fails to satisfy the strictures of Rule 702 and *Daubert. 720 Lex Acquisition LLC*, 2014 WL 4184691, at *10; *accord Chill*, 2018 WL 4778912, at *6–7. Here, there is no need to prevent the jury from being "bamboozled by technical evidence of dubious merit." *New York v. Solvent Chem. Co.,* No. 83-CV-1401C, 2006 WL 2640647, at *1 (W.D.N.Y. Sept. 14, 2006) (quoting *SmithKline Beecham Corp. v. Apotex*

*Corp.,* 247 F.Supp.2d 1011, 1042 (N.D. Ill. 2003)) (internal quotation mark omitted). These considerations apply no less in the context of motions for summary judgment, *Matter of Trs. Established under Pooling & Servicing Agreements relating to Wachovia Bank Com. Mortg. Tr. Com. Mortg. Pass-Through Certificates, Series 2007-C30*, No. 17-CV-1998 (KPF), 2020 WL 1304400, at N.18 (S.D.N.Y. Mar. 19, 2020), and weigh even more strongly against exclusion of rebuttal expert testimony.

"Evidence can be divided into two categories: that which goes to proof of a party's case in chief, and that which responds or rebuts evidence of an adverse party." *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 252 (S.D.N.Y. 2014), *aff'd sub nom Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016). "To determine whether evidence is 'rebuttal' evidence, a court must ask whether the rebuttal evidence is proffered to counter evidence that the defendant has offered, or whether it is simply a continuation of the plaintiffs case in-chief." *Id.* Though the NYAG admits that Dr. English produced a rebuttal report, Doc. 116 at 7, the NYAG curiously positions its arguments as if Doe 2 is offering Dr. English's testimony as affirmative, rather than as rebuttal evidence. Indeed, the NYAG's brief is replete with arguments that demonstrate it does not understand the appropriate standards for evaluating the admissibility of rebuttal testimony.

Federal Rule of Procedure 26 permits parties to submit expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." FED. R. CIV. P. 26(a)(2)(D)(ii). A rebuttal expert, such as Dr. English, has a different and lower burden than the expert that he is seeking to rebut. *See Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11-cv-681 (KBF), 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015) ("A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may

properly concern criticizing that presented by another party.") (*citing See In re Zyprexa Products Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007)) (". . . defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts."). "In general, expert opinions which assess or critique another expert's substantive testimony are relevant," and a party may use a rebuttal expert to refute the factual basis for the other side's expert opinion without usurping the trier of fact's role of assessing the credibility of the other side's expert. *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 481 (E.D.N.Y. 2011).

"The scope of a rebuttal is limited to the same subject matter encompassed in the opposing party's expert report, but district courts have been reluctant to narrowly construe the phrase 'same subject matter' beyond its plain language." *Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 211303, at \*5 (D.Vt. Jan. 18, 2013) (quoting *T.C. Sys. Inc. v. Town of Colonie, New York*, 213 F.Supp.2d 171, 180 (N.D.N.Y. 2002)) (internal citations and quotation marks omitted). A rebuttal expert is permitted to use new methodologies "for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness." *Park W. Radiology v. CareCore Nat'l LLC*, 675 F.Supp.2d 314, 326 (S.D.N.Y. 2009). The fact that a rebuttal expert has not conducted his own research is not a basis to exclude his/her testimony. *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 481–82 (E.D.N.Y. 2011) *Id* at 482 (*citing In re Viagra Prods. Liab. Litig.*, 572 F. Supp. 2d 1071, 1088 (D. Minn. 2008)). "[A] district court has wide discretion in determining whether to permit evidence on rebuttal." *United States v. Tejada*, 956 F.2d 1256, 1266 (2d Cir.1992).

An expert rebuttal is "hardly limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an

adversary." *United States v. Barrow*, 400 F.3d 109, 121 (2d Cir. 2005) (*cited in In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 256 (S.D.N.Y. June 26, 2014) (in the context of discussing appropriate scope of rebuttal expert testimony)). A rebuttal expert "is free to support his opinions with evidence not cited in [the affirmative expert's] report so long as he rebuts the same 'subject matter' identified in those reports." *SEC v. Badian*, No. 06-CV-2621 (LTS) (DFE), 2009 WL 5178537, at * 5 (S.D.N.Y. Dec. 23, 2009); *see also Ironshore Ins. Ltd. v. Western Asset Mgmt. Co.*, No. 11-CV-5954 (LTS) (JCF), 2013 WL 2051863, at *3 (S.D.N.Y. May 15, 2013) (noting that rebuttal reports are permissible to "explain, repel, counteract or disprove the evidence of the adverse party."); *S.W. v. City of New York*, No. 09-CV-1777 (ENV) (MDG), 2011 WL 3038776, at *2 (E.D.N.Y. July 25, 2011) (same). A rebuttal expert may also appropriately use different methodologies or information than a primary expert to rebut the subject matter opined on by the primary expert. *See, e.g., Radiology v. CareCore Nat., LLC*, 675 F. Supp. 2d 314, 325–26 (S.D.N.Y. 2009); *Scientific Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851 (NGG) (RML), 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008) ("[A]rchetypal rebuttal testimony . . . identifies a flawed premise in an expert report that casts doubt on . . . that report's conclusions."). In short, "Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party." *Id.* at *2 (*quoting Crowley v. Chait*, 322 F.Supp.2d 530, 551 (D.N.J. 2004)).

The NYAG's brief amounts to nothing more than a clumsy attempt to reframe Dr. English's devastating refutation of its experts' opinions as a continuation of Doe 2's case in chief. *See* Doc. 116 at 9. ("Dr. English endeavors to rebut these opinions as part of his experiment in assessing the costs and benefits of [Section 400.00(5)]."). Dr. English's Rebuttal Report was solely directed to responding to the subject matter of the NYAG's experts' reports. *See* English Report, Ex. 13 to

Dague Decl., Doc. 109-13 (Mar. 16, 2020). Indeed, Dr. English took issue with their conclusions in large part based on the data the NYAG's experts themselves relied upon. Doc. 109-13 at 1 ("based on the statistics cited by these expert reports, more than 99.99% of gun owners will not use their firearms to commit intimate partner violence, and more than 99.99% of gun owning households will not have a child accidentally killed by a firearm."). Dr. English simply refutes the factual basis for, and exposes the analytical flaws in, the opposing experts' opinions. *See Deutsch*, 768 F. Supp. 2d at 481.

## II.    Dr. English Is Qualified To Rebut the Opinions of Intervenor's Experts.

The Second Circuit has distilled Rule 702's requirements into three broad criteria: (1) qualifications, (2) reliability, and (3) relevance and assistance to the trier of fact. *See Nimely v. City of New York,* 414 F.3d 381, 396–97 (2d Cir. 2005). When conducting an inquiry into an expert's qualifications, this Court must consider the "question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018) (*citing Nimely v. City of New York,* 414 F.3d 381, 396 n.11 (2d Cir. 2005) (*quoting* Fed. R. Evid. 702)). Courts must analyze "the totality of the witness's background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702 . . . with respect to a relevant field." *Id.* (*quoting Washington v. Kellwood Co.*, 105 F.Supp.3d 293, 304 (S.D.N.Y. 2015)). "[A]ny one of [Rule 702's] five forms of qualifications will satisfy the rule." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 457, 458 (S.D.N.Y. 2007). "A formal education in a particular field is sufficient to qualify a witness as an expert" and a "lack of extensive practical experience directly on point does not necessarily preclude [the] expert from testifying." *Cary Oil Co. v. MG Ref. &*

*Mktg., Inc.*, No. 99-CV-1725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (internal quotation marks omitted). Similarly, "a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 559 (S.D.N.Y. 2004). The Court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," which must overlap. *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

"[C]ourts in this circuit have noted that an expert should not be required to satisfy an overly narrow test of his own qualifications." *Arista Records LLC v. Lime Grp*. LLC, No. 06-CV-5936, 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (internal quotation marks and citations omitted); *see also In re Puda*, 30 F. Supp. 3d at 250 ("In the Second Circuit, courts have construed the inquiry into an expert's qualifications with an eye towards the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony.") (internal quotation marks and citations omitted). "Thus, [i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Washington*, 105 F. Supp. 3d at 305 (internal quotation marks and citations omitted) (alteration in original); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 691 F. Supp. 2d 448, 457 (S.D.N.Y. 2010) (noting that the Second Circuit has "allowed an expert to testify as to matters within his general expertise even though he lacked qualifications as to certain technical matters within that field.") (*citing McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042–43 (2d Cir. 1995)); *Yaccarino v. Motor Coach Indus., Inc.*, No. 03-CV-4527 (CPS), 2006 WL 5230033, at *9 (E.D.N.Y. Sept.

29, 2006) (district court "need not preclude an expert from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute") (*citing*, *inter alia*, *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997)).

"In considering a witness' practical experience and educational background as criteria for qualification, the threshold question is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 235–36 (E.D.N.Y. 2014) *See also Khairkhwa v. Obama*, 793 F.Supp.2d 1, 11 (D.D.C. 2011) (*citing Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir.1981) (noting that an "expert need not have complete knowledge about the field in question, and need not be certain"); *Keenan v. Mine Safety Appliances Co.*, No. 03-CV-0710 (TCP) (ARL), 2006 WL 2546551, at *2 (E.D.N.Y. Aug. 31, 2006) (explaining that for the "testimony to be admissible it need only assist the trier of fact in some way") (citations omitted); *Lappe v. Am. Honda Motor Co., Inc.*, 857 F.Supp. 222, 226 (N.D.N.Y.1994) (noting that the expert's skill, knowledge, or experience should be such that the opinion will "probably aid the trier of fact in his search for the truth").

"Thus, a witness' lack of particular knowledge, education, or experience may go to the weight, not the admissibility, of the testimony." *Hilaire*, 54 F. Supp. 3d at 236. *See also McCullock*, 61 F.3d at 1043 (finding that the expert's alleged shortcomings in academic training in fume dispersal and lack of specific knowledge about the chemical constituents of the fumes, should be explored on cross-examination); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F.Supp.2d 448, 461 (S.D.N.Y.2010) (finding that while the expert "may not be the world's leading expert" in the relevant field, plaintiffs' arguments regarding his qualifications went to the weight and credibility of the testimony); *Emig v. Electrolux Home Prods. Inc.*, No. 06-CV-

9

4791 (KMK), 2008 WL 4200988, at *5 (S.D.N.Y. 2008) (finding the expert's lack of a post-graduate degree in engineering and absence of experience in a particular area of consumer products went to the weight of the testimony). Finally, the NYAG's insistence that Dr. English's testimony should be *in toto* is unfounded and wholly inappropriate. "[A]n expert's lack of qualifications as to some of the opinions offered does not render inadmissible the opinions that he is qualified to offer." *In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 299 F. Supp. 3d at 467.

Dr. English is an accomplished social scientist with expertise in empirical methods, behavioral economics, public policy, and firearms laws. Indeed, Dr. English has been accepted as an expert in these areas by other courts. *See ex. Rupp v. Becerra*, 401 F. Supp. 3d 978, 993 (C.D. Cal. 2019) (offering expert and rebuttal testimony in case involving an "assault weapon ban" regarding the ownership and use rate by the law-abiding American public of "modern sporting rifles."). Dr. English serves as Assistant Professor of Ethics, Political Economy, and Behavioral Economics at the Georgetown University McDonough School of Business. He received his doctorate in Political Science at Duke University with a Dissertation titled *Social Thought and Social Change: Methodological Dilemmas at the Intersection of Science and Ethics*. Dr. English has degrees in Political Science, Economics, and Mathematics from Duke University and a degree in Ethics from Oxford University, UK. Dr. English has written, lectured, taught, and commented extensively on topics in public policy, statistical analysis, methodology, regulation, government, behavioral economics, and ethics. *See* English Decl. Ex. A. In deposition, Dr. English describes his expertise this way:

> Q [AAG Dague]: What do you consider to be your field of expertise?
> A [Dr. English]: So I'm a social scientist by training. And my dissertation -- as long-standing interest, I'll say the methodological foundations of social science. So my dissertation examined the strengths and weaknesses of different methodological approaches, approaches and statistics, formal modeling. And I'd say the -- the one thing that has defined my scholarly arc has been thinking about how do we -- how

do we do good public policy, think about social phenomenon in the most comprehensive and informative way, and how do we integrate data and analysis into those evaluations. And a concern, for me, can run two ways. I think there's a lot of bad social science; there is, there's a lot of ways in which -- you know, sometimes intentional, sometimes not intentional -- people misuse or misunderstand data. And so a -- a good portion of my work has been to take studies, and often important studies, and examine their underlying data or methods or statistical approaches, and to try to evaluate their conclusions in the light of their particular claims as well as in light of larger say public policy, debates that they feed into. So I think of myself as a methodologist, someone who's interested in public policy. And my work has also examined problems of institutional failures, institutional design, role of informal norms, informal institutions. And I'm in a – in the department of -- of ethics, economics, and public policy. So I'd say, you know, in sum, I'm -- I'm a methodologist interested in the use of evidence in the social sciences, and the implications on policy.

English Dep., Ex. 6 to Dague Decl., Doc. 109-6 at 15:6–16:19.

Notably, the NYAG does not challenge Dr. English's qualifications with respect to these areas of expertise. Instead, the NYAG repeatedly recycles the ill-conceived argument that, because Dr. English is admittedly not an expert in certain specific areas—e.g., "domestic violence", "suicide prevention", etc.—that "his assessments are based upon speculation and guesswork" and "he lacks the scientific, technical, or other specialized knowledge necessary to help the Court resolve the cross-motions for summary judgment."[1] See Doc. 116 4–13. The NYAG never bothers to explain how a purported lack of expertise in these areas undermines Dr. English's rebuttal report, in which Dr. English leverages his expertise in public policy, statistical data analysis, and methodological integrity to provide an analysis of the testimony proffered by the NYAG's experts and the data and methodologies underlying their conclusions that Penal Law Section 400.00(5)(a)

---

[1] The NYAG uses nearly 10 pages of its brief to identify the following areas in which it contends Dr. English must have expertise to "be helpful to the Court" without addressing his expertise in public policy statistical analysis, or methodological integrity: "legal training," "domestic violence," "orders of protection," "obtaining firearms restrictions," "suicide prevention," "the use of firearms in suicide," "children with emotional disturbances," "New York's regulatory framework," and "open government." Doc. 116 at 4–13

serves important governmental objectives. Indeed, the NYAG seems to misunderstand the English Report entirely, which springs from its fundamental misunderstanding of Dr. English's role as a rebuttal expert. *See Supra* § I.

Worse still, the various iterations of the NYAG's argument ignore the fact that Dr. English applies his expertise in public policy, statistical analysis, and methodological integrity to the NYAG expert's reports to arrive at his conclusions. Even a cursory glance at the English report reveals that Dr. English, in his role as a rebuttal expert witness, critiqued each expert report in detail, noting errors and omissions in their methodologies and identifying serious flaws in their analyses. For example, the NYAG claims that "[Dr. English's] assessments [of Dr. Zeoli's opinions] are based upon speculation and guesswork" because "[Dr. English] has no relevant expertise in the domestic violence field nor does he use any reliable or sound methodology in reaching [ ]his conclusion." Doc. 116 at 10. However, Dr. English simply reviews the methodologies employed by Dr. Zeoli and explains how they render Dr. Zeoli's opinions unreliable:

> A detailed examination of intimate partner violence statistics further weakens Dr. Zeoli's arguments. Dr. Zeoli reports that 76 individuals were killed in New York in 2015 by intimate partner violence, citing a scholarly paper by Díez et al (2017), which claims to  have arrived at this number using a database maintained by the anti-gun activist group Everytown for Gun Safety. However, this number conflicts with the number reported by New York State's Office for the Prevention of Domestic Violence and the Department for Criminal Justice Statistics. According to New York State, there were 64 intimate partner homicides in 2015; and in 2017, which is the most recent year for which statistics are reported, the number was 59. Moreover, the State's own report notes, "A knife, cutting instrument or blunt object was used most frequently in intimate partner homicides: 28 of 59 (47.5%)" while firearms were used in only 16 of the 59 intimate partner homicides (27.1%).

> We are not told by the State, nor by Dr. Zeoli, how many of these 16 firearms homicides involved handguns, nor how many involved perpetrators who had orders of protection and used a handgun that was legally owned, which the victim was unaware of and would have otherwise petitioned for a firearm restriction had they been aware - which is the hypothetical scenario Dr. Zeoli's entire line of reasoning

is concerned with. The number may very well be zero. However, even if this elaborate scenario were to describe all 16 intimate partner firearm homicides that took place in New York, that is an extraordinarily small number in a state with over 19.5 million residents (yielding an incidence rate of 0.0000008), and it would mean that over 99.99% of handgun permit holders were not implicated in intimate partner homicides (1-(16/250,000)).

Doc. 109-13 at 9–10. It is hard to understand how Dr. English's lack of expertise in domestic violence renders this rebuttal analysis unreliable.

The NYAG resorts to this tactic repeatedly in an attempt to impugn Dr. English's analysis of the testimony of the State's other experts. *See* Doc. 116 at 11 ("Dr. English openly admits that he has never studied and is not an expert in the field of suicide prevention nor the use of firearms in suicide, nor in studying children with emotional disturbances. His opinions and testimony thus display a shocking lack of understanding of the unique and dangerous role that firearms play in juvenile suicides."). Again, in each instance, Dr. English simply applies his methodological integrity and data analysis expertise to each expert report. *See* Doc. 109-13 at 12 ("Dr. Sege admits that he is unaware of any research or data that demonstrates whether parents have ever searched for and used such information. Although he summarizes a number of statistics that are meant to suggest that firearms pose a serious risk to children at large, closer examination of these statistics reveals that the kinds of incidents that Dr. Sege claims that Penal Law Section 400.00(5)(a) can prevent are exceedingly rare. Indeed, they are so rare that knowledge of who has a handgun license is of little, if any, predictive value for parents."). Here again, Dr. English need not be an expert in "suicide prevention" to conduct his analysis.

In sum, the record shows that Dr. English is an accomplished social scientist whose expertise lies at the cross section of public policy and empirical data analysis. As such, he is eminently qualified to assess empirical arguments concerning the effectiveness of public policies, such as those forwarded by the NYAG's experts in their defense of Section 400(5)(a)'s public

disclosure requirement. The NYAG's omissions and misrepresentations does not alter the fact that the analyses Dr. English provides in his rebuttal report are at the very core of his expertise and expose the proffered opinions of the NYAG's expert witnesses as thoroughly and irredeemably wrong.

### III.   Dr. English's Analysis in Rebuttal to the Opinions of the State's Expert Witnesses Is Sound and Reliable.

The Second Circuit has made clear that "*Daubert* contemplates liberal admissibility standards," *Town of Southampton v. Suffolk County,* 367 Fed. App'x 234, 235 (2d Cir. 2010) (internal quotation marks omitted), and "reinforces the idea that there should be a presumption of admissibility of evidence," *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995). The Second Circuit has frequently quoted the Supreme Court's own admonition against heavy-handed gate-keeping  in *Daubert* itself, i.e., "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 596 (1993). Other Circuits have likewise instructed trial judges to let the gate swing open in most cases. *See, e.g., United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi,* 80 F.3d 1074, 1078 (5th Cir. 1996) ("the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994) ( "[T]he reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence. . . A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate. . . .The same standard of reliability extends to the step in the expert's analysis that 'fits' his or her conclusions to the case at hand. Once again, we emphasize that the standard is not that high."). It is no surprise, then, that "[a] review of the caselaw

14

after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Advisory Committee Notes, 2000 Amendments to FED. R. EVID. 702.

The *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotation marks omitted). Indeed, "expert testimony may be based on 'experience alone—or experience in conjunction with other knowledge, skill, training or education.'" *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412–13 (S.D.N.Y. 2016) (*quoting* FED. R. EVID. 702 advisory committee's note). "In all cases, 'the test of reliability is flexible,' and a district court has 'the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.' *Id.* (*quoting Kumho Tire Co.*, 526 U.S. at 141–42). Accordingly, "[i]n assessing the reliability of an expert opinion, a resort to common sense is not inappropriate." *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F.Supp.2d 268, 286 (S.D.N.Y. 2000).

Echoing its summary judgment motion, Doc. 116 at 25, the NYAG presents a distortion of Dr. English's rebuttal testimony, asserting that Dr. English "attempts to attack the constitutionality of Penal Law § 400.00(5) and the validity of Intervenor's three experts using a unique, unreliable, and *ad hoc* 'cost benefit' analysis," and, "purports to weigh the costs and benefits of the § 400.00(5) to reach his conclusion that the law is not constitutional, but he lacks any recognized reliable methodology, bases his opinions on assumptions, cherry picks information, blithely dismisses or diminishes the effects of gun violence, and ignores evidence that weigh against his preferred outcome." Doc. 116 at 13–14. This is fiction.

First, the NYAG wastes a lot of ink repeating the claim Dr. English's "cost-benefit" analysis is somehow improper, even "shocking," without identifying how or why it would be

inappropriate in this case. This is especially puzzling, because analyses that weigh the pros and cons of public policy decisions are *de rigueur* for public policy makers and those who advise them; it is a universally accepted standard of how public policy decisions are devised, evaluated, and judged. "[Cost-benefit analysis] serves as the analytical framework for the design and evaluation of modern federal regulatory policy." Caroline Cecot & W. Kip Viscusi, *Judicial Review of Agency Benefit-Cost Analysis*, 22 Geo. Mason L. Rev. 575, 576 (2015) (*citing* Cass R. Sunstein, *The Cost-Benefit State: The Future of Regulatory Protection*, at xi (2002)). Indeed, cost-benefit analysis is so fundamental to the fields of public policy and social science that many, if not the vast majority, of university curriculums in these disciplines require courses on cost-benefit analysis as an essential principle.[2] Dr. English identifies why this type of analysis is necessary in this case:

> Q  [AAG Dague]: Were you asked to opine with respect to the constitutionality or legal viability of PL 400, or were you asked to simply rebut the reports of Zeoli, Sege, and Hamilton?
>
> A  [Dr. English]: I was asked to rebut -- to evaluate the reports. The challenge, though, is as a – a social scientist, when I evaluate public policy, you know, at the highest level you can think that -- of this as a -- a cost benefit analysis. So I need to ask, you know, what are the – the potential benefits of this law, the most likely benefits. And those are substantially what those three reports are arguing about. But to -- to even evaluate those arguments in a larger policy, you might say, well, what are the costs on the other -- you know, what -- what are the downsides. So, you know, if this potentially could save one from child's life every century, that could be a benefit, again, but at what price. And so the -- the beginning part of this report is my attempt to just understand what's the -- the universe we're considering in terms of cost and benefits, who might be adversely affected by this law, you know, to what degree are the benefits that the doc -- the three doctors arguing for stand up to scrutiny. And so to be clear in answering your question, my -- my primary purpose is to evaluate their arguments. But that evaluation, in -- in

---

[2] The following list of courses dedicated to teaching cost-benefit analysis are but a small sample of these courses: NYU's Robert F. Wagner Graduate School of Public Service ("Cost-Benefit Analysis"), https://bit.ly/352mSWT; Notre Dame's Keough School of Global Affairs ("Cost Benefit Policy Analysis") https://bit.ly/2S6ziro; Duke University's Nicholas School for the Environment ("Cost-Benefit Analysis for Health and Environmental Policy") https://bit.ly/2S6YDlc; University of Chicago's Harris School of Public Policy ("Cost-Benefit Analysis"), https://bit.ly/2KwNp4W.

> my opinion requires thinking about the -- the – the terms of the cost and benefits in the sort of widest scope.

Doc. 109-6 at 114–115. There is nothing "novel," Doc. 116 at 1, about Dr. English's approach. His "cost-benefit analysis entails only a systematic weighing of pros and cons, or what Benjamin Franklin referred to as a 'moral or prudential algebra.'" *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, *UAW v. OSHA*, 938 F.2d 1310, 1321 (D.C. Cir. 1991).

Further, the English Report clearly lays out Dr. English's duty as a rebuttal expert and limits the scope of his analysis to the subject matter raised by Intervenor's experts:

> In sum, there are reasons to believe that gun owners may be harmed by the disclosure requirements of New York State's Penal Law §400.00(5)(a), and the American legal system affords significant privacy protections when they concern the exercise of fundamental rights and liberties. Moreover, privacy is protected even with regard to many attributes that may be predictively useful for purposes of public policy, and the law does not permit the abscription of guilt by association. Against the backdrop of these basic considerations, the expert reports in this case argue that Penal Law §400.00(5)(a) serves an important governmental objective of advancing the safety of its citizens. In evaluating the claims of Dr. Zeoli, Dr. Sege, and Dr. Hamilton, I consider whether there is in fact good reason to believe that the law advances the safety of citizens, how substantial the purported safety benefits are, whether these are sufficient to justify privacy violations that impinge on the exercise of a fundamental constitutional right, and whether less burdensome means could accomplish the same ends that these experts claim are advanced by Penal Law §400.00(5)(a).

Doc. 109-13 at 8. Dr. English's expert evaluation as outlined above yielded a clear and compelling rebuttal on the merits of the opposing experts' opinions and the relevant public policy considerations:

> In my opinion, the expert reports submitted by Dr. Zeoli, Dr. Sege, and Dr. Hamilton do not make a compelling case that Penal Law §400.00(5)(a) serves an important governmental objective. The claims made about the benefits of Penal Law §400.00(5)(a) are highly speculative and doubtful, and the state has refused to permit similar invasions of privacy even when they promise to provide much more informative assessments of risk. Given the value our legal system places on privacy, the potential harms of disclosure to gun owners, the doubtful benefits of this law, and the state's ability to address the concerns raised by the authors through less

17

burdensome means, it is my opinion that Penal Law §400.00(5)(a) does not serve an important governmental objective.

Doc. 109-13 at 21.

Contrary to the NYAG's claims, Dr. English simply applies his expertise in public policy, data analysis, and methodological integrity to the experts' opinion testimony. Nowhere does Dr. English "attack," "opine on," or even "assess" the constitutionality of Section 400.00(5)(a). Doc. 116 at 2, 8, 13. Rather, he simply concludes that, contrary to the expert reports submitted by Dr. Zeoli, Dr. Sege, and Dr. Hamilton, "Penal Law §400.00(5)(a) does not serve an important governmental objective." Doc. 109-13 at 21.

Finally, the NYAG darkly claims that, "[a]ccording to Dr. English's 'cost-benefit' analysis, New York's stated interests are not 'important' enough to outweigh the cost to gun owners' privacy until the State can demonstrate that more minors or domestic violence victims have died as a result of handguns than have died from AIDS over the last 30-years." NYAG Memo at 1. The NYAG supports this claim by quoting a snippet of Dr. English's deposition testimony, wrenched from its context. Doc. 116 at 1–2. Though Doe 2 has already provided a comprehensive refutation of this claim, *see* Plaintiff Doe 2's Combined Response to Intervenor's Mot. for Summary Judgment and Reply in Support of His Mot. for Summary Judgment, Doc. 121 at 16–19 (Apr. 27, 2020) ("Pls. Combined Brief"), we feel constrained to point out again that this claim is a blatant distortion of Dr. English's testimony.

Dr. English's testimony in rebuttal to the opinions of the State's experts is sound and reliable.

**IV.    Dr. English Does Not Offer Legal Arguments or Opinions About the Constitutionality or Any Other Aspect of Section 400.00(5)(a).**

The NYAG argues that "Dr. English offers varied and far ranging expert legal opinions." Doc. 116 at 7. Specifically, the NYAG charges Dr. English with attempting to "attack," "assess," and "opine on" "the constitutionality of § 400.00(5)." Doc. 116 2, 8, 13. As noted above, Dr. English does no such thing. Dr. English's report is utterly devoid of any constitutional discussion or analysis. It cannot be that the NYAG's argument that Dr. English's opinion that "Penal Law §400.00(5)(a) does not serve an important governmental objective" amounts to what the NYAG calls an "expert legal opinion." If it were, then the NYAG's own experts have improperly "assessed" the constitutionality of Section 400.00(5)(a), for they all "opine" that Section 400.00(5)(a) serves important government purposes. *See* Expert Report of Marcia Hamilton, Ex. 18 to Pls.' SUMF, Doc. 100-18 at 8 (Jan. 27, 2020) ("While Penal Law 400.00(1) does not provide for 100% disclosure of gun licensing, it is sufficient to directly serve these compelling interests."); Expert Report of Robert Sege, Ex. 17 to Pls.' SUMF, Doc. 100-17 at 6 (Jan. 27, 2020) ("§ 400.00(5) serves the important governmental objective of advancing the safety of its citizens"); Expert Report of April Zeoli, Ex. 20 to Pls.' SUMF, Doc. 100-20 at 5 (Jan. 27, 2020) ("§ 400.00(5)(a) serves the important governmental objective of advancing the safety of its citizens."). Dr. English has removed any possible doubt that he limited his testimony to an evaluation of the relevant expert reports, and refused to opine on the legality or constitutionality of Penal Law Section 400.00(5)(a):

> Q [AAG Dague]: Okay. And I guess what I'm wondering is partially answered. Were you asked to take a de novo or clear review or new review of this law from your field of expertise, or were you asked to look at the law through the lens of the three expert reports provided with that?
> A [Dr. English]: I was asked to evaluate the three expert reports.
> Q [AAG Dague]: Were you asked to provide -- were you asked by counsel to provide an assessment of the constitutionality of PL 400?
> A [Dr. English]: I was asked to evaluate the three expert witness reports.

Q [AAG Dague]: Okay. Do you believe in the course of your evaluation of the three expert reports that you provided an opinion as to the constitutionality of this law?

A [Dr. English]: I certainly had many questions that arose regarding constitutionality. And -- and, specifically, just to lay out what I'm trying to do and why these questions arose, if -- if we're to think about the cost of this law, the question -- one question for me is: You know, what are other similar circumstances, analogous circumstances, other -- I mean I take it, you know, this law is -- is impinging on an enumerated right in the Constitution. There are many enumerated rights in the Constitution.

So as a test case, you know, how are other rights, Constitutionally enumerated rights, protected and what deference is given the protection of privacy surrounding those rights. And so it -- for me, it's part and parcel of this cost benefit analysis. You know, thinking about, on the one hand: What are the -- what other things are like this? How do we evaluate those things? And, you know, the Constitution's obviously the -- the reference point for those analogs. And, you know, what are the potential -- you know, what are -- what are -- if there are for those other protected rights, you know, strong barriers, what's the rationale behind those barriers? How do we think about the cost to violating them. So I -- the Constitutional analysis I do here I think raises my questions about the constitutionality of this law. But my purpose was to explore this in -- in the context of establishing the potential costs.

Q [AAG Dague]: Okay.

A [Dr. English]: The potential and actual costs of this law

Q [AAG Dague]: Okay. So in your analysis, you believe you uncovered some constitutional questions, but did you answer those questions through this report?

A [Dr. English]: So I -- I -- this report is fundamentally about evaluating Dr. Zeoli, Dr. Sege, Dr. Hamilton. It strikes me there are deep constitutional concerns, which -- which I've out -- outlaid here.

Q [AAG Dague]: Okay.

A [Dr. English]: I can tell you, at least in the context of my evaluation, the -- the claimed benefits of this law I found extraordinarily uncompelling, which then has to be weighed against what are -- what are the costs. And if the costs, as I laid them out in those first few pages, strike me as -- as, you know, fairly substantial.

Q [AAG Dague]: Okay.

A [Dr. English]: But the constitutional reasoning is -- is instrumental to trying to understand and evaluate the arguments of the other three experts.

Q [AAG Dague]: And I just want to be clear so that I understand the full scope of this --

A [Dr. English]: Uh-huh

Q [AAG Dague]: -- are you or are you not offering an expert opinion as to the constitutionality of PL 400?

A [Dr. English]: Yeah, that's beyond the scope of what I was asked to do.

Q [AAG Dague]: Okay. Are you or are you not offering an opinion with respect to the legality of PL 400, or is that --

20

      A [Dr. English]: And I --
          Q [AAG Dague]: -- beyond the scope?
      A [Dr. English]: -- I'm not a lawyer. I'm -- what I'm offering here is an
evaluation of the three expert witnesses' claims

Doc. 109-6 at 115:20–120:13.

      Q [AAG Dague]: Okay. But when you use the term "well tailored," are you
opining on the legal constitutionality of the tailoring of this law, or something else?
      A [Dr. English]: That's above my pay grade. I'm saying -- making a point
that -- say as a social scientist, if I asked: Is this giving me the information that
these experts are claiming is what you would want if you actually thought that these
things were a serious problem, which could be resolved through this information?
And it seems clear to me that there are huge gaping problems with the -- you know,
comprehensiveness is that this law, which makes it hard to claim this is exact -- this
is what its justification is.
      Q [AAG Dague]: Okay. So you would agree with me that the concept of
whether a law is well tailored or properly tailored from a constitutional law
perspective, that's -- that's within the province of the judge or the jury who make a
determination, right?
      A [Dr. English]: I – I'll leave that to the legal – the lawyers or the judges -
      Q [AAG Dague]: All right.
      A [Dr. English]: -- to determine

Doc. 109-6 at 190:16–191:19.

The lack of constitutional analysis in Dr. English's report combined with his repeated

denials that he is offering legal opinions during his deposition makes clear that his testimony is

not directed to legal conclusions or the constitutionality of Section 400.00(5)(a), but instead an

analysis of the opinions and conclusions of the NYAG's experts.

The NYAG also criticizes as "legal conclusions" Dr. English's reliance on the plain

language of Section 400.00(5)(a) and the NYAG's experts' reports. For example, the NYAG

claims Dr. English has "no legal training or basis" to interpret the "unwarranted harassment"

exception to mandatory disclosure. As we describe in detail in our accompanying Pls Combined

Brief, Dr. English can hardly be criticized for not anticipating the NYAG's contention that the

"unwarranted harassment" exception should be interpreted to include ostracizing, shunning, and

other activity defined by active avoidance and exclusion, the polar opposite of harassment. *See* Pls. Combined Brief at 4–6. Dr. English properly relied on his own understanding of harassment, and the statutory definition of harassment found in the Penal Law itself, which is consistent with the common understanding of "harassment" and the definition provided by all major dictionaries. *See* Pls. Combined Brief at 5. Indeed, for purposes of determining whether and to what extent Section 400.00(5)(a) serves an important governmental interest, Dr. English needs no more legal training to interpret the plain language of the exceptions to New York's mandatory disclosure requirement than Dr. Zeoli needs to interpret the surprisingly complex New York Family Act. *See* Doc. 100-20 at 2. Neither expert witness "proffer[ed] expert opinions in the law" by simply reading the law and applying it to their analysis. That is what all New York residents, like Doe 2, must do in determining for themselves whether they are eligible to claim an exception to public disclosure, on pain of perjury.

In any event, critiques of Dr. English in this regard go to the weight of his testimony, not its admissibility. *See Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 286 (S.D.N.Y. 2011) ("contentions that assumptions are unfounded go to the weight, not the admissibility of the testimony."); *see also Raskin v. The Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997) ("disputes as to the validity of the underlying data [relied upon by an expert] go to the weight of the [expert's] evidence."). If the Court deems any portion of Dr. English's Report constitutes a legal conclusion, which it plainly does not, the appropriate remedy is to strike only the offending portions while leaving the remaining testimony intact. *See, e.g., Ebbert v. Nassau County*, No. 05-CV-5445 (FB) (AKT), 2008 WL 4443238, at *13 (E.D.N.Y. Sept. 26, 2008) (denying motion to strike entire expert report and striking only legal conclusions from testimony) (collecting cases).

## CONCLUSION

The Second Circuit has advised that the preclusion of an expert is a "harsh remed[y]" that "should be imposed only in rare situations." *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71–72 (2d Cir. 1988). This is not one of those rare situations. Doe 2's rebuttal expert, Dr. English, is qualified to evaluate the data analysis, methodologies, and conclusions of the reports of the NYAG's expert witnesses. His evaluation of the expert reports is reliable and will assist the Court as the trier of fact. Thus, Dr. English's testimony should not be excluded.

Dated: April 27, 2020

Respectfully submitted,

s/ Charles J. Cooper
Charles J. Cooper*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 27, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that the foregoing was served upon all counsel of record using the CM/ECF system.

<u>s/ Charles J. Cooper</u>
Charles J. Cooper*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Admitted Pro Hac Vice*

*Attorney for Plaintiffs*